## Exhibit A

**Loan Agreement**

**FIRST BUSINESS SPECIALTY FINANCE
DIP FACTORING AND SECURITY AGREEMENT**

THIS DIP FACTORING AND SECURITY AGREEMENT (this "**Agreement**") is made as of November [___], 2025 (the "**Effective Date**") by and between P. Judge & Sons Inc., a New Jersey corporation ("**Judge & Sons**"), Port Elizabeth Terminal & Warehouse Corp., a New Jersey corporation ("**Port Elizabeth**"), Amex Shipping Agent, Inc., a New Jersey corporation ("**Amex Shipping**"), P. Judge & Sons Trucking, LLC, a Georgia limited liability company("**Judge & Sons Trucking**"), Judge Warehousing, LLC, a Georgia limited liability company ("**Judge Warehousing**"), and The Judge Organization, LLC, a Georgia limited liability company ("**Judge Organization**", and together with Judge & Sons, Port Elizabeth, Amex Shipping, Judge & Sons Trucking, and Judge Warehousing, "**Sellers**", each, individually, a "**Seller**"), each operating as debtor-in-possession, and First Business Specialty Finance, LLC, a Wisconsin limited liability company ("**Purchaser**").

RECITALS

WHEREAS, on November 14, 2025, (the "**Bankruptcy Filing Date**"), Sellers filed a voluntary petition for Chapter 11 bankruptcy under § 1184 of Title 11 of the United States Code, 11 U.S.C. §§ 101 et. seq (the "**Bankruptcy Code**") pending before the United States Bankruptcy Court Middle District of New Jersey (the "**Bankruptcy Court**") captioned *In re Port Elizabeth Terminal & Warehouse Corp.*, Case No. 25-22123-JKS  (the "**Bankruptcy Proceeding**");

WHEREAS, DIP Sellers have continued in possession of their assets in the management of their business pursuant to §§ 1106 and 1107 of the Bankruptcy Code and are each operating as a debtor-in-possession (the "**DIP**");

WHEREAS, prior to the Bankruptcy Filing Date, the Sellers and Purchaser entered into that certain Factoring and Security Agreement, dated February 18, 2020, as amended by that certain First Amendment to Factoring and Security Agreement, dated May 11, 2020, as amended by that certain Second Amendment to Factoring and Security Agreement, dated January 16, 2023, as amended by that certain Third Amendment to Factoring and Security Agreement, dated October 14, 2025 (the "**Pre-Petition Factoring Agreement**"), pursuant to which the Sellers offered for sale and purchase all of the Sellers' Accounts (the "**Pre-Petition Accounts**") and received financial accommodations from Purchaser;

WHEREAS, Purchaser and Sellers desire to enter into this Agreement to provide for the purchase and sale of the Accounts of the Sellers operating as a DIP pursuant to the terms of this Agreement;

WHEREAS, the Pre-Petition Factoring Agreement shall remain in full force and effect as to the Pre-Petition Accounts and all transactions related thereto; and

WHEREAS, subject to the approval of the Bankruptcy Court upon notice and a hearing in accordance with the Bankruptcy Code and the other conditions precedent set forth in herein, Sellers and Purchaser desire to enter into and perform under this Agreement.

1

NOW THEREFORE, in consideration of the Recitals set forth above and the mutual representations, warranties and agreements set forth below, the parties hereto hereby agree as follows:

1.    **Definitions and Index to Definitions**.  The following terms used herein shall have the following meaning.  All capitalized terms used herein which are not herein defined shall, to the extent defined therein, have the meaning set forth in the Uniform Commercial Code:

"**Advance Rate**" – shall mean the lesser of (a) ninety-three percent (93%) of the face amount of the Purchased Accounts; or (b) ninety-three percent (93%) less the Dilution Percentage.

"**Avoidance Claim**" - shall mean any claim that any payment received by Purchaser from or for the account of an Account Debtor is avoidable under the Bankruptcy Code or any other debtor relief statute.

"**Balance Subject to Discount**" – shall mean the difference between the unpaid Face Amount of Purchased Accounts *minus* the Reserve Account.

"**Bankruptcy Orders**" – shall mean all court orders issued by the Bankruptcy Court in the Bankruptcy Proceeding, including the Factoring Orders.

"**Base Fees**" - shall mean the Factoring Fee and the Discount.

"**Clearance Days**"- shall mean three (3) business days for all payments.

"**Closed**" - shall mean that a Purchased Account is closed upon the first to occur of (a) receipt of full payment by Purchaser; or (b) the unpaid Face Amount has been charged to the Reserve Account by Purchaser pursuant to the terms hereof.

"**Collateral**" - shall mean all of Sellers' now owned and hereafter acquired personal property and fixtures, including, without limitation, Accounts (including the Pre-Petition Accounts), Chattel Paper (whether tangible or electronic), contracts and contract rights, Goods, Inventory, Equipment, Instruments, Investment Property, Documents (including, without limitation, all bills of lading and proof of delivery), General Intangibles, Reserve Accounts, Supporting Documentation, all books and records relating to any of the foregoing and all accessions, substitutions for and all replacements, products, cash and non-cash proceeds of the foregoing, in whatever form, including, without limitation, all insurance proceeds and all claims against third parties for loss or destruction of or damage to any of the foregoing.

"**Collections**" – shall mean all collected funds received by Purchaser from or on behalf of an Account Debtor with respect to Purchased Accounts.

"**Credit Insurance**" – shall mean any insurance coverage on an Account Debtor's Accounts.

"**Default Discount Rate**" – shall mean the Discount Rate *plus* five percent (5.0%) per annum.

"**Dilution Percentage**" – shall mean the monthly percentage of charge-backs to Sellers as indicated in Purchaser's software platform.

"**Discount Rate**" - shall mean the Prime Rate *plus* one percent (1%).

2

"**Early Termination Date**" – shall have the meaning set forth in Section 20 hereof.

"**Early Termination Fee**" –shall mean the product of the Maximum Funds Employed *multiplied* by (a) during the twelve (12) month period following the Effective Date, two percent (2%); or (b) thereafter, one percent (1%).

"**Effective Date**" – shall have the meaning set forth in the Preamble.

"**Eligible Account**" - shall mean an Account that is acceptable for purchase as determined by Purchaser in the exercise of its sole credit or business judgment.

"**Events of Default**" – shall mean any of the events set forth in Section 17.1 of this Agreement.

"**Excluded Accounts**" – shall mean brokerage Accounts.

"**Exposed Payments**" – shall mean payments received by Purchaser from an Account Debtor that has become subject to a bankruptcy proceeding, to the extent such payments cleared said Account Debtor's deposit account within ninety (90) days of the commencement of said bankruptcy case.

"**Face Amount**" - shall mean the face amount due on an Account at the time of purchase as indicated on the corresponding Invoice.

"**Factoring Availability Report**" - shall mean Purchaser's then current form of Factoring Availability Report furnished to Sellers.

"**Factoring Fee**" - shall mean the Factoring Fee Percentage *multiplied* by the Face Amount of a Purchased Account, for each Factoring Fee Period or portion thereof, that any portion thereof remains unpaid, computed from the Purchase Date to and including the date such Purchased Account is paid, Repurchased or charged to the Reserve Account.

"**Factoring Fee Percentage**" – shall mean six tenths of one percent (0.60%) of the Face Amount, charged at the time of purchase.

