**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

***Caption in Compliance with D.N.J. LBR 9004-1(b)***
**SAUL EWING LLP**
Stephen B. Ravin, Esquire
Jeffrey C. Hampton, Esquire
Turner N. Falk, Esquire
Maxwell M. Hanamirian, Esquire (admitted *pro hac vice*)
One Riverfront Plaza
1037 Raymond Blvd., Suite 1520
Newark, NJ 07102-5426
Telephone: (973) 286-6714
E-mail: stephen.ravin@saul.com
jeffrey.hampton@saul.com
turner.falk@saul.com
maxwell.hanamirian@saul.com

*Counsel to the Debtors and Debtors in Possession*

| | |
|---|---|
| In re:<br><br>PORT ELIZABETH TERMINAL & WAREHOUSE CORP., *et al.*,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 25-22123 (JKS)<br><br>(Jointly Administered) |

**DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING AND APPROVING BIDDING PROCEDURES FOR THE SALE OF ALL OR SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS, (II) APPROVING BID PROTECTIONS, (III) SCHEDULING AN AUCTION AND A SALE HEARING, (IV) APPROVING THE FORM AND MANNER OF NOTICE THEREOF, AND (V) ESTABLISHING NOTICE AND PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND LEASES**

The above-captioned debtors and debtors in possession (collectively, the "Debtors"), respectfully move (the "Motion") as follows:

[1] The last four digits of each Debtors' tax identification number are as follows: Port Elizabeth Terminal & Warehouse, Corp. (6485), P. Judge & Sons, Inc. (3713), Amex Shipping Agent, Inc. (4699), the Judge Organization, LLC (8267), P. Judge & Sons Trucking, LLC (9853), and Judge Warehousing, LLC (6690). The location of the Debtors' principal place of business and the Debtors' service address in these Chapter 11 Cases is 13 Manor Road, East Rutherford, NJ 07073.

## RELIEF REQUESTED

a. The Debtors seek entry of an order, substantially in the form attached hereto as **Exhibit "A"** (the "Bidding Procedures Order"):

i. authorizing and approving the proposed bidding procedures substantially in the form attached to the Bidding Procedures Order as Exhibit 1 (the "Bidding Procedures") in connection with one or more sales or dispositions (collectively, the "Sale") of the Northern Assets (as defined below), the Southern Assets (as defined below) and substantially all other assets of the Debtors (collectively with the Northern Assets and Southern Assets, the "Assets");

ii. approving the Bid Protections with respect to the Stalking Horse Bid (each as defined below) and authorizing the Debtors to incur and pay the Bid Protections to the extent applicable;

iii. establishing the below dates and deadlines for the sale process:

| Deadline | Date |
|---|---|
| Deadline to mail Sale Notice and Contract Notice | **Within 5 business days following entry of the Bidding Procedures Order** |
| Sale Objection Deadline and Contract Objection Deadline[2] | **4:00 p.m. (ET) 21 days following mailing of the Sale and Contract Notice** |
| Bid Deadline | **October 5, 2026, at 5:00 p.m. (ET)** |
| Deadline for Debtors to Designate Qualifying Bids and Baseline Bid | **October 7, 2026** |
| Auction | **October 13, 2026, commencing at 10:00 a.m. (ET)** |
| Deadline to File and Serve Notice of Successful Bidder | **As soon as practicable after completion of the Auction** |
| Adequate Assurance Objection Deadline for any Successful Bidder other than the Stalking Horse Bidder | **October 14, 2026, at noon (ET)** |
| Debtors' Deadline to Reply to Sale | **October 14, 2026, at noon (ET)** |

[2] The Sale Objection Deadline and Contract Objection Deadline apply to all objections to the sale of the Assets and the assumption and assignment of the Assumed Contracts (including adequate assurance of future performance by the Stalking Horse Bidder), with the exception of objections related to adequate assurance of future performance by a Successful Bidder other than the Stalking Horse Bidder.

| | |
|---|---|
| Objections (other than Adequate Assurance Objections) | |
| Sale Hearing (subject to Court availability) | **October 20, 2026, at 10:00 a.m. (ET)** |
| Sale Closing | **As soon as practicable after completion of the Sale Hearing, but no later than November 13, 2026** |

iv. approving the form and manner of notice of the auction, if any, for the Debtors' Assets (the "Auction"), the Sale and the hearing with respect to the approval of the Sale (the "Sale Hearing"), attached as Exhibit 2 to the Bidding Procedures Order (the "Sale Notice");

v. approving procedures for the assumption and assignment of certain executory contracts and unexpired leases that may be assumed and assigned in connection with the Sale and approving the form and manner of notice thereof, attached as Exhibit 3 to the Bidding Procedures Order (the "Contract Notice"); and

vi. granting related relief.

## JURISDICTION AND VENUE

2. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

3. The statutory bases for the relief requested herein are sections 105, 363 and 365 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (as amended, the "Bankruptcy Code"), as supplemented by rules 2002, 6004 and 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and rules 6004-4 and 6006-1(a) of the Local Bankruptcy Rules of the United States Bankruptcy Court for the District of New Jersey (the "Local Rules").

## BACKGROUND

4. On November 14, 2025 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of New Jersey (the "Court").

5. An Official Committee of Unsecured Creditors (the "Committee") has been appointed pursuant to 11 U.S.C. § 1102(a)(i) [D.I. 62].

6. A description of the Debtors' businesses, the reasons for commencing the chapter 11 cases (the "Chapter 11 Cases"), the relief sought from the Court, and the facts and circumstances supporting this Motion are set forth in the *Declaration of Patrick Wynne in Support of First Day Motions for Relief* [Docket No. 19].

7. Collectively, the Debtors provide transportation, logistic, and warehouse related services. More specifically, the Debtors offer rail boxcar services, container handling services, warehousing services, multiple shipping options (e.g., rail, truck, air, and international shipping), specialized material handling services, cross docking, handling, and packing services, beverage specialists and alcoholic beverages expertise services, and product care and protection services.

8. The Debtors' businesses consist of two primary segments, one located in northern New Jersey and Bristol, Pennsylvania, the other located in Savannah, Georgia.

## THE SALE PROCESS

9. In 2019, the Debtors retained Cambridge Financial Services, LLC ("Cambridge"), an experienced financial advisor, to advise the Debtors on strategies to address the businesses' worsening financial situation.

10. As Debtors continued to face ongoing challenges in 2024-2025, the Debtors, through Cambridge, began to explore a potential sale of substantially all of their assets as a means to address their financial and operational difficulties.

11. Prepetition, the Debtors and Cambridge provided extensive diligence materials to potential financiers and strategic parties, parties that expressed an interested in acquiring some or all of the Debtors' Assets, and parties that are active in the transportation and logistics industry.

12. Postpetition, the Debtors have continued their marketing process, seeking interested parties in conjunction with a potential sales process for all or substantially all of the Debtors' assets in connection with a section 363 sale.

13. Cambridge focused its efforts on developing marketing materials and marketing the Debtors' Assets to parties to serve as the stalking horse bidder. In short order, the Debtors and their professionals prepared extensive diligence materials to support a marketing effort, including a data room containing the key financial and contractual information related to the Debtors' businesses (collectively, the "Investment Material").

14. The Debtors solicited interest from potential financial and strategic investors for bids for all or substantially all the Debtors' Assets, on a going concern basis. This process is ongoing. The Debtors have contacted a number of interested parties, providing any qualified party access to the Investment Material once a nondisclosure agreement ("NDA") is executed.

15. Once under an NDA, the Debtors have engaged in business-to-business discussions with these interested parties and offered site visits to address their questions and engaged in further negotiations.

16. Since the Petition Date, the Debtors have made outreach to several dozen identified strategic potential buyers.

17. Additionally, through DailyDAC (Distressed Asset Central), an online distressed business marketing firm, the debtors caused to be distributed a teaser to over 300 distressed business investors.

18. Since they commenced the postpetition marketing process, the Debtors have obtained executed NDAs from twelve potentially interested parties.

19. As a result of this process, to date the Debtors received two letters of intent from interested parties. The Debtors engaged in extensive negotiations with both these parties; the outcome of these negotiations is a stalking horse bid from East Coast Warehouse and Distribution Corp., a New Jersey corporation, and its designees (the "Stalking Horse Bidder"), for substantially all of the Debtors' assets, constituting all or substantially all of the assets used at the Debtors' Jersey City, New Jersey, and Levittown, Pennsylvania locations, and substantially all of the assets for the Debtors' East Rutherford, New Jersey and Savannah, Georgia locations as more specifically set forth in the Stalking Horse Agreement (defined below).

20. The parties' stalking horse asset purchase agreement (the "Stalking Horse Agreement"), a copy of which is attached to this Motion as **Exhibit "B"**, provides for, among other things: (i) a base purchase price of $6,500,000 (subject to certain specified adjustments) and (ii) the assumption of certain liabilities as described in the Stalking Horse Agreement (collectively, the "Stalking Horse Bid").

21. With a stalking horse bidding floor in place for the Assets (the key terms of which have already been subject to a robust market test), the Debtors now seek to effectuate one or more sale transactions to the Stalking Horse Bidder and/or other Successful Bidder(s) (as defined below), subject to a competitive bidding process that is consistent with the Debtors' fiduciary duties to maximize value of the Assets for their estates, creditors, and other stakeholders and

parties in interest.

