**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

**Caption in Compliance with D.N.J. LBR 9004-1(b)**

**BALLARD SPAHR LLP**
Leslie C. Heilman
Margaret A. Vesper
Erin L. Williamson
222 Delaware Avenue, 10th Floor
Wilmington, DE 19801
Telephone: (302) 252-4465
Facsimile: (302) 252-4466
E-mail: heilmanl@ballardspahr.com
vesperm@ballardspahr.com
williamsone@ballardspahr.com

*Counsel to Seagis East Rutherford, LLC*

| | |
|---|---|
| In re:<br><br>PORT ELIZABETH TERMINAL & WAREHOUSE CORP., *et al.*,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 25-22123 (JKS)<br><br>(Jointly Administered) |

**LIMITED OBJECTION AND RESERVATION OF RIGHTS OF SEAGIS EAST RUTHERFORD, LLC TO (1) DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING AND APPROVING BIDDING PROCEDURES FOR THE SALE OF ALL OR SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS, (II) APPROVING BID PROTECTIONS, (III) SCHEDULING AN AUCTION AND A SALE HEARING, (IV) APPROVING THE FORM AND MANNER OF NOTICE THEREOF, AND (V) ESTABLISHING NOTICE AND PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND LEASES; AND (2) NOTICE OF POSSIBLE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

[1] The last four digits of each Debtors' tax identification number are as follows: Port Elizabeth Terminal & Warehouse, Corp. (6485), P. Judge & Sons, Inc. (3713), Amex Shipping Agent, Inc. (4699), the Judge Organization, LLC (8267), P. Judge & Sons Trucking, LLC (9853), and Judge Warehousing, LLC (6690). The location of the Debtors' principal place of business and the Debtors' service address in these Chapter 11 Cases is 13 Manor Road, East Rutherford, NJ 07073.

Seagis East Rutherford, LLC (the "Landlord"), by and through its undersigned counsel, hereby files this limited objection and reservation of rights (the "Objection") to: (1) the proposed sale transaction (the "Sale") contemplated by the *Debtors' Motion for Entry of an Order (I) Authorizing and Approving Bidding Procedures for the Sale of All or Substantially All of the Debtors' Assets, (II) Approving Bid Protections, (III) Scheduling an Auction and a Sale Hearing, (IV) Approving the Form and Manner of Notice Thereof, and (V) Establishing Notice and Procedures for the Assumption and Assignment of Certain Executory Contracts and Leases* (the "Sale Motion") [Docket No. 417]; and (2) the *Notice of Possible Assumption and Assignment of Certain Executory Contracts and Unexpired Leases* [Docket No. 441] (the "Cure Notice"),[2] and respectfully represents as follows:

## I. BACKGROUND

1. On November 14, 2026 (the "Petition Date"), the above-captioned Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (as amended, the "Bankruptcy Code") with the United States Bankruptcy Court for the District of New Jersey (the "Court"), commencing these cases (these "Chapter 11 Cases"). The Debtors continue to operate their business and manage their properties as debtors and debtors-in-possession pursuant to 11 U.S.C. §§ 1107(a) and 1108. No trustee or examiner has been appointed in these Chapter 11 Cases.

2. The Debtors lease warehouse space (the "Premises") from the Landlord pursuant to an unexpired lease of non-residential real property (as may have been amended, supplemented

[2] Capitalized terms used but not otherwise defined herein shall have the meaning given to them in the Sale Motion and the Cure Notice, as applicable.

or modified from time to time, the "Lease") located at 13 Manor Road, East Rutherford, New Jersey, 07073.

3. On August 26, 2026, the Debtors filed the Sale Motion, which contemplates, among other things, the Sale of substantially all the assets of the Debtors, pursuant to a proposed asset purchase agreement ("Stalking Horse Agreement"), in the form attached to the Sale Motion as Exhibit B, to East Coast Warehouse and Distribution Corp.. and its designees (the "Stalking Horse Bidder"), or such other successful bidder. Among other things, the Stalking Horse Agreement requires "a transition period in the form of a modified lease or license not to exceed a period of three months with the landlords of [the Lease] and the Savannah Lease to transition operations to Purchasers' existing facilities." *See* Stalking Horse Agreement, § 2.1(b).

4. On September 4, 2026, the Court entered the *Order (I) Authorizing and Approving Bidding Procedures for the Sale of All or Substantially All of the Debtors' Assets, (II) Approving Bid Protections, (III) Scheduling an Auction and a Sale Hearing, (IV) Approving the Form and Manner of Notice Thereof, (V) Establishing Notice and Procedures of Assumption and Assignment of Certain Executory Contracts and Leases, and (VI) Granting Related Relief* [Docket No. 433] (the "Bidding Procedures Order"), authorizing, among other things, bidding procedures for the solicitation of bids pursuant to an auction process for the sale of the Debtors' assets to the Stalking Horse Bidder or such other successful bidder.

5. On September 10, 2026, the Debtors filed the Cure Notice, which sets forth the Debtors' proposed cure amounts for certain unexpired non-residential real property leases and executory contracts that may be assumed and assigned in connection with the Sale (the "Proposed Cure Amounts"), including the Lease. Pursuant to the Cure Notice, the Debtors' Proposed Cure Amount for the Lease is $341,891.366.

6. The Cure Notice established October 9, 2026 as the deadline for Landlord to object to the Proposed Cure Amount and the assumption and assignment of its Lease to the Stalking Horse Bidder.

7. Pursuant to paragraph 21 of the Bidding Procedures Order, adequate assurance information for the Stalking Horse Bidder was to be provided to any requesting lease or contract counterparty on or before September 29, 2026.

8. On September 11, 2026, counsel to the Stalking Horse Bidder reached out to counsel for the Landlord and provided a form of non-disclosure agreement as a precondition to the dissemination of the Stalking Horse Bidder's adequate assurance information, to which the Landlord agreed and provided its comments thereto. However, after a revised draft of the non-disclosure agreement was shared by counsel to the Landlord, on September 29, 2026, Landlord was advised by counsel to the Stalking Horse Bidder that the Lease was not contemplated to be assumed and assigned to the Stalking Horse Bidder and, therefore, no such adequate assurance information was necessary or would be provided.

9. On October 7, 2026, the Debtors filed the *Notice of Successful Bidder and Cancellation of Auction* [Docket No. 482], which advised parties that aside from the Stalking Horse Bid, no other bids had been received by the Bid Deadline and, as a result, the Auction was canceled and the Stalking Horse Bidder was declared the Successful Bidder.

10. The Landlord files this Objection and reservation of rights to preserve all of its rights, including as to cure and adequate assurance of future performance, in connection with the Sale and the transactions contemplated under the Stalking Horse Agreement, in the event the Stalking Horse Bidder later seeks to assume and take an assignment of the Lease or should an alternate bid be received by the Debtors that would contemplate the assumption and assignment of the Lease. Moreover, the Landlord objects and reserves all of its rights with respect to any use

and occupancy of the leased premises by the Stalking Horse Bidder for any transition period, absent strict compliance with all Lease obligations during any such transition period, including with respect to the payment of the rents, and all insurance and indemnification obligations, unless otherwise agreed by the Landlord pursuant to any yet to be documented agreement between the parties as contemplated under the Stalking Horse Agreement. Further, the Sale Order must be modified to require that the Debtors and/or the Stalking Horse Bidder shall be liable and responsible for the timely performance of all obligations arising under the Lease during any transition period and that nothing in the Stalking Horse Agreement shall override Section 365(d)(3) and the Debtors' obligation to timely perform in accordance with the Lease and Section 365(d)(4). Finally, no transition period shall extend beyond the current deadline for the Debtors to Assume or Reject the Lease, absent further consent of the Landlord.

11. Accordingly, Landlord files this Objection in order to preserve all of its rights with respect to any defaults under the Lease to be cured at the time of any assumption and assignment of the Lease, and to reserve its rights to raise other or further objections to any assumption and assignment of the Lease, including as to the ability of a successful bidder to provide adequate assurance of future performance under the Lease. More specifically, the Proposed Cure Amount set forth in the Cure Notice does not reflect all outstanding balances due and owing to Landlord under the Lease nor does it account for accrued but not yet due or accruing, but unbilled charges which may come due in the future. The Cure Amount set forth by the Debtors must be modified to reflect additional charges owing, as well as recognize the liability for accruing charges due under the Lease, as more fully set forth herein.

## II. OBJECTION

12. While Landlord does not generally object to a sale of the Debtors' assets to maximize the value of the estate for the benefit of all creditors, including as to Landlord's Lease, Landlord does object to any proposed assumption and assignment of the Lease unless and until the Debtors and/or the purchaser comply with all of the requirements of Section 365 of the Bankruptcy Code.

### A. The Debtors' Proposed Cure Amount Does Not Provide for Payment of All Obligations Due and Owing Under the Lease.

13. To assume and assign the Lease, the Debtors must comply with Section 365(b)(1) of the Bankruptcy Code which provides that:

> If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee –
>
> (A) cures, or provides adequate assurance that the trustee will promptly cure, such default other than a default that is a breach of a provision relating to the satisfaction of any provision (other than a penalty rate or penalty provision) relating to a default arising from any failure to perform nonmonetary obligations under an unexpired lease of real property, if it is impossible for the trustee to cure such default by performing nonmonetary acts at and after the time of assumption, except that if such default arises from a failure to operate in accordance with a nonresidential real property lease, then such default shall be cured by performance at and after the time of assumption in accordance with such lease, and pecuniary losses resulting from such default shall be compensated in accordance with the provisions of this paragraph;. . .

11 U.S.C. § 365(b)(1).

14. Landlord's base cure costs to cure all monetary defaults existing under the Lease through October 2026, exclusive of any interest, fees and costs, is in the aggregate amount of $840,264.47, as more fully set forth in detail on the statement of account attached hereto as **Exhibit A** and incorporated herein (the "Landlord's Cure Amount").

15. Landlord's Cure Amount is the Landlord's base cure claim amount subject to additional qualifications and modifications (such as reimbursement amounts for attorney's fees, interests and costs) as more fully set forth below.[3]

**i. Year-end Adjustments and Reconciliations.**

16. In addition to rent and related monthly charges, attorneys' fees, costs and interest, some charges for which the Debtors bear responsibility under the Lease have not yet been reconciled and/or adjusted from pre-petition (or even post-petition) periods. By way of example, the Debtors occupy warehouse space pursuant to a triple-net lease, where they typically pay rent and related lease charges in advance for each month. The Debtors pay fixed minimum rent, along with a pro-rata share of expenses such as real property taxes, insurance, operating expenses ("OPEX") fees, annual percentage rent, and the like. Certain charges, such as OPEX and property taxes are estimated prospectively, billed to and paid by the tenant during the year, and then reconciled after year-end. The reconciliation compares the amounts estimated and paid against actual charges incurred at the premises. To the extent the estimated payments exceed actual charges, the result is a credit to the tenant. To the extent the estimated payments do not cover actual charges incurred under the Lease, the result is an additional amount (or debit) for which the tenant is liable. In some instances, year-end reconciliations and adjustments for previous years for the Premises may not yet be complete (i.e., year-end reconciliations and adjustments that accrued through 2024 and 2025 may not yet have been billed under the Lease, and such charges that are

[3] Unless otherwise indicated, Landlord's cure does not include any charges that have been billed or come due after the filing of this Objection or charges that are billed directly to the Debtors, including in some cases, real estate taxes. To the extent Landlord is later billed for any amount due to the Debtor's failure to pay, Landlord reserves the right to amend the Objection to include such amounts. The Debtors must timely pay all rent and other lease charges as they come due under the Lease, and the Landlord reserves the right to seek payment (and amend this Objection to the extent necessary) for any amounts that come due under the Lease through the later of the date of any cure payment or effective date of the assumption and assignment of the Lease. In addition, unless otherwise indicated, Landlord's cure is exclusive of attorneys' fees, interest and costs that form the basis of the Landlord's actual pecuniary losses. Presently, Landlord estimates that its attorneys' fees incurred to date are in an amount not less than $10,000.

accruing for 2026 will not be billed until 2027). In other instances, certain charges may be paid in arrears and cannot be calculated (in some cases) until a year or more after year-end.

17. Since Section 365(b) only requires the Debtors to cure defaults under the Lease at the time of an assumption and assignment, and since there can be no default for failure to pay an amount that has not as yet been billed, these accrued, but unbilled, charges are not yet due under the Lease, and they do not create a current default that gives rise to a requirement of cure by the Debtors at this time. The obligation to pay the year-end adjustments is, however, certainly a part of the obligation to provide adequate assurance of future performance. As a result, the Court should deny any attempt to assume and/or subsequently assign the Lease "free and clear" of these obligations.

18. Debtors (or the Purchaser) must remain responsible for all accrued or accruing charges under the Lease and must pay such charges when they come due under the Lease. The Debtors must assume the Lease and assign it to the purchaser subject to all its terms, including obligations that have accrued but may not yet have been billed under the Lease. Any proposed order must make clear that the assumption and assignment of the Lease is not free and clear of these continuing and accruing obligations under the Lease, and should clearly state that the Debtors (or the purchaser, as assignee) will assume these lease obligations and pay them when due, regardless of whether they relate to the period prior to, or after, the closing of the Sale. In addition, any provision in the proposed order that purports to release the Debtors (or the Purchaser, as assignee) of further liability based upon a payment of cure amounts, must specify that such release does not apply to obligations to pay accrued or accruing, but unbilled, charges that come due under the Lease, or any nonmonetary defaults where performance is required as cure at or after the assumption of the Lease.

19. Finally, the Lease requires the Debtors (or the purchaser) to indemnify and hold the Landlord harmless with respect to any existing claims which may not become known until after the assumption of the Lease, examples of which may include such claims as personal injuries at the Premises and damage to the Premises by the Debtors or its agents. Any assumption and assignment of the Lease must be subject to the terms of the Lease, including the continuation of all indemnification obligations, regardless of when they arose.[4] In the alternative, the Debtors must provide (by tail insurance or otherwise) that they can satisfy the indemnification obligations under the Lease for any claims that relate to the period prior to assumption of the Lease. Nothing in any proposed Sale Order should preclude the Landlord from pursuing the Debtor, its insurance, or any other party that may be liable under the Lease, and the Landlord requests that any proposed order specifically preserves its right to pursue such rights irrespective of any resolution of the cure amounts herein.[5]

20. Landlord, therefore, requests that in the event the assumption and assignment of the Lease is approved by the Court, language must be inserted into any proposed order to provide for the payment of the Landlord's cure, and that the Debtors (or the purchaser) shall be responsible for all unpaid year-end adjustments, whether accruing prior to or after the effective date of the assignment of the Lease, when such charges become due in accordance with the terms of the Lease, including with respect to any indemnification and insurance obligations. Alternatively, a suitable escrow for the Lease equal to 150% of the average year-end adjustments for the prior three (3)

---

[4] Any ability to assume the Lease is subject to the protections provided by Section 365(b) and (f). Therefore, any assumption must be in accordance with all provisions of the Lease.

[5] If Debtors are covered under an "occurrence basis" insurance policy, rather than a "claims made" policy, this objection may be satisfied by proof of such insurance by the Debtors for Landlord's location.

years must be established to assure that any amounts due will be available to Landlord when the year-end adjustments are actually billed and become due pursuant to the terms of the Lease.

**ii. Attorneys' Fees, Costs, and Interest.**

21. The Lease contains provisions for recovery of attorneys' fees, costs, and interest in the event the Landlord is required to take legal action to protect their interests. The Debtors are obligated to cure all defaults under the Lease and compensate the Landlord for its actual pecuniary losses as a result of defaults under the Lease. See 11 U.S.C. § 365(b)(1)(A) and (B). The principle is well-recognized. In re LCO Enters., 12 F.3d 938, 941 (9th Cir. 1993); Elkton Associates v. Shelco Inc. (Matter of Shelco), 107 B.R. 483, 487 (Bankr. D. Del. 1989) (debtors allowed to assume lease provided it cured *all pre-petition defaults*).

22. The Debtors (or the purchaser) take the Lease *cum onere*—subject to existing burdens. The Debtors cannot assume the favorable portions, and reject the unfavorable provisions, of the Lease. In re Washington Capital Aviation & Leasing, 156 B.R. 167, 172 (Bankr. E.D. Va. 1993). If forced to continue in the performance of the Lease, the Landlord is entitled to the full benefit of the bargain under its Lease with the Debtors. See Matter of Superior Toy and Mfg. Co., Inc., 78 F.3d 1169 (7th Cir. 1996). The "full benefit of the bargain" principle has been held to require payment of interest. "The cure of a default under an unexpired lease pursuant to 11 U.S.C. § 365 is more akin to a condition precedent to the assumption of a contract obligation than it is to a claim in bankruptcy. One of the purposes of Section 365 is to permit the debtors to continue in a beneficial contract; provided, however, that the other party to the contract is made whole at the time of the debtor's assumption of the contract." In re Entm't, Inc., 223 B.R. 141, 151 (Bankr. N.D. Ill. 1998) (citation omitted; bankruptcy court allowed interest at 18%). Interest on pre-petition lease charges continues to run from the filing of the Debtors' petition and must be paid as

a condition of the assumption of the Lease. See In re Skylark Travel, Inc., 120 B.R. 352, 355 (Bankr. S.D.N.Y. 1990). Interest calculations are therefore not cut short by the automatic stay, and payment of such interest is required to fully compensate Landlord for the Debtors' default under the Lease, and thus to properly assume the Lease. Finally, post-petition interest is allowable where such interest is provided for under the terms of the Lease. Cukierman v. Uecker (In re Cukierman), 265 F.3d 846, 853 (9th Cir. 2001).

23. Attorneys' fees and costs incurred in enforcement of the covenants, obligations, and conditions of a lease are also proper components of a cure claim, and the Debtors (or the assignee) must satisfy these lease charges as part of the assumption or assumption and assignment of the Lease. In re Entm't, Inc., 223 B.R. at 152 (citation omitted). There is no logical distinction for purposes of Section 365 between attorneys' fees incurred in connection with pre-petition defaults and fees incurred with post-petition defaults. Id. at 154. The fact that a landlord uses bankruptcy procedures to enforce a lease should not preclude recovery of attorneys' fees and costs for such enforcement activity (particularly where the Bankruptcy Court is the exclusive forum where the landlord can obtain any relief, being foreclosed from state court relief by the automatic stay). Id., see also In re Crown Books Corporation, 269 B.R. 12 (Bankr. D. Del. 2001) (Landlords' fees and costs are recoverable as a component of cure under 11 U.S.C. § 365(b)(1)); Urban Retail Properties v. Loews Cineplex Entm't Corp., et al., 01 Civ. 8946 (RWS), 2002 U.S. Dist. LEXIS 6186 at *25 (S.D.N.Y. Apr. 9, 2002) (where lease "provides for recovery of attorneys' fees and interest, their receipt deserves the same priority under Section 365(d)(3) as any of the debtors' other obligations that arise postpetition . . . ."); Three Sisters Partners, L.L.C. v. Harden (In re Shangra-La, Inc.), 167 F.3d 843, 850 (4th Cir. 1999). The Supreme Court has upheld the enforceability of such attorneys' fees clauses, ruling that pre-petition attorneys' fee clauses were

enforceable with respect to issues peculiar to bankruptcy law. Travelers Cas. & Sur. Co. of Am. v. Pac. Gas & Electric, 127 S. Ct. 1199, 1206 (2007).

24. Accordingly, unless otherwise agreed as between Debtors (or the assignee) and the Landlord, Landlord further requests that it be reimbursed for all of its actual pecuniary losses including, but not limited to, attorney's fees and costs expended with regard to Debtors' defaults under the Lease. To date, the Landlord estimates its attorney's fees and costs to be no less than $10,000 through the date of this Objection.

**iii. The Cure Amounts Serve Only as Estimates.**

25. Landlord can only provide the information presently available regarding amounts that the Debtors owe, while reserving the right to amend this Objection as necessary to include any additional or unknown charges that arise, including but not limited to subsequent rent defaults, attorneys' fees, costs, interest, and year-end adjustments and reconciliations. There is no basis to impose upon the Landlord the equivalent of an administrative bar date, limiting its recourse to recover charges to which they are entitled under the Lease.

**iv. The Debtors Must Pay Undisputed Cure Amounts Immediately.**

26. Section 365(b)(1)(A) requires that the Debtors promptly cure outstanding balances due under the Lease upon assumption. To the extent there is a dispute over the total cure obligation for the Lease, the undisputed portion of the cure amount should be paid immediately. Debtors should escrow any disputed amounts, and the Court should set a status conference within thirty (30) days of the assumption of the Lease to deal with any disputes that remain unresolved after such period.

**B. Adequate Assurance of Future Performance**

27. Pursuant to Section 365(f)(2)(B) of the Bankruptcy Code, Debtors may only assume and assign the Landlords' Leases if "adequate assurance of future performance by the assignee of such . . . lease is provided, . . . ."

28. The burden of proof on adequate assurance issues is with the Debtors. See In re Lafayette Radio Elecs. Corp., 12 B.R. 302, 312 (Bankr. E.D.N.Y. 1981).

29. As discussed above, the Landlord has not received any adequate assurance information from the Stalking Horse Bidder or any other successful bidder and has been told that the Lease is not to be assumed by the Debtors and assigned to the Stalking Horse Bidder. Should the Stalking Horse Bidder or some other successful bidder seek to assume and assign the Lease, the Landlord reserves all of its rights to require proof of adequate assurance of future performance at that time and supplement its Objection. Strict proof is demanded at the time of any assignment of the Lease, and the Landlord reserves all rights as to these issues.

**IV. TRANSITION PERIOD**

30. The Stalking Horse Agreement contemplates the Stalking Horse Bidder having he ability to use and occupy the Premises for a period of three months pursuant to a yet to be documented short term lease or license agreement. Landlord objects to any use and occupancy of the Premises during any transition period without the payment of all post-petition rent as required by Section 365 when due under the Lease and compliance with all of the Lease terms, including with respect to the proposed post-Closing occupancy of Landlord's premises by a third-party (the Stalking Horse Bidder). Nor shall any such transition period occupancy extend beyond the current deadline for the Debtors to assume or reject the Lease in these cases, absent consent of the Landlord.

31. The Proposed Sale Order must be modified to ensure strict compliance with all Lease obligations during any such transition period, including with respect to the payment of the rents, and all insurance and indemnification obligations, unless otherwise agreed by the Landlord pursuant to any yet to be documented agreement between the parties as contemplated under the Stalking Horse Agreement. Further, the Sale Order must be modified to require that the Debtors and/or the Stalking Horse Bidder shall be liable and responsible for the timely performance of all obligations arising under the Lease during any transition period and that nothing in the Stalking Horse Agreement shall override Section 365(d)(3) and the Debtors' obligation to timely perform in accordance with the Lease and Section 365(d)(4). Finally, no transition period shall extend beyond the current deadline for the Debtors to Assume or Reject the Lease, absent further consent of the Landlord.

## V. RESERVATION OF RIGHTS

32. The Landlord reserves its right to (i) raise further or other objections as may be necessary, including but not limited to, to (i) any final form of Sale Order approving the assumption and assignment of the Lease and the purchaser's APA once those documents become available; (ii) require payment of all Lease charges and compliance with all Lease terms; and (iii) to require any assignment on a form acceptable to Landlord.

## VI. CONCLUSION

WHEREFORE, the Landlord respectfully requests that the Court enter an order consistent with the foregoing Objection and for such other and further relief as may be just and proper under all of the circumstances.

Dated: October 9, 2026

*/s/ Leslie C. Heilman*
Leslie C. Heilman
Margaret A. Vesper
Erin L. Williamson
BALLARD SPAHR LLP
222 Delaware Avenue, 10th Floor
Wilmington, Delaware 19801-3034
Telephone: (302) 252-4465
Facsimile: (302) 252-4466
E-mail: heilmanl@ballardspahr.com
vesperm@ballardspahr.com
williamsone@ballardspahr.com

*Attorneys for Seagis East Rutherford, LLC*