| | |
|---|---|
| **UNITED STATES BANKRUPTCY COURT**<br>**DISTRICT OF NEW JERSEY** | |
| ***Caption in Compliance with D.N.J. LBR 9004-1(b)***<br>**SAUL EWING LLP**<br>Stephen B. Ravin, Esquire<br>Jeffrey C. Hampton, Esquire<br>Turner N. Falk, Esquire<br>One Riverfront Plaza<br>1037 Raymond Blvd., Suite 1520<br>Newark, NJ 07102-5426<br>Telephone: (973) 286-6714<br>E-mail: stephen.ravin@saul.com<br>jeffrey.hampton@saul.com<br>turner.falk@saul.com<br>*Counsel to the Debtors and Debtors in Possession* | |
| In re:<br><br>PORT ELIZABETH TERMINAL & WAREHOUSE CORP., *et al.*,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 25-22123 (VFP)<br><br>(Jointly Administered) |

**DEBTORS' REPLY IN SUPPORT OF DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING AND APPROVING BIDDING PROCEDURES FOR THE SALE OF ALL OR SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS, (II) APPROVING BID PROTECTIONS, (III) SCHEDULING AN AUCTION AND A SALE HEARING, (IV) APPROVING THE FORM AND MANNER OF NOTICE THEREOF, AND (V) ESTABLISHING NOTICE AND PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND LEASES**

The above-captioned debtors and debtors in possession (collectively, the "**Debtors**"), by and through their undersigned counsel, hereby submit this reply ("**Reply**") in further support of the Debtors' request for approval of the Sale more fully described in the *Debtors' Motion for Entry of an Order (I) Authorizing and Approving Bidding Procedures for the Sale of all or Substantially*

[1] The last four digits of each Debtors' tax identification number are as follows: Port Elizabeth Terminal & Warehouse, Corp. (6485), P. Judge & Sons, Inc. (3713), Amex Shipping Agent, Inc. (4699), the Judge Organization, LLC (8267), P. Judge & Sons Trucking, LLC (9853), and Judge Warehousing, LLC (6690). The location of the Debtors' principal place of business and the Debtors' service address in these Chapter 11 Cases is 13 Manor Road, East Rutherford, NJ 07073.

*all of the Debtors' Assets, (II) Approving Bid Protections, (III) Scheduling an Auction and a Sale Hearing, (IV) Approving the Form and Manner of Notice Thereof, and (V) Establishing Notice and Procedures for the Assumption and Assignment of Certain Executory Contracts and Leases* and associated Contract Notice [D.I. 441] (the "**Sale Motion**").[2] In support of the Sale Motion and this Reply, the Debtors rely, in part, on the *Declaration of Joseph Compitello in Support of Debtors' Sale Motion* (the "**Compitello Declaration**"), filed contemporaneously herewith, and respectfully state as follows:

**<u>Marketing Process and Bid Procedures Background</u>**

1. Collectively, the Debtors provide transportation, logistic, and warehouse related services. More specifically, the Debtors offer rail boxcar services, container handling services, warehousing services, multiple shipping options (e.g., rail, truck, air, and international shipping), specialized material handling services, cross docking, handling, and packing services, beverage specialists and alcoholic beverages expertise services, and product care and protection services.

2. The Debtors' businesses consist of two primary segments, one located in northern New Jersey and Bristol, Pennsylvania, the other located in Savannah, Georgia.

3. In 2019, the Debtors retained Cambridge Financial Services, LLC ("**Cambridge**"), an experienced financial advisor, to advise the Debtors on strategies to address the businesses' financial situation.

4. As Debtors continued to face ongoing challenges in 2024-2025, the Debtors, through Cambridge, began to explore a potential sale of substantially all of their assets as a means to address their financial and operational difficulties.

5. Prepetition, the Debtors and Cambridge provided diligence materials to potential

---

[2] Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the Sale Motion or Bid Procedures (as defined herein), as applicable.

funding sources, parties that expressed an interest in acquiring some or all of the Debtors' Assets, and strategic parties that are active in the transportation and logistics industry.

6. As part of their prepetition marketing efforts , the Debtors and Cambridge contacted in excess of 50 parties active in the transportation and logistics industry.

7. Postpetition, the Debtors continued their marketing efforts, seeking potential interested parties in conjunction with a potential sales process for all or substantially all of the Debtors' assets in connection with a section 363 sale.

8. Cambridge focused its efforts on developing marketing materials and marketing the Debtors' Assets to parties to serve as a stalking horse bidder. The Debtors, with the assistance of their professionals, prepared various due diligence materials to support a marketing effort, including a data room containing the key financial, operational, and contractual information related to the Debtors' businesses (collectively, the "**Investment Material**").

9. The Debtors solicited interest from potential financial and strategic parties for bids for all or substantially all the Debtors' Assets, on a going concern basis.

10. All parties contacted during the prepetition marketing process were contacted again, as the opportunity for a free-and-clear sale could reignite their interest in the Assets.

11. Upon the filing of the instant bankruptcy cases, the Debtors received significant interest from parties interested in evaluating the Assets and the Investment Materials. These parties included financial and strategic investors. East Coast Warehouse and Distribution Corp., the eventual Stalking Horse Bidder, was one such party that only began to evaluate the Assets postpetition.

12. Additionally, post-petition and before the Court's approval of the Bid Procedures, through DailyDAC (Distressed Asset Central), an online distressed business marketing firm, the Debtors caused to be distributed a teaser to over 300 distressed business investors.

13. The Debtors provided qualified parties access to the Investment Material once a nondisclosure agreement ("**NDA**") was executed. In addition, the Debtors engaged in business-to-business discussions with interested parties and offered site visits with a view toward engaging in further negotiations.

14. Since they commenced the postpetition marketing process, the Debtors obtained executed NDAs from fourteen potentially interested parties and received two letters of intent from interested parties, including one from the Stalking Horse Bidder.

15. The Debtors engaged in negotiations with both these parties. From the beginning of these negotiations, the Stalking Horse Bidder's offer consistently appeared, in the business judgment of the Debtors and their professionals, to be a higher and better offer than the terms offered by the other party.

16. The Debtors' negotiations with the Stalking Horse Bidder over what would become the Asset Purchase Agreement were arms-length, extensive, and hard-fought by both the Debtors and Stalking Horse Bidder.

17. The Stalking Horse Bidder requested additional due diligence materials, which the Debtors largely provided and added to the Investment Material available to all interested NDA parties.

18. Between early April 2026 and late August 2026, when the Sale Motion and APA were filed, the Debtors and Stalking Horse Bidder exchanged numerous revisions to and drafts of the APA, attempting to achieve a workable, value-maximizing arrangement agreeable to both

parties.

19. The outcome of these negotiations was the APA embodying the Stalking Horse Bid, which provided for a largely going-concern sale for substantially all of the Debtors' assets, constituting all or substantially all of the assets used at the Debtors' Jersey City, New Jersey, and Levittown, Pennsylvania locations, and substantially all of the assets for the Debtors' East Rutherford, New Jersey and Savannah, Georgia locations. Pursuant to the APA, the Stalking Horse Bidder would purchase the assets free and clear in exchange for (i) a base purchase price of $6,500,000 (subject to certain specified adjustments) and (ii) the assumption of certain liabilities as described in the APA.

20. With a stalking horse bidding floor in place for the Assets (the key terms of which have already been subject to a robust market test), the Debtors filed the Sale Motion, seeking approval of the Bid Procedures necessary to subject the Assets to a competitive bidding process.

21. The Court entered the Bid Procedures Order, approving the Bid Procedures and the designation of the Stalking Horse Bidder, on September 4, 2026.

22. Following the entry of the Bid Procedures Order, the Debtors served the Sale Notice Parties with the Bid Procedures, and published the Sale Notice in the national edition of *USA Today*, and the local newspaper for the locations of each of the Debtors' facilities: (i) Jersey City, New Jersey; (ii) East Rutherford, New Jersey; (iii) Levittown, Pennsylvania; and (iv) Savannah, Georgia, to provide notice to any other potential interested parties.

23. Following the Court's entry of the Bidding Procedures Order, the Debtors continued to engage with certain interested parties, offering additional site visits and business-to-business discussions.

24. No party other than the Stalking Horse Bidder made an actionable offer for the

Assets. By the Bid Deadline, the Debtors did not receive any Qualified Bids, aside from the Stalking Horse Bid.

25. Consistent with the Bid Procedures, the Debtors cancelled the Auction and designated the Stalking Horse Bid as the Successful Bid. See *Notice of Successful Bidder and Cancellation of Auction* [D.I. 482].

26. Pursuant to the APA with the Stalking Horse Bidder, the Base Purchase Price for the Assets is $6.5 million.

27. The proposed sale of the Assets to the Stalking Horse Bidder in accordance with the Bid Procedures, is a sound exercise of the Debtors' business judgment that will maximize the value of the Debtors' assets as a result of the effective testing of the market value of the Assets through a competitive bidding process.

**The Objections**

31. As of the date hereof, the Debtors have received informal comments from one lease counterparty and limited objections from four parties (the "**Objections**").

32. The Objections and their current status is as follows:

a. Informal comments from warehouse landlord REEF America Reit II Corp. YYY regarding the applicable cure amount. The Debtors and REEF America Reit II Corp. YYY are working to determine the applicable cure amount.

b. Informal comments from equipment lessor XTRA Lease LLC regarding the applicable cure amount and the specific contracts being assumed. The Debtors and XTRA Lease LLC are working to determine the applicable cure amount.

c. A limited objection filed by Huntington National Bank [D.I. 481] regarding the applicable cure amounts on five equipment lease contracts presently identified for assumption and assignment. The Debtors and Huntington National Bank are working to determine the applicable cure amount.

d. A limited objection filed by warehouse landlord F. Greek Bristol Properties, L.P. [D.I. 483] regarding the applicable cure amount. The Debtors and F. Greek Bristol Properties, L.P. are working to determine the applicable cure amount.

e. A limited objection filed by Milestone Chassis Company LLC ("**Milestone**") [D.I. 486] regarding the applicable cure amount for an equipment lease.

f. A limited objection filed by Seagis East Rutherford, LLC ("**Seagis**") [D.I. 495] regarding the applicable cure amount for this lease, which is not presently designated for assumption and assignment, and requesting certain treatment for amounts coming due during the temporary post-closing transition period contemplated under the APA.

g. A reservation of rights filed by customer Constellation Brands, Inc. and Crown Imports LLC ("**Crown**") [D.I. 496], seeking to reserve all rights to obtain adequate assurances that the Stalking Horse Bidder will be able to acquire the relevant licenses, permits, bonds, and approvals necessary to continue performance under the applicable warehousing agreements with Crown.

33. The Debtors are working constructively with the relevant parties to provide additional information, reconcile Cure Amounts, and provide additional adequate assurance information. Importantly, none of the responding parties are challenging the Debtors' business judgment to consummate the Sale itself.

34. The portion of the limited objection filed by Seagis addressing the cure amount is moot, as the lease with this landlord is not presently designated for assumption and assignment. If this lease is later so designated, the Debtors will engage with Seagis to determine the applicable cure amount.

35. The limited objection filed by Milestone is also moot, as the Debtors have learned that the Stalking Horse Bidder will not be taking assignment of the Milestone contracts.

## Argument

### A. The Sale is a Sound Exercise of the Debtors' Business Judgment, and Should Be Approved

36. The paramount goal in any proposed sale of property of a debtor is to maximize the proceeds received by the estate. *See generally In re Cont'l Airlines*, 91 F.3d 553, 565 (3d Cir. 1996) (acknowledging a "strong public policy in favor of maximizing debtors' estates and facilitating successful reorganization, reflected in the Code itself ...").



58801434.1

37. The debtor's decision to sell its assets is accorded strong deference if supported by a sound exercise of the debtor's business judgment. *See, e.g., In re Culp*, 550 B.R. 683, 697 (D. Del. 2015) ("'In determining whether to authorize use, sale or lease of property of the estate under Section 363, courts require the [debtor] to show that a sound business purpose justifies such actions.' If the [debtor's] decision evidences a sound business purpose, then the Bankruptcy Court should approve the sale.") (*quoting In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999)).

38. "[C]ourts will not substitute [their] views for those of the [debtor] if the latter's decision can be attributed to any rational business purpose." I*n re Vill. Roadshow Ent. Grp. USA Inc.*, 676 B.R. 504, 509 (Bankr. D. Del. 2025) *quoting Paramount Communications Inc. v. QVC Network Inc.*, 637 A.2d 34, 45 n.17 (Del. 1994).

39. Courts routinely approve, as a valid exercise of a debtors' business judgment, sales to the highest and best offeror after a court-approved marketing process. *See In re Stream TV Networks, Inc.*, 666 B.R. 299, 310 (Bankr. E.D. Pa. 2025) (approving sale to stalking horse bidder over objection of executory contract party where court-approved marketing process did not produce any higher or better offers).

40. Here, the Assets were marketed extensively prior to the Petition Date, but the Debtors were unable to find a buyer.

41. It was only after the instant cases that the Debtors were able to find not just one, but two potential suitors. Crucially, the Stalking Horse Bidder did not engage in an evaluation of the Assets until after the bankruptcy was filed.

42. The Assets have now been market tested both prepetition and post-petition, and the Stalking Horse Bid is the highest and best offer available.

43. The Stalking Horse Bid provides that a large part of the Debtors' operations will continue as a going concern, preserving jobs and continuing beneficial relationships with selected members of the Debtors' vendors, creditors and customers. If the Stalking Horse Bid is not approved, the Debtors would have no other option but to liquidate, to the detriment of all parties in interest.

44. Further, the Base Purchase Price of the Stalking Horse Bid, and the assumption of substantial post-closing lease and executory contract liabilities by the Stalking Horse Bidder, which would otherwise generate rejection damages claims against the estates, provide substantial value for the estates.

45. The Sale to the Stalking Horse Bidder is a sound exercise of the Debtors' business judgment, and should be approved.

46. Section 363(m) of the Bankruptcy Code provides in relevant part that the reversal or modification on appeal of an authorization under section 363(b) of a sale or lease of property does not affect the validity of a sale or lease under such authorization to a buyer who bought or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal. 11 U.S.C. § 363(m).

47. "Although the Bankruptcy Code does not define the meaning of 'good-faith buyer,' . . . most courts have adopted a traditional equitable definition: 'one who purchases the assets for value, in good faith and without notice of adverse claims.'" *Licensing by Paolo v. Sinatra (In Re Gucci)*, 126 F.3d 380, 392 (2d Cir. 1997). The "good faith" component of the test under § 363(m) speaks to "the integrity of [the bidder's] conduct in the course of the sale proceedings. Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly

unfair advantage of other bidders.'" *In re Pursuit Cap. Mgmt., LLC*, 874 F.3d 124, 135 (3d Cir. 2017) *quoting In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978).

48. The Debtors submit that the Stalking Horse Bidder has at all times acted in good faith and without collusion with other potential bidders in connection with the negotiation and execution of the APA and the Sale process generally.

49. The Stalking Horse Bidder negotiated the APA over nearly five months, bargaining strenuously with the Debtors in an arm's length back-and-forth.

50. The outcome of the marketing process pursuant to the Bid Procedures was that the Stalking Horse Bid was the only Qualified Bid, and the highest and best offer.

51. The Debtors consulted with the Committee on each major stage of the APA negotiations, the marketing process, and the eventual designation of the Stalking Horse Bidder as the Successful Bidder.

52. The Stalking Horse Bidder has at all times acted as an arm's length bidder operating in good faith, and is entitled to the protections of section 363(m) of the Bankruptcy Code.

**B. The Objections do not Prevent Approval of the Sale**

53. Pursuant to the Bid Procedures Order ¶ 18(h), if a

> Contract Objection relates solely to a Cure Dispute, the Selected Assumed Contract may be assumed by the Debtors and assigned to the applicable Successful Bidder provided that the cure amount that the Counterparty asserts is required to be paid under section 365(b)(1)(A) and (B) of the Bankruptcy Code (or such lower amount as agreed to by the Counterparty) is deposited in a segregated account by the Debtors, pending the Court's adjudication of the Cure Dispute or the parties' consensual resolution of the Cure Dispute.

54. The Objections, to the extent not already resolved or mooted, are Cure Disputes that relate solely to the amount necessary to cure any arrearage under the applicable contracts or leases.

55. The Stalking Horse Bidder's Base Purchase Price of $6.5 million provides the Debtors with sufficient funds at closing to pay all undisputed cures and other amounts that must be paid at closing, and to segregate an amount equivalent to the disputed cure amounts raised in the Objections.

56. Seagis's objection also seeks specific language in the eventual sale order addressing Seagis's right to be paid for charges coming due during the contemplated three-month transition period after closing on the Sale. The Debtors submit that this requested language largely restates the Debtors' duties under Section 365(d)(3), and does not raise any legal barrier to approval of the sale. However, the Debtors will work with Seagis to negotiate acceptable language for the sale order in an effort to address Seagis's concerns.

57. Crown does not object to the sale, and merely reserves its rights to raise objections in the event of specific contingencies. The Debtors will work with Crown to address these concerns, which may include addition of protective language to the sale order.

58. As such, the Debtors will continue to work in good faith to resolve the Objections, and respectfully request that the Court approve the sale, subject to potential future adjudication if the parties cannot resolve the dispute consensually.

[remainder of page left intentionally blank]

**Conclusion**

For the foregoing reasons, the Debtors respectfully request that the Court approve the Sale, and grant such other and further relief as may be just and proper.

Dated: October 14, 2026

**SAUL EWING LLP**

By: */s/ Stephen B. Ravin*

Stephen B. Ravin, Esquire
Jeffrey C. Hampton, Esquire
Turner N. Falk, Esquire
One Riverfront Plaza
1037 Raymond Blvd., Suite 1520
Newark, NJ 07102-5426
Telephone: (973) 286-6714
E-mail: stephen.ravin@saul.com
jeffrey.hampton@saul.com
turner.falk@saul.com

*Counsel for the Debtors and Debtors in Possession*