| | |
|---|---|
| **UNITED STATES BANKRUPTCY COURT**<br>**DISTRICT OF NEW JERSEY** | |
| ***Caption in Compliance with D.N.J. LBR 9004-1(b)***<br>**SAUL EWING LLP**<br>Stephen B. Ravin, Esquire<br>Jeffrey C. Hampton, Esquire<br>Turner N. Falk, Esquire<br>One Riverfront Plaza<br>1037 Raymond Blvd., Suite 1520<br>Newark, NJ 07102-5426<br>Telephone: (973) 286-6714<br>E-mail: stephen.ravin@saul.com<br>jeffrey.hampton@saul.com<br>turner.falk@saul.com<br>*Counsel to the Debtors and Debtors in Possession* | |
| In re:<br><br>PORT ELIZABETH TERMINAL & WAREHOUSE CORP., *et al.*,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 25-22123 (VFP)<br><br>(Jointly Administered) |

**DECLARATION OF NICHOLAS JALOWSKI**
**IN SUPPORT OF DEBTORS' SALE MOTION**

I, Nicholas Jalowski, hereby declare as follows:

1. I am a Financial Advisor of Cambridge Financial Services, LLC ("**Cambridge**"), the firm retained by the above-captioned debtors and debtors in possession (collectively, the "**Debtors**") in these bankruptcy cases.

2. I make this declaration in support of the Debtors' request for approval of the Sale more fully described in the *Debtors' Motion for Entry of an Order (I) Authorizing and Approving Bidding Procedures for the Sale of all or Substantially all of the Debtors' Assets, (II) Approving*

[1] The last four digits of each Debtors' tax identification number are as follows: Port Elizabeth Terminal & Warehouse, Corp. (6485), P. Judge & Sons, Inc. (3713), Amex Shipping Agent, Inc. (4699), the Judge Organization, LLC (8267), P. Judge & Sons Trucking, LLC (9853), and Judge Warehousing, LLC (6690). The location of the Debtors' principal place of business and the Debtors' service address in these Chapter 11 Cases is 13 Manor Road, East Rutherford, NJ 07073.

*Bid Protections, (III) Scheduling an Auction and a Sale Hearing, (IV) Approving the Form and Manner of Notice Thereof, and (V) Establishing Notice and Procedures for the Assumption and Assignment of Certain Executory Contracts and Leases* and associated Contract Notice [D.I. 441] (the "**Sale Motion**"),[2] and the Reply in support of the Sale Motion filed contemporaneously herewith.

3. Except as otherwise indicated herein, all facts set forth in this Declaration are based upon my personal knowledge, formed after a review of filings and correspondence related to these cases by myself or others at Cambridge under my supervision. I am over eighteen (18) years of age, and I am authorized to submit the Declaration on behalf of Cambridge. If called upon to testify, I could and would competently testify to the facts set forth herein from my own personal knowledge, except as otherwise stated above.

**Marketing Process and Bid Procedures Background**

4. Collectively, the Debtors provide transportation, logistic, and warehouse related services. More specifically, the Debtors offer rail boxcar services, container handling services, warehousing services, multiple shipping options (e.g., rail, truck, air, and international shipping), specialized material handling services, cross docking, handling, and packing services, beverage specialists and alcoholic beverages expertise services, and product care and protection services.

5. The Debtors' businesses consist of two primary segments, one located in northern New Jersey and Bristol, Pennsylvania, the other located in Savannah, Georgia.

6. In 2019, the Debtors retained Cambridge, an experienced financial advisor, to advise the Debtors on strategies to address the businesses' financial situation.

7. After the filing of the instant bankruptcy cases, the Debtors received inquiries from

---

2 Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the Sale Motion or Bid Procedures, as applicable.

parties interested in evaluating the Assets for potential purchase. These parties included financial and strategic investors. East Coast Warehouse and Distribution Corp., the eventual Stalking Horse Bidder, was one such party that began to evaluate the Assets.

8. Prior to the filing of the Bid Procedures, the Debtors began marketing efforts, affirmatively seeking out potential interested parties in conjunction with a sale process for all or substantially all of the Debtors' assets in connection with a section 363 sale.

9. Cambridge generated a list of potential strategic and financial acquirors consisting of 35 parties active in the transportation and logistics industry, all of which were contacted by the Debtor with a sale "teaser" inviting them to evaluate the Debtors' assets for purchase in the instant cases.

10. Debtors focused their efforts on developing marketing materials and marketing the Debtors' Assets to parties to serve as a stalking horse bidder. The Debtors, with the assistance of their professionals, prepared various due diligence materials to support a marketing effort, including a data room containing the key financial, operational, and contractual information related to the Debtors' businesses (collectively, the "**Investment Material**").

11. Additionally, it is our understanding that post-petition and before the Court's approval of the Bid Procedures, through DailyDAC (Distressed Asset Central), an online distressed business marketing firm, the Debtors caused to be distributed a teaser to over 300 distressed business investors.

12. The Debtors provided qualified parties access to the Investment Material once a nondisclosure agreement ("**NDA**") was executed. In addition, the Debtors engaged in business-to-business discussions with interested parties and offered site visits with a view toward engaging in further negotiations.

13. Since they commenced the marketing process, I understand that the Debtors obtained executed NDAs from fourteen interested parties and received two letters of intent from interested parties, including one from the Stalking Horse Bidder.

14. The Debtors engaged in negotiations with both of these parties. From the beginning of these negotiations, the Stalking Horse Bidder's offer consistently appeared, in the business judgment of the Debtors and their professionals, to be a higher and better offer than the terms offered by the other party.

15. The Debtors' negotiations with the Stalking Horse Bidder over what would become the Asset Purchase Agreement were arms-length, extensive, and hard-fought by both the Debtors and Stalking Horse Bidder.

16. The Stalking Horse Bidder requested additional due diligence materials, which the Debtors provided and added to the Investment Material available to all interested NDA parties.

17. Between early April 2026 and late August 2026, when the Sale Motion and APA were filed, the Debtors and Stalking Horse Bidder exchanged numerous revisions to and drafts of the APA, attempting to achieve a workable, value-maximizing arrangement agreeable to both parties and beneficial to the estate.

18. The outcome of these negotiations was the APA embodying the Stalking Horse Bid, which provided for a going-concern sale of substantially all of the Debtors' assets, constituting all or substantially all of the assets used at the Debtors' Jersey City, New Jersey, and Levittown, Pennsylvania locations, and substantially all of the assets for the Debtors' East Rutherford, New Jersey and Savannah, Georgia locations. Pursuant to the APA, the Stalking Horse Bidder would purchase the assets free and clear in exchange for (i) a base purchase price of $6,500,000 (subject to certain specified adjustments) and (ii) the assumption of certain liabilities

as described in the APA.

19. With a stalking horse bidding floor in place for the Assets (the key terms of which have already been subject to a robust market test), the Debtors filed the Sale Motion, seeking approval of the Bid Procedures necessary to subject the Assets to a competitive bidding process.

20. The Court entered the Bid Procedures Order, approving the Bid Procedures and the designation of the Stalking Horse Bidder, on September 4, 2026.

21. It is my understanding that following the entry of the Bid Procedures Order, the Debtors caused the Bid Procedures to be served on the Sale Notice Parties, and published the Sale Notice in the national edition of *USA Today*, and the local newspaper for the locations of each of the Debtors' facilities: (i) Jersey City, New Jersey; (ii) East Rutherford, New Jersey; (iii) Levittown, Pennsylvania; and (iv) Savannah, Georgia, to provide notice to any other potential interested parties.

22. Following the Court's entry of the Bidding Procedures Order, the Debtors continued to engage with certain interested parties, offering additional site visits and business-to-business discussions.

23. No party other than the Stalking Horse Bidder made an actionable offer for the Assets. By the Bid Deadline, the Debtors did not receive any Qualified Bids, aside from the Stalking Horse Bid.

24. Consistent with the Bid Procedures, the Debtors cancelled the Auction and designated the Stalking Horse Bid as the Successful Bid. See *Notice of Successful Bidder and Cancellation of Auction* [D.I. 482].

25. Pursuant to the APA with the Stalking Horse Bidder, the Base Purchase Price for the Assets is $6.5 million.

26. The proposed sale of the Assets to the Stalking Horse Bidder in accordance with the Bid Procedures, is a sound exercise of the Debtors' business judgment that will maximize the value of the Debtors' assets as a result of the effective testing of the market value of the Assets through a competitive bidding process.

27. I believe the Sale is in the best interest of the Debtors, their estates, their creditors and all parties in interest, and should be approved.

28. Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Date: October 23, 2026

Respectfully submitted,

*/s/ Nicholas Jalowski*
Nicholas Jalowski



58833414.7