"**Factoring Fee Period**" – shall mean the period beginning on the date a Purchased Account was Purchased until payment in full of such Purchased Account.

"**Factoring Orders**" – shall mean all orders and judgments of the Bankruptcy Court with respect to the Bankruptcy Proceeding in connection with or related to this Agreement and transactions contemplated herein, in form and substance satisfactory to the Purchaser in its sole discretion.

"**Guaranties**" shall mean, collectively, that certain (a) Amended and Restated Individual Guaranty, dated concurrently herewith, executed by Patrick J. Wynne for the benefit of Purchaser; (b) Amended and Restated Individual Guaranty, dated concurrently herewith, executed by Michael Wynne for the benefit of Purchaser; and (c) Amended and Restated Individual Guaranty, dated concurrently herewith, executed by Barbara Judge for the benefit of Purchaser.

"**Invoice**" - shall mean the document that evidences or is intended to evidence an Account.

Initials _____

"**Late Payment Date**" – shall mean ninety (90) days from the Invoice date of a Purchased Account.

"**Maximum Amount**" - shall mean Five Million and No/100 Dollars ($5,000,000.00), *minus* the outstanding amounts owed to Purchaser related to the Pre-Petition Accounts pursuant to the Pre-Petition Factoring Agreement.

"**Minimum Invoice Charge**" – shall means Two and 50/100 Dollars ($2.50).

"**Minimum Monthly Fee**" – shall mean Five Thousand Five Hundred and No/100 Dollars ($5,500.00).

"**Monthly Minimum Volume**" – shall mean One Million and No/100 Dollars ($1,000,000.00) in Eligible Accounts purchased by Purchaser each calendar month.

"**Misdirected Payment Fee**" - shall mean fifteen percent (15%) of the amount of any payment of a Purchased Account received by any Seller and not delivered in kind to Purchaser on the next business day following the date of receipt by such Seller.

"**Missing Notation Fee**" – shall mean fifteen percent (15%) of the Face Amount of a Purchased Account.

"**Obligations**" - shall mean all present and future obligations and indebtedness owing by each Seller to Purchaser whether arising hereunder, under Pre-Petition Factoring Agreement, the Other Agreements or otherwise, howsoever arising or evidenced, including all obligations and indebtedness owing by any Seller to Purchase in the Bankruptcy Proceeding and any subsequent bankruptcy proceeding.

"**On-Line System**" – shall mean the system set up on Purchaser's website where Sellers provide Purchaser with the pertinent data necessary for Purchaser to purchase Accounts under this Agreement and otherwise administer this Agreement.

"**Other Agreements**" – shall mean any and all documents, instruments and agreements executed and delivered by any Seller or any other Person in connection with this Agreement or the Obligations, including but not limited to the Guaranties, as any or all of the same may be amended, supplemented, restated or otherwise modified from time to time.

"**Parties**" - shall mean Sellers and Purchaser.

"**Person**" – shall mean any natural person, corporation, limited liability company, professional association, limited partnership, general partnership, joint venture, or other organization.

"**Prime Rate**" – shall mean, for any day, the greater of (a) four percent (4.0%); or (b) the rate of interest which is identified as the "Prime Rate" and normally published in the Money Rates section of The Wall Street Journal (or, if such rate ceases to be so published, as quoted from such other generally available and recognized source as Purchaser may select).  Any change in the Prime Rate due to a change in the published Prime Rate shall be effective on the effective date of such change in such published Prime Rate.

4

Initials _____

"**Purchase Date**" - shall mean the date on which Purchases an Account as indicated through the On Line System.

"**Purchase Price**" - shall mean the Face Amount of a Purchased Account *multiplied* by the Advance Rate, *minus* the Reserve Shortfall.

"**Purchased Accounts**" - shall mean the Accounts purchased hereunder which have not been Closed.

"**Repurchased**" - shall mean an Account for which any Seller has paid to Purchaser the then unpaid Face Amount and all fees due and owing on such Account..

"**Required Reserve Amount**" - shall mean the Reserve Percentage *multiplied* by the unpaid balance of all outstanding Purchased Accounts.

"**Reserve Account**" - shall mean a bookkeeping account on the books of Purchaser representing an amount equal to the Reserve Percentage multiplied by the Face Amount of Purchased Account.

"**Reserve Percentage**" – shall mean the *difference* of one hundred percent (100%) *minus* the Advance Rate.

"**Reserve Shortfall**" - shall mean the amount by which the Reserve Account is less than the Required Reserve Amount.

"**Schedule of Accounts**" - shall mean the format required by Purchaser pursuant to which each Seller identifies its respective Accounts offered for purchase by Purchaser under the terms of this Agreement.

"**Uniform Commercial Code**" – shall mean the Uniform Commercial Code as in effect from time to time in the State of Illinois.

"**Wire Fee**" – shall mean an amount equal to Thirty and No/100 Dollars ($30.00) for each wire transfer of funds by Purchaser to any Seller.

2.      **Sale; Purchase Price; Account Debtor Statements**.

2.1.    **Assignment and Sale**.

(a)     Each Seller shall sell to Purchaser as absolute owner, with full recourse, all of each Seller's Accounts, which shall be identified from time to time on Schedules of Accounts submitted by Sellers, other then Excluded Accounts. Each Schedule of Accounts shall be accompanied by copies of Invoices, purchase orders, contracts, proof of delivery or service of other documentation supporting and evidencing the Account, as Purchaser shall from time to time request. Purchaser shall be entitled to rely on all of the information provided by Sellers to Purchaser in connection with the Schedule of Accounts and to rely on the submission of any Schedule of Accounts as authorized by each Seller.

(b)     Purchaser may, but need not purchase from any Seller such Accounts as Purchaser determines to be Eligible Accounts, so long as the unpaid balance of Purchased Accounts does

Initials _____

not exceed, before and after such purchase, the Maximum Amount.  The number and amount of Purchased Accounts may decrease and increase from time to time during the Initial Term and any Renewal Term, so long as the unpaid balance of Purchased Accounts does not exceed, before and after such purchases, the Maximum Amount.

(c)     Purchaser shall pay the Purchase Price, less any amounts due to Purchaser from Sellers, including, without limitation, any amounts due under <u>Section 6</u> and <u>Section 7</u> hereof, of any Purchased Account, to Sellers within two (2) business days of the Purchase Date, whereupon the Accounts shall be deemed purchased hereunder.

(d)     Effective upon Purchaser's payment of the Purchase Price and for and in consideration therefore and in consideration of the covenants of this Agreement, Sellers will have absolutely sold, transferred and assigned to Purchaser, all of each Seller's right, title and interest in and to each Purchased Account and all monies due or which may become due on or with respect to such Purchased Account.

(e)     Sellers shall instruct all Account Debtors to make payments on Purchased Accounts directly to Purchaser

2.2.     **Account Debtor Statements**.  Purchaser may send a monthly statement to all Account Debtors for outstanding Accounts.

3.     <u>**Reserve Account**</u>.

3.1.     **Reserve**.

(a)     Upon the purchase of each Purchased Account, Purchaser shall, unless waived by it in its sole discretion, establish a reserve ("**Reserve**") in the Required Reserve Amount.  The Reserve shall be a book balance maintained on the records of Purchaser and shall not be a segregated fund.

(b)     Sellers shall pay to Purchaser on demand the amount of any Reserve Shortfall.

(c)     Purchaser shall pay to Sellers any amount by which the Reserve Account exceeds the Required Reserve Amount on the last business day of each week or as otherwise agreed to between Purchaser and Sellers.

(d)     Purchaser may charge the Reserve Account with any Obligation if not paid by Sellers when due or declared due.

(e)     Purchaser may pay any amounts due Sellers hereunder by a credit to the Reserve Account; *provided, however*, the parties will perform a weekly true-up as of the last day of each calendar week, and Sellers will pay to Purchaser any Reserve Shortfall, and Purchaser will pay directly to Sellers any amount by which the Reserve Account exceeds the Required Reserve Amount, with all payments being made on the first business day of the week following such end of the prior week.

3.2     **Exposed Payments**.

Initials _____

(a)     Upon termination of this Agreement, Sellers shall pay to Purchaser (or Purchaser may retain), to hold in a non-segregated non-interest bearing account the amount of all Exposed Payments (the "**Preference Reserve**").

(b)     Purchaser may charge the Preference Reserve with the amount of any Exposed Payments that Purchaser pays to the bankruptcy estate of the Account Debtor that made the Exposed Payment, on account of a claim asserted under Section 547 of the Bankruptcy Code.

(c)     Purchaser shall refund to Sellers, from time to time, that balance of the Preference Reserve for which a claim under Section 547 of the Bankruptcy Code can no longer be asserted due to the passage of the statute of limitations, settlement with the bankruptcy estate of the Account Debtor or otherwise.

(d)     Purchaser may retain the Reserve Account unless and until Sellers have executed and delivered to Purchaser a general release in form acceptable to Purchaser.

4.     **Collections, Charges and Remittances**.  All Collections will go directly to Purchaser and Purchaser shall apply all Collections to Sellers' Obligations hereunder in such order and manner as Purchaser may determine.  Sellers will hold in trust and safekeeping, as the sole property of Purchaser, and immediately turn over to Purchaser, in identical form received, any payment on a Purchased Account that comes into Sellers' possession.  In the event any Seller comes into possession of a remittance comprising payments of both a Purchased Account and an Account which has not been purchased by Purchaser, such Seller shall hold same in accordance with the provisions set forth above and immediately turn same over to Purchaser, in identical form received.  Upon collection of such item, Purchaser shall remit to Sellers their portion thereof, provided, however, that for all purposes under this Agreement, Clearance Days will be added to the date on which Purchaser receives any payment before crediting such payment to the Obligations.  Sellers agree to indemnify and save Purchaser harmless from and against any and all claims, loss, costs and expenses caused by or arising out of the Accounts or any attempt by Purchaser to collect same or resolve any dispute.

5.     **Authorization for Purchases**.  Subject to the terms and conditions of this Agreement, Purchaser is authorized to purchase Accounts upon telephonic, electronic or other instructions received from any authorized officer, employee or representative of Sellers.

6.     **Fees and Expenses**.  Sellers shall pay to Purchaser:

6.1     **Discount**.  The Discount, on the first day of the month following the month in which it accrues.

6.2     **Early Termination Fee**.  The Early Termination Fee, on the Early Termination Date, in the event that Sellers terminate this Agreement on the Early Termination Date as provided in Section 20 hereof.

6.3     **Factoring Fee**.  The Factoring Fee, which accrues daily, on the date on which a Purchased Account is paid, Repurchased or charged to the Reserve Account.

6.4     **Credit Insurance**.  Should Purchaser determine that Credit Insurance is necessary on an Account Debtor(s) regarding Purchased Accounts, Purchaser shall have the right to obtain such

Initials _____

coverage and charge the cost of such Credit Insurance to Sellers. Prior to obtaining any such Credit Insurance, Purchaser shall discuss with Sellers the respective Account Debtor and the relevant Purchased Accounts.

6.5    **Minimum Monthly Fee**. Any amount by which the Base Fees earned in any month (prorated for partial months) is less than the Minimum Monthly Fee, to be paid on the first day of the following month.

6.6    **Misdirected Payment Fee**. Any Misdirected Payment Fee immediately upon a failure to remit Account proceeds the business day following Sellers' receipt of the same.

6.7    **Missing Notation Fee**. The Missing Notation Fee on any Invoice that is sent by any Seller to an Account Debtor that does not contain the notice as required by Section 13 hereof, which Missing Notation Fee shall be due and payable upon demand by Purchaser, or at Purchaser's option, by Purchaser's charge to the Reserve Account.

6.8    **Out-of-pocket Expenses**. On demand by Purchaser, or at Purchaser's option, by Purchaser's charge to the Reserve Account, the out-of-pocket expenses directly incurred by Purchaser in the administration of this Agreement such as Wire Fees, postage and Audit Fees.

7.    **Repurchase Of Accounts**. Purchaser may require that Sellers repurchase, by payment of the then unpaid Face Amount thereof, together with any unpaid fees relating to the Purchased Account on demand, or, at Purchaser's option, by Purchaser's charge to the Reserve Account:

7.1    Any Purchased Account, the payment of which has been disputed by the Account Debtor obligated thereon, Purchaser being under no obligation to determine the bona fides of such dispute;

7.2    Any Purchased Account for with any Seller has breached any representation or warranty contained in this Agreement;

7.3    Any Purchased Account owing from an Account Debtor which (a) in Purchaser's reasonable credit judgment has become insolvent; or (b) which has indicated an inability or unwillingness to pay the Purchased Account when due;

7.4    Any Purchased Account that is no longer an Eligible Account;

7.5    All Purchased Accounts upon the occurrence of an Event of Default, or upon the termination date of this Agreement; and/or

7.6    Any Purchased Account that remains unpaid beyond the Late Payment Date.

8.    **Security Interest**.

8.1    Grant of Security Interest. As collateral securing the Obligations, Sellers grant to Purchaser a continuing first priority security interest in the Collateral.

8.2    Priority. Purchaser (a) shall have, as to all Obligations of Sellers under this Agreement and the diminution—if any—in the value of Purchaser's interest in Cash Collateral (as that terms is

Initials _____

defined in Section 363 of the Bankruptcy Code and/or in any ensuing Bankruptcy Orders or Factoring Orders), priority in payment over any and all administrative expenses of the kind specified in §§ 503(b) or 507(b) of the Bankruptcy Code, except United States Trustee fees and professional fees allowed and payable under §§ 330, 331 and 503 of the Bankruptcy Code; (b) shall have a perfected, first priority lien on Cash Collateral; (c) shall have—except toward certain machinery and equipment to which Purchaser has expressly subordinated its interests—first priority priming liens on all of the Collateral pursuant to § 364(d) of the Bankruptcy Code, and super-priority administrative claims having recourse to all prepetition and post petition property of the Seller's estate, now owned or hereafter acquired, and the proceeds of each of the foregoing, including, the proceeds of avoidance actions, pursuant to Section 364(c)(1) of the Bankruptcy Code; and (d) agrees to subordinate its security interest in the Seller's machinery and equipment attached hereto as <u>Exhibit A</u>.

8.3    <u>Liens</u>.  (a) Purchaser's liens on the Collateral shall be deemed valid and perfected by entry of the Factoring Orders.  Purchaser shall not be required to file, register or publish any financing statements, mortgages, hypothecs, notices of lien or similar instruments in any jurisdiction or filing or registration office, or to take possession of any Collateral or to take any other action in order to validate, render enforceable or perfect the liens on Collateral granted by or pursuant to this Agreement. If Purchaser shall, in its sole discretion, from time to time elect to file, register or publish any such financing statements, mortgages, hypothecs, notices of lien or similar instruments, take possession of any Collateral, or take any other action to validate, render enforceable or perfect all or any portion of the Purchaser's liens on the Collateral, all such documents and actions shall be deemed to have been filed, registered, published or recorded or taken at the time and on the date the entry of the Factoring Orders; and (b) the liens, lien priorities, superpriority administrative expense claims and other rights and remedies granted to the Purchaser shall not be modified, altered or impaired in any manner by any other financing or extension of credit or incurrence of debt by Seller (pursuant to Section 364 of the Bankruptcy Code or otherwise), or by dismissal or conversion of the Bankruptcy Proceeding, or by any other act or omission whatsoever.

8.4    <u>True Sale</u>.  Notwithstanding the creation of this security interest, the relationship of the parties shall be that of Purchaser and Seller of Accounts, and not that of lender and borrower.

8.5    <u>Pre-Petition Accounts</u>.  The parties acknowledge and agree that Purchaser is the sole owner of the Pre-Petition Accounts of each Seller, and such Pre-Petition Accounts are not part of the respective Seller's bankruptcy estate.

9.    **Conditions Precedent**.  Any purchase of Accounts as contemplated by this Agreement, is subject to the following conditions:

9.1    Sellers have delivered to Purchaser executed copies of the Guaranties;

9.2    Sellers have delivered to Purchaser financial projections (the "**Financial Projections**") acceptable to Seller in its sole discretion;

9.3    the Bankruptcy Court has issued a Factoring Order approving this Agreement and authorizing the purchase of Sellers Accounts by Purchaser and incurrence by Sellers of the post-petition secured indebtedness in accordance with this Agreement;

9.4    the Bankruptcy Court has issued a Bankruptcy Order providing that Purchaser is

Initials _____

the sole owner of all Pre-Petition Accounts;

9.5    the Factoring Orders shall be in full force and effect, and shall not have been vacated, reversed or rescinded, and an appeal of such Factoring Orders shall not have been timely filed *and* a stay of such order pending appeal shall not be presently effective, and without the prior written consent of the Purchaser, such Factoring Orders shall not have been amended or modified;

9.6    Sellers shall be in compliance with all Bankruptcy Orders;

9.7    All proceedings taken in connection with the execution of this Agreement and all agreements related thereto and approval thereof by the Bankruptcy Court (including, without limitation, the nature, scope and extent of notices to interested parties with respect to all hearings related hereto and thereto) shall be reasonably satisfactory in form, scope and substance to the Purchaser; and

9.8    Sellers have delivered to Purchaser all other documents, agreements, Account-related documents, and all other documentation as requested by Purchaser.

10.    **Authorization to Purchaser**.

10.1    Sellers irrevocably authorizes Purchaser at Sellers' expense, to exercise at any time any of the following powers until all of the Obligations have been paid in full:

10.2    Receive, take, endorse, assign, deliver, accept and deposit, in the name of Purchaser or any Seller, any and all proceeds of any Collateral securing the Obligations or the proceeds thereof;

10.3    Take or bring, in the name of Purchaser or any Seller, all steps, actions, suits or proceedings deemed by Purchaser necessary or desirable to effect collection of or other realization upon Purchased Accounts;

10.4    Pay any sums necessary to discharge any lien or encumbrance which is senior to Purchaser's security interest in any assets of Sellers, which sums shall be included as Obligations hereunder;

10.5    File in the name of any Seller or Purchaser or both:

(a)    Mechanics liens or related notices, or

(b)    Claims under any payment bond, in connection with goods or services sold by any Seller in connection with the improvement of realty;

10.6    Notify any Account Debtor obligated with respect to any Account, that the underlying Account has been assigned to Purchaser by the applicable Seller and that payment thereof is to be made to the order of and directly and solely to Purchaser, and communicate directly with such Seller's Account Debtors to verify the amount and validity of any Account created by such Seller;

10.7    File any initial financing statements and amendments thereto that:

Initials _____

(a)     Indicate the Collateral as all assets of Sellers or words of similar effect, regardless of whether any particular asset comprised in the collateral falls within the scope of Article 9 of the Uniform Commercial Code, or as being of an equal or lesser scope or with greater detail;

(b)     Contain any other information required by part 5 of Article 9 of the Uniform Commercial Code for the sufficiency or filing office acceptance of any financing statement or amendment, including (i) whether the each Seller is an organization, the type of organization, and any organization identification number issued to the each Seller; and (ii) in the case of a financing statement filed as a fixture filing or indicating collateral as as-extracted collateral or timber to be cut, a sufficient description of real property to which the collateral relates; and

(c)     Contain a notification that the applicable Seller has granted a negative pledge to Purchaser, and that any subsequent lien or may be tortuously interfering with Purchaser's rights;

(d)     Advises third parties that any notification of any Seller's Account Debtors will interfere with Purchaser's collection rights.

10.8    After an Event of Default:

(a)     Change the address for delivery of mail to any Seller and to receive and open mail addressed to such Seller;

(b)     Extend the time of payment of, compromise or settle for cash, credit, return of merchandise, and upon any terms or conditions, any and all Accounts and discharge or release any account debtor or other obligor (including filing of any public record releasing any lien granted to the applicable Seller by such account debtor), without affecting any of the Obligations;

10.9    Sellers hereby release and exculpate Purchaser, its officers, employees and designees, from any liability arising from any acts under this Agreement and the On-Line System, or in furtherance thereof whether of omission or commission, and whether based upon any error of judgment or mistake of law or fact, except for gross negligence or willful misconduct.  In no event will Purchaser have any liability to any Seller for lost profits or other special or consequential damages.

10.10   Sellers authorize Purchaser to accept, endorse and deposit on behalf of each Seller any checks tendered by an Account Debtor "in full payment" of its obligation to such Seller.  Sellers shall not assert against Purchaser any claim arising therefrom, irrespective of whether such action by Purchaser effects an accord and satisfaction of any Seller's claims, under §3311 of the Uniform Commercial Code, or otherwise.  Sellers may, subject to the payment of the Early Termination Fee, thereafter elect, in their discretion, to repurchase from Purchaser any other Purchased Accounts outstanding from said Account Debtor, or not to sell to Purchaser subsequent Accounts arising from said Account Debtor.

11.     **Power of Attorney**.  In order to carry out the sale of Purchased Accounts to Purchaser hereunder, Sellers do hereby irrevocably appoint Purchaser and its successors and assigns as Sellers' true and lawful attorney in fact, with respect to Purchased Accounts and hereby authorizes Purchaser, regardless of whether there has been an Event of Default, (a) to sell, assign, transfer or pledge the whole or any part of the Purchased Accounts; (b) to demand, collect, receive, sue, and give releases

Initials _____

to any Account Debtor for the monies due or which may become due upon or with respect to the Purchased Accounts and to compromise, prosecute, or defend any action, claim, case or proceeding relating to the Purchased Accounts, including the filing of a claim or the voting of such claims in any bankruptcy case, all in Purchaser's name or any Seller's name as Purchaser may choose; (c) to prepare, file and sign any Seller's name on any notice, claim, assignment, demand, draft or notice of or satisfaction of lien or mechanic's lien or similar document; (d) to receive, open, and dispose of all mail addressed to any Seller for the purpose of collecting the Purchased Accounts; (e) to endorse any Seller's name on any checks or other forms of payment on the Purchased Accounts; and (f) to do all acts and things necessary or expedient, in furtherance of any such purposes.

12.     **ACH Authorization**.  In order to satisfy any of the Obligations, Sellers authorize Purchaser to initiate electronic debit or credit entries through the ACH system to the following deposit account maintained by Sellers: _____.

13.     **Covenants By Sellers**.

13.1     Sellers shall not, without the prior written consent of Purchaser in each instance, (a) grant any extension of time for payment of any of their Purchased Accounts; (b) compromise or settle any of their Purchased Accounts for less than the full amount thereof; (c) release in whole or in part any Account Debtor on any Purchased Accounts; or (d) grant any credits, discounts, allowances, deductions, return authorizations or the like (i) with respect to any of the Purchased Accounts; or (ii) with respect to any other Accounts except in accordance with ordinary and customary industry terms consistent with Sellers' past practice.

13.2     Sellers agree to furnish the following:

(a)     On a monthly basis, as soon as possible, but in any event, no later than twenty-five (25) days after the end of each calendar month (i) an aging of accounts receivable of the previous month; (ii) an aging of accounts payable of the previous month; (iii) an income statement of the previous month; and (iv) bank statements of the previous;

(b)     On a monthly basis, as soon as possible, but in any event, no later than twenty-five (25) days after the end of each calendar month, monthly financial statements of Sellers prepared and certified as correct by duly authorized officer of each Seller;

(c)     Quarterly, as soon as available, but in any event no later than sixty (60) day after the end of each fiscal quarter account prepared financial statements such recently ended fiscal quarter;

(d)     Yearly, as soon as available, but in any event no later than one hundred-twenty (120) days after the end of each fiscal year, year-end reviewed financial statements with notes; and

(e)     Prior to the Effective Date, the Turnaround Financial Projections.

13.3     From time to time as requested by Purchaser, at the sole expense of Sellers, Purchaser or its designee shall have access, during reasonable business hours and upon reasonable notice if prior to an Event of Default and at any time if on or after an Event of Default, to all premises where Collateral is located for the purposes of inspecting (and removing, if after the occurrence of an Event of Default) any of the Collateral, including any Seller's books and records,

Initials _____

and Sellers shall permit Purchaser or its designee to make copies of such books and records or extracts therefrom as Purchaser may request. Sellers shall pay Purchaser audit fees not to exceed Nine Hundred and No/100 Dollars ($900 per day), plus out of pocket expenses per audit ("**Audit Fees**"). Without expense to Purchaser, Purchaser may reasonably use any of Sellers' personnel, equipment, including computer equipment, programs, printed output and computer readable media, supplies and premises for the collection of accounts and realization on other Collateral as Purchaser, in its discretion, deems appropriate. Sellers hereby irrevocably authorize all accountants and third parties to disclose and deliver to Purchaser at Sellers' expense all financial information, books and records, work papers, management reports and other information in their possession relating to Sellers. Before sending any Invoice to an Account Debtor, Sellers shall mark same with a notice of assignment as may be required by Purchaser.

13.4    Sellers shall pay when due all payroll and other taxes, and shall provide proof thereof to Purchaser in such form as Purchaser shall reasonably require.

13.5    Sellers shall not, without the prior written consent of Purchaser in each instance (a) change their respective legal name; (b) use a fictitious name not already identified in this Agreement; or (c) merger or consolidate with, or sell to, any other entity.

13.6    Except as otherwise provided herein, Sellers shall not create, incur, assume or permit to exist any lien upon or with respect to any assets in which Purchaser now or hereafter holds a security interest.

13.7    Notwithstanding Sellers' obligation to pay the Misdirected Payment Fee, each Seller shall remit to Purchaser on the next banking day following the date of receipt by such Seller the amount of any payment on account of a Purchased Account.

13.8    Sellers shall comply with all Bankruptcy Orders. Sellers shall not seek, consent to or suffer to exist any modification, stay, vacation or amendment of the Factoring Orders, except for any modifications and amendments agreed to in writing by Purchaser. Sellers will not apply to the Bankruptcy Court for authority to take any action prohibited by this Agreement, except to the extent such application and the taking of such action is conditioned upon receiving the written consent of the Purchaser.

13.9    Sellers will not incur, create, assume, suffer to exist or permit any administrative expense, unsecured claim or other superpriority claim or lien which is *pari passu* with or senior to the claims or liens, as the case may be, of Purchaser against Sellers hereunder, or apply to the Bankruptcy Court for authority to do so.

14.    **Avoidance Claims**. Sellers shall indemnify Purchaser from any loss arising out of the assertion of any Avoidance Claim and shall pay to Purchaser on demand the amount thereof. Sellers shall notify Purchaser within two (2) business days of their becoming aware of the assertion of an Avoidance Claim. This provision shall survive termination of this Agreement.

15.    **Account Disputes**. Sellers shall notify Purchaser promptly of and, if requested by Purchaser, will settle all disputes concerning any Purchased Account, at Sellers' sole cost and expense. Purchaser may, but is not required to, attempt to settle, compromise, or litigate (collectively, "**Resolve**") the dispute upon such terms, as Purchaser in its sole discretion deems advisable, for any Seller's account and risk

and at Sellers' sole expense.  Upon the occurrence of an Event of Default Purchaser may Resolve such issues with respect to any Account of any Seller.

16. **Representation and Warranties**.  Each Seller represents and warrants that:

16.1    it is in good standing in the jurisdiction of its formation

16.2    it is fully authorized to enter into this Agreement and to perform hereunder;

16.3    This Agreement constitutes the legal, valid and binding obligation of each Seller; and

16.4    The Purchased Accounts are and will remain: (a) bona fide existing obligations created by the sale and delivery of goods or the rendition of services in the ordinary course of Sellers' business; (b) unconditionally owed and will be paid to Purchaser without defenses, disputes, offsets, counterclaims, or rights of return or cancellation; (c) sales to an entity that is not affiliated with any Seller or in any way not an "arms-length" transaction; and (d) in all respects, an Eligible Account.

17. **Default**.

17.1.    **Events of Default**.   The following events will constitute an Event of Default hereunder: (a) Sellers default in the payment of any Obligations; (b) Sellers default in the performance of any covenant, condition or provision hereof or of any Other Agreement now or hereafter entered into with Purchaser, (c) any warranty or representation contained herein or in any Other Agreement proves to be false or inaccurate in any respect; (d) any Seller breaches the covenants set forth in Section 13 hereto; (e) any provision of this Agreement shall for any reason cease to be valid or binding or enforceable against Sellers; (f) a Bankruptcy Order is entered (i) modifying any Factoring Order with the prior written consent of Purchaser; (ii) avoiding or requiring disgorgement by Purchaser of any amounts received with respect to the Obligations; (iii) or a motion or other request shall be filed with the Bankruptcy Court seeking authority to use any proceeds of any of the Collateral without the consent of Purchaser; (iv) enjoining, restraining in any way preventing Sellers from continuing to conduct all or any material part of their business affairs; (g) any such guarantor fails to perform or observe any of such guarantor's obligations to Purchaser or shall notify Purchaser of their intention to rescind, modify, terminate or revoke any guaranty of the Obligations, or any such guaranty shall cease to be in full force and effect for any reason whatever; and/or (h) any guarantor of the Obligations becomes subject to any bankruptcy, insolvency or other debtor-relief proceedings

17.2.    **Waiver of Notice.    SELLERS WAIVE ANY REQUIREMENT THAT PURCHASER INFORM ANY SELLER BY AFFIRMATIVE ACT OR OTHERWISE OF ANY ACCELERATION OF SELLERS' OBLIGATIONS HEREUNDER.    FURTHER, PURCHASER'S FAILURE TO CHARGE OR ACCRUE INTEREST OR FEES AT ANY "DEFAULT" OR "PAST DUE" RATE SHALL NOT BE DEEMED A WAIVER BY PURCHASER OF ITS CLAIM THERETO**.

17.3.    **Effect of Default**. Upon the occurrence of any Event of Default, in addition to any rights Purchaser has under this Agreement or applicable law and at the sole discretion of Purchaser:

(a)    Discount shall accrue and be payable at the Default Discount Rate on the Balance Subject to Discount.

Initials _____

(b)     Notwithstanding the provisions of Section 362 of the Bankruptcy Code, but subject to the Factoring Orders, the Purchaser may take any or all of the following actions, without further order of or application to the Bankruptcy Court and without prejudice to the rights of Purchaser to otherwise enforce its claims against Sellers: (i) cease advances of funds under this Agreement; (ii) declare all Obligations owing Purchaser by Sellers due and payable without presentment, demand, protest or other notice of any kind, all of which are hereby waived by Sellers; and (iii) enforce, as Purchaser any and all of the liens and rights under this Agreement.

(c)     the automatic stay arising pursuant to Bankruptcy Code Section 362 shall be vacated and terminated in accordance with the Factoring Orders so as to permit Purchaser full exercise of all of its rights and remedies, including, without limitation, all of its rights and remedies with respect to the Collateral. With respect to the Purchaser's exercise of its rights and remedies, each Seller agrees, waives and, releases, and shall be enjoined from attempting to contest, delay, or otherwise dispute the exercise by Purchaser of its rights and remedies before the Bankruptcy Court or otherwise.

18.     **Account Stated**.  Purchaser shall make available to Sellers through the On-Line System the transactions arising hereunder.  All information in the On-Line System shall be considered correct and binding upon Sellers as an account stated, except to the extent that Purchaser receives, within sixty (60) days following the date such information is first available in the On-Line System, written notice from Sellers of any specific exceptions by Sellers, and then it shall be binding against Sellers as to any items to which they have not objected.

19.     **Online User Standards**.

19.1     **Online Conducting of Business**.  Purchaser and Sellers intend to conduct business contemplated by this Agreement through the internet and through Purchaser's On-Line Service. Purchaser is the sole and exclusive owner of the On-Line Service.  Sellers hereby accept a non-exclusive, non-transferable, terminable right to access the On-Line Service, upon the terms and subject to the conditions contained herein.

19.2     **Standards Regarding Conducting Business Online**.

(a)     Purchaser shall have the right to terminate or limit Sellers' access to the On-Line Service upon the occurrence of an Event of Default or at any other time within Purchaser's discretion.

(b)     Sellers shall not: (i) copy the On-Line Service nor otherwise reproduce the same other than for normal system operation backup; (ii) translate, adapt, vary, or modify the On-Line Service; or (iii) disassemble, decompile or reverse engineer the On-Line Service.

(c)     Purchaser shall not be liable to Sellers for any loss or damage whatsoever or howsoever caused, whether caused by tort (including negligence), breach of contract, or otherwise arising directly or indirectly in connection with the use of the On-Line Service, including for any inability of Sellers to obtain access to the on-line system or for unauthorized access to that system by others.  Sellers hereby waive any legal rights they have with respect to data privacy to the fullest extent permitted by law.

Initials _____

(d)     Sellers acknowledge that any and all of the copyright, trademarks, trade names, patents and other intellectual property rights subsisting in or used in connection with the On-Line Service, including all documentation and manuals relating thereto, are, and shall remain, the sole property of the Purchaser.  Sellers shall not, during or at any time after the expiry or termination of their use of the On-Line Service, in any way question or dispute the ownership by Purchaser thereof.

(e)     To the extent permitted by applicable law, Purchaser excludes all warranties with respect to the On-Line Service, either express or implied, including, but not limited to, any implied warranties of merchantability, satisfactory quality or fitness for any particular purpose.

(f)     Sellers are solely responsible for virus scanning the On-Line Service, and Purchaser makes no representations or warranties regarding any virus associated with the On-Line Services.

(g)     All information, data, drawings, specifications, documentation, software listings, source or object code which Purchaser may have imparted and may from time to time impart to Sellers relating to the On-Line Service is proprietary and confidential.  Sellers hereby agree that they shall use the same solely in accordance with the provisions of this Agreement and that they shall not, at any time during or after expiry or termination of this Agreement, disclose the same, whether directly or indirectly, to any third party or use it in connection with any purpose other than the transaction contemplated herein.

(h)     Sellers shall be responsible for restricting access to passwords and systems relating to the On-Line Service and shall only provide passwords and access to the Online Reporting System to those individuals on an as needed basis.  Upon learning of any breach of security or suspected breach of security to the Online Reporting System, Sellers shall report the incident immediately to Purchaser.  Sellers agree to implement and follow authentication procedures and protocols requested by Purchaser.  Sellers shall be solely responsible for safeguarding the confidentiality of their authentication codes and passwords, and Sellers assume all responsibility for any transactions undertaken in any Seller's name through the use of those authentication codes, passwords or using any Seller's electronic signature.  Purchaser shall have no duty to verify or authenticate that the person(s) using Sellers' systems are authorized to act on behalf of any Seller.

19.3   **Online Access**.  Upon an Event of Default, all of Sellers' rights and access to any online internet services that Purchaser makes available to Sellers shall be provisional pending Sellers' curing of all such Events of Default and Purchaser may elect to terminate Sellers' online access as provided for herein.  During that period of time, Purchaser may limit or terminate any Seller's access to online services.  Sellers acknowledge that the information Purchaser makes available to Sellers through online internet access, both before and after an Event of Default, constitutes and satisfies any duty to respond to a request for accounting or request regarding a statement of account that is referenced in the UCC.

20.   **Amendment and Waiver**.  Only a writing signed by all parties hereto may amend this Agreement.  No failure or delay in exercising any right hereunder shall impair any such right that Purchaser may have, nor shall any waiver by Purchaser hereunder be deemed a waiver of any

Initials _____

default or breach subsequently occurring. Purchaser's rights and remedies herein are cumulative and not exclusive of each other or of any rights or remedies that Purchaser would otherwise have.

21. **Termination; Effective Date**. This Agreement will be effective from the date on which it has been signed by the Parties through November 30, 2027 (the "**Initial Term**"), and shall be automatically extended for successive one (1) year periods (each, a "**Renewal Term**") unless Sellers shall provide written notice to Purchaser of their intention to terminate this Agreement at least sixty (60) days prior to the next anniversary date. Sellers shall provide sixty (60) day notice of an intent to terminate this Agreement on any date other than an anniversary date (an "**Early Termination Date**"), whereupon this Agreement shall terminate on the Early Termination Date, *provided, however*, that should Purchaser terminate this Agreement prior to the end of the Initial Term or any Renewal Term, Purchaser shall pay the Early Termination Fee. Notwithstanding the foregoing, if Purchaser and Sellers hereafter enter into an asset based or other financing arrangement where Purchaser is the lender, then the foregoing Termination Fee will be automatically waived. Purchaser may terminate this Agreement (a) by giving Sellers thirty (30) days prior written notice of termination, whereupon this Agreement shall terminate on the earlier date of the date of termination or on the anniversary date hereof; and (b) immediately upon an Event of Default.

22. **No Lien Termination without Release**. In recognition of Purchaser's right to have its attorneys' fees and other expenses incurred in connection with this Agreement secured by the Collateral, notwithstanding payment in full of all Obligations by Sellers, Purchaser shall not be required to record any terminations or satisfactions of any of Purchaser's liens on the Collateral unless and until Sellers and all guarantors have executed and delivered to Purchaser a general release in form acceptable to Purchaser. **Sellers understand that this provision constitutes a waiver of their rights under §9-513 of the UCC**.

23. **Conflict**. Unless otherwise expressly stated in any other agreement between Purchaser and Sellers, if a conflict exists between the provisions of this Agreement and the provisions of such other agreement, the provisions of this Agreement shall control.

24. **Severability**. In the event any one or more of the provisions contained in this Agreement is held to be invalid, illegal or unenforceable in any respect, then such provision shall be ineffective only to the extent of such prohibition or invalidity, and the validity, legality, and enforceability of the remaining provisions contained herein shall not in any way be affected or impaired thereby.

24. **Enforcement**. This Agreement and all agreements relating to the subject matter hereof is the product of negotiation and preparation by and among each party and its respective attorneys, and shall be construed accordingly.

25. **Relationship of Parties**. The relationship of the parties hereto shall be that of Seller and Purchaser of Purchased Accounts. Purchaser shall not be a fiduciary of any Seller. Sellers shall be a fiduciary of Purchaser in connection with the proceeds of Collateral as set forth herein.

26. **Attorneys' Fees**. Sellers agree to reimburse Purchaser on demand for:

26.1    the actual amount of all costs and expenses, including reasonable attorneys' fees, which Purchaser has incurred or may incur in relation to negotiating, preparing, or administering this

Initials _____

Agreement and in the Bankruptcy Proceeding, and any documents prepared in connection herewith; or any way arising out of this Agreement;

26.2    protecting, preserving or enforcing any lien, security interest or other right granted by Sellers to Purchaser or arising under applicable law, whether or not suit is brought, including but not limited to the defense of any Avoidance Claims;

26.3    the actual costs, including photocopying (which, if performed by Purchaser's employees, shall be at the rate of $.10/page), travel, and reasonable attorneys' fees and expenses incurred in complying with any subpoena or other legal process in any way relating to Sellers.  This provision shall survive termination of this Agreement;

26.4    The actual amount of all costs and expenses, including reasonable attorneys' fees, which Purchaser may incur in enforcing this Agreement and any documents prepared in connection herewith, or in connection with any federal or state insolvency proceeding commenced by or against Sellers, including those (a) arising out the automatic stay; (b) seeking dismissal or conversion of the bankruptcy proceeding; (c) opposing confirmation of any Seller's plan there under; (d) the Bankruptcy Proceeding.

27.    **Entire Agreement**.  This Agreement represents the entire agreement and understanding between Purchaser and Sellers concerning the subject matter contained herein, and supersedes and replaces any and all prior agreements, including the Pre-Petition Factoring Agreement, and understandings, whether written or oral, between Sellers and Purchaser.  This Agreement may only be amended and/or modified pursuant to <u>Section 19</u> hereof.

28.    **Choice of Law**.  This Agreement and all transactions contemplated hereunder and/or evidenced hereby shall be governed by, construed under, and enforced in accordance with the internal laws of the State of Illinois, without regard for the internal bankruptcy laws of the State of Illinois.

29.    **Jury Trial Waiver. IN RECOGNITION OF THE HIGHER COSTS AND DELAY WHICH MAY RESULT FROM A JURY TRIAL, THE PARTIES HERETO WAIVE ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION (A) ARISING HEREUNDER, OR (B) IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO OR ANY OF THEM WITH RESPECT HERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT OR TORT OR OTHERWISE; AND EACH PARTY FURTHER WAIVES ANY RIGHT TO CONSOLIDATE ANY SUCH ACTION IN WHICH A JURY TRIAL HAS BEEN WAIVED WITH ANY OTHER ACTION IN WHICH A JURY TRIAL CANNOT BE OR HAS NOT BEEN WAIVED; AND EACH PARTY HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY, AND THAT ANY PARTY HERETO MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES HERETO TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY**.

30.    **Venue; Jurisdiction**.  Sellers hereby irrevocably agree that any suit, action or proceeding arising hereunder, or the interpretation, performance or breach hereof, shall, be instituted in any state

Initials _____

or federal court located in the City of Chicago, County of Cook, State of Illinois (the "**Acceptable Forums**").  Notwithstanding the foregoing, Purchaser shall have the right to institute any suit, action or proceeding arising hereunder, in order to protect and/or enforce Purchaser's interest in the Collateral, in the jurisdiction in which such Collateral is located, each such forum being an "**Acceptable Forum**".  Sellers agree that the Acceptable Forums are convenient to them and submit to the jurisdiction of the Acceptable Forums and waives any and all objections to jurisdiction or venue.  Should such proceeding be initiated in any other forum, Sellers waive any right to oppose any motion or application made by Purchaser to transfer such proceeding to an Acceptable Forum.

31.     **Service of Process**.  Sellers agree that Purchaser may effect service of process upon each Seller by certified mail at the address set forth in this Agreement, in addition to service on Sellers' counsel at McManimon, Scotland & Baumann, LLC, 75 Livingston Avenue, Roseland, NJ 07068 Attn: Thomas M. Walsh.

32.     **Assignment**.  This Agreement shall be binding upon and inure to the benefit of the Parties and their successors and assigns; provided that Sellers may not assign their rights or obligations under this Agreement without the prior written consent of Purchaser.  Purchaser may assign its rights and delegate its duties hereunder.  Upon such assignment, Sellers shall be deemed to have attorned to such assignee and shall owe the same obligations to such assignee and shall accept performance hereunder by such assignee as if such assignee were Purchaser.

33.     **Counterparts**.  This Agreement may be signed in any number of counterparts, each of which shall be an original, with the same effect as if all signatures were upon the same instrument. Delivery of an executed counterpart of the signature page to this Agreement by electronic means shall be effective as delivery of a manually executed counterpart of this Agreement, and any party delivering such an executed counterpart of the signature page to this Agreement by electronic means to any other party shall thereafter also promptly deliver a manually executed counterpart of this Agreement to such other party, provided that the failure to deliver such manually executed counterpart shall not affect the validity, enforceability, or binding effect of this Agreement.

34.     **Notice**.  All notices required to be given to any party other than Purchaser shall be deemed given upon the first to occur of (a) two (2) business days after deposit thereof in a receptacle under the control of the United States Postal Service; (b) transmittal by electronic means to a receiver under the control of such party; or (c) actual receipt by such party or an employee or agent of such party. All notices to Purchaser hereunder shall be deemed given upon actual receipt by an authorized officer of Purchaser.  For the purposes hereof, notices hereunder shall be sent to the following addresses, or to such other addresses as each such party may in writing hereafter indicate:

**SELLERS**

| | |
|---|---|
| Address: | 201 Bay Avenue |
| | Elizabeth, NJ 07201 |
| Officer: | Patrick J. Wynne, President |
| Email: | pwynne@judgeorg.com |

**PURCHASER**

| | |
|---|---|
| Address: | 2400 E. Devon Avenue |
| | Des Plaines, Illinois 60016 |
| Officer: | Robbin Salvage, Vice President |

Initials _____

Email:
rsalvage@firstbusiness.bank.com
Fax Number:  (847) 297-3520

35.    **Joint and Several Liability**.

35.1    Notwithstanding anything to the contrary contained herein, all Obligations of each Seller hereunder shall be joint and several obligations of each Seller.

35.2    Notwithstanding any provisions of this Agreement to the contrary, it is intended that the joint and several nature of the Obligations of each Seller and the liens and security interests granted by each Seller to secure the Obligations, not constitute a "Fraudulent Conveyance" (as defined below).  Consequently, Purchaser and Sellers agree that if the Obligations of a Seller, or any liens or security interests granted by such Seller securing the Obligations would, but for the application of this sentence, constitute a Fraudulent Conveyance, the Obligations of such Seller and the liens and security interests securing such Obligations shall be valid and enforceable only to the maximum extent that would not cause such Obligations or such lien or security interest to constitute a Fraudulent Conveyance, and the Obligations of such Seller and this Agreement shall automatically be deemed to have been amended accordingly.  For purposes hereof, "**Fraudulent Conveyance**" means a fraudulent conveyance under Section 548 of the Bankruptcy Code, or a fraudulent conveyance or fraudulent transfer under the applicable provisions of any fraudulent conveyance or fraudulent transfer law or similar law of any state, nation or other governmental unit, as in effect from time to time.

35.3    Each Seller hereby agrees that, except as hereinafter provided, its obligations hereunder shall be unconditional, irrespective of (a) the absence of any attempt to collect a Seller's Obligation from any Seller or any guarantor or other action to enforce the same; (b) the waiver or consent by Purchaser with respect to any provision of any instrument evidencing a Seller's Obligation, or any part thereof, or any other agreement heretofore, now or hereafter executed by a Seller and delivered to Purchaser; (c) failure by Purchaser to take any steps to perfect and maintain its security interest in, or to preserve its rights to, any security or collateral for Sellers' Obligations; (d) the institution of any proceeding under the Bankruptcy Code, or any similar proceeding, by or against a Seller or Purchaser's election in any such proceeding of the application of Section 1111(b)(2) of the Bankruptcy Code; (e) any borrowing or grant of a security interest by any Borrower as debtor-in-possession, under Section 364 of the Bankruptcy Code; (f) the disallowance, under Section 502 of the Bankruptcy Code, of all or any portion of Purchaser's claim(s) for repayment of any of Sellers' Obligations; or (g) any other circumstance which might otherwise constitute a legal or equitable discharge or defense of a guarantor.

35.4    No payment made by or for the account of a Seller including, without limitations, (a) a payment made by such Seller on behalf of another Sellers' Obligations; or (b) a payment made by any other person under any guaranty, shall entitle such Seller, by subrogation or otherwise, to any payment from such other Seller or from or out of such other Seller's property and such other Seller shall not exercise any right or remedy against such other Seller or any property of such other Seller by reason of any performance of such Seller of its joint and several obligations hereunder.

36.    **General Release**.  In consideration of Purchaser entering into this Agreement, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged,

Initials _____

each Seller and each affiliate, subsidiary, successor and assign thereof, and each of them on their behalf and on behalf of their respective equity holders, shareholders, members, managers, officers, directors, attorneys, participants, agents, employees, successors and assigns, as applicable (collectively, the "**Releasors**" and each a "**Releasor**"), hereby forever release, discharge, and acquit Purchaser and each affiliate, subsidiary, successor and permitted assign thereof, and each of its respective equity holders, shareholders, members, officers, directors, shareholders, members, attorneys, participants, agents and employees (collectively, the "**Releasees**" and each a "**Releasee**"), of and from any and all demands, actions, causes of action, suits, damages and any and all other claims, counterclaims, defenses, rights of set-off, demands and liabilities whatsoever (individually, a "**Claim**" and collectively, "**Claims**") of every type, kind, nature, description, or character, and irrespective of how, why, or by reason of what facts, whether heretofore existing, now existing or hereafter arising, or which could, might, or may be claimed to exist, of whatever kind or name, whether known or unknown, whether suspected or unsuspected, whether liquidated or unliquidated, at law or in equity, each as though fully set forth herein at length, to the extent that they arise out of, are connected with or relate to (a) the Pre-Petition Factoring Agreement and any agreement, instrument and document related thereto (collectively the "**Original Factoring Documents**"); (b) any guaranty executed in connection with the Obligations under the Pre-Petition Factoring Agreement and other Original Factoring Documents in favor of Releasees; (c) the Obligations owing from Judge Sellers to Purchaser pursuant to the Pre-Petition Factoring Agreement; (d) any Obligations owing by any Releasor to any Releasee pursuant to the Pre-Petition Factoring Agreement; (e) any guaranteed obligations under the Pre-Petition Factoring Agreement; or (f) any other arrangement or relationship between any Releasor, on the one hand, and any Releasee, on the other hand in relation to the Original Factoring Documents, *provided, however*, that nothing in this paragraph shall release Purchaser from its obligations arising under this Agreement.  Each Releasor acknowledges that such Releasor is aware that Releasor may later discover facts in addition to or different from those which such Releasor now knows or believes to be true with respect to the subject matter of this Section 35, but it is each Releasor's intention to fully and finally forever settle and release any and all matters, disputes and differences, known and unknown, suspected and unsuspected, which now exist, may later exist, or may previously have existed between any of the Releasors and any of the Releasees arising from, connected with or relating to the Original Factoring Documents.  The releases given in Section 35 shall be and remains in effect as a full and complete release notwithstanding discovery or existence of any such additional or different facts.  Each Releasor waives any protections afforded by any statute or law in any jurisdiction whose purpose substance, or effect is to provide that a general release shall not extend to claims, material or otherwise, which the person giving the release does not know of or suspect to exist at the time of executing the release.

*[Signature Page Follows.]*

21

Initials _____

IN WITNESS WHEREOF, the Parties have executed this DIP Factoring and Security on the day and year first above written.

**PURCHASER:**    **FIRST BUSINESS SPECIALTY FINANCE, LLC,**
a Wisconsin limited liability company

By: _____
Name: Robbin Salvage
Title: VP of Operations

**SELLER (To Be Notarized):**    **THE JUDGE ORGANIZATION, LLC**

By: _____
Name: Patrick J. Wynne
Title: President

**P. JUDGE & SONS TRUCKING, LLC**

By: _____
Name: Patrick J. Wynne
Title: President

**P.JUDGE & SONS, INC.**

By: _____
Name: Patrick J. Wynne
Title: President

**PORT ELIZABETH TERMINAL & WAREHOUSE CORP**

By: _____
Name: Patrick J. Wynne
Title: President

**AMEX SHIPPING AGENT INC.**

By: _____
Name: Patrick J. Wynne
Title: President

**JUDGE WAREHOUSING, LLC**

By: _____
Name: Patrick J. Wynne
Title: President


SUBSCRIBED AND SWORN TO
before me, the undersigned, a Notary Public
in and for the State of _____  and County of _____,
this _____ day of November,  2025.


_____
Notary

My commission Expires:




_____

# EXHIBIT A

EQUIPMENT AND MACHINERY