22. Based upon the indications of interest received thus far, the Debtors believe that the most effective sale process may require the Debtors to entertain separate offers for the assets of their New Jersey/Pennsylvania segment (the "Northern Assets") and the assets of their Savannah, Georgia segment (the "Southern Assets"). The Debtors will also entertain any other appropriate offer, including those for substantially all of the Assets.

23. The Debtors seek to establish Bid Procedures in short order, to move these Chapter 11 Cases along expeditiously in order to emerge from chapter 11. Given the extensive prepetition marketing period, and the lengthy negotiation process that has occurred postpetition, the Debtors submit that the marketing and bidding timeline proposed via these Bidding Procedures is appropriate and necessary as to the needs of these Chapter 11 Cases.

24. Upon the Court's entry of the Bidding Procedures Order, the Debtors will provide notice of the Bidding Procedures, the deadline to object to the proposed sale(s), and the Sale Hearing, in the form attached as Exhibit 2 to the Bidding Procedures Order, to all creditors and parties in interest and all potential purchasers of the Assets that have contacted or been contacted by the Debtors or their advisors during the marking process to date, and provide publication notice of such information and the notice provided will include the description of the Debtors' Assets attached to Exhibit 2 of the Bidding Procedures Order.

**The Proposed Stalking Horse Bid**

25. The following is a summary of the material provisions of the Stalking Horse Agreement which, as noted above, contemplates the sale of the certain Assets:[3]

[3] This summary is provided for the convenience of the Court and parties in interest. To the extent any inconsistencies exist between the summary provided in this Motion or anywhere else in this Motion and the actual terms of the Stalking Horse Agreement, the Stalking Horse Agreement controls. Capitalized terms used but not defined herein are defined in the Stalking Horse Agreement.

| Provision | Summary Description |
|---|---|
| Seller | Port Elizabeth Terminal & Warehouse, Corp., a New Jersey Corporation, P. Judge & Sons, Inc., a New Jersey corporation, Amex Shipping Agent, Inc., a New Jersey corporation, P. Judge & Sons Trucking, LLC, a Georgia limited liability company, and Judge Warehousing, LLC, a Georgia limited liability company, and The Judge Organization, LLC, a Georgia limited liability company. |
| Stalking Horse Bidder | East Coast Warehouse and Distribution Corp., a New Jersey corporation, and its designees. |
| Consideration | The aggregate consideration payable to Seller for the sale and transfer of the Acquired Assets shall be the sum of the following items: (i) the Base Purchase Price of $6.5 million, plus (ii) the assumption by Purchaser of the Assumed Liabilities, minus (iii) the Cure Amounts, minus (iv) 50% of the reasonable fees and expenses charged by the Escrow Agent (such aggregate amount, as adjusted, the "Purchase Price"). |
| Acquired Assets | As further described in Section 2.1 of the Stalking Horse Agreement, (a) the Assigned Contracts set forth on Schedule 2.1(a); (b) the Assigned Leases set forth on Schedule 2.1(b); (c) all tangible personal property, machinery, equipment, fixtures, furniture, vehicles, and other personal property used in connection with the Business; all Intellectual Property of the Business (including, for the avoidance of doubt, the name[s] P. Judge & Sons, The Judge Organization, Judge Warehousing, Port Elizabeth, Amex Shipping Agent, P. Judge & Sons Trucking, The Judge Organization Logistics Services and similar names utilized by the Seller); all goodwill associated with the Business; all Books and Records related to the Business (other than Excluded Assets); and such other assets as the Parties may agree in writing prior to Closing; and (d) (i) all Accounts Receivable, but notably excluding the Factored Accounts Receivable, and (ii) current assets, prepaid expenses, credits, advance payments, security deposits under the Assigned Leases, rights of refunds for Acquired Assets, and similar prepaid items constituting current assets. |
| Assumption of Contracts; Cure Amounts | The Stalking Horse Bidder shall take assignment of the Assigned Contracts and Assigned Leases as determined by the Stalking Horse Bidder. Cure Amounts shall be paid by the Seller from the Base Purchase Price, promptly in accordance with the Bankruptcy Code, or as otherwise agreed with the applicable counterparty or approved by the Court.<br><br>The Stalking Horse Bidder shall only assume and shall only be required to perform and discharge in accordance with their respective terms the following (collectively, the "Assumed |

| | |
|---|---|
| | Liabilities”): (a) all Liabilities with respect to the Assigned Contracts and the Assigned Leases, solely to the extent such Liabilities arise on or after the Closing, (b) all Liabilities (including for any Tax) that arise on or after Closing with respect to Purchaser’s ownership or operation of the Acquired Assets on or after the Closing, and (c) all Employee Costs that arise on or after the Closing. |
| Bid Protections | The Stalking Horse Bidder is entitled to the following bid protections (the “Bid Protections”):<br><br>(1) a Break-Up Fee equal to 3% of the Base Purchase Price, payable to Purchaser if the parties execute the Stalking Horse Agreement and Seller consummates an Alternative Transaction, to be paid at the closing of any such Alternative Transaction solely from the proceeds of such sale and before any distribution to Seller or its secured parties of closing proceeds;<br>(2) an Expense Reimbursement in the amount not to exceed $150,000 for Purchaser's reasonable and documented out-of-pocket expenses incurred in connection with negotiating, documenting the transaction, and participating in the sale process, to be paid at the closing of any Alternative Transaction solely from the proceeds of such sale and before any distribution to Seller or its secured parties of closing proceeds;<br>(3) an initial overbid requirement of at least $50,000 above the Base Purchase Price;<br>(4) minimum bid increments of $50,000 for any subsequent bids at auction. For the avoidance of doubt, the Bidding Procedures Order must require that any topping bid by a qualified bidder shall exceed the sum of the Base Purchase Price, the Break-Up Fee, the Expense Reimbursement, and the initial overbid amount. |
| Other Terms and Conditions | Closing of the Sale of the Acquired Assets to the Stalking Horse Bidder will be subject to, among other customary conditions, (i) entry of the Approval Order (as defined in the Stalking Horse Agreement) and, unless otherwise waived by the Stalking Horse Bidder, such Approval Order shall not be subject to any stay or appeal, (ii) the Seller’s and Stalking Horse Bidder’s representations and warranties in the Stalking Horse Agreement being true and correct in all material respects, (iii) the Stalking Horse Bidder’s receipt of certain closing documents from Seller, including a bill of sale, an assignment and assumption agreement, and a lease assignment and assumption agreement, (iv) the Seller’s and Stalking Horse Bidder’s performance and compliance with the covenants in the Stalking Horse Agreement in all material respects, (v) Purchaser’s procurement of licenses or short-term leases for the |

| | |
|---|---|
| | East Rutherford Lease and Savannah Lease, and (vi) consent or approval from any applicable Governmental Body, unless, with respect to clauses (i)–(vi), otherwise waived by the Seller or Stalking Horse Bidder, as applicable. |

**PROVISIONS TO BE HIGHLIGHTED PURSUANT TO LOCAL RULE 6004-2**

26. The following chart discloses certain information required to be highlighted pursuant to Local Bankruptcy Rule 6004-2:

| Rule | Disclosure |
|---|---|
| **Qualification of Bidders**<br>*Local Rule 6004-2(b)(1)* | Any person or entity that wishes to participate in the bidding process for the any of the Assets (each, a "Potential Bidder") must first become a "Qualifying Bidder" in the reasonable discretion of the Debtors. To become a Qualifying Bidder, and thus conduct due diligence and gain access to the Debtors' confidential electronic Data Room, a Potential Bidder must submit to the Debtors and their advisors:<br><br>i. Documentation identifying the interested party, its principals, and the representatives thereof who are authorized to appear and act on their behalf for all purposes regarding the contemplated transaction;<br><br>ii. An executed nondisclosure or confidentiality agreement in form and substance satisfactory to the Debtors;<br><br>iii. A statement and other factual support demonstrating to the Debtors' reasonable satisfaction that the interested party has a *bona fide* interest in consummating a sale transaction; and<br><br>iv. Sufficient information, as determined by the Debtors, to allow the Debtors to determine that the interested party (x) has, or can obtain, the financial wherewithal and any required internal corporate, legal or other authorizations to close a sale transaction, including, but not limited to, current audited financial statements of the interested party (or such other form of financial disclosure acceptable to the Debtors in their discretion), and (y) can provide adequate assurance of future performance under any executory contracts and unexpired leases to be assumed by the Debtors and assigned to such bidder, pursuant to section 365 of the Bankruptcy Code, in connection with the Sale. |

| | |
|---|---|
| **Bid Deadline**<br>*Local Rule 6004-2(b)(2)* | October 5, 2026, at 5:00 p.m. (ET) |
| **Qualifying Bid Requirements**<br>*Local Rule 6004-2(b)(2)* | Other than in the case of the Stalking Horse Bidder, who shall be deemed to be a Qualified Bidder by virtue of the Stalking Horse Agreement, to be deemed a "Qualifying Bid," a bid must be received from a Qualifying Bidder on or before the Bid Deadline and satisfy each of the following requirements (each, a "Bid Requirement"):<br><br>i. be in writing;<br><br>ii. fully disclose the identity of the Qualifying Bidder and provide the contact information of the specific person(s) whom the Debtors or their advisors should contact in the event that the Debtors have any questions or wish to discuss the bid submitted by the Qualifying Bidder;<br><br>iii. set forth the purchase price to be paid by such Qualifying Bidder. For Qualifying Bidders seeking to purchase the Acquired Assets, such purchase price must equal or exceed $6,895,000 (i.e., the Base Purchase Price of the Stalking Horse Bid plus the Break-Up Fee and Expense Reimbursement plus $50,000) plus the value of Assumed Liabilities;<br><br>iv. not propose payment in any form other than cash (except as otherwise expressly set forth in the Bidding Procedures);<br><br>v. state the liabilities proposed to be paid or assumed by such Qualifying Bidder;<br><br>vi. specify the Assets that are included in the bid and state that such Qualifying Bidder offers to (i) purchase the Assets, and (ii) assume, if applicable, specified liabilities;<br><br>vii. specify whether the bid includes the proposed purchase of (i) some or all of the Northern Assets, (ii) some or all of the Southern Assets, or (iii) some or all of any of the Debtors' other Assets;<br><br>viii. be accompanied by an asset purchase agreement (a "Modified Agreement") marked to reflect any variations from the Stalking Horse Agreement;<br><br>ix. at the Debtors' request, allocate the bid among the assets proposed to be purchased; |

| | |
|---|---|
| | x. state that such Qualifying Bidder's offer is formal, binding and unconditional and is irrevocable until two (2) business days after the closing of the Sale;<br><br>xi. state that such Qualifying Bidder is financially capable of consummating the transactions contemplated by its bid and provide written evidence in support thereof;<br><br>xii. contain such financial and other information to allow the Debtors to make a reasonable determination as to the Qualifying Bidder's financial and other capabilities to close the transactions contemplated by the bid, including, without limitation, such financial and other information supporting the Qualifying Bidder's ability to comply with the requirements of adequate assurance of future performance under section 365(f)(2)(B), including the Qualifying Bidder's financial wherewithal and willingness to perform under any contracts and leases that are assumed and assigned to the Qualifying Bidder, in a form that allows the Debtors to serve such information on any counterparties to any contracts or leases potentially being assumed and assigned in connection with the Sale within one (1) business day after the Debtors' receipt of such information;<br><br>xiii. identify with particularity each executory contract and unexpired lease the assumption and assignment of which is a condition to close the transactions contemplated by the Qualifying Bidder's bid;<br><br>xiv. contain a commitment to close the transactions contemplated by the Qualifying Bidder's bid by no later than November 13, 2026;<br><br>xv. not request or entitle such Qualifying Bidder to any break-up fee, termination fee, expense reimbursement or similar type of fee or payment;<br><br>xvi. not contain any contingencies of any kind, including, without limitation, contingencies related to financing, internal approval or due diligence;<br><br>xvii. contain written evidence satisfactory to the Debtors, in consultation with the Committee, that the Qualifying Bidder has a firm, non-conditional commitment for financing or other evidence of the ability to close the |

| | | |
|---|---|---|
| | | transactions contemplated by its bid, with appropriate contact information for such financing sources; |
| | xviii. | contain a written acknowledgement and representation that the Qualifying Bidder (i) has had an opportunity to conduct any and all due diligence regarding the Assets it seeks to acquire, (ii) has relied solely upon its own independent review, investigation and/or inspection of any documents and other information in making its Qualifying Bid, and (iii) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Assets, or the completeness of any documents or other information provided in connection with the Bidding Procedures and the Sale; |
| | xix. | sets forth (i) a statement or evidence that the Qualifying Bidder, if required, has made or will make in a timely manner all necessary filings under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, if applicable, and pay the fees associated with such filings, and (ii) any regulatory and third-party approval required for the Qualifying Bidder to close the transactions contemplated by the bid, and the time period within which the Qualifying Bidder expects to receive such regulatory and third-party approvals (and in the case that receipt of any such regulatory or third-party approval is expected to take more than five (5) days following execution and delivery of such transaction documents contemplated by the bid, those actions the bidder will take to ensure receipt of such approval(s) as promptly as possible); provided that a Qualifying Bidder agrees that its legal counsel will coordinate in good faith with Debtors' counsel to discuss and explain Qualifying Bidder's regulatory analysis, strategy, and timeline for securing all such approvals as soon as reasonably practicable; provided, further that the offer contains a covenant to cooperate with the Debtors to provide pertinent factual information regarding the bidder's operations reasonably required to analyze issues arising with respect to any applicable antitrust laws and other applicable regulatory requirements; |
| | xx. | provides for the Qualifying Bidder to serve as a backup bidder (the "Back-Up Bidder") if the Qualifying Bidder's bid is the next highest and best bid (the "Back-Up Bid") |

| | |
|---|---|
| | after the Successful Bid;<br><br>xxi. includes written evidence of authorization and approval from the Qualifying Bidder's board of directors (or comparable governing body) with respect to the submission, execution, and delivery of the bid and the transactions contemplated therein;<br><br>xxii. provides a deposit (the "Deposit") equal to 10% of the proposed purchase price; and<br><br>xxiii. provides that the Deposit shall be forfeited to the Debtors in the event of the Qualifying Bidder's breach of, or failure to perform under, the Qualifying Bidder's bid, including any agreements set forth in such bid, without prejudice to any and all other rights and remedies of the Debtors. |
| **Good Faith Deposit**<br>*Local Rule 6004-2(b)(2)* | A Qualifying Bidder must submit a Deposit equal to 10% of the proposed purchase price. |
| **Stalking Horse Bid Protections**<br>*Local Rule 6004-2(b)(3)* | The Stalking Horse Bidder is entitled to the following bid protections (the "Bid Protections"):<br><br>(1) a Break-Up Fee equal to 3% of the Base Purchase Price, payable to Purchaser if the parties execute the Stalking Horse Agreement and Seller consummates an Alternative Transaction, to be paid at the closing of any such Alternative Transaction solely from the proceeds of such sale and before any distribution to Seller or its secured parties of closing proceeds;<br>(2) an Expense Reimbursement in the amount not to exceed $150,000 for Purchaser's reasonable and documented out-of-pocket expenses incurred in connection with negotiating, documenting the transaction, and participating in the sale process, to be paid at the closing of any Alternative Transaction solely from the proceeds of such sale and before any distribution to Seller or its secured parties of closing proceeds;<br>(3) an initial overbid requirement of at least $50,000 above the Base Purchase Price;<br>(4) minimum bid increments of $50,000 for any subsequent bids at auction. For the avoidance of doubt, the Bidding Procedures Order must require that any topping bid by a qualified bidder shall exceed the sum of the Base Purchase Price, the Break-Up Fee, the Expense Reimbursement, and the initial overbid amount. |
| **Modification of Bidding and Auction Procedures** | The Debtors and their estates reserve the right, after consultation with the Committee and any professional retained by the Debtors |

| | |
|---|---|
| *Local Rule 6004-2(b)(4)* | or Committee (collectively, the "Consultation Parties"), to modify the Bidding Procedures at, before, or during the Auction, including, without limitation, to extend the deadlines set forth in this Motion, modify bidding increments, waive terms and conditions set forth herein with respect to any or all potential bidders (including, without limitation, the Bid Requirements), impose additional terms and conditions with respect to any or all Potential Bidders, adjourn or cancel the Auction at or before the Auction, and adjourn the Sale Hearing; provided, however, that the Debtors shall not modify the terms of the Stalking Horse Agreement or the Bid Protections associated with same, and provided further that such extensions or modification are not materially inconsistent with this Bidding Procedures Order. The Debtors shall file a notice on the Court's docket promptly upon any material modification to the Bidding Procedures, including any modification to the dates or deadlines set forth therein. |
| **Closing with Alternative Back-Up Bidders**<br>*Local Rule 6004-2(b)(5)* | In the event that the Successful Bidder fails to close the applicable Sale on or before November 13, 2026 (or such date as may be extended by the Debtors, in consultation with the Consultation Parties), the Back-Up Bid will be deemed to be the Successful Bid, the Back-Up Bidder will be deemed to be the Successful Bidder, and the Debtors shall be authorized, but not directed, to close the applicable Sale to the Back-Up Bidder subject to the terms of the Back-Up Bid without the need for further order of the Court and without the need for further notice to any interested parties. |

## THE BIDDING PROCEDURES

27. The Debtors desire to receive the greatest value for the Northern Assets, the Southern Assets, and all other Assets. The Debtors intend to offer all or substantially all the Debtors' Assets for sale pursuant to a value-maximizing section 363 sale process aimed at achieving the highest or otherwise best bids.

28. In addition to the provisions highlighted in the above chart, certain of the key terms of the Bidding Procedures, which shall apply to Potential Bidders, Qualifying Bidders, the submission, receipt, and analysis of all bids relating to the Sale, and the conduct of the Sale and the Auction, are included below:

a. **Qualification as Bidder**: Any Potential Bidder must first become a Qualifying

Bidder in accordance with the process outlined in the chart above. Notwithstanding anything to the contrary herein, and for the avoidance of doubt, for all purposes under the Bidding Procedures: (i) the Stalking Horse Bidder is a Qualifying Bidder, and the Stalking Horse Agreement is a Qualifying Bid; and (ii) in determining whether the Potential Bidders constitute Qualifying Bidders, the Debtors may consider a combination of bids for the Assets, but regardless of whether such bid or bids are for the Northern Assets, the Southern Assets, or all of the Assets, such bids must account for the Bid Protections and any payments that may be required to be made to the Stalking Horse Bidder thereunder.

b. **Due Diligence**: The Debtors will provide any Qualifying Bidders with reasonable access to the Data Room and any other additional information that the Debtors believe to be reasonable and appropriate under the circumstances. All additional due diligence requests shall be directed to: (i) Joseph Compitello (joscompitello@gmail.com) and Nicholas Jalowski (nbj@cambridgefinancialcorp.com); and (ii) Stephen B. Ravin (Stephen.ravin@saul.com), Jeffrey Hampton (jeffrey.hampton@saul.com), and Turner N. Falk (turner.falk@saul.com). The due diligence period shall extend through and including the Bid Deadline. The Debtors may, but shall not be obligated to, in their sole discretion, furnish any due diligence information after the Bid Deadline. The Debtors reserve the right, in their reasonable discretion, to withhold or limit access to any due diligence information that the Debtors determine is business-sensitive or otherwise not appropriate for disclosure to a Qualifying Bidder. Notwithstanding any prepetition limitations, including, without limitation, any nondisclosure, confidentiality or similar provisions relating to any due diligence information, the Debtors and their estates shall be authorized to provide due diligence information to Qualifying Bidders provided that such Qualifying Bidders have delivered an executed confidentiality agreement in form and substance acceptable to the Debtors. The Debtors and their estates are not responsible for, and shall have no liability with respect to, any information obtained by, or provided to, any Qualifying Bidders in connection with the Bidding Procedures and the Sale.

c. **Bid Requirements**.

i. *Qualifying Bid*. Other than in the case of the Stalking Horse Bid, which is deemed to be a Qualifying Bid, a bid must be received from a Qualifying Bidder on or before the Bid Deadline and satisfy the Bid Requirements set forth in the chart above.

A bid from a Qualifying Bidder satisfying all of the above requirements, as determined by the Debtors, in consultation with the Consultation Parties, shall constitute a Qualifying Bid. The Debtors reserve the right to work with any Qualifying Bidder in advance of the Auction to cure any deficiencies in a bid that is not initially deemed a Qualifying Bid.

Each Qualifying Bidder submitting a bid shall be deemed to: (a) acknowledge and represent that it is bound by all of the terms and conditions of the Bidding Procedures; (b) have waived the right to pursue a substantial contribution claim under section 503 of the Bankruptcy Code related in any way to the submission of its bid, the Bidding Procedures, and the Sale; (c) have waived any right to a jury trial in connection with, and consented and submitted to the exclusive jurisdiction of the Court over, any actions or proceedings arising from or relating to its bid, the Bidding Procedures, the Sale, the Auction and the construction and enforcement of the contemplated transaction documents of the Auction Bidders (as defined below); (d) agree to bring any such action or proceeding in the Court; and (e) have consented to the Court entering a final judgment determining any such action or proceeding and that such final judgment in any such action or proceeding, including all appeals, shall be conclusive and may be enforced in other jurisdictions (including any foreign jurisdictions) by suit on the judgment or in any other manner provided by applicable law.

ii. *Credit Bid.* Any Potential Bidder that has a valid and perfected lien on any assets of the Debtors' estates (a "Secured Creditor") shall have the right to credit bid all or a portion of the value of such Secured Creditor's claims within the meaning of section 363(k) of the Bankruptcy Code; *provided* that a Secured Creditor shall have the right to credit bid its claim only with respect to the collateral by which such Secured Creditor is secured; and *provided further* that any credit bid by a Secured Creditor shall contain a cash component sufficient to repay in full the secured claims of a Secured Creditor, if any (unless such senior Secured Creditor agrees to a different treatment).

iii. *Bid Deadline*. A Qualifying Bidder, other than the Stalking Horse Bidder, that desires to make a bid shall deliver a written and electronic copy of its bid in both PDF and MS-WORD format to the Bidding Procedures Notice Parties and the Consultation Parties so as to be received on or before **October 5, 2026, at 5:00 p.m. (ET)** (the "Bid Deadline"); provided that the Debtors may extend the Bid Deadline without further order of the Court, after consultation with the Consultation Parties; provided that such extension is not materially inconsistent with the Bidding Procedures Order. To the extent that the Bid Deadline is extended for all parties, the Debtors shall file a notice on the docket of these Chapter 11 Cases indicating the same. **Any party that does not submit a bid by the Bid Deadline will not be allowed to (a) submit any offer after the Bid Deadline, or (b) participate in the Auction**.

iv. *Evaluation of Qualifying Bids*. The Debtors will deliver, within one (1) business day after receipt thereof, copies of all bids from Qualifying Bidders to the Consultation Parties. The Debtors, after consultation with the Consultation Parties, shall make a determination regarding whether a timely submitted bid from a Qualifying Bidder is a Qualifying Bid. No later than

**October 7, 2026, at 5:00 p.m. (ET)**, the Debtors shall: (i) notify all Qualifying Bidders whether their bids have been determined to be a Qualifying Bid; and (ii) determine, in consultation with the Consultation Parties, which of the Qualifying Bids, at such time, is the highest or best bid for purposes of constituting the opening bid of the Auction (the "Baseline Bid" and the Qualifying Bidder submitting the Baseline Bid, the "Baseline Bidder") and shall promptly notify the Stalking Horse Bidder and all Qualifying Bidders with Qualifying Bids of the Baseline Bid and that the Debtors are proceeding with the Auction. Subject to the Stalking Horse Agreement, the Debtors reserve the right to withdraw any Assets from the sale process at any time before the Auction.

v. *No Qualifying Bids*. If no Qualifying Bids other than the Stalking Horse Bid for certain of the Assets are submitted on or before the Bid Deadline, then the Debtors shall not hold an Auction as to those Assets and shall request at the Sale Hearing that the Court approve the Stalking Horse Agreement and the transaction contemplated thereunder.

d. **Auction**: If the Debtors receive one or more timely Qualifying Bids for the same Assets, then the Debtors shall conduct the Auction. Following the Auction, the Debtors will determine, in consultation with the Consultation Parties, which Qualifying Bid is the highest or best bid for the applicable Assets, which will be determined by considering, among other things, the following non-binding factors: (i) the total consideration to be received by the Debtors and their estates; (ii) the transaction structure and execution risk, including conditions to, timing of and certainty of closing, termination provisions, availability of financing and financial wherewithal to meet all commitments, and required governmental or other approval; (iii) the net benefit to the Debtors' estates; and (iv) any other factors the Debtors may reasonably deem relevant. The Auction shall be governed by the following procedures:

i. the Auction shall be held on **October 13, 2026, at 10:00 a.m. (ET)** (i) at the offices of Saul Ewing LLP, 1735 Market Street, 34th Floor, Philadelphia, Pennsylvania 19103 or (ii) on such other date and/or at such other location or by virtual means as determined by the Debtors in consultation with the Consultation Parties;

ii. only the Qualifying Bidders with Qualifying Bids (the "Auction Bidders"), shall be entitled to make any subsequent bids at the Auction;

iii. each Auction Bidder must attend the Auction, either on its own behalf or through a duly authorized representative with power to bind such Auction Bidder at the Auction;

iv. only the Debtors, the Auction Bidders, the Consultation Parties, and all creditors of the Debtors, together with the professional advisors to each of the foregoing parties, may attend the Auction; provided that any such

creditors provide counsel for the Debtors one (1) day's prior written notice of their intent to attend the Auction, including the name, title, contact information, and affiliation of any individual attending on behalf of such creditor; provided that creditors may only attend the Auction to observe the proceedings and shall not be entitled to participate; provided further that the Debtors' right to object on an emergency basis to any such creditor's proposed attendance at the Auction is reserved;

v. the Debtors and their professional advisors shall direct and preside over the Auction, which shall be transcribed;

vi. the Auction Bidders shall confirm on the record that they have not engaged in any collusion with respect to their bid, the Bidding Procedures, the Auction or the Sale;

vii. bidding shall commence at the amount of the Baseline Bid, and subsequently continue in minimum increments of at least $50,000 (each, an "<u>Overbid</u>"), provided that: (i) each Overbid must be a Qualifying Bid; and (ii) the Debtors shall retain the right to modify the bid increment requirements at the Auction, provided further, for the avoidance of doubt, that the Debtors have the right to impose different bid increments for the Northern Assets and Southern Assets;

viii. any Overbid must remain open and binding on the Qualifying Bidder until and unless (i) the Debtors accept a higher or otherwise better bid submitted by another Qualifying Bidder during the Auction as an Overbid and (ii) such Overbid is not selected as the Back-Up Bid;

ix. the Auction may include separate discussions or negotiations with any of the Auction Bidders, but all bids shall be made on the record and in the presence of all Auction Bidders;

x. all material terms of the bid that is deemed to be the highest or otherwise best bid for Assets for each round of bidding shall be fully disclosed to the Auction Bidders, and the Debtors shall use reasonable efforts to clarify any and all questions that the Auction Bidders may have regarding the Debtors' announcement of the then-current highest and best bid;

xi. the Debtors and their professional advisors, in consultation with the Consultation Parties, may employ and announce at the Auction additional or modified procedural rules that are reasonable under the circumstances (e.g., the amount of time allotted to make subsequent bids) for conducting the Auction; provided that such rules are (i) not materially inconsistent with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, or any applicable order of the Court entered in connection with these Chapter 11 Cases, including, without limitation, the Bidding Procedures Order, and (ii) disclosed to the Auction Bidders; provided further that such rules shall not

modify the terms of the Stalking Horse Agreement or the Bid Protections, provided further, for the avoidance of doubt, that the Debtors shall file a notice on the Court's docket promptly upon any material modification to the Bidding Procedures, including any modification to the dates or deadlines set forth therein;

xii. each Auction Bidder shall (i) be deemed to have waived any right to a jury trial in connection with, and consented and submitted to the exclusive jurisdiction of the Court over, any actions or proceedings arising from or relating to the Bidding Procedures, the Sale, the Auction and the construction and enforcement of the contemplated transaction documents of the Auction Bidders, (ii) bring any such action or proceeding in the Court, and (iii) be deemed to have consented to the Court entering a final judgment determining any such action or proceeding and that such final judgment in any such action or proceeding, including all appeals, shall be conclusive and may be enforced in other jurisdictions (including any foreign jurisdictions) by suit on the judgment or in any other manner provided by applicable law;

xiii. the Auction Bidders shall have the right to make additional modifications to their Qualifying Bid in each round of bidding during the Auction, provided that (i) any such modifications on an aggregate basis and viewed in whole, shall not, in the Debtors' discretion, in consultation with the Consultation Parties, be less favorable to the Debtors and their estates than the terms of the Stalking Horse Agreement, and (ii) each Qualifying Bid shall constitute an irrevocable offer and shall be binding on the Auction Bidder submitting such bid until such party shall have submitted a subsequent Qualifying Bid at the Auction or the conclusion of the Sale Hearing, whichever occurs sooner, unless such bid is selected as the Successful Bid or the Back-Up Bid, which shall remain binding as provided for herein;

xiv. the Debtors and the Consultation Parties shall have the right to request any additional financial information that will enable the Debtors and the Consultation Parties to make a reasonable determination as to an Auction Bidder's financial and other capabilities to consummate its proposed Qualifying Bid, as it may be amended during the Auction and any further information that the Debtors may believe is reasonably necessary to clarify and evaluate any bid made by an Auction Bidder during the Auction;

xv. upon the conclusion of the Auction, the Debtors shall determine, in consultation with the Consultation Parties, subject to Court approval, the offer or offers for the Assets that is or are the highest or otherwise best from among the Qualifying Bids submitted at the Auction (the "<u>Successful Bid(s)</u>"). In making this decision, the Debtors may consider, in consultation with the Consultation Parties, among other things, the amount of the purchase price, the likelihood of the bidder's ability to close a transaction and the timing thereof, the number, type and nature of any changes to the

Stalking Horse Agreement requested by each bidder, and the net benefit to the Debtors' estates. The bidder(s) submitting such Successful Bid(s) shall become the "Successful Bidder(s)." The Debtors may, in consultation with the Consultation Parties, designate one or more Back-Up Bids (and the corresponding Back-Up Bidder(s)) to purchase the Assets in the event that the Successful Bidder(s) do not close the Sale(s); and

xvi. before the Sale Hearing, the Successful Bidder(s) and any Back-Up Bidder(s) shall complete and execute all agreements, contracts, instruments and other documents evidencing and containing the terms and conditions upon which the Successful Bid was made.

**THE SUCCESSFUL BID(S) AND ANY BACK-UP BID(S) SHALL CONSTITUTE AN IRREVOCABLE OFFER AND BE BINDING ON THE SUCCESSFUL BIDDER(S) AND THE BACK-UP BIDDER(S), RESPECTIVELY, FROM THE TIME THE BID IS SUBMITTED UNTIL TWO (2) BUSINESS DAYS AFTER THE SALE HAS CLOSED. EACH QUALIFYING BID THAT IS NOT A SUCCESSFUL BID OR BACK-UP BID SHALL BE DEEMED WITHDRAWN AND TERMINATED AT THE CONCLUSION OF THE SALE HEARING.**

**e.** **Sale Hearing**: The Successful Bid(s) and any Back-Up Bid(s) (or if no Qualifying Bid other than the Stalking Horse Bid is received, then the Stalking Horse Bid as the Successful Bid) will be subject to approval by the Court. The Sale Hearing to approve the Successful Bid(s) and any Back-Up Bid(s) shall take place on **October 20, 2026 at 10:00 a.m. (ET)**, subject to Court availability. The Sale Hearing may be adjourned by the Debtors from time to time without further notice to creditors or other parties in interest other than by announcement of the adjournment in open court on the date scheduled for the Sale Hearing, or by filing a notice on the docket of these cases.

**f.** **Back-Up Bidder**: Notwithstanding any of the foregoing, in the event that the Successful Bidder fails to close a Sale on or before November 13, 2026 (or such date as may be extended by the Debtors, in consultation with the Consultation Parties), the Back-Up Bid will be deemed to be the Successful Bid, the Back-Up Bidder will be deemed to be the Successful Bidder, and the Debtors are authorized, but not directed, to close the Sale to the Back-Up Bidder subject to the terms of the Back-Up Bid without the need for further order of the Court and without the need for further notice to any interested parties.

**g.** **Return of Deposits**: All Deposits shall be returned to each bidder not selected by the Debtors as the applicable Successful Bidder no later than five (5) business days following the closing of the applicable Sale. The deposit of the Successful Bidder or, if the Sale is closed with the Back-Up Bidder, the deposit of the Back-Up Bidder, shall be applied to the purchase price for the Sale. If the Successful Bidder(s) (or, if any Sale is to be closed with the Back-Up Bidder, then the Back-Up Bidder) fails

to consummate the Sale because of a breach or failure to perform on the part of such bidder, then, the Debtors and their estates shall be entitled to retain the Deposit of the Successful Bidder (or, if the Sale is to be closed with the Back-Up Bidder, then the Back-Up Bidder) as part of the damages resulting to the Debtors and their estates for such breach or failure to perform. For the avoidance of doubt, the Debtors' retention of a Deposit shall not constitute a waiver of any of the Debtors' legal or equitable rights relating to a Successful Bidder's or Back-Up Bidder's breach or failure to close and all such rights and remedies are preserved.

**h.** **Reservation of Rights**: Notwithstanding any of the foregoing, the Debtors and their estates reserve the right, after consultation with the Consultation Parties, to modify the Bidding Procedures at, before, or during the Auction, including, without limitation, to extend the deadlines set forth herein, modify bidding increments, waive terms and conditions set forth herein with respect to any or all potential bidders (including, without limitation, the Bid Requirements), impose additional terms and conditions with respect to any or all Potential Bidders, adjourn or cancel the Auction at or before the Auction, and adjourn the Sale Hearing; provided that such extensions or modifications are not materially inconsistent with the Bidding Procedures Order and provided that the Debtors shall file a notice on the Court's docket promptly upon any material modification to the Bidding Procedures, including any modification to the dates or deadlines set forth therein.

29. The Debtors, in consultation with their advisors, believe that the timeline set forth in the Bidding Procedures will provide parties with sufficient time to obtain information necessary to formulate a competitive bid, maximizing the prospect that the Debtors will receive offers that will benefit the Debtors' estates and their stakeholders. The Debtors submit that the sale process is reasonable in time and scope, and will permit sufficient time for any interested bidders to conduct their due diligence with respect to the Northern Assets, Southern Assets, and all other Assets, and formulate bids therefor. Accordingly, the Debtors believe the relief requested in this Motion is in the best interest of the Debtors' estates, will provide interested parties with sufficient opportunity to participate, and thus should be approved.

## FORM AND MANNER OF SALE NOTICE

30. Within five (5) business days of entry of the Bidding Procedures Order, the Debtors will serve the Sale Notice on the following parties or their respective counsel, if known (collectively, the "Sale Notice Parties"): (i) the Office of the United States Trustee for the District



57187749.13

of New Jersey; (ii) counsel to the DIP lender; (iii) all parties known by the Debtors to assert a lien on any of the Assets; (iv) all persons known or reasonably believed to have asserted an interest in any of the Assets; (v) all persons known or reasonably believed to have expressed an interest in acquiring all or a substantial portion of the Assets within the one (1) year prior to the Petition Date; (vi) the Office of the United States Attorney for the District of New Jersey; (vii) the Office of the Attorney General in each state in which the Debtors operate; (viii) the Office of the Secretary of State in each state in which the Debtors operate; (ix) all taxing authorities having jurisdiction over any of the Assets, including the Internal Revenue Service; (x) all environmental authorities having jurisdiction over any of the Assets; (xi) the Federal Trade Commission; (xii) the United States Attorney General/Antitrust Division of Department of Justice; (xiii) all non-Debtor parties to any of the Assumed Contracts; (xiv) counsel for the Stalking Horse Bidder, Bradley Arant Boult Cummings LLP, Promenade Tower, 1230 Peachtree Street NE, Atlanta, Georgia 30309, Attn. Sean C. Kulka (sean.kulka@bradley.com) and Riker Danzig LLP, 7 Giralda Farms, Suite 250, Madison, NJ 07940-1051, Attn: Joseph L. Schwartz (jschwartz@riker.com) and John Harmon (jharmon@riker.com); (xv) the Pennsylvania Liquor Control Board; (xvi) State of New Jersey Department of Law and Public Safety, Division of Alcoholic Beverage Control; (xvii) all of the Debtors' other known creditors and equity security holders; and (xviii) all parties that have filed a notice of appearance and demand for service of papers in these Chapter 11 Cases as of the service date.

31. Additionally, as soon as practicable after entry of the Bidding Procedures Order, the Debtors shall cause the Sale Notice to be published once in the national edition of *USA Today*, and the local newspaper for the locations of each of the Debtors' facilities: (i) Jersey City, New Jersey; (ii) East Rutherford, New Jersey; (iii) Levittown, Pennsylvania; and (iv) Savannah,

Georgia. This publication notice will provide notice of the Sale to any other creditors or interested parties whose identities are unknown to the Debtors.

## SALE HEARING AND SALE OBJECTION DEADLINE

32. The Debtors intend to present the Stalking Horse Bid or other Successful Bid(s) for approval by the Court pursuant to sections 105, 363 and 365 of the Bankruptcy Code at the Sale Hearing. The Debtors respectfully request that the Sale Hearing be scheduled on or about **October 20, 2026, at 10:00 a.m. (ET)**. Upon the failure to consummate a sale of Assets after the Sale Hearing because of the occurrence of a breach or default under the terms of the Successful Bid(s) or the non-approval of this Court, the next highest or otherwise best Back-Up Bid(s), if any, as disclosed at the Sale Hearing, shall be deemed the Successful Bid(s) without further order of the Court, and the parties shall be authorized to consummate the transaction contemplated by the Back-Up Bid(s).

33. The Debtors further request that any and all objections to a Sale of Assets and entry of a Sale Order (a "Sale Objection"): (i) be made in writing; (ii) state with particularity the grounds for the response or objection; (iii) conform to the Bankruptcy Rules and the Local Bankruptcy Rules; (iv) be filed with the Court no later than **4:00 p.m. (ET), 21 days following mailing of the Sale Notice** (the "Sale Objection Deadline"); and (v) be served on the following parties (collectively, the "Objection Notice Parties"): (A) Office of the United States Trustee for the District of New Jersey, Attn: Fran Steele (Fran.B.Steele@usdoj.gov) and David Gerardi (David.Gerardi@usdoj.gov), One Newark Center, Suite 2100, Newark, NJ 07102; (B) Debtors' counsel, Saul Ewing LLP, One Riverfront Plaza, 1037 Raymond Boulevard, Suite 1520, Newark, NJ 07102 (Attn: Jeffrey Hampton (jeffrey.hampton@saul.com), Turner N. Falk (turner.falk@saul.com), and Stephen B. Ravin (stephen.ravin@saul.com); (C) counsel to the

Committee, FBT Gibbons LLP, One Gateway Center, Newark, NJ 07102, Attn: John S. Mairo (jmairo@fbtgibbons.com) and Christopher P. Anton (canton@fbtgibbons.com); (D) counsel for the Stalking Horse Bidder, Bradley Arant Boult Cummings LLP, Promenade Tower, 1230 Peachtree Street NE, Atlanta, Georgia 30309, Attn. Sean C. Kulka (sean.kulka@bradley.com) and Riker Danzig LLP, 7 Giralda Farms, Suite 250, Madison, NJ 07940-1051, Attn: Joseph L. Schwartz (jschwartz@riker.com) and John Harmon (jharmon@riker.com); and (E) counsel for any other Successful Bidders.

**ASSUMPTION AND ASSIGNMENT PROCEDURES**

34. To facilitate the Sale(s), the Debtors seek authority to assume and assign to the Successful Bidder(s), the Assumed Contracts in accordance with the Assumption and Assignment Procedures.

35. The Assumption and Assignment Procedures are as follows:

a. Within five (5) business days following entry of the Bidding Procedures Order (the "Contract Notice Deadline"), the Debtors shall file with the Court and serve on each counterparty to an Assumed Contract (each, a "Counterparty," and collectively, the "Counterparties") a notice of each executory contract and unexpired lease that may be assumed as part of the proposed sale (the "Contract Notice").

b. The Contract Notice shall include, without limitation, the cure amount, as of the Petition Date (each, a "Cure Amount"), if any, that the Debtors believe is required to be paid to the applicable Counterparty under section 365(b)(1)(A) and (B) of the Bankruptcy Code for each of the Assumed Contracts. If a Counterparty objects to (i) the proposed assumption and assignment of the Counterparty's Assumed Contract, (ii) the proposed Cure Amount for its Assumed Contract or (iii) the provision of adequate assurance of future performance, the Counterparty must file with the Court and serve on the Objection Notice Parties a written objection (a "Contract Objection").

c. Any Contract Objection shall: (i) be in writing; (ii) comply with the Bankruptcy Code, Bankruptcy Rules, the Local Bankruptcy Rules and all orders of the Court entered in these chapter 11 cases; (iii) state the basis for such objection; (iv) if such objection is to the Cure Amount, state with specificity what Cure Amount the Counterparty believes is required (in all cases, with appropriate documentation in support thereof); and (v) be filed with the Court and served

on the Objection Notice Parties by no later than **4:00 p.m. (ET) twenty-one (21) days following mailing of the Contract Notice** (the "Contract Objection Deadline").

***Any objections to adequate assurance of performance by the Stalking Horse Bidder shall be filed by the Contract Objection Deadline.***

***Any objections to adequate assurance of future performance by a Successful Bidder other than the Stalking Horse Bidder shall be filed in accordance with subparagraph (e) below.***

d. As soon as reasonably practicable after the completion of the Auction, or to the extent an Auction is not necessary, then after the Debtors' determination of the Qualifying Bids (in consultation with the Consultation Parties), the Debtors shall file with the Court a notice identifying the Successful Bidder(s) (a "Notice of Successful Bidder(s)"), which shall set forth, among other things, (i) the Successful Bidder(s) and Back-Up Bidder(s) (if any), (ii) the Selected Assumed Contracts, and (iii) the proposed assignee(s) of such Selected Assumed Contracts. For the avoidance of doubt, if the Debtors do not timely receive any Qualifying Bids for the Assets other than the Stalking Horse Bid, the Stalking Horse Bidder shall be deemed the Successful Bidder for the Acquired Assets (as defined in the Stalking Horse Agreement).

e. As soon as reasonably practicable after the completion of the Auction or, to the extent an Auction was not necessary, after the Debtors' determination of the Qualifying Bids (in consultation with the Consultation Parties), the Debtors will cause to be served by overnight mail upon each affected Counterparty and its counsel (if known) the Notice of Successful Bidder(s).

***Contract Objections solely on the basis of adequate assurance of future performance shall be filed not later than October 14, 2026 at noon (ET), except with respect Contract Objections to the Stalking Horse Bidder's adequate assurance of future performance, which shall be filed not later than the Contract Objection Deadline.***

f. At the Sale Hearing, the Debtors will seek Court approval of their assumption and assignment to the Successful Bidder(s) of only those Assumed Contracts that have been selected by the Successful Bidder(s) to be assumed and assigned (the "Selected Assumed Contracts"). The Debtors and their estates reserve any and all rights with respect to any Assumed Contracts that are not ultimately designated as Selected Assumed Contracts.

g. If no Contract Objection is timely received with respect to a Selected Assumed Contract: (i) the Counterparty to such Selected Assumed Contract shall be deemed to have consented to the assumption by the Debtors and assignment to the Successful Bidder of the Selected Assumed Contract, and be forever barred from asserting any objection with regard to such assumption and assignment

(including, without limitation, with respect to adequate assurance of future performance by the Successful Bidder); (ii) any and all defaults under the Selected Assumed Contract and any and all pecuniary losses related thereto shall be deemed cured and compensated pursuant to section 365(b)(1)(A) and (B) of the Bankruptcy Code; and (iii) the Cure Amount for such Selected Assumed Contract shall be controlling, notwithstanding anything to the contrary in such Selected Assumed Contract, or any other related document, and the Counterparty shall be deemed to have consented to the Cure Amount and shall be forever barred from asserting any other claims related to such Selected Assumed Contract against the Debtors and their estates or the Successful Bidder, or the property of any of them, that existed prior to the date that the Contract Notice is filed. Notwithstanding the foregoing, the Debtors shall remain obligated to any Counterparty of a Selected Assumed Contract for any amounts that may arise under such contract or lease between the date of the Contract Notice and Closing. Amounts owed by the Debtors after the Petition Date may be entitled to administrative expense status pursuant to 11 U.S.C. § 503(b).

h. To the extent that the parties are unable to consensually resolve any Contract Objection prior to the commencement of the Sale Hearing, including, without limitation, any dispute with respect to the cure amount required to be paid to the applicable Counterparty under section 365(b)(1)(A) and (B) of the Bankruptcy Code (any such dispute, a "<u>Cure Dispute</u>"), such Contract Objection will be adjudicated at the Sale Hearing or at such other date and time as may be determined by the Debtors or fixed by the Court; *provided*, *however*, that if the Contract Objection relates solely to a Cure Dispute, the Selected Assumed Contract may be assumed by the Debtors and assigned to the applicable Successful Bidder provided that the cure amount that the Counterparty asserts is required to be paid under section 365(b)(1)(A) and (B) of the Bankruptcy Code (or such lower amount as agreed to by the Counterparty) is deposited in a segregated account by the Debtors or the applicable Successful Bidder, pending the Court's adjudication of the Cure Dispute or the parties' consensual resolution of the Cure Dispute.

i. Notwithstanding anything to the contrary herein, if after the Sale Hearing or the entry of the Sale Order additional executory contracts or unexpired leases of the Debtors are determined to be Assumed Contracts, as soon as practicable thereafter, the Debtors shall file with the Court and serve, by overnight delivery, on the Counterparties a supplemental Contract Notice, and such Counterparties shall file any Contract Objections not later than fourteen (14) days thereafter. If no Contract Objection is timely received, the Debtors shall be authorized to assume and assign such Assumed Contracts to the applicable Successful Bidder without further notice to creditors or other parties in interest and without the need for further order of the Court, and such assumption and assignment shall be subject to the terms of the Sale Order.

## <u>**BASIS FOR RELIEF**</u>

**I. The Bid Procedures are appropriate and will maximize value for the Debtors' estates.**

36. The key objective in any sale of property of a debtor's estate is to maximize the value received by the estate. *See In re Mushroom Transp. Co.*, 382 F.3d 325, 339 (3d Cir. 2004) (finding that debtor "had a fiduciary duty to protect and maximize the estate's assets"); *In re Food Barn Stores, Inc.*, 107 F.3d 558, 564–65 (8th Cir. 1997) (recognizing that a main goal of any proposed sale of property of a debtor's estate is to maximize value). Procedures used to enhance competitive bidding support this objective and, therefore, are appropriate in the context of bankruptcy sales. *See Calpine Corp. v. O'Brien Envtl. Energy, Inc.*, 181 F.3d 527, 536–37 (3d Cir. 1999) (noting that bidding procedures that promote competitive bidding provide a benefit to a debtor's estate); *see also Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 659 (S.D.N.Y. 1992) (stating that bidding procedures "encourage bidding and . . . maximize the value of the debtor's assets").

37. The Debtors have designed the Bidding Procedures to promote a competitive and fair bidding process and, thus, to maximize value for the Debtors' estates, creditors, and all other stakeholders. The Bidding Procedures will allow the Debtors to conduct the Auction in a controlled, fair and open fashion that will encourage participation by financially capable bidders, thereby increasing the likelihood that the Debtors will receive the highest or best possible consideration for the Assets. Furthermore, the Bidding Procedures provide an appropriate framework for the Debtors to review, analyze, and compare any bids received in order to determine which bids are in the best interests of the Debtors' estates, their creditors, and all stakeholders.

38. The Debtors submit that the Bidding Procedures are fair and transparent and will derive the highest or best bids for the Assets. Therefore, the Debtors request that the Court approve the Bidding Procedures.

**II. The Bid Protections have a sound business purpose and should be approved.**

39. The paramount goal in any proposed sale of property of a debtor is to maximize the proceeds received by the estate. *See generally In re Cont'l Airlines*, 91 F.3d 553, 565 (3d Cir. 1996) (acknowledging a "strong public policy in favor of maximizing debtors' estates and facilitating successful reorganization, reflected in the Code itself ..."). To that end, courts have recognized that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and, therefore, are appropriate in the context of bankruptcy sales. *See In re Edwards*, 228 B.R. 552, 561 (Bankr. E.D. Pa. 1998) ("The purpose of procedural bidding orders is to facilitate an open and fair public sale designed to maximize value for the estate.").

40. The use of a stalking horse in a public auction process for dispositions pursuant to section 363 of the Bankruptcy Code is a customary practice in chapter 11 cases, as the use of a stalking horse bid is, in many circumstances, the best way to maximize value in an auction process by "establish[ing] a framework for competitive bidding and facilitat[ing] a realization of that value." *Official Comm. of Unsecured Creditors v. Interforum Holding LLC*, 2011 WL 2671254, at *1 (E.D. Wis. July 7, 2011); *see also AgriProcessors, Inc. v. Fokkena (In re Tama Beef Packing, Inc.)*, 321 B.R. 496, 497–98 (B.A.P. 8th Cir. 2005).

41. Stalking horse bidders often require break-up fees and, in many cases, other forms of bid protections as an inducement for "setting the floor at auction, exposing its bid to competing bidders, and providing other bidders with access to the due diligence necessary to enter into an asset purchase agreement." *Interforum Holding*, 2011 WL 2671254, at *1 (citations omitted). Thus, the use of bid protections has become an established practice in chapter 11 cases.

42. Indeed, break-up fees and other forms of bid protections are a normal and, in many cases, necessary, components of significant dispositions conducted under section 363 of the

Bankruptcy Code. "Break-up fees are important tools to encourage bidding and to maximize the value of the debtor's assets . . . . In fact, because the . . . corporation has a duty to encourage bidding, break-up fees can be necessary to discharge [such] duties to maximize value." *In re Integrated Res., Inc.*, 147 B.R. at 659–60 (emphasis added). Specifically, bid protections may be necessary to convince a white knight bidder to enter the bidding by providing some form of compensation for the risks that it is undertaking. *Id.* at 660–61 (bid protections can prompt bidders to commence negotiations and "ensure that a bidder does not retract its bid"); *In re Hupp Int'l Indus., Inc.*, 140 B.R. 191, 194 (Bankr. N.D. Ohio 1992) ("[W]ithout such fees, bidders would be reluctant to make an initial bid for fear that their first bid will be shopped around for a higher bid from another bidder who would capitalize on the initial bidder's . . . due diligence."). As a result, courts routinely approve bid protections in connection with proposed bankruptcy sales where a proposed fee or reimbursement provides a benefit to the estate. *See In re O'Brien Envtl. Energy, Inc.*, 181 F.3d 527 (3d Cir. 1999).

43. Here, the Debtors request approval of the Bid Protections for the Stalking Horse Bidder, which are customary for transactions of this type and consistent with bankruptcy decisions in the Third Circuit. Subject to the terms of the Stalking Horse Agreement, the Bid Protections comprise, among other things, a break-up fee of 3% of the Base Purchase Price under the Stalking Horse Agreement (the "<u>Break-Up Fee</u>") and an expense reimbursement up to $150,000 (the "<u>Expense Reimbursement</u>"). The Debtors believe that the Bid Protections, the product of arm's-length negotiations, benefit the Debtors' estates. The Stalking Horse Bidder has devoted a substantial amount of time into conducting diligence of the Assets and the negotiation of the Stalking Horse Agreement, and the Stalking Horse Bid will establish a floor price for the Sale of

the Debtors' Assets that other prospective bidders can rely upon and is anticipated to encourage competitive bidding with the goal of achieving higher or otherwise better bids.

44. Without the Bid Protections, because of the risk that it would be outbid, the Stalking Horse Bidder has informed the Debtors that it would not agree to act as a stalking horse for the Assets given the substantial time and expense it has already incurred in connection with its efforts to conduct diligence on the Debtors' business and negotiate definitive documentation. This, in turn, would cause the Debtors to lose the opportunity to obtain the highest or otherwise best offer for their assets and the downside protection afforded by the existence and commitment of the Stalking Horse Bidder.

45. Finally, the Bid Protections only become payable in the event the Stalking Horse Bidder is not the Successful Bidder for the Acquired Assets. Accordingly, payment of the Bid Protections in the context of a sale to another purchase will not diminish the Debtors' estates to the extent they become payable, as the Bidding Procedures require that any competing bid for the Acquired Assets must exceed the Stalking Horse Bid by an amount in excess of the Break-Up Fee and Expense Reimbursement.

46. Accordingly, for the reasons set forth above, the Debtors respectfully request that the Court approve the Bid Protections and grant the Debtors authority to incur and pay the Break-Up Fee and Expense Reimbursement to the extent that such Bid Protections are necessary to preserve the value of the Debtors' estates.

**III. Secured Creditors should be authorized to credit bid for the Assets under section 363(k) of the Bankruptcy Code.**

47. Secured Creditors should be permitted to credit bid for the Debtors' Assets under section 363(k) of the Bankruptcy Code. Section 363(k) of the Bankruptcy Code provides that, unless the court for cause orders otherwise, the holder of a claim secured by property that is the



57187749.13

subject of a sale "may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property." 11 U.S.C. § 363(k).

48. As a result, the Debtors propose that creditors whose claims are secured by valid, binding, enforceable, non-avoidable and perfected liens on and security interests in the Assets be entitled to credit bid all or a portion of the principal amount of the secured debt owed to such creditors under section 363(k) of the Bankruptcy Code, subject to the Bidding Procedures and the right of any applicable party to object to the credit bid for cause under section 363(k) of the Bankruptcy Code.

**IV. The Assumption and Assignment Procedures reflect the Debtors' reasonable business judgment.**

49. Section 365 of the Bankruptcy Code authorizes a debtor to assume or assume and assign its executory contracts and unexpired leases, subject to the approval of the court, *provided* that the defaults under such contracts and leases are cured and adequate assurance of future performance is provided. The Debtors' decision to assume or reject an executory contract or unexpired lease must only satisfy the "business judgment rule" and will not be subject to review unless such decision is clearly an unreasonable exercise of such judgment. *Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36, 40 (3d Cir. 1989) (describing deference to a debtor's business judgment as "breathing space afforded [to] the debtor to consider whether to reject or assume executory contracts under the [Bankruptcy] Code."); *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006) ("The propriety of a decision to reject an executory contract is governed by the business judgment standard").

50. Here, the Debtors' decision to assume and assign certain designated executory contracts and unexpired leases in connection with the Sale, and pursuant to the Assumption and

Assignment Procedures, is a sound exercise of the Debtors' business judgment. Many of the Assumed Contracts are necessary to operate the Assets and, as such, they are essential to inducing the best offer for the Assets. It is unlikely that any purchaser would want to acquire the Assets unless a significant number of the executory contracts and unexpired leases needed to manage the Debtors' day-to-day operations were included in the transaction. In addition, the Assumed Contracts will be assumed and assigned through the process approved by the Court pursuant to the Bidding Procedures Order and, thus, will be reviewed by key constituents in these Chapter 11 Cases.

51. Accordingly, the Debtors submit that the proposed Assumption and Assignment Procedures should be approved as the procedures are fair and reasonable and the assumption and assignment of the Assumed Contracts is an exercise of the Debtors' business judgment.

**V. The Sale(s) Satisfy the Requirements of Section 363(f) for a Sale Free and Clear of All Liens, Claims, Encumbrances and Interests.**

52. Section 363(f) permits a debtor to sell property free and clear of another party's interest in the property if: (a) applicable non-bankruptcy law permits such a free and clear sale; (b) the holder of the interest consents; (c) the interest is a lien and the sale price of the property exceeds the value of all liens on the property; (d) the interest is in bona fide dispute; or (e) the holder of the interest could be compelled in a legal or equitable proceeding to accept a monetary satisfaction of its interest. *See* 11 U.S.C. § 363(f). Section 363(f) is stated in the disjunctive, so satisfaction of any one of its five requirements will suffice to warrant approval of the proposed sale. *See In re Elliot*, 94 B.R. 343, 345 (E.D. Pa. 1988) (noting that section 363(f) is written in the disjunctive, authorizing a trustee or debtor-in-possession to sell property of the estate free and clear of all liens "if any of the five conditions of § 363(f) are met"); *Scherer v. Fed. Nat'l Mortg. Ass'n (In re*



57187749.13

*Terrace Chalet Apts., Ltd.)*, 159 B.R. 821, 825 (N.D. Ill. 1993) (sale extinguishes liens under section 363(f) as long as one of the five specified exceptions applies).

53. Here, the Debtors aver that sections 363(f)(2) and (5) are satisfied with respect to all parties asserting liens. First, all parties known to have asserted a lien or other encumbrance on the Assets will receive notice of the Sale. To the extent they have not objected to the Sale by the Sale Objection Deadline, they will be deemed to have consented to the Sale free and clear of all liens, claims, encumbrances and interests (other than Assumed Liabilities). The Debtors propose to sell the Assets in a commercially reasonable manner and expect that the value of the proceeds from such sale will adequately reflect the value of the property sold.

54. The Debtors' DIP lender is a factor that purchases the majority of the Debtors' receivables as they are generated. The Stalking Horse Agreement specifically contemplates that the cash portion of the Purchase Price will be sufficient to pay the factor's secured claim in full, effectively repurchasing the factored receivables to be collected by the Debtors for the benefit of creditors, as those receivables are not Acquired Assets under the Stalking Horse Agreement. As such, section 363(f) is satisfied as to the factor.

55. The Debtors believe that the proposed Sale will result in sufficient cash proceeds to pay all parties asserting a valid encumbrance on the Assets in full. Second, the Debtors further propose that upon the closing, any party with a valid and enforceable lien or other encumbrance shall have a corresponding security interest in the proceeds of the Sale, as such liens and encumbrances will attach to the proceeds of the Sale with the same validity, priority, and force and effect as such lien or encumbrance had immediately prior to the closing of the Sale. In addition, all such persons could be compelled to accept money satisfaction for their interests. As such, the requirements of section 363(f) of the Bankruptcy Code would be satisfied for the sale of the

Business or Assets, free and clear of all liens, claims, and encumbrances (other than the Assumed Liabilities).

56. The Debtors also submit that it is appropriate to sell the Assets free and clear of successor liability relating to the Assets. Such limitations on successor liability ensure that a Successful Bidder is protected from any claims or lawsuits premised on the theory that the Successful Bidder is a successor in interest to the Debtors' estates. If such relief is not granted, the value-maximizing purpose of the Sale would be thwarted by the potential for holders of claims to thereafter use the transfer as a basis to assert claims against a buyer arising from the Debtors' conduct.

57. Courts have consistently held that a buyer of a debtor's assets pursuant to a section 363 sale takes free and clear from successor liability relating to the debtor's business. *See, e.g., In Matter of Motors Liquidation Co.*, No. 15-2844-BK(L), 2016 WL 3766237 (2d Cir. July 13, 2016) *12, *13 ("We agree that successor liability claims can be 'interests' when they flow from a debtor's ownership of transferred assets" and holding that "a bankruptcy court may approve a § 363 sale 'free and clear' of successor liability claims if those claims flow from the debtor's ownership of the sold assets. Such a claim must arise from a (1) right to payment (2) that arose before the filing of the petition or resulted from pre-petition conduct fairly giving rise to the claim"); *In re Chrysler LLC*, 405 B.R. 84, 111 (Bankr. S.D.N.Y. 2009) ("[I]n personam claims, including any potential state successor or transferee liability claims against New Chrysler, as well as in rem interests, are encompassed by section 363(f) and are therefore extinguished by the Sale."); *Contrarian Funds, LLC v. Westpoint Stevens, Inc. (In re Westpoint Stevens, Inc.)*, 333 B.R. 30, 50 (S.D.N.Y. 2005), *rev'd in part on other grounds*, 600 F.3d 231 (2d Cir. 2010) ("Where . . . a sale is to be free and clear of existing liens and interests other than those of the estate, one or

more of the criteria specified in section 363(f) of the statute must also be met.”).

58. For these reasons, a Successful Bidder should not be liable under any theory of successor liability relating to the Assets, but instead, should receive the Assets free and clear of all claims (other than the Assumed Liabilities) including any successor liability claims.

**VI. A Successful Bidder Should be Entitled to the Protections of Section 363(m) of the Bankruptcy Code and the Sale Does Not Violate Section 363(n).**

59. Section 363(m) of the Bankruptcy Code provides in relevant part that the reversal or modification on appeal of an authorization under section 363(b) of a sale or lease of property does not affect the validity of a sale or lease under such authorization to a buyer who bought or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal. 11 U.S.C. § 363(m).

60. “Although the Bankruptcy Code does not define the meaning of ‘good-faith buyer,’ . . . most courts have adopted a traditional equitable definition: ‘one who purchases the assets for value, in good faith and without notice of adverse claims.’” *Licensing by Paolo v. Sinatra (In Re Gucci)*, 126 F.3d 380, 392 (2d Cir. 1997). The “good faith” component of the test under § 363(m) speaks to “the integrity of [the bidder’s] conduct in the course of the sale proceedings. Typically, the misconduct that would destroy a purchaser’s good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.’” *In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978).

61. The Debtors submit that the Stalking Horse Bidder has at all times acted in good faith and without collusion with other potential bidders in connection with the negotiation and execution of the Stalking Horse Agreement and the Sale process generally. Further, as will be demonstrated at the Sale Hearing, the Debtors’ conduct of the sale process, and the selection of

one or more Successful Bid, shall have been conducted in good faith and at arm's-length in accordance with the Bid Procedures, and following consultation with the Consultation Parties. Accordingly, the Debtors request that the Sale Order include a provision that the Successful Bidder for the Assets is a "good faith" buyer within the meaning of section 363(m) of the Bankruptcy Code.

62. The Debtors believe that providing a Successful Bidder with such protection will ensure that the maximum price will be achieved for the Assets.

63. Furthermore, as will be demonstrated at the Sale Hearing, neither the Debtors nor any Successful Bidder, once selected, shall have engaged in any conduct that would cause or permit the applicable agreement to be avoided under section 363(n) of the Bankruptcy Code. The Debtors will have negotiated each asset purchase agreement in good faith and at arms' length and following consultation with the Consultation Parties. Moreover, the Bidding Procedures are designed to prevent the Debtors or the Successful Bidder from engaging in any conduct that would cause or permit any to be avoided under section 363(n) of the Bankruptcy Code.

**Waiver of Bankruptcy Rule 6004(h)**

64. To the extent applicable, the Debtors also request that the Court waive the stay imposed by Bankruptcy Rule 6004(h), which provides that "[u]nless the court orders otherwise, an order authorizing the use, sale or lease of property (other than cash collateral) is stayed for 14 days after the order is entered." Fed. R. Bankr. P. 6004(h). As described above, the relief requested in this Motion is necessary for the Debtors to preserve the value of their estates and any delay in the Debtors' ability to commence the marketing process or consummate the Sale(s) on the timeline contemplated by the Bidding Procedures would be detrimental to the Debtors, their creditors and their estates. Accordingly, the Debtors respectfully request that the Court waive the 14-day stay

imposed by Bankruptcy Rule 6004(h).

**Conclusion**

WHEREFORE, the Debtors respectfully request the court enter the proposed Bidding Procedures Order substantially in the same form as Exhibit A, granting the relief requested herein and such other and further relief as is just and proper.

Dated: August 26, 2026

**SAUL EWING LLP**

By: *<u>/s/ Turner N. Falk</u>*
Stephen B. Ravin, Esquire
Jeffrey C. Hampton, Esquire
Turner N. Falk, Esquire
One Riverfront Plaza
1037 Raymond Blvd., Suite 1520
Newark, NJ 07102-5426
Telephone: (973) 286-6714
E-mail: stephen.ravin@saul.com
jeffrey.hampton@saul.com
turner.falk@saul.com

-and-

Maxwell M. Hanamirian, Esquire (admitted *pro hac vice*)
1735 Market Street, Suite 3400
Philadelphia, PA 19103-7504
E-mail: maxwell.hanamirian@saul.com

*Counsel for the Debtors and Debtors in Possession*