UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

**Caption in Compliance with D.N.J. LBR 9004-1(b)**

**Order Filed on October 27, 2026**
**by Clerk**
**U.S. Bankruptcy Court**
**District of New Jersey**

In Re:

Port Elizabeth Terminal & Warehouse Corp.,

Debtor.

| | |
|---|---|
| Case No.: | 25-22123 |
| Chapter: | 11 |
| Hearing Date: | 10/26/2026 |
| Judge: | Vincent F. Papalia |

**ORDER (I) APPROVING ASSET PURCHASE AGREEMENT BETWEEN DEBTORS AND PURCHASER; (II) APPROVING SALE OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS; (III) APPROVING ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (IV) GRANTING RELATED RELIEF**

The relief set forth on the following pages, is hereby **ORDERE**D

**DATED: October 27, 2026**

Honorable Vincent F. Papalia
United States Bankruptcy Judge

| |
|---|
| **UNITED STATES BANKRUPTCY COURT**<br>**DISTRICT OF NEW JERSEY** |
| *Caption in Compliance with D.N.J. LBR 9004-1(b)*<br>**SAUL EWING LLP**<br>Stephen B. Ravin, Esquire<br>Jeffrey C. Hampton, Esquire<br>Turner N. Falk, Esquire<br>One Riverfront Plaza<br>1037 Raymond Blvd., Suite 1520<br>Newark, NJ 07102-5426<br>Telephone: (973) 286-6714<br>E-mail: stephen.ravin@saul.com<br>jeffrey.hampton@saul.com<br>turner.falk@saul.com<br>*Counsel to the Debtors and Debtors in Possession* |

| | |
|---|---|
| In re: | Chapter 11 |
| PORT ELIZABETH TERMINAL & WAREHOUSE CORP., *et al.*, | Case No. 25-22123 (VFP) |
| Debtors.[1] | (Jointly Administered) |

**ORDER (I) APPROVING ASSET PURCHASE AGREEMENT BETWEEN DEBTORS AND PURCHASER; (II) APPROVING SALE OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS; (III) APPROVING ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (IV) GRANTING RELATED RELIEF**

Upon the *Debtors' Motion for Entry of an Order (I) Authorizing and Approving Bidding Procedures for the Sale of all or Substantially all of the Debtors' Assets, (II) Approving Bid Protections, (III) Scheduling an Auction and a Sale Hearing, (IV) Approving the Form and Manner of Notice Thereof, and (V) Establishing Notice and Procedures for the Assumption and Assignment of Certain Executory Contracts and Leases* [D.I. 417] (the "Motion")[2] of the above-captioned

[1] The last four digits of each Debtor's tax identification number are as follows: Port Elizabeth Terminal & Warehouse Corp. (6485), P. Judge & Sons, Inc. (3713), Amex Shipping Agent, Inc. (4699), the Judge Organization, LLC (8267), P. Judge & Sons Trucking, LLC (9853), and Judge Warehousing, LLC (6690). The location of the Debtors' principal place of business and the Debtors' service address in these Chapter 11 Cases is 13 Manor Road, East Rutherford, NJ 07073.

[2] Capitalized terms used but not defined in this Order are defined in the Motion or APA (defined below), as applicable.

debtors and debtors in possession (collectively, the "Debtors") seeking entry of an order (this "Order") authorizing and approving: (a) the proposed sale of substantially all of the Debtors' assets free and clear of all liens, claims, encumbrances, and other interests other than any assumed liabilities specifically identified in the APA (defined below); (b) the assumption of the Assigned Contracts and Assigned Leases of the Debtors identified in the APA and assignment and sale of the Assigned Contracts and Assigned Leases (except as removed prior to Closing) to East Coast Warehouse and Distribution Corp., and/or its designee(s) (the "Purchaser"); and (c) granting related relief, and the Court having entered an order (D.I. 433) (the "Bidding Procedures Order") approving, among other things, the bidding procedures (the "Bidding Procedures"), the proposed form of notice of the Sale Hearing, and Purchaser as the Stalking Horse Bidder for substantially all of the Debtors' assets; after an extensive marketing process conducted pursuant to the terms of the Bidding Procedures Order, and no Qualified Bids aside from that of the Purchaser having been received, and on October 5, 2026, the Debtors having identified that certain asset purchase agreement, by and among the Debtors as sellers (collectively, the "Seller"), and Purchaser (including all exhibits, schedules, and ancillary documents related thereto, the "APA") as the highest or otherwise best bid for substantially all of the Seller's assets as more particularly described in the APA (the "Acquired Assets"), and the Court having conducted a Sale Hearing regarding the Motion on October 26, 2026 at which time all interested parties were offered an opportunity to be heard with respect to the Motion; and the Court having (a) reviewed and considered the Motion, all relief related thereto, any objections thereto and statements of counsel and the evidence and/or proffer presented in support of the relief requested by the Debtors in the Motion at the Sale Hearing, and (b) found that, after an appropriate marketing process by the Debtors under the facts and circumstances of these cases, Purchaser, a good faith purchaser, has

submitted the highest or otherwise best bid for the Acquired Assets; and adequate and sufficient notice of the Bidding Procedures, the APA, and all transactions contemplated thereunder and in this Order was given pursuant to and consistent with the Bidding Procedures Order; and it appearing that the relief requested in the Motion is in the best interests of the Debtors, their estates, creditors, and other parties in interest; and it further appearing that the legal and factual bases set forth in the Motion and at the Sale Hearing establish just cause for the relief granted herein; and after due deliberation thereon; and good and sufficient cause appearing therefor;

**IT IS HEREBY FOUND AND DETERMINED THAT:**

A. **Jurisdiction and Venue**. This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b). Venue of these cases and this Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

B. **Statutory Predicates**. The statutory predicates for the relief sought in the Motion are sections 105, 363 and 365 of the Bankruptcy Code, as supplemented by Bankruptcy Rules 2002, 6004, 6006, 9007 and 9014, and the applicable requirements of the local rules of the Court.

C. **Final Order**. This Order constitutes a final order within the meaning of 28 U.S.C. § 158(a). Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), and to any extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rule 7054, this Court expressly finds that there is no just reason for delay in the implementation of this Order, and expressly directs entry of judgment as set forth herein.

D. **Notice**. Notice of the Motion, the time and place of the Sale Hearing and the time for filing objections to the Motion (the "Sale Notice") was reasonably calculated to provide all interested parties with timely and proper notice of the Sale and the Sale Hearing.

E. As evidenced by the certificates of service previously filed with the Court, proper, timely, adequate, and sufficient notice of the Motion, Sale Hearing, Sale and transactions contemplated thereby has been provided in accordance with the Bidding Procedures Order, sections 363 and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006, 9007 and 9008. The Debtors have complied with all obligations to provide notice of the Motion as set forth in the Bidding Procedures Order. The notices described above were good, sufficient, and appropriate under the circumstances, and no other or further notice of the Motion or Sale Hearing is or shall be required. The disclosures made by the Debtors concerning the Motion and Sale Hearing were good, complete, and adequate, and no further notice or hearing is required to approve the relief granted in this Order.

F. **Compliance with Bidding Procedures Order**. As demonstrated by evidence proffered or adduced, documents, and declarations filed in connection with the Sale Hearing, and the representations of counsel at the Sale Hearing, the Debtors have conducted a thorough marketing process and a fair and open sale process in compliance with the Bidding Procedures Order. The Bidding Procedures were non-collusive, substantively and procedurally fair to all parties, were the result of arm's-length negotiations, and afforded a full, fair, and reasonable opportunity for any interested party to obtain necessary due diligence information and to submit the materials required under the Bidding Procedures Order by the Bid Deadline. Through marketing efforts and a competitive sale process conducted in accordance with the Bidding Procedures Order, the Debtors: (i) afforded interested potential purchasers a full, fair, and reasonable opportunity to qualify as bidders and submit their highest or otherwise best offer to purchase the Acquired Assets; (ii) provided potential purchasers sufficient information to enable them to make an informed judgment on whether to bid on the Acquired Assets; and (iii) considered

any bids submitted on or before the Bid Deadline. Based upon the circumstances and record of these chapter 11 cases, all creditors and other parties in interest and all prospective purchasers have been afforded a reasonable and fair opportunity to bid for the Acquired Assets.

G. In accordance with the Bidding Procedures Order, the Debtors have served a notice of potential assumption and assignment [D.I. 441] (the "Contract Notice"), which identifies the amount that the Debtors believe is required to be paid to cure any defaults arising under the contract that existed as of the Petition Date pursuant to section 365(b)(1) of the Bankruptcy Code (the "Cure Amount"), upon each non-Debtor counterparty to an Assigned Contract or Assigned Lease. The service and provision of the Contract Notice was good, sufficient, and appropriate under the circumstances and, except as may be provided herein, no further notice need be given in respect of assumption, assignment and sale of the Assigned Contracts and Assigned Leases or establishing a Cure Amount for the respective Assigned Contract or Assigned Lease. Non-Debtor counterparties to the Assigned Contracts and Assigned Leases have had an adequate opportunity to object to assumption and assignment thereof and the Cure Amount set forth in the Contract Notice (including objections related to the adequate assurance of future performance and objections based on whether applicable law excuses the non-Debtor counterparty from accepting performance by, or rendering performance to, Purchaser for purposes of section 365(c)(1) of the Bankruptcy Code). The deadline to file an objection to the stated Cure Amount, to the proposed assumption, assignment, or transfer of an Assigned Contract or Assigned Lease, and adequate assurance of future performance provided by the Purchaser (a "Contract Objection") has expired and to the extent any such party timely filed a Contract Objection, all such Contract Objections have been resolved, withdrawn, overruled, or continued to a later hearing pursuant to the Bidding Procedures or by agreement of the parties as set forth in this Order. To the extent that any such

party did not timely file a Contract Objection, such party shall be deemed to have consented to (i) the assumption, assignment and sale of the Assigned Contract or Assigned Lease to the Purchaser and (ii) except for the Informal Cure Dispute (as defined in paragraph 26 of this Order), the proposed Cure Amount set forth on the Contract Notice.

H. **Corporate Authority**. Subject to the entry of this Order, each Debtor (i) has the requisite corporate power and authority to execute, deliver, and perform its obligations under the APA and all other documents contemplated thereby, and has taken all requisite corporate or other organizational action and formalities necessary to authorize and approve the execution, delivery and performance of its obligations under the APA and to consummate the Sale, including as required by its organizational documents, and upon execution thereof, the APA and the related documents were or will be duly executed and delivered by each Debtor and enforceable against such Debtor in accordance with their terms and, assuming due authorization, execution and delivery thereof by the other parties thereto, constituted or will constitute a valid and binding obligation of each Debtor. No government, regulatory, or other consents other than those expressly provided for in the APA were required for the execution, delivery and performance by the Debtors of the APA or the consummation of the Sale contemplated thereby. No consents or approvals of the Debtors, other than those expressly provided for in the APA or this Order, are required for the Debtors to consummate the Sale.

I. The APA was not entered into for the purpose of hindering, delaying, or defrauding creditors under the Bankruptcy Code or under the laws of the United States, any state, territory, possession, or the District of Columbia. Neither the Debtors nor the Purchaser is entering into the transactions contemplated by the APA fraudulently for the purpose of statutory and common law fraudulent conveyance and fraudulent transfer claims or similar claims.

J. The Acquired Assets are property of the Debtors' estates and title thereto is vested in the Debtors' estates within the meaning of section 541(a) of the Bankruptcy Code. The Acquired Assets are subject to first priority security interests and liens (the "DIP Liens") granted to First Business Specialty Finance, LLC (the "DIP Lender") under and subject to the *Final Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, 503, 506, And 507 and Fed. R. Bankr. P. 2002, 4001, 6003, 6004 and 9014 (I) Authorizing Debtors to Obtain Post-Petition Financing, (II) Granting Liens and Superpriority Claims, (III) Authorizing Use of Cash Collateral, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* [D.I. 194] (the "Final DIP Order"). The transfers of the Acquired Assets by Debtors to Purchaser (a) vest or will vest Purchaser with all right, title, and interest of the Debtors in and to the Acquired Assets, and to the fullest extent permitted by 11 U.S.C. § 363(f) and all other applicable laws, free and clear of all liens, claims, interests, and encumbrances (including, but not limited to, any "claims" as defined in 11 U.S.C. § 101(5), reclamation claims, covenants, restrictions, hypothecations, charges, indentures, loan agreements, causes of action, instruments, contracts, leases, licenses, options, rights of first refusal, offsets, rights of recovery, judgments, orders and decrees of any court or foreign or domestic governmental entity, claims for reimbursement, successor liability, contribution, indemnity or exoneration, assignment, preferences, debts, charges, suits, rights of recovery, interests, products liability, alter-ego, environmental liability, successor liability, tax and other liabilities, causes of action and claims, and in each case whether secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, notice or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or unmatured, material or non-material, disputed or undisputed, or known or unknown whether arising prior to, on, or subsequent to the date on which

Debtors filed their voluntary petitions under chapter 11 of the Bankruptcy Code, whether imposed by agreement, understanding, law, equity or otherwise (collectively, the "Encumbrances"), with any such Encumbrances to attach only to the proceeds of sale with the same priority, validity, force, and effect as they existed with respect to the Acquired Assets prior to Sale closing, and (b) constitute transfers for reasonably equivalent value and fair consideration under the Bankruptcy Code and applicable non-bankruptcy law. For the avoidance of doubt and without limiting the foregoing, the transfer of the Acquired Assets to Purchaser is free and clear of any Encumbrances relating to or in connection with (i) any Employee Benefit Plan or pension plans contributed to or maintained by the Debtors, or multiemployer plan participated in by the Debtors prior or subsequent to the Petition Date, which plans and agreements are not being assumed and assigned to the Purchaser under the APA and this Order; (ii) the Worker Adjustment and Retraining Notification Act of 1988; (iii) the Consolidated Omnibus Budget Reconciliation Act of 1985 or any similar laws or regulations; or (iv) any collective bargaining agreement(s) to which Debtors are a party or otherwise obligated under, which plans and agreements are not being assumed and assigned to the Purchaser under the APA and this Order.

K. **Sale in Best Interests of the Debtors' Estates**. Good and sufficient reasons for approval of the APA and the transactions to be consummated in connection therewith have been articulated, and the relief requested in the Motion is in the best interests of the Debtors, their estates, their creditors, and other parties in interest. The Debtors have demonstrated both (a) good, sufficient and sound business purposes and justifications and (b) compelling circumstances for the Sale other than in the ordinary course of business, pursuant to section 363(b) of the Bankruptcy Code, outside of a plan of reorganization, in that, among other things, immediate consummation of the Sale to Purchaser is necessary and appropriate to maximize the value of the Debtors' estates.

L. The Sale must be approved and consummated promptly in order to maximize the value of the Debtors' estates. Time is of the essence in consummating the Sale. Given all of the circumstances of these chapter 11 cases and the adequacy and fair value of the Base Purchase Price, the proposed Sale constitutes a reasonable and sound exercise of the Debtors' business judgment and should be approved.

M. The consummation of the Sale and the assumption, assignment and sale of the Assigned Contracts and Assigned Leases are legal, valid, and properly authorized under all applicable provisions of the Bankruptcy Code, including, without limitation, sections 105(a), 363(b), 363(f), 363(m), and 365, and all of the applicable requirements of such sections have been complied with in respect of the transaction and shall be deemed effective and enforceable at Closing.

N. **<u>Good Faith of Purchaser and Sellers</u>**. The APA was negotiated, proposed, and entered into by the Debtors and Purchaser without collusion, in good faith, and from arm's-length bargaining positions, and is substantively and procedurally fair to all parties. Based on the record in these cases and at the Sale Hearing, neither any of the Debtors, nor Purchaser has engaged in any conduct that would cause or permit the APA to be avoided under Bankruptcy Code section 363(n) or otherwise. Specifically, Purchaser has not acted in a collusive manner with any potential bidder and/or other person and the Base Purchase Price was not controlled by any agreement among bidders. The Debtors and Purchaser have fully disclosed the identities of each entity participating in Purchaser's bid. Purchaser is purchasing the Acquired Assets, in accordance with the APA, in good faith and is a good faith buyer within the meaning of section 363(m) of the Bankruptcy Code, and is therefore entitled to all of the protections afforded by such provision, and otherwise has proceeded in good faith in all respects in connection with the Debtors' chapter 11

cases. As demonstrated by (i) evidence proffered or adduced at the Sale Hearing and (ii) the representations of counsel made on the record at the Sale Hearing, appropriate marketing efforts and a competitive sale process were conducted in accordance with the Bidding Procedures Order and, among other things: (a) the Debtors, the Consultation Parties and Purchaser complied with the provisions in the Bidding Procedures Order; (b) Purchaser was determined by the Debtors in consultation with the Consultation Parties to be the Successful Bidder; and (c) all payments made and to be made by Purchaser in connection with the Sale have been disclosed.

O. **Highest or Otherwise Best Offer**. The Debtors conducted the marketing process for the assets in accordance with, and have otherwise complied in all material respects with, the Bidding Procedures Order. The procedures established in the Bidding Procedures Order afforded a full, fair and reasonable opportunity for any person or entity to make a higher or otherwise better offer to purchase the Acquired Assets. The Bidding Procedures and the opportunity to submit a higher or otherwise better bid were duly noticed and conducted in a non-collusive, fair, and good faith manner, and a reasonable opportunity was given to any interested party to make a higher or otherwise better offer for the Acquired Assets in accordance with the terms of the Bidding Procedures. The APA constitutes the highest or otherwise best offer for the Acquired Assets and will provide a greater recovery for the Debtors' estates than would be provided by any other available alternative. The Debtors' determination, after consulting with the Consultation Parties, that the APA constitutes the highest or otherwise best offer for the Acquired Assets is a valid and sound exercise of their fiduciary duties and constitutes a valid and sound exercise of the Debtors' business judgment.

P. **Consideration**. The consideration provided by Purchaser pursuant to the APA (a) is fair and reasonable, (b) is the highest or otherwise best offer for the Acquired Assets, and (c)

constitutes reasonably equivalent value and fair consideration (as those terms are defined in each of the Uniform Voidable Transactions Act (formerly the Uniform Fraudulent Transfer Act), Uniform Fraudulent Conveyance Act, and section 548 of the Bankruptcy Code) under the laws of the United States, any state, territory, possession, or the District of Columbia. No other person or entity or group of entities has offered to purchase the Acquired Assets for greater value to the Debtors' estates than Purchaser.

Q. **Legal, Valid, and Binding Transfer**. The Acquired Assets are property of the Debtors' estates and title thereto is vested in the Debtors' estates within the meaning of section 541(a) of the Bankruptcy Code. The transfer of the Acquired Assets to the Purchaser is a legal, valid, and effective transfer of the Acquired Assets and, except as provided in the APA or this Order, vests the Purchaser with all right, title, and interest of the Debtors to the Acquired Assets free and clear of all Encumbrances, unless specifically assumed by the Purchaser pursuant to the APA, in accordance with section 363(f) of the Bankruptcy Code as one or more of the bases provided in section 363(f) of the Bankruptcy Code are present and were established at the Sale Hearing. The APA is a valid and binding contract between the Debtors and the Purchaser and is enforceable according to its terms.

R. **No Merger**. Purchaser is not holding itself out to the public as a continuation of the Debtors, and no common identity of directors, stockholders, members, or other equity holders exists between Purchaser and the Debtors. The Sale does not amount to a consolidation, merger, or *de facto* merger of Purchaser and Debtors and/or Debtors' bankruptcy estates; there is no substantial continuity, common identity, or continuation of enterprise between the Debtors and Purchaser. Purchaser is not a mere continuation of the Debtors or their bankruptcy estates, and Purchaser does not constitute an alter ego or a successor in interest to the Debtors or their

bankruptcy estates and any Encumbrances based on such theories are expressly waived and barred as to Purchaser to the maximum extent provided under the law.

S. **No Successor**. Except for the contractual commitments of Purchaser pursuant to the APA, Purchaser is not, and shall not be considered or deemed, as a result of any action taken in connection with the Sale, to be a successor in interest of the Debtors or their estates for any purpose, including but not limited to under any federal, state, or local statute or common law, or revenue, pension, ERISA, tax, labor, employment, environmental, escheat or unclaimed property laws, or other law, rule, or regulation (including without limitation filing requirements under any such laws, rules or regulations), or under any products liability law or doctrine with respect to the Debtors' liability under such law, rule, or regulation or doctrine or common law, or under any product warranty liability law or doctrine with respect to the Debtors' liability under such law, rule or regulation or doctrine and Purchaser and its affiliates shall have no liability or obligation under the Worker Adjustment and Retraining Notification Act (the "WARN Act"), 29 U.S.C. §§ 2101 et seq. or similar state laws, or the Comprehensive Environmental Response Compensation and Liability Act or similar state laws, and shall not be deemed to be a "successor employer" for purposes of the Internal Revenue Code of 1986, Title VII of the Civil Rights Act of 1964, as amended, the Age Discrimination in Employment Act, the Americans with Disabilities Act, the Family Medical Leave Act, the National Labor Relations Act, the Labor Management Relations Act, the Older Workers Benefit Protection Act, the Equal Pay Act, the Civil Rights Act of 1866 (42 U.S.C. 1981), the Employee Retirement Income Security Act, the Multiemployer Pension Protection Act, the Pension Protection Act, the Fair Labor Standards Act, and/or any state laws similar to the foregoing federal laws. The (i) transfer of the Acquired Assets to Purchaser and (ii) assumption, assignment and sale to Purchaser of the Assigned Contracts and Assigned Leases do not and will not

subject Purchaser to any liability whatsoever with respect to the operation of the Debtors' business before the Closing Date (as such term is defined in the APA) or by reason of such transfer under the laws of the United States, any state, territory, or possession thereof, or the District of Columbia, based, in whole or in part, directly or indirectly, on any theory of law or equity, including, without limitation, any theory of equitable law, including any theory of antitrust or successor or transferee liability. For the avoidance of doubt, Purchaser shall have no obligation for any claims or liabilities with respect to or arising under the Assigned Contracts and Assigned Leases that arose prior to Closing, including without limitation any contractual warranty claims under the Assigned Contracts and Assigned Leases and claims by counterparties to the Assigned Contracts and Assigned Leases for contribution toward third-party injury, damage, or loss that were not expressly assumed under the APA.

T. **Free and Clear**. The conditions of section 363(f) of the Bankruptcy Code have been satisfied in full; therefore, the Debtors may sell the Acquired Assets free and clear of any Encumbrances, to the fullest extent permitted by applicable law. Purchaser would not have entered into the APA and would not consummate the transactions contemplated thereby if the Sale to Purchaser was not free and clear of all Encumbrances. The consideration payable under the APA reflects Purchaser's reliance on the free-and-clear transfer and the protections against successor and transferee liability provided in this Order. These protections are integral to the Sale and to Purchaser's agreement to pay such consideration. The Debtors may sell the Acquired Assets free and clear of any Encumbrances of any kind or nature whatsoever because in each case, one or more of the standards set forth in section 363(f)(1)–(5) of the Bankruptcy Code has been satisfied. Each entity with any Encumbrances of any kind on the Acquired Assets to be transferred on the Closing Date: (i) has, subject to the terms and conditions of this Order, consented to the Sale or is

deemed to have consented to the Sale; (ii) could be compelled in a legal or equitable proceeding to accept money satisfaction of such Encumbrances; or (iii) otherwise falls within the provisions of section 363(f) of the Bankruptcy Code. Without limiting the generality of the foregoing, the DIP Lender has consented to the sale of the Acquired Assets, free and clear of the DIP Liens, conditioned on the Debtors' representations that they will remit at Closing that portion of the proceeds of sale to the DIP Lender in the amount necessary to satisfy the DIP Lender's liens at Closing. All Encumbrances attach to any cash proceeds received by the Debtors that are ultimately attributable to the property against or in which such Encumbrances are asserted, subject to the terms of such Encumbrances with the same validity, force, and effect, and in the same order of priority, which such holders of Encumbrances now have against the Acquired Assets or their proceeds, if any, subject to any rights, claims, and defenses the Debtors or their estates, as applicable, may possess with respect thereto. Notwithstanding the foregoing, no representation of the Debtors to the DIP Lender shall alter the free and clear nature and transfer of the Acquired Assets to the Purchaser pursuant to this Order.

U. **Not a *Sub Rosa* Plan**. The APA and Sale do not constitute an impermissible *sub rosa* chapter 11 plan for which approval has been sought without the protections that a disclosure statement would afford.

V. **Cure and Adequate Assurance**. Notice of the Debtors' assumption, assignment and sale to the Purchaser of the Assigned Contracts and Assigned Leases has been provided to each non-Debtor counterparty to an Assigned Contract or Assigned Lease, together with the Cure Amount, if any, to be paid to such non-Debtor counterparty to cure any defaults under, and to otherwise comply with the requirements of section 365(b) of the Bankruptcy Code with respect to each Assigned Contract or Assigned Lease. As to each Assigned Contract or Assigned Lease,

payment of the Cure Amount listed on Exhibit 1 to the Contract Notice (or such other Cure Amount as agreed, in writing, by the Purchaser, the Debtors, and the counterparty thereto, or ordered by this Court) is sufficient for the Debtors to comply fully with the requirements of section 365(b) of the Bankruptcy Code. In addition, Purchaser has provided to requesting parties adequate assurance of its ability to perform its obligations under each of the Assigned Contracts and Assigned Leases within the meaning of section 365 of the Bankruptcy Code. All other requirements and conditions under the Bankruptcy Code for the assumption by the Debtors and assignment and sale to Purchaser of the Assigned Contracts and Assigned Leases have been satisfied. Therefore, subject to the terms of this Order, the Assigned Contracts and Assigned Leases may be assumed by the Debtors and assigned and sold to Purchaser. Notwithstanding the foregoing, the Debtors shall remain obligated to pay any and all allowed administrative expense claims from the Petition Date through Closing arising under any and all of the Assigned Contracts and Assigned Leases that were not identified as a Cure Amount in the Contract Notice and which the Debtors have not paid as of Closing.

**THEREFORE, IT IS ORDERED, ADJUDGED AND DECREED THAT**:

1. The Motion is granted to the extent set forth in this Order.

2. Any objections or reservation of rights filed or asserted in response to the Motion and the relief granted, to the extent not resolved as set forth herein or on the record at the Sale Hearing, are hereby overruled on the merits in their entirety with prejudice, other than objections on account of a Cure Dispute, if any, that are presently subject to the cure resolution process pursuant to the Bidding Procedures.

3. The APA, and all other ancillary documents, and all of the terms and conditions thereof, are hereby approved in all respects. The Debtors are authorized and directed to comply

with, and execute, all obligations arising under the APA, and to reasonably cooperate with Purchaser to consummate the transactions contemplated by the APA. The APA is attached to this Order as **Exhibit 1**.

4. Pursuant to sections 363(b) and 363(f) of the Bankruptcy Code, the Debtors are hereby authorized without the need of further approval from this Court to (a) execute any additional instruments or documents that may be reasonably necessary or appropriate to implement the APA, including without limitation a management agreement, *provided* that such additional documents do not materially change the APA's terms adversely as to the Debtors' estates; (b) consummate the Sale in accordance with the terms and conditions of the APA and the instruments to the APA contemplated thereby; and (c) execute and deliver, perform under, consummate, implement, and close fully the transactions contemplated by the APA, including the assumption, assignment and sale to Purchaser (in accordance with the APA) of the Assigned Contracts and Assigned Leases, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the APA and the Sale. Purchaser is not required to seek or obtain relief from the automatic stay under section 362 of the Bankruptcy Code to enforce any of its remedies under the APA or any other Sale-related document. The automatic stay imposed by section 362 of the Bankruptcy Code is modified solely to the extent necessary to implement the preceding sentence and the other provisions of this Order, *provided, however*, that this Court retains exclusive jurisdiction over any and all disputes with respect thereto.

5. This Order and terms and provisions of the APA are binding in all respects upon the Debtors, and all their successors and assigns, the Debtors' estates, all creditors of, and holders of equity interests in, the Debtors, any holders of Encumbrances in, against, or on all or any portion of the Acquired Assets (whether known or unknown), Purchaser and all successors and assigns of

Purchaser, the Acquired Assets, and any trustees subsequently appointed in the Debtors' chapter 11 cases or upon a conversion to chapter 7 under the Bankruptcy Code of the Debtors' cases. This Order and the APA inure to the benefit of the Debtors, their estates, Purchaser, and the respective successors and assigns of each of the foregoing. The APA is not subject to rejection or avoidance by the Debtors, their estates, their creditors, their equity holders, or any trustee, examiner, or receiver. Any trustee appointed in these chapter 11 cases is hereby authorized to operate the business of the Debtors to the fullest extent necessary to perform compliance with the terms of this Order and the APA.

6. The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Order in accordance with the Motion.

7. The Sale of the Acquired Assets to Purchaser pursuant to the APA and the consummation of the transactions contemplated thereby do not require any consents other than as specifically required in the APA. Each and every federal, state, and local government agency or department is hereby authorized and directed to accept any and all documents and instruments necessary and appropriate to consummate the transaction contemplated by the APA. A certified copy of this Order may be filed with the appropriate clerk or recorded with any recorder of any state, county or local authority to act to cancel any Encumbrances.

8. **Transfer of Acquired Assets Free and Clear of Encumbrances**. Pursuant to sections 105(a), 363(b), 363(f), 365(b) and 365(f) of the Bankruptcy Code, the Debtors are authorized to transfer the Acquired Assets to Purchaser in accordance with the APA and such transfer shall constitute a legal, valid, binding, and effective transfer of such Acquired Assets. Such transfer of the Acquired Assets vests Purchaser with title in and to the Acquired Assets and at Closing, Purchaser shall take title to and possession of the Acquired Assets free and clear of all

Encumbrances of any kind or nature whatsoever, including but not limited to successor or successor in interest liability and claims in respect of the Excluded Assets, and all such Encumbrances, if any, shall attach to the sale proceeds, with the same validity, force and effect, and in the same order of priority, which such Encumbrance had prior to the Closing of the Sale, subject to any rights, claims, and defenses of the Debtors or their estates in connection therewith. Without limiting the generality of the foregoing, sale proceeds sufficient to satisfy the obligations owed to the DIP Lender in full shall be remitted to the DIP Lender in accordance with and subject to the Final DIP Order and consistent with a closing statement reasonably acceptable to the DIP Lender. Purchaser shall have no obligation to monitor, and no liability for, any subsequent allocation, segregation, application, or distribution of the sale proceeds, whether by or on behalf of the Debtors or pursuant to the provisions of the Debtors' confirmed plan of liquidation. No subsequent failure by the Debtors, their estates, or pursuant to the provisions of the Debtors' confirmed plan of liquidation , to apply or distribute those proceeds shall revive any released Encumbrance against Purchaser or the Acquired Assets or impair the validity of the Sale.

9. Unless otherwise expressly included in the Assigned Contracts and Assigned Leases in the APA, Purchaser shall not be responsible for any Encumbrances, including, but not limited to, in respect of the following: (a) any mortgages, deeds of trust, and security interests; (b) any claims that might otherwise arise under or pursuant to (i) the Employee Retirement Income Security Act, as amended, (ii) the Fair Labor Standards Act, (iii) Title VII of the Civil Rights Act of 1964, (iv) the Federal Rehabilitation Act of 1973, (v) the National Labor Relations Act, (vi) the WARN Act, (vii) the Age Discrimination in Employment Act, as amended, (viii) the Americans with Disabilities Act, (ix) the Family Medical Leave Act, (x) the Labor Management Relations Act, (xi) the Comprehensive Environmental Response Compensation and Liability Act,

(xii) other federal or state environmental laws, (xiii) state discrimination laws, (xiv) state unemployment compensation laws or any other similar state laws, or (xv) any other state or federal benefits or claims relating to any employment with the Debtors or any of their respective predecessors; (c) any bulk sales or similar law; (d) any tax statutes or ordinances, including, without limitation, the Internal Revenue Code of 1986, as amended, or any state or local tax laws; (e) any escheat or unclaimed property laws; (f) to the extent not included in the foregoing, any of the Excluded Liabilities under the APA; and (g) any theories of successor or transferee liability as a result of any action taken in connection with the Sale. For avoidance of doubt, unless expressly provided in the APA, Purchaser shall not be obligated for any liability under any of the Assigned Contracts and Assigned Leases arising prior to the Closing Date.

10. On the Closing Date, each of the Debtors' creditors is authorized and directed to execute such documents and take all other actions as may be reasonably necessary to release its Encumbrances or other interests in the Acquired Assets, if any, as such Encumbrances may have been recorded or may otherwise exist.

11. If any person or entity which has filed statements or other documents or agreements evidencing Encumbrances on, against, or in, all or any portion of the Acquired Assets has not delivered to the Debtors prior to the Closing Date, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of liens and easements, and any other documents necessary for the purpose of documenting the release of all Encumbrances of any kind or other interests which the person or entity has or may assert with respect to all or any portion of the Acquired Assets, the Debtors are hereby authorized, and Purchaser is hereby authorized, to execute and file such statements, instruments, releases, and other documents on behalf of such person or entity with respect to the Acquired Assets and file a copy

of this Order with such documents, and/or seek contempt against such person or entity that has failed to make such filing or execute such document.

12. On the Closing Date, this Order constitutes for any and all purposes a full and complete general assignment, conveyance, and transfer to Purchaser of the Debtors' interests in the Acquired Assets and assumption and assignment of the Assigned Contracts and Assigned Leases to Purchaser. This Order is a determination that, on the Closing Date, all Encumbrances or other interests of any kind or nature whatsoever existing as to the Acquired Assets prior to the Closing Date, have been unconditionally released, discharged, and terminated to the fullest extent permitted by applicable law, and that the conveyances described herein have been effected. This Order is binding upon and governs the acts of all persons and entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any lease; and each of the foregoing persons and entities is hereby authorized and directed to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the transactions contemplated by the APA. A certified copy of this Order may be filed with the appropriate clerk and/or recorded with the recorder to act to cancel any Encumbrances and other interests of record. The transfer and release provisions of this Order are self-executing, and neither the Debtors nor Purchaser shall be required to obtain or file any separate release, termination statement, assignment, consent, or other instrument to effectuate

them. This Order may be relied upon by filing officers, title agents, and title insurers as conclusive evidence of such transfer and releases.

13. All persons or entities that are presently, or on the Closing Date may be, in possession of some or all of the Acquired Assets are hereby authorized and directed to surrender possession of the Acquired Assets to Purchaser on the Closing Date or at such later time as Purchaser reasonably requests. Subject to the terms, conditions, and provisions of this Order, all persons and entities are hereby forever prohibited and enjoined from taking any action that would adversely affect or interfere with (i) the ability of the Debtors to sell and/or transfer the Acquired Assets to Purchaser in accordance with the terms of the APA or (ii) Purchaser's right to own, possess or convey the Acquired Assets.

14. To the greatest extent available under applicable law, Purchaser is authorized, as of the Closing Date, to operate under any license, permit, registration, and governmental authorization or approval of the Debtors with respect to the Acquired Assets to the extent transferred in the APA or permitted under the Interim Management Agreement, and all such licenses, permits, registrations, and governmental authorizations and approvals are deemed to have been transferred to Purchaser as of the Closing Date. The Interim Management Agreement is approved, and the applicable Debtors are authorized and directed to perform thereunder. Purchaser is authorized to possess and operate the Acquired Assets, including the use of the Alcohol Licenses in accordance with the Interim Management Agreement pending the transfer or issuance of the Alcohol Licenses to Purchaser, *provided* that nothing in this Order authorizes the transfer or assignment of the Alcohol Licenses without compliance with all applicable requirements and approvals under applicable law. To the extent provided by section 525 of the Bankruptcy Code, no Governmental Unit may deny, revoke, suspend or refuse to renew any grant, permit, or license

relating to the operation of the Acquired Assets sold, transferred, assigned, or conveyed to Purchaser or its Affiliates on account of the filing or pendency of these chapter 11 cases or the consummation of the Sale. Each and every federal, state, and local governmental agency or department is hereby authorized and directed to accept any and all documents and instruments necessary and appropriate to consummate the Sale set forth in the APA and to allow Purchaser to operate under the Interim Management Agreement.

15. **Prohibition of Actions Against Purchaser**. Except for liabilities arising after Closing under the Assigned Contracts and Assigned Leases, and as otherwise expressly set forth in the APA, Purchaser has no liability or other obligation arising under or related to any of the Acquired Assets. Without limiting the generality of the foregoing, and except as expressly provided in the APA, Purchaser is not liable for any Encumbrances including, but not limited to, any liabilities, whether known or unknown as of the Closing, now existing or hereafter arising, whether fixed or contingent, with respect to the Debtors or any obligations of the Debtors, including, but not limited to, liabilities on account of any taxes arising, accruing, or payable under, out of, in connection with, or in any way relating to the operation of the Debtors' business prior to the Closing Date. Further, without limiting the generality of the foregoing, Purchaser shall not have any liability for any claims under the Assigned Contracts and Assigned Leases that arose under such agreements prior to the Closing Date. For the avoidance of doubt, and without limiting the generality of the foregoing, any and all liabilities, claims, damages, losses, costs, and expenses (including any repair, restoration, remediation, or mold abatement costs, and any claims for damage to property of the landlord or any customer, bailor, or other third party) arising out of or relating to the pipe burst and resulting water damage that occurred on or around October 7, 2026 at the premises subject to the Jersey City Lease (the "Jersey City Water Damage") constitute

Excluded Liabilities, shall remain the sole responsibility of the Debtors and their estates, and shall not be asserted against Purchaser, its successors or assigns, or the Acquired Assets, and no landlord or other counterparty to the Jersey City Lease or any Assigned Contract shall assert any default, claim, or right of setoff or recoupment against Purchaser under the Jersey City Lease or any Assigned Contract arising out of or relating to the Jersey City Water Damage, whether such default or claim is asserted before or after the Closing Date. Nothing in this paragraph releases or impairs any insurance rights or proceeds, warranty claims, indemnity claims, or other causes of action against third parties, including any rights related to the Jersey City Water Damage.

16. Except with respect to any rights and obligations as set forth in the Assigned Contracts and Assigned Leases, or as otherwise expressly provided for in this Order or the APA, all persons and entities, including, but not limited to, all debt holders, equity security holders, governmental, tax and regulatory authorities, lenders, trade creditors, litigation claimants, and other creditors, holding Encumbrances of any kind or nature whatsoever against or in all or any portion of the Acquired Assets (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, liquidated or unliquidated, senior or subordinate), arising under or out of, in connection with, or in any way relating to the Debtors, the Acquired Assets, the operation of the Debtors' business prior to the Closing Date or the transfer of the Acquired Assets to Purchaser in accordance with the APA, hereby are forever barred, estopped, and permanently enjoined from asserting against Purchaser, its successors or assigns, its property, or the Acquired Assets, such persons' or entities' Encumbrances in and to the Acquired Assets, including, without limitation, the following actions: (a) commencing or continuing in any manner any action or other proceeding against Purchaser, its successors, assets, or properties; (b) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order

against Purchaser, its successors, assets or properties; (c) creating, perfecting, or enforcing any Encumbrances of any kind whatsoever or any other interest against Purchaser, its successors, assets, or properties; (d) asserting any setoff, recoupment, or right of subrogation of any kind against any obligation due Purchaser or its successors; (e) commencing or continuing any action, in any manner or place, that does not comply or is inconsistent with the provisions of this Order or other orders of the Court, or the agreements or actions contemplated or taken in respect thereof; or (f) revoking, terminating, or failing or refusing to transfer or renew any license, permit, or authorization to operate any of the Acquired Assets or conduct the business operated with the Acquired Assets.

17. All persons and entities are hereby forever prohibited and enjoined from taking any action that would adversely affect or interfere with the ability of the Debtors to sell and transfer the Acquired Assets to Purchaser free and clear of any and all Encumbrances in accordance with the terms of the APA, and this Order.

18. Notwithstanding the foregoing, nothing herein prevents (a) the Debtors from pursuing an action against Purchaser arising under the APA or the related documents, or (b) any administrative agencies, governmental, tax and regulatory authorities, secretaries of state, federal, state, and local officials from properly exercising their police and regulatory powers.

19. **Assumption, Assignment and Sale of Contracts and Leases**. The Debtors are hereby authorized and directed, in accordance with sections 105(a), 363 and 365 of the Bankruptcy Code, to (a) assume, assign, and sell to Purchaser, in accordance with the APA, effective upon the Closing Date, the Assigned Contracts and Assigned Leases free and clear of all Encumbrances and other interests of any kind or nature whatsoever and (b) execute and deliver to Purchaser such documents or other instruments as Purchaser deems reasonably necessary to assign and transfer

the Assigned Contracts and Assigned Leases to Purchaser in accordance with the APA, and all of the counterparties to the Assigned Contracts and Assigned Leases are directed to execute and deliver to Purchaser without imposing an additional assignment fee or other charge on Purchaser such documents, consents, or other instruments as Purchaser deems reasonably necessary to assign and transfer the Assigned Contracts and Assigned Leases to Purchaser in accordance with the APA.

20. The Purchaser has provided, or will provide, adequate assurance of future performance under the Assigned Contracts and Assigned Leases within the meaning of section 365 of the Bankruptcy Code.

21. Effective as of the Closing Date, in accordance with the terms and provisions of the APA, the Assigned Contracts and Assigned Leases shall be assumed by the Debtors and assigned and sold to Purchaser, notwithstanding any provision in any such Assigned Contract or Assigned Lease or applicable law (including those of the type described in sections 365(b)(2), 365(c), and 365(f) of the Bankruptcy Code) that directly or indirectly prohibits, restricts, or conditions such assignment or transfer, and following the Closing Date remain in full force and effect for the benefit of Purchaser, in accordance with the APA, and, pursuant to section 365(k) of the Bankruptcy Code, as of the Closing Date the Debtors are relieved from any further liability with respect to the Assigned Contracts and Assigned Leases arising after such assignment to and assumption by Purchaser in accordance with the APA; and upon the Closing Date, in accordance with sections 363 and 365 of the Bankruptcy Code, Purchaser is fully and irrevocably vested in all rights, title, and interest of each Assigned Contract and Assigned Lease. This Order constitutes and effectuates the assignment of each Assigned Contract and Assigned Lease, including the Jersey City Lease and the Levittown Lease, to Purchaser as of the Closing Date, and no consent,

approval, waiver, estoppel, or other action of any landlord or other non-Debtor counterparty is required to effectuate such assignment; to the extent any such consent or approval would otherwise be required, it is deemed given, and any provision purporting to require such consent, approval, or action, or to permit any landlord or counterparty to terminate, recapture, modify, or impose any fee, penalty, or profit-sharing obligation by reason of such assignment, is unenforceable against Purchaser. The execution or delivery of any document, consent, or instrument contemplated by paragraph 19 of this Order is not a condition to the effectiveness of any such assignment. Notwithstanding the foregoing, the Debtors shall remain obligated to pay any and all allowed administrative expense claims from the Petition Date through the Closing Date arising under any and all of the Assigned Contracts and Assigned Leases that were not identified as a Cure Amount in the Contract Notice and which the Debtors have not paid as of Closing Date. If and to the extent Purchaser designates any additional executory contracts or unexpired leases for assumption and assignment to Purchaser pursuant to the APA, the Debtors shall promptly provide notice to the affected non-Debtor counterparty and file such notice with the Court prior to the Closing Date in accordance with supplemental Contract Notice procedures established by Paragraph 18(i) of the Bidding Procedures Order.

22. All defaults or other obligations of the Debtors under the Assigned Contracts and Assigned Leases arising or accruing prior to the Closing (without giving effect to any acceleration clauses or any default provisions of the kind specified in section 365(b)(2) of the Bankruptcy Code) shall be cured on the Closing Date or as soon thereafter as practicable by payment of the Cure Amount by the Debtors. Except with respect to the Informal Cure Dispute (as defined in paragraph 26 of this Order), to the extent that any counterparty to an Assigned Contract or Assigned Lease did not object to its Cure Amount by the Contract Objection Deadline, such counterparty is deemed

to have consented to such Cure Amount and the assumption, assignment and sale of its respective Assigned Contract(s) or Assigned Lease to Purchaser in accordance with the APA. Purchaser has no liability arising or accruing under the Assigned Contracts and Assigned Leases on or prior to the Closing, except as otherwise expressly provided in the APA, the Assigned Contracts, the Assigned Leases, or this Order. The non-Debtor counterparties to the Assigned Contracts and Assigned Leases are barred from asserting against the Debtors, their estates, Purchaser, and their respective successors and assigns, any default or unpaid obligation allegedly arising or occurring before the Petition Date, any pecuniary loss resulting from such default, or any other obligation under the Assigned Contracts and Assigned Leases arising or incurred prior to the Petition Date, other than the Cure Amount set forth on the Contract Notice or such other Cure Amount as agreed to by the Debtors (with the consent of Purchaser) or as determined by the Court, and are further barred from asserting against Purchaser and its successors and assigns any default, unpaid obligation, or other liability under the Assigned Contracts and Assigned Leases arising or accruing prior to the Closing Date.

23. Unless otherwise represented by the Debtors in a separate notice, on the record at the Sale Hearing, or pursuant to a contract or lease amendment entered into by the Debtors, Purchaser, and the appropriate counterparty (any such amendment being deemed approved by this Order), and except for the Assigned Lease subject to the Informal Cure Dispute (defined in Paragraph 26 herein), the Contract Notice reflects the sole amounts necessary under section 365(b) of the Bankruptcy Code to cure all monetary defaults under the Assigned Contracts, and no other amounts are or shall be due in connection with the assumption by the Debtors and the assignment and sale to Purchaser of the Assigned Contracts and Assigned Leases in accordance with the APA.

24. Upon the Debtors' assignment and sale of the Assigned Contracts and Assigned Leases to Purchaser under the provisions of this Order and any additional orders of this Court and payment of any Cure Amount, for purposes of assumption and assignment, no default exists under any Assigned Contract or Assigned Lease, and no counterparty to any Assigned Contract or Assigned Lease is permitted (a) to declare a default by Purchaser under such Assigned Contract or Assigned Lease or (b) otherwise take action against Purchaser as a result of Debtors' financial condition, bankruptcy, or failure to perform any of their obligations under the relevant Assigned Contract or Assigned Lease. Each non-Debtor party to an Assigned Contract or Assigned Lease hereby is also forever barred, estopped, and permanently enjoined from (i) asserting against the Debtors, or the property of any of them, any default or claim arising out of any indemnity obligation or warranties for acts or occurrences arising prior to or existing as of the Petition Date; (ii) asserting against the Purchaser, or the property of the Purchaser, any default or claim arising out of any indemnity obligation or warranties for acts or occurrences arising prior to or existing as of the Closing, including those constituting Excluded Liabilities or any counterclaim, defense, setoff, recoupment or any other claim asserted or assertable against the Debtors; and (iii) imposing or charging against Purchaser any rent accelerations, assignment fees, increases, or any other fees as a result of the Debtors' assumption, assignment and sale to Purchaser of any Assigned Contract or Assigned Lease in accordance with the APA. The validity of such assumption, assignment and sale of each Assigned Contract and Assigned Lease is not affected by any dispute between the Debtors and any non-Debtor party to an Assigned Contract or Assigned Lease. Purchaser may exercise any unexpired extension, renewal, or other option or right assigned to it notwithstanding a provision purporting to make that right personal to the Debtors, a named entity, or an entity operating under a specified trade name.

25. Except as provided in the APA or this Order, after the Closing, the Debtors and their estates have no further liabilities or obligations with respect to any Assigned Contracts and Assigned Leases arising prior to the Petition Date or after the Closing, and all counterparties of such Assigned Contracts and Assigned Leases of any kind whatsoever are forever barred and estopped from asserting such claims against the Debtors, their successors or assigns, their property, or their assets or estates. The failure of the Debtors or Purchaser to enforce at any time one or more terms or conditions of any Assigned Contract or Assigned Lease is not a waiver of such terms or conditions, or of the Debtors' and Purchaser's rights to enforce every term and condition thereof. In accordance with Section 2.2(i) of the APA, the Debtors, their estates, and any successors thereto (including any subsequently-appointed trustee) shall not assert any Avoidance Actions against any counterparty to an Assigned Contract or Assigned Lease that has been assumed and assigned to Purchaser.

26. Notwithstanding anything to the contrary in this Order or the Contract Notice, with respect to the Assigned Contracts and Assigned Leases for which the non-Debtor counterparties thereto filed timely Contract Objections that have not been resolved as of the entry of this Order, these Contract Objections are adjourned (collectively, the "Adjourned Contract Objections"). In addition, as to the informal dispute regarding the Cure Amount set forth in the Contract Notice applicable to the lease with RREEF America Reit II Corp. YYY (the "Informal Cure Dispute"), RREEF America Reit II Corp. YYY shall not be deemed to have consented to such Cure Amount, and the Informal Cure Dispute shall be treated as an Adjourned Contract Objection for all purposes of this Order. The Cure Amount of any Assigned Contract or Assigned Lease subject to an Adjourned Contract Objection shall be fixed at the amounts agreed to in writing by the Debtors and such counterparties, or if no such agreement is reached, fixed at the amounts ordered by this

Court after notice to Purchaser and a hearing at a date and time reasonably determined by the Debtors (or otherwise scheduled by this Court). Pending the parties' consensual resolution of the Adjourned Contract Objection or the Court's adjudication of such amounts: (i) any Assigned Contract or Assigned Lease that is the subject of an Adjourned Contract Objection solely with respect to Cure Amount may be assumed by the Debtors and assigned and sold to Purchaser, provided that the Debtors segregate the Cure Amount the non-Debtor counterparty asserts in the Adjourned Contract Objection is required to be paid (or such lower amounts as agreed to by the Debtors and the counterparty) with proof thereof to the counterparty; and (ii) Purchaser may, prior to Closing, elect to re-designate any Assigned Contract or Assigned Lease to exclude such contract. Upon the Cure Amount subject to an Adjourned Contract Objection becoming fixed as provided for in this paragraph: (a) such fixed amount shall be the "Cure Amount" for the Assigned Contract or Assigned Lease for all purposes under this Order; (b) the Purchaser may elect to re-designate the related Assigned Contract or Assigned Lease to exclude such contract; and (c) if the Assigned Contract or Assigned Lease is not re-designated and was not previously assumed by the Debtors and assigned and sold to Purchaser, such Assigned Contract or Assigned Lease shall be promptly assumed by the Debtors and assigned and sold to Purchaser. Any segregation or payment required by this paragraph shall be funded in accordance with the APA and shall not create an additional payment obligation of Purchaser beyond the APA.

27. Notwithstanding anything herein to the contrary, in addition to the right to remove contracts pursuant to paragraph 28 of this Order, and subject to the provisions of the APA and the supplemental Contract Notice procedures established by Paragraph 18(i) of the Bidding Procedures Order, prior to the Closing, Purchaser may add any contract or lease to the applicable Schedule of the APA and thereby include such Contract in the definition of Assigned Contracts or

Assigned Leases (each an "Additional Contract"). W ith respect to each Additional Contract, the Cure Amount will be either (i) the amount reflected on the Contract Notice if no timely Contract Objection has been filed, (ii) the amount agreed to in writing by the Debtors and such counterparty, in consultation with the Purchaser, or, (iii) the amount determined and so ordered by the Court. Any Cure Amounts for an Additional Contract shall be paid by Purchaser in addition to the Base Purchase Price. Further, any continued use of the premises subject to that certain Prologis Clear Lease, dated October 16, 2024, between Duke Realty Limited Partnership and Judge Warehousing, LLC (the "Prologis Lease") and that certain Agreement of Lease (Net Lease), dated May, 2024, between Seagis East Rutherford, LLC and Port Elizabeth Terminal & Warehouse Corp. (the "East Rutherford Lease"), after the Closing Date, must be consistent with the *Order Further Extending the Deadline for the Debtors to Assume or Reject Unexpired Leases of Nonresidential Real Property Pursuant to 11 U.S.C. § 365(d)(4)* [D.I. 440] (the "Extension Order"), which conditions the extension of the time to assume the Prologis Lease or the East Rutherford Lease on the Debtors' timely payment of postpetition rent, including the payment of all incurred, unpaid postpetition late fees, among other things, in accordance with the terms set forth in the Extension Order.

28. Notwithstanding anything herein to the contrary, and subject to the provisions of the APA, prior to the Closing, Purchaser may remove any contract or lease from the applicable Schedule of the APA (and thereby exclude such Contract from the definition of Assigned Contracts or Assigned Leases). For the avoidance of doubt, nothing in this paragraph affects Purchaser's right to re-designate an Assigned Contract or Assigned Lease to exclude such contract following any resolution of an Adjourned Contract Objection with respect to the Assigned Contract or Assigned Lease, whether such resolution occurs before or after the Closing Date.

29. **No Successor Liability**. Purchaser and its successors and assigns cannot and shall not be deemed, as a result of any action taken in connection with the transfer of the Acquired Assets, to (i) be a successor to the Debtors or their estates, (ii) have, de facto or otherwise, merged or consolidated with or into the Debtors or their estates, (iii) be a continuation or substantial continuation of the Debtors or any enterprise of the Debtors, (iv) have a common identity with the Debtors, (v) have acquired the trade or business of any of the Debtors for any purpose under applicable U.S. federal law (including the Bankruptcy Code and the Internal Revenue Code of 1986, as amended) or state law except as expressly provided in the APA, or (vi) be held out to the public as a continuation of the Debtors or the Debtors' trade or business, and Purchaser shall have no successor, transferee, or vicarious liability of any kind or character, including, but not limited to, under any theory of foreign, federal, state, or local antitrust, environmental, successor, tax, ERISA, assignee, or transferee liability, labor, product liability, employment, de facto merger, substantial continuity, or other law, rule, or regulation, whether known or unknown as of the Closing Date, now existing or hereafter arising, whether asserted or unasserted, fixed or contingent, liquidated or unliquidated with respect to the Debtors or any obligations of the Debtors arising prior to the Closing Date. Except as otherwise provided in this Order or in the APA, the transfer of the Acquired Assets to Purchaser pursuant to the APA shall not result in Purchaser or the Acquired Assets having any liability or responsibility for, or being required to satisfy in any manner, whether in law or in equity, whether by payment, setoff, or otherwise, directly or indirectly, any claim against the Debtors or against any insider of the Debtors or any Encumbrances.

30. **Consideration**. The consideration provided by Purchaser under the APA constitutes (i) reasonably equivalent value under the Bankruptcy Code, the Uniform Fraudulent

Transfer Act, and the Uniform Voidable Transactions Act, (ii) fair consideration under the Uniform Fraudulent Conveyance Act, and (iii) reasonably equivalent value, fair consideration and fair value under any other applicable Laws of the United States, any state, territory or possession thereof, or the District of Columbia. The consideration provided by Purchaser for the Acquired Assets under the APA is fair and reasonable and may not be avoided under section 363(n) of the Bankruptcy Code.

31. **Good Faith**. The transactions contemplated by the APA are undertaken by Purchaser without collusion and in "good faith," as that term is used in section 363(m) of the Bankruptcy Code and, accordingly, the reversal or modification on appeal of the authorization provided in this Order to consummate the Sale shall not affect the validity of the Sale (including the assumption, assignment and sale of the Assigned Contracts and Assigned Leases) with Purchaser, unless such authorization is duly stayed pending such appeal. Purchaser is a good faith purchaser of the Acquired Assets, and is entitled to all of the benefits and protections afforded by section 363(m) of the Bankruptcy Code.

**32.** **Books and Records**. Following the closing date for the Sale, and consistent with Section 9.17 of the APA, Purchaser shall grant the Debtors and their respective representatives, including any trustee or fiduciary appointed to act on behalf of the Debtors or as a successor to the Debtors (a "Trustee"), reasonable access to any books and records transferred to Purchaser pursuant to the APA during regular business hours and upon reasonable notice for the purpose of allowing the Debtors and their successors, the Trustee and/or their representatives to perform the duties necessary to administer the Debtors' estates. Such access shall not unreasonably interfere with Purchaser's business operations. Nothing in this paragraph enlarges Purchaser's record-

retention, employee-assistance, or reimbursement obligations beyond those expressly set forth in the APA.

33. **Failure to Specify Provisions**. The failure specifically to include any particular provisions of the APA in this Order does not diminish or impair the effectiveness of such provisions, it being the intent of the Court that the APA and all of the Exhibits thereto (including the Interim Management Agreement) be authorized and approved in their entirety; *provided*, *however*, that this Order governs if there is any inconsistency between the APA (including all ancillary documents executed in connection therewith) and this Order. Likewise, all of the provisions of this Order are non-severable and mutually dependent. To the extent that this Order is inconsistent with any prior order or pleading with respect to the Motion in these chapter 11 cases, the terms of this Order control.

34. **Non-Material Modifications**. The APA and any related agreements, documents, or other instruments may be modified, amended, or supplemented by the parties thereto, in writing signed by such parties, and in accordance with the terms thereof, without further order of the Court, provided that any such modification, amendment, or supplement does not have a material adverse effect on the Debtors' estates.

35. **Subsequent Plan Provisions**. Nothing contained in any chapter 11 plan confirmed in the Debtors' cases or any order confirming any such plan or in any other order in these chapter 11 cases (including any order entered after any conversion of any of these cases to a case under chapter 7 of the Bankruptcy Code) or any related proceeding subsequent to entry of this Order shall alter, conflict with, or derogate from, the provisions of the APA or this Order. To the extent of any such conflict or derogation, the terms of the APA or this Order, as applicable, shall govern.

36. **No Third-Party Beneficiaries**. Except as expressly set forth in this Order or in the APA, nothing in this Order or the APA creates or may be deemed to create any third-party beneficiary rights in any Person or entity not a party to the APA.

37. **No Stay of Order**. Notwithstanding the provisions of Bankruptcy Rule 6004(h) and Bankruptcy Rule 6006(d), and pursuant to Bankruptcy Rules 7062 and 9014, this Order is effective and enforceable immediately upon its entry.

38. **Retention of Jurisdiction**. This Court retains exclusive jurisdiction pursuant to its statutory powers under 28 U.S.C. § 157(b)(2), to, among other things, interpret, implement, and enforce the terms and provisions of this Order and the APA, all amendments thereto, and any waivers and consents thereunder and each of the agreements executed in connection therewith to which any Debtor is a party or which has been assigned and sold by the Debtors to Purchaser in accordance with the APA, and to adjudicate, if necessary, any and all disputes concerning or relating in any way to the Sale, including, but not limited to, retaining jurisdiction to (a) interpret, implement and enforce the provisions of this Order and the APA; (b) adjudicate, if necessary, any and all disputes concerning or relating in any way to the Sale; (c) protect Purchaser against any Encumbrances or other interests in the Debtors or the Acquired Assets of any kind or nature whatsoever, attaching to the proceeds of the Sale; and (d) enter any orders under sections 363 and 365 of the Bankruptcy Code with respect to the Assigned Contracts and Assigned Leases.

39. Notwithstanding anything in this Order or the APA to the contrary, nothing in this Order or the APA relieves the Debtors of their obligations to timely perform their obligations in accordance with Section 365(d)(3), Section 365(d)(4), Section 365(d)(5), or the ability of any party to seek allowance of an administrative expense pursuant to Section 503(b). During any post-Closing transition period, the Purchaser shall be liable for the prorated portion of any operational

expenses directly related to Purchaser's use of the Debtors' property that was not an Acquired Asset, including any leased premises not assigned to Purchaser under the APA and this Order, accruing on or after the Closing Date.

40. Notwithstanding anything in the Sale Order or the APA to the contrary, the Debtors shall remain the tenant and be obligated to the perform their obligations as and when they come due under each lease of nonresidential real property to which a Debtor is a party that is not an Assigned Lease, until such time as such lease is rejected, or assumed and assigned, in accordance with Section 365(d)(3) of the Bankruptcy Code and pursuant to the terms of the applicable lease, including the obligation to maintain insurance beyond the Closing Date. Nothing in the Sale Order or the APA shall modify those obligations, except as may be agreed by written agreement with the applicable counterparty.

41. The Purchaser shall be responsible for any and all liabilities of the Debtor under any nonresidential real property lease that is not an Assigned Lease, in each case that are first incurred and come due and payable during the post-Closing transition period. For the avoidance of doubt, Purchaser shall pay the post-Closing transition period portion of rent and other charges attributable to any lease of nonresidential real property that is not an Assigned Lease on a current basis as and when due and payable under the terms of the applicable lease, directly to the applicable lease counterparty. Notwithstanding, nothing in this paragraph relieves the Debtors or their estates of any obligations under the APA, Bankruptcy Code, or applicable law or contract. Purchaser's obligations pursuant to this paragraph shall not be deemed to make Purchaser the tenant or counterparty under any lease of nonresidential real property that is not an Assigned Lease.

42. Notwithstanding anything to the contrary contained in the APA or this Sale Order, any use and occupancy by the Purchaser of non-residential real property governed by lease of

nonresidential real property that is not an Assigned Lease shall be in the nature of a sublease terminating concurrently with the earlier of (i) expiration of the Extension Order term on January 8, 2027 (unless extended by written agreement between the Debtor and the applicable landlord), (ii) entry of a final, non-appealable order approving the assumption and assignment of the particular lease of nonresidential real property to the Purchaser; or (iii) the rejection of the particular nonresidential real property lease that is not an Assigned Lease (the "Transition Period"). During the term of such sublease between the Debtors and the Purchaser, the Purchaser will be responsible for performance of all terms, obligations and covenants of the respective non-residential real property lease first arising during the Transition Period and submits to the jurisdiction of this Court for purposes of enforcement, including recovery of possession at the end of the Transition Period. For the avoidance of doubt, with respect to the use and occupancy of leased premises by the Purchaser and operation of the business during the Transition Period, (i) to the extent not maintained by the Debtors, Purchaser shall be responsible for maintaining, and providing evidence of, insurance coverage, naming the respective landlords and their agents as additional insureds, consistent with the terms of the underlying leases, and (ii) nothing herein modifies or relieves the Debtors of their obligation to timely perform lease obligations as they become due pursuant to Section 365(d)(3).

43. **Insurance**. Nothing in this Order or the APA shall be construed to modify the terms of any insurance policy maintained by the Debtors.

44. **Crown Imports LLC Warehousing Agreement**. That certain Warehousing Agreement, dated July 1, 2023 by and between Port Elizabeth Terminal & Warehouse Corp. and Crown Imports LLC, as amended by Amendment No. 2 to Warehousing Agreement, dated October 9, 2026, is hereby assumed by the Debtors and assigned to the Purchaser.

45. Purchaser shall notify the Debtors in writing of the completion of Purchaser's transition of operations prior to January 8, 2027 related to any lease that is not an Assigned Lease, so that the Debtors may move to reject the lease and the Debtors shall seek expedited Court approval of the rejection of any such lease. The Debtors shall not seek to reject any unexpired lease of nonresidential real property that is not an Assigned Lease on or prior to December 19, 2026, unless advised otherwise in writing pursuant to this paragraph.

46. Purchaser shall notify the Debtors in writing no later than December 19, 2026 if Purchaser wishes Debtors to seek a landlord's consent for a further extension of the deadline to assume or reject any lease that is not an Assigned Lease. The Debtors shall make reasonable efforts to negotiate such an extension of the deadline with the counterparty, consistent with Section 365(d)(4) and will seek expedited Court approval of any such agreed upon extension.

# EXHIBIT 1

## Asset Purchase Agreement

# ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT** (this "**Agreement**") is made and entered into as of August 26, 2026 (the "**Effective Date**"), by and between (i) Port Elizabeth Terminal & Warehouse, Corp., a New Jersey Corporation, P. Judge & Sons, Inc., a New Jersey corporation, Amex Shipping Agent, Inc., a New Jersey corporation, P. Judge & Sons Trucking, LLC, a Georgia limited liability company, Judge Warehousing, LLC, a Georgia limited liability company, and The Judge Organization, LLC, a Georgia limited liability company (each a "**Seller**" and collectively, the "**Sellers**"), and (ii) East Coast Warehouse and Distribution Corp., a New Jersey corporation, and its designees (the "**Purchaser**" and, together with the Sellers, the "**Parties**" and each, a "**Party**").

## RECITALS

WHEREAS, Sellers' business includes the provision of transportation, logistic, and warehouse related services. More specifically, the Sellers offer rail boxcar services, container handling services, warehousing services, multiple shipping options (e.g., rail, truck, air, and international shipping), specialized material handling services, cross docking, handling, and packing services, beverage specialists and alcoholic beverages expertise services, and product care and protection services (the "**Business**").

WHEREAS, each Seller is a debtor-in-possession in the jointly administered chapter 11 proceedings pending in the United States Bankruptcy Court for the District of New Jersey (the "**Bankruptcy Court**"), as Case No. 25-22123 (JKS) (collectively, the "**Chapter 11 Case**").

WHEREAS, in connection with the Chapter 11 case, each Seller remains in possession and control of its assets and properties in accordance with §§1107 and 1108 of the Bankruptcy Code.

WHEREAS, each Seller desires to sell the Acquired Assets (as that term is defined below in this Agreement) to Purchaser, subject to higher and better bids, Bankruptcy Court approval, and pursuant to the terms and conditions of this Agreement, and Purchaser desires to so purchase and acquire such assets from each Seller pursuant to the terms and conditions of this Agreement.

WHEREAS, contemporaneously with the execution of this Agreement, Purchaser has posted, with the Fiduciary Valet Corp. (the "**Escrow Agent**") a deposit in the amount of $650,000 (the "**Deposit**").

WHEREAS, contemporaneously with the execution of this Agreement Purchaser, Sellers and the Escrow Agent have executed the Escrow Agreement.

NOW, THEREFORE, in exchange for the Purchase Price and the other mutual covenants and agreements herein contained, the receipt and sufficiency of which are hereby acknowledged and intending to be legally bound, Purchaser hereby agrees to buy, and Sellers hereby agree to sell the Acquired Assets, upon the terms and conditions set forth in this Agreement.

**1. DEFINITIONS.** As used herein, the following terms shall have the following meanings:

"**Accounts Receivable**" shall mean only Sellers' trade accounts receivable from or related to the Business in existence as of the Closing Date (whether or not billed), other than Factored Accounts Receivable.

"**Acquired Assets**" shall have the meaning ascribed thereto in Section 2.1 of this Agreement.

"**Affiliate**" or "**Affiliates**" means, with respect to any Person, any other Person who directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person. The term "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise, and the terms "controlled" and "controlling" have meanings correlative thereto.

"**Alcohol Licenses**" means that certain (i) Bailee for Hire License issued by the Pennsylvania Liquor Control Board for the premises located at 30 Runway Road, Suite B, Levittown PA 19057-4732 and (ii) Public Warehouse License issued by the State of New Jersey Department of Law and Public Safety Division of Alcoholic Beverage Control for the premises located at 150 Industrial Drive, Jersey City, NJ 07305.

"**Allocation Methodology**" shall have the meaning ascribed thereto in Section 6.7(b) of this Agreement.

"**Alternative Transaction**" means the consummation of one or more transactions involving the sale, transfer, or other disposition of all or substantially all of the assets of the Sellers or the sale of all or substantially all of the Acquired Assets, in each case to any party or parties other than Purchaser or its Affiliates. For the avoidance of doubt, the sale, transfer or other disposition of all or substantially all of the Northern Assets or Southern Assets (each as defined in the Bidding Procedures Order) shall be deemed an Alternative Transaction.

"**Ancillary Agreements**" means any certificate, agreement, document or other instrument to be executed and delivered in connection with this Agreement.

"**Approval Order**" shall have the meaning ascribed thereto in Section 6.2(b) of this Agreement.

"**Assigned Contracts**" means those Contracts of any Seller in connection with the Business that Purchaser has agreed to assume pursuant to this Agreement and all of which are identified on Schedule 2.1(a), to the extent assignable pursuant to applicable law.

"**Assigned Leases**" means those leases of any Seller of Leased Real Estate in connection with the Business that Purchaser has agreed to assume pursuant to this Agreement and all of which are identified on Schedule 2.1(b), to the extent assignable pursuant to applicable law.

"**Avoidance Actions**" means all avoidance claims or causes of action under the Bankruptcy Code or applicable Law (including, without limitation, claims to avoid, or set aside, transfers of property by any debtor that may be avoidable under by Chapter 5 of the Bankruptcy Code).

"**Base Purchase Price**" means Six Million Five Hundred Thousand Dollars ($6,500,000).

"**Bankruptcy Code**" means 11 U.S.C. § 101 et seq.

"**Bankruptcy Court**" shall have the meaning ascribed thereto in the Recitals of this Agreement.

"**Bankruptcy Petition**" means a voluntary bankruptcy petition filed by Sellers in the Chapter 11 Case.

**"Bankruptcy Rules"** shall mean the Federal Rules of Bankruptcy Procedure and the local rules of the Bankruptcy Court.

"**Bid Protections**" shall have the meaning ascribed thereto in Section 6.3(a) of this Agreement.

"**Bidding Procedures**" shall have the meaning ascribed thereto in Section 6.4 of this Agreement.

"**Bidding Procedures Order**" shall have the meaning ascribed thereto in Section 6.3 of this Agreement.

"**Break-Up Fee**" means a fee equal to 3% of the Base Purchase Price, payable to Purchaser if the Parties execute this Agreement and Sellers consummate an Alternative Transaction, to be paid at the closing of any such Alternative Transaction solely from the proceeds of such sale.

"**Business**" shall have the meaning ascribed thereto in the Recitals of this Agreement.

"**Business Day**" means a day, based on U.S. Eastern Time, other than a Saturday, Sunday, or U.S. federal holiday or any day in which banking institutions in the State of New Jersey are authorized or required by law or other governmental action to be closed.

"**Causes of Action**" means any and all causes of action, defenses, counterclaims and/or other claims of any nature whatsoever, known or unknown, whether or not apparent or yet to be discovered, accruing to each Seller or that is property of the Estate, based upon facts, circumstances and transactions that occurred prior to the Closing Date, and shall include, without limitation, (i) claims against past and present vendors or customers of Sellers, (ii) claims against the directors, officers or other insiders of Sellers, (iii) claims regarding or related in any way to any collective bargaining agreement(s), and (iv) claims against any administrative agent or other agent, lender or secured party related to any credit facility existing at any time whether prior to or after the filing of the Bankruptcy Petition. Causes of Action shall not include Avoidance Actions.

"**Chapter 11 Case**" shall have the meaning ascribed thereto in the Recitals of this Agreement.

"**Claims**" shall have the meaning ascribed thereto in Section 6.2(b)(ii) of this Agreement.

"**Closing Date**" shall have the meaning ascribed thereto in Section 3.1 of this Agreement.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Confidentiality Agreement**" shall have the meaning ascribed thereto in Section 9.16 of this Agreement.

"**Contracts**" means all contracts, leases, licenses, instruments, notes, commitments, undertakings, indentures, joint ventures, and all other agreements, commitments, and legally binding arrangements, whether written or oral, other than Employee Benefit Plans.

"**Cure Amounts**" means all amounts, costs, and expenses required by the Bankruptcy Court to be paid to cure any and all defaults under the Assigned Contracts or the Assigned Leases through the Closing Date so that they may be assumed and assigned to Purchaser pursuant to §§ 363 and 365 of the Bankruptcy Code; provided, however, that any Cure Amounts shall be paid to the counterparties of such Assigned Contracts or the Assigned Leases out of the Purchase Price at Closing and shall not constitute additional consideration above the Purchase Price.

"**Deposit**" shall have the meaning ascribed to it in the Recitals to this Agreement.

"**Disclosure Schedules**" means the disclosure schedules attached to this Agreement and incorporated herein, which contain and set forth additional information corresponding to the Section of this Agreement referenced thereon.

"**East Rutherford Lease**" means that certain Agreement of Lease (Net Lease), by and between Seagis East Rutherford LLC, a Delaware limited liability company, and Port Elizabeth Terminal & Warehouse Corp., a New Jersey Corporation, dated May, 2024.

"**Employment Liability**" means any claim or Liability asserted against Sellers or its property under any Law (or common law) arising from or relating to the former, current or future employment of a Person by Sellers, whether pursuant to a contract, labor agreement, at-will arrangement or otherwise, as well as any claim asserting healthcare, pension, or other employment-related benefits, whether asserted by an employee or former employee, a retiree or future retiree, any of the aforementioned Person's agent, assigns, custodians, heirs, or representatives, a collective bargaining unit or union, any pension and/or retirement fund, or any other agent thereof.

"**Employee**" means an individual who, as of the applicable date, is employed by, or engaged to provide services to, any Seller in connection with the Business.

"**Employee Benefit Plans**" means (i) all "employee benefit plans" (as defined in §3(3) of ERISA), including any employee pension benefit plans; (ii) all employment, consulting, non-competition, employee non-solicitation, employee loan or other compensation agreements, and (iii) all bonus or other incentive compensation, equity or equity-based compensation, stock purchase, deferred compensation, change in control, severance, leave of absence, vacation, salary continuation, medical, life insurance or other death benefit, educational assistance, training, service award, dependent care, pension, welfare benefit or other material employee or fringe benefit plans, policies, agreements or arrangements, whether written or unwritten, qualified or unqualified, funded or unfunded and all underlying insurance policies, trusts and other funding vehicles, in each case currently maintained by or as to which any Seller has or could reasonably be expected to have any obligation or liability, contingent or otherwise, thereunder for current or former employees, directors or individual consultants of any Seller.

"**Employee Costs**" means, with respect to all employees hired by Purchaser pursuant to Section 7 of this Agreement, all claims and rights for and with respect to sick time and paid time off earned, accrued, or, with respect to sick time and paid time off, otherwise relating to the period prior to the date on which such employee is hired by Purchaser.

"**Employment Documents**" shall have the meaning ascribed thereto in Section 7 of this Agreement.

**"Environmental Law"** means any and all federal, state, local, municipal, foreign, or international law, statute, regulation, ordinance, rule, code, order, decree, judgment, consent decree, directive, guideline, permit, license, other governmental requirement, or common law, whether now existing or hereafter enacted, promulgated, or issued, in each case as amended from time to time, relating to or governing: (a) pollution or the protection, preservation, or restoration of the environment (including ambient air, surface water, groundwater, drinking water, wetlands, land surface, subsurface strata, sediments, and natural resources); (b) exposure to, or use, storage, recycling, treatment, generation, transportation, processing, handling, labeling, production, release, or disposal of Hazardous Substances; (c) protection of human health or safety (solely to the extent relating to exposure to Hazardous Substances or environmental conditions); or (d) the protection of endangered or threatened species, natural resources, or ecological systems. Environmental Law includes, without limitation, the Comprehensive Environmental Response, Compensation, and Liability Act (42 U.S.C. § 9601 et seq.), the Resource Conservation and Recovery Act

(42 U.S.C. § 6901 et seq.), the Clean Air Act (42 U.S.C. § 7401 et seq.), the Federal Water Pollution Control Act (33 U.S.C. § 1251 et seq.), the Safe Drinking Water Act (42 U.S.C. § 300f et seq.), the Toxic Substances Control Act (15 U.S.C. § 2601 et seq.), the Emergency Planning and Community Right-to-Know Act (42 U.S.C. § 11001 et seq.), the Endangered Species Act (16 U.S.C. § 1531 et seq.), the Oil Pollution Act (33 U.S.C. § 2701 et seq.), the Occupational Safety and Health Act (29 U.S.C. § 651 et seq.) (solely to the extent relating to exposure to Hazardous Substances), and any analogous or equivalent state, local, or foreign laws, and all regulations, rules, and guidance documents promulgated or issued thereunder.

"**Environmental Liabilities**" shall mean any and all liabilities, obligations, losses, damages, costs, and expenses (including reasonable attorneys' fees, consultants' fees, investigation costs, remediation costs, natural resource damages, and court costs) arising out of, relating to, or resulting from:

(a) any violation or alleged violation of, or non-compliance with, any Environmental Law, whether arising before, on, or after the Closing Date, to the extent attributable to the ownership, operation, or condition of the Acquired Assets or the Business prior to the Closing Date;

(b) the presence, Release, or threatened Release of any Hazardous Substance on, at, under, migrating to or from, or otherwise affecting the Acquired Assets, the Real Property, or any other property, to the extent such presence, Release, or threatened Release occurred or originated prior to the Closing Date;

(c) the generation, transportation, storage, treatment, recycling, disposal, or arrangement for disposal of any Hazardous Substance by or on behalf of Seller or any predecessor in interest, at any location, whether on-site or off-site, at any time prior to the Closing Date;

(d) any environmental claim, demand, investigation, proceeding, order, directive, consent decree, or judgment arising out of or related to acts, omissions, conditions, or circumstances existing or occurring prior to the Closing Date, regardless of when such claim is first asserted;

(e) any exposure of any person to Hazardous Substances in connection with the ownership, operation, or condition of the Acquired Assets or the Business prior to the Closing Date, including any claim for personal injury, wrongful death, or property damage; and

(f) any obligation to conduct or pay for any investigation, monitoring, cleanup, remediation, removal, corrective action, response action, or restoration of natural resources required by any Environmental Law or Governmental Body, to the extent arising from acts, omissions, conditions, or events occurring prior to the Closing Date.

For the avoidance of doubt, Environmental Liabilities shall include all such liabilities regardless of (i) whether known or unknown, fixed or contingent, matured or unmatured, accrued or unaccrued, liquidated or unliquidated, or currently existing or arising hereafter, (ii) when or where such liabilities are first asserted or discovered, or (iii) whether such liabilities arise under any theory of liability, including strict liability, joint and several liability, or any other theory under any Environmental Law.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and regulations and formal guidance issued thereunder.

"**Escrow Agent**" shall have the meaning ascribed to it in the Recitals to this Agreement.

"**Escrow Agreement**" shall mean that certain Escrow Agreement, by and among the Escrow Agent, Purchaser and Sellers, dated as of the date hereof.

"**Estate**" means the estate of Sellers created by Section 541 of the Bankruptcy Code upon the filing of the Chapter 11 Case.

"**Excluded Liabilities**" shall have the meaning ascribed thereto in Section 2.4 of this Agreement.

"**Expense Reimbursement**" means reimbursement in the amount not to exceed $150,000 for Purchaser's reasonable and documented out-of-pocket fees and expenses incurred in connection with negotiating, documenting the transaction, and participating in the sale process, to be paid at the closing of any Alternative Transaction solely out of the proceeds of such sale.

"**Factored Accounts Receivable**" means all Accounts Receivable that are subject to the Factoring Agreement.

"**Factoring Agreement**" means that certain DIP Factoring and Security Agreement between the Sellers and First Business Specialty Finance, LLC, effective November 19, 2025 and that certain Factoring and Security Agreement, by and among the Sellers and First Business Growth Funding, dated February 18, 2020, as amended by that certain First Amendment, dated May 11, 2020, as further amended by that certain Second Amendment, dated January 1, 2023, as amended by that certain Third Amendment, dated October 14, 2025.

"**Final Order**" means an order of the Bankruptcy Court that has not been appealed, reversed, modified, amended or stayed and the time to appeal from or to seek review or rehearing of such order has expired; provided, however, that no order shall fail to be a Final Order solely because of the possibility that a motion pursuant to Rule 60 of the Federal Rules of Civil Procedure or Rule 9024 of the Federal Rules of Bankruptcy Procedure may be filed with respect to such order, as long as such motion has not actually been filed.

"**GAAP**" means generally accepted accounting principles generally accepted in the United States of America consistently applied, as of the date of the applicable financial report.

"**Governmental Body**" means any (i) nation, state, county, city, town, borough, village, district or other jurisdiction, (ii) federal, state, local, municipal, foreign or other government, (iii) governmental or quasi-governmental body of any nature (including any agency, branch, department, board, commission, court, tribunal or other entity exercising governmental or quasi-governmental powers), (iv) multinational organization or body, (v) body exercising, or entitled or purporting to exercise, any administrative, executive, judicial, legislative, police, regulatory or taxing authority or power, or (vi) official of any of the foregoing.

**"Hazardous Substances"** means any and all substances, materials, wastes, pollutants, contaminants, constituents, compounds, chemicals, or mixtures that are defined, listed, classified, regulated, or otherwise characterized under any Environmental Law as "hazardous," "toxic," "radioactive," "dangerous," "a pollutant," "a contaminant," or words of similar meaning or regulatory effect, including: (a) petroleum and petroleum products, by-products, derivatives, and distillates (including crude oil and any fraction thereof); (b) natural gas, synthetic gas, and any mixtures thereof; (c) asbestos and asbestos-containing materials, in any form or condition; (d) polychlorinated biphenyls (PCBs) and PCB-containing equipment or materials; (e) per- and polyfluoroalkyl substances (PFAS); (f) radon and other radioactive materials or wastes; (g) urea formaldehyde foam insulation; (h) lead and lead-based paint; (i) mold, mycotoxins, and microbial contamination, to the extent regulated under any Environmental Law; (j) any substance listed under the Comprehensive Environmental Response, Compensation, and Liability Act (42 U.S.C. § 9601 et seq.) or the Emergency Planning and Community Right-to-Know Act (42 U.S.C. § 11001 et seq.); (k) any "hazardous waste" as defined under the Resource Conservation and Recovery Act (42

U.S.C. § 6901 et seq.) or any analogous state or local law; (l) any "toxic substance" or "hazardous chemical" as defined under the Toxic Substances Control Act (15 U.S.C. § 2601 et seq.) or the Occupational Safety and Health Act (29 U.S.C. § 651 et seq.); (m) pesticides, herbicides, fungicides, and other biocides regulated under the Federal Insecticide, Fungicide, and Rodenticide Act (7 U.S.C. § 136 et seq.); and (n) any other substance, material, or waste, whether in solid, liquid, gaseous, semisolid, or any other form, that is prohibited, limited, or regulated under any Environmental Law or that could reasonably be expected to give rise to liability under any Environmental Law.

"**Income Tax**" means any Tax imposed on or determined in whole or in part with reference to income, gross receipts, profits or similar measure, including any interest, penalty or other addition with respect thereto.

"**Interim Management Agreement**" means that certain Interim Management Agreement to be entered into by and among Port Elizabeth Terminal & Warehouse, Corp., a New Jersey corporation, Judge Warehousing, LLC, a Georgia limited liability company, and The Judge Organization, LLC, a Georgia limited liability company (collectively, the "Owners") and Purchaser at or prior to Closing, pursuant to which the Owners shall, in accordance with the terms of the Sale Order, (i) grant Purchaser the right to utilize the Alcohol Licenses and (ii) appoint Purchaser as its agent to manage, control, and operate the Business at the premises under the Jersey City Lease and the Levittown Lease during an interim period pending the transfer or issuance of the Alcohol Licenses to Purchaser, in accordance with the terms and conditions set forth therein, substantially in the form attached hereto as Exhibit B.

"**Jersey City Lease**" means that certain Multi-Tenant Industrial Net Lease dated on or about December 12, 2014, whereby Port Elizabeth Terminal & Warehouse Corp. leases from RREEF America REIT II Corp. YYY the building commonly known as 150 Industrial Drive, Jersey City, New Jersey, as amended by that certain First Amendment, dated August 21, 2020.

"**Knowledge**" means the actual knowledge of Patrick Wynne and/or Joseph Compitello, on the date hereof or on the Closing Date.

"**Law**" means any applicable federal, state, local, municipal, foreign, international, multinational or other constitution, law, ordinance, principle of common law, code, regulation, statute or treaty.

"**Leased Real Property**" means those real estate leases of each Seller listed on Schedule 2.1(c) of this Agreement.

"**Levittown Lease**" means that certain Lease Agreement dated October 30, 2003, whereby Port Elizabeth Terminal & Warehouse Corp. and The Judge Organization leases from F. Greek Bristol Properties L.P. the building located at 30 Runway Road, Levittown, Pennsylvania 18974, as amended by that certain First Amendment, dated May 9, 2008, as further amended by that certain Ninth Amendment, dated March 31, 2026.

"**Liability**" means any and all obligations, liabilities, debts and commitments, whether known or unknown, asserted or unasserted, fixed, absolute or contingent, matured or unmatured, accrued or unaccrued, liquidated or unliquidated, due or to become due, whenever or however arising (including, without limitation, whether arising out of any contract or tort based on negligence, strict liability, or otherwise) and whether or not the same would be required by GAAP to be reflected as a liability in financial statements or disclosed in the notes thereto.

"**Lien**" means any mortgage, deed of trust, lien, claim, Liability, Employment Liability, pledge, charge, title defect, security interest, pledge, leasehold interest or other legal or equitable encumbrance of any kind.

"**Material Adverse Effect**" means any change, effect, event, occurrence, state of facts, or development that, individually or in the aggregate, has had, or would reasonably be expected to have, a material and adverse effect on (i) the Acquired Assets, or the financial condition, properties, assets, liabilities, business, prospects, or results of operations of Sellers, or (ii) the ability of Sellers to perform their obligations under this Agreement or to consummate the transactions contemplated herein; provided, however, that none of the following shall be deemed to constitute, or shall be taken into account in determining whether there has been, a "Material Adverse Effect": (a) any adverse change, effect, event, occurrence, state of facts or development attributable to general conditions affecting the industry in which Sellers participate, the U.S. economy as a whole, or the capital markets in general, in each case only to the extent such change, effect, event, occurrence, state of facts or development does not materially and disproportionately affect Sellers or the Acquired Assets relative to other participants in the industries in which Sellers operate; or (b) any adverse change, effect, event, occurrence, state of facts or development arising from or relating to any change in GAAP or applicable laws, rules or regulations or the interpretation thereof, in each case only to the extent such change does not materially and disproportionately affect Sellers or the Acquired Assets relative to other participants in the industries in which Sellers operate; provided further, that (x) the underlying cause of any failure by Sellers to meet any internal or published projections, forecasts, estimates, or predictions of revenue, earnings, or other financial or operating metrics may be taken into account in determining whether a "Material Adverse Effect" has occurred, and (y) any adverse change, effect, event, occurrence, state of facts or development that is cured prior to the Closing Date shall nonetheless be taken into account in determining whether a "Material Adverse Effect" has occurred if such change, effect, event, occurrence, state of facts or development had a material adverse effect on the Acquired Assets or the business of Sellers at the time of its occurrence. Notwithstanding anything to the contrary, any change, circumstance, or effect that arises out of, results from or relates to the conduct of the Chapter 11 Case shall not be considered in determining whether a Material Adverse Effect has occurred.

[redacted]

"**Person**" means any individual, corporation, partnership, joint venture, trust, association, limited liability company, unincorporated organization, other entity, or Governmental Body or subdivision, agency, commission or authority thereof.

"**Petition Date**" means November 14, 2025, the date that the Sellers each filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of New Jersey.

"**Pre-Closing Tax Liabilities**" shall mean all Taxes imposed upon Sellers with respect to the Business or Acquired Assets for taxable periods ending on or before the Closing Date and, with respect to any taxable period that begins before and ends after the Closing Date, the portion of such taxable period ending on the Closing Date.

"**Purchase Price**" shall have the meaning ascribed thereto in Section 2.5(a) of this Agreement.

"**Savannah Lease"** means that certain lease (as amended) whereby Judge Warehousing, LLC leases from Duke Realty Limited Partnership the building commonly known as 400 Expansion Blvd., Savannah, Georgia 31407.

"**Tax**" or "**Taxes**" means any federal, state, local, or foreign income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental, custom duties, capital stock, franchise, profits, withholding, social security (or similar excises), unemployment, disability, ad valorem, real property, personal property, sales, use, transfer, registration, unclaimed property, escheat, value added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever, including any interest, penalty, or addition thereto, whether disputed or not, by any Governmental Body responsible for imposition of any such tax (domestic or foreign).

"**Transactions**" shall have the meaning ascribed thereto in Section 2.4 of this Agreement.

"**Transfer Tax**" means any sales, use, transfer, stamp, conveyance, value added or other similar Taxes, duties, excises or governmental charges imposed by any Tax authority, domestic or foreign, and all recording or filing fees (excluding vehicle registration fees), notarial fees and other similar costs provided, however, that the term "Transfer Tax" shall not include any Income Tax.

"**Union**" shall mean the Teamsters Local 11 - International Brotherhood of Teamsters.

Undefined terms used in this Agreement shall have the meaning ascribed to them under 11 U.S.C. § 101 of the United States Bankruptcy Code.

**2. SALE AND PURCHASE OF ASSETS**.

2.1 **Acquired Assets.** On the terms and subject to the conditions set forth in this Agreement, on the Closing Date (defined below), Purchaser shall purchase from Sellers, and Sellers shall sell, assign, transfer, convey, and deliver to Purchaser, all of Sellers' right, title, and interest in and to the following assets (collectively, the "**Acquired Assets**"):

(a) all Assigned Contracts set forth on Schedule 2.1(a) hereof. For the avoidance of doubt, after the date hereof, but up until the Closing Date, Purchaser may add or delete Contracts that relate solely to the Leased Real Property or the Business to Schedule 2.1(a), which such Contracts shall be deemed Assigned Contracts; provided, however, that if Purchaser adds any Contract to Schedule 2.1(a) after the deadline for qualified bids set forth in the Bidding Procedures, Purchaser shall be responsible for any Cure Amounts associated with such Contract added to Schedule 2.1(a).

(b) all Assigned Leases set forth on Schedule 2.1(b) hereof, which shall include (i) the Jersey City Lease and the Levittown Lease to be assigned to Purchaser, and (ii) a transition period in the form of a modified lease or license not to exceed a period of three months with the landlords of the East Rutherford Lease and Savannah Lease to transition operations to Purchaser's existing facilities. For the avoidance of doubt, after the date hereof, but up until the Closing Date, Purchaser may add or delete Assigned Leases, to Schedule 2.1(b), which such leases shall be deemed Assigned Leases; provided, however, that if Purchaser adds any Assigned Lease to Schedule 2.1(b) after the deadline for qualified bids set forth in the Bidding Procedures, Purchaser shall be responsible for any Cure Amounts associated with such Assigned Lease added to Schedule 2.1(b).

(c) all tangible personal property, machinery, equipment, fixtures, furniture, vehicles, and other personal property used in connection with the Business; all Intellectual Property of the Business (including, for the avoidance of doubt, the names P. Judge & Sons, The Judge Organization, Judge Warehousing, Port Elizabeth, Amex Shipping Agent, P. Judge & Sons Trucking, The Judge Organization Logistics Services, and similar names utilized by the Sellers); all goodwill associated with the Business; all books and records related to the Business (other than Excluded Assets); and such other assets as the Parties may agree in writing prior to Closing.

(d) all Accounts Receivable except for Factored Accounts Receivable, current assets, prepaid expenses, credits, advance payments, security deposits under the Assigned Leases, rights of refunds for Acquired Assets, and similar prepaid items constituting current assets.

(e) the Alcohol Licenses, subject to the terms of the Interim Management Agreement.

The allocation of Acquired Assets shall be set forth in a schedule to the Bill of Sale to be delivered at Closing pursuant to Section 3.5(a)(i). Such schedule shall be completed by Purchaser at or prior to Closing.

2.2 **Excluded Assets**. All assets, properties, rights, interests, benefits, and privileges of Sellers that are not included in the Acquired Assets shall be "**Excluded Assets**", including, but not limited to:

(a) all cash, bank deposits, securities and cash equivalents, including for this purpose (i) all cash and cash equivalents if credited to Sellers' bank account(s) and/or received by Sellers prior to the Closing Date, (ii) all deposits arising outside of the ordinary course of the Business, including without limitation utility adequate assurance deposits and all such amounts held by Sellers' attorneys, accountants, investment bankers, restructuring advisors, notice and claims agents, public relations advisors, and other professional advisors, and (iii) all financial investments;

(b) all Contracts of Sellers, other than any Assigned Contracts;

(c) all current assets of Sellers, other than current assets, prepaid expenses, credits, advance payments, security deposits under the Assigned Leases, rights of refunds, and similar prepaid items constituting current assets;

(d) Sellers' insurance policies, and related claims and refunds (including for prepaid insurance) in effect after the Closing Date;

(e) all of Sellers' rights with respect to Employee Benefit Plans and all Contracts, agreements, licenses, leases, warranties, commitments, and purchase and sale orders and the rights associated therewith, other than the Assigned Contracts and Assigned Leases;

(f) any accounting records, tax records, financial records and any books, records or other information related solely and exclusively to the other Excluded Assets and all of Sellers' accounting records, tax records, financial records and any books, records or other information subject to attorney client privilege, attorney work product, or other similar privilege;

(g) all records that Sellers are required by Law to retain;

(h) all refunds, credits or deposits of Taxes with respect to the period prior to the Closing Date, including without limitation any refunds, credits or deposits of Taxes arising as a result of Sellers' operation of the Business or ownership, operation, utilization or maintenance of the Acquired Assets prior to the Closing Date and all of Sellers' tax attributes;

(i) all Causes of Action and Avoidance Actions; provided that each Seller expressly agrees that it will not assert any Avoidance Actions against any of the counterparties to the Assigned Contracts and Assigned Leases that are assumed and assigned to Purchaser hereunder;

(j) all rights to receive mail and other communications addressed to Sellers that do not relate to the Acquired Assets or the Assumed Liabilities;

(k) all property, rights and assets relating to an Excluded Asset or arising from and relating to the defense, release, compromise, discharge or satisfaction of any of the Liabilities which are not Assumed Liabilities;

(l) all rights of Sellers arising under this Agreement, the Ancillary Agreements, and under any other agreement between Sellers and Purchaser entered into in connection with this Agreement; and

(m) All documents, records and other items subject to attorney-client privilege, attorney work product privilege, and all other similar privileges.

(n) All Factored Accounts Receivables, and all rebates, credits, escrows, deposits, reserves, or other rights of the Sellers arising out of the Factoring Agreement.

(o) All security deposits under leases that are not Assigned Leases and under contracts that are not Assigned Contracts.

2.3 **Assumed Liabilities.** Upon the terms and subject to the conditions set forth in this Agreement, at the Closing, Purchaser shall only assume and shall only be required to perform and discharge in accordance with their respective terms the following: (a) all Liabilities with respect to the Assigned Contracts and the Assigned Leases, solely to the extent such Liabilities arise on or after the Closing, (b) all Liabilities (including for any Tax) that arise on or after Closing with respect to Purchaser's ownership or operation of the Acquired Assets on or after the Closing, and (c) all Employee Costs (collectively, the "**Assumed Liabilities**").

2.4 **Excluded Liabilities.** Notwithstanding anything to the contrary contained in any other provision of this Agreement, Purchaser, by its execution and delivery of this Agreement and any Ancillary Agreements, and its performance of the transactions contemplated by this Agreement and any Ancillary Agreements (collectively, the "**Transactions**"), shall not assume, pay or otherwise be responsible for any Liability other than the Assumed Liabilities (the "**Excluded Liabilities**"). Purchaser shall not assume any liabilities of Sellers under any Contract or Leased Real Property, including any Assigned Contract or Assigned Lease, which first arose or was to be performed prior to the Closing Date or which otherwise relate to any period prior to the Closing Date or any liability of Sellers arising out of or resulting from their noncompliance with any law, rules, or regulations of any Governmental Body. For the avoidance of doubt, Purchaser shall not assume any Liabilities arising under or related to any collective bargaining agreement with the Union or any other union, which shall constitute Excluded Liabilities. For further avoidance of doubt, Purchaser shall not assume (i) any Employment Liabilities, (ii) any Liabilities arising under any of the Assigned Contracts and the Assigned Leases that were unbilled prior to the Closing Date or arose prior to the Closing Date (iii) any Environmental Liabilities (iv) any Pre-Closing Tax Liabilities or (v) any successor liability imposed on Purchaser by operation of applicable law.

2.5 **Purchase Price**.

(a) The aggregate consideration payable to Sellers for the sale and transfer of the Acquired Assets shall be the sum of the following items: (i) the Base Purchase Price, plus (ii) the assumption by Purchaser of the Assumed Liabilities, minus (iii) the Cure Amounts, minus (iv) 50% of the reasonable fees and expenses charged by the Escrow Agent (such aggregate amount, as adjusted, the "Purchase Price"). At the Closing, Purchaser shall deliver the Purchase Price (less the Deposit) to Sellers, by wire transfer of immediately available funds to one or more accounts designated in writing by Sellers.

(b) Deposit. Upon the execution of this Agreement, Purchaser shall deposit the Deposit, which shall be placed in a non-interest-bearing account with the Escrow Agent. The Deposit and Escrow Agent's duties hereunder shall be further subject to the provisions set forth in the Escrow Agreement and this Agreement, which shall be executed by Purchaser, each Seller and the Escrow Agent on the date hereof. Purchaser, on one hand, and Sellers, on the other hand, shall each be responsible for 50% of the fees and expenses charged by the Escrow Agent.

(c) Adjustment of the Purchase Price. The Purchase Price will be adjusted at the Closing as follows:

(i) Tax Prorations between Purchaser and Sellers. All ad valorem property and personal property taxes payable with respect to the Acquired Assets will be prorated between Sellers and Purchaser for the tax year in which the Closing is held on the basis of the tax statements for such year; provided, however, that if tax statements for the current year are not available as of the Closing Date, the tax proration between Sellers and Purchaser will be made on the basis of the taxes for the immediately prior tax year unless (1) such tax statement will become available within thirty (30) days following the Closing, or (2) to Sellers' Knowledge, the taxes for the immediately prior tax year will be significantly less than the current year, in which case the parties shall use a good faith estimate as agreed upon by the parties. Notwithstanding anything to the contrary, the tax proration made at Closing will be a final proration between Purchaser and Sellers.

(ii) Expenses. Operational expenses directly related to the Acquired Assets and the Business, including, without limitation, Assumed Contract expenses, utilities and rent (including sales tax on rent), will be prorated with Sellers being responsible for those expenses accruing prior to the Closing and Purchaser being responsible for those expenses accruing at or after the Closing. If the closing or assigning of Sellers' operating accounts with utility and other providers, and opening of Purchaser's operating accounts with same, is impractical or would cause an interruption in service (the Parties shall work in good faith to ensure a smooth transition and avoid any interruption in service), utilities, deposits and similar expenses shall be adjusted as of Closing and settled within thirty (30) days after Closing.

(iii) Security Deposits. At Closing, Sellers shall assign such security deposits for Assigned Contracts and Assigned Leases to Purchaser.

## 3. CLOSING; CONDITIONS TO CLOSING.

3.1 **Closing.** Subject to the terms and conditions of this Agreement, the closing (the "**Closing**") of the sale and purchase of the Acquired Assets and the assumption of the Assumed Liabilities shall take place at a time, place, and manner specified in the Approval Order; provided, that the Closing shall be deemed to occur at 12:01 AM Eastern Standard Time on the Closing Date. The time and date upon which the Closing occurs is referred to herein as the "**Closing Date.**" Transactions at the Closing shall be deemed to take place simultaneously and none shall be deemed to have taken place until all shall have taken place. Sellers, Purchaser and their attorneys need not be physically present at any Closing and they may deliver documents to the Escrow Agent in escrow by electronic delivery, overnight air courier or other means.

3.2 **Bankruptcy Court Approval Required.** Purchaser and each Seller acknowledge and agree that this Agreement is subject to approval of the Bankruptcy Court and that the Bankruptcy Court's entry of the Approval Order (as defined in Section 6.2) shall be required in order to consummate the Transactions, and that the requirement that the Approval Order be entered is a condition that cannot be waived by any party. Purchaser acknowledges that to obtain such approval, Sellers must demonstrate, among other things, that they have taken reasonable steps to obtain the highest and/or otherwise best offer possible for the Acquired Assets. Each Seller agrees that it shall provide advance prior written notice to all

creditors of Sellers and all parties in interest in the Chapter 11 Case (including all counterparties to the Assigned Contracts and the Assigned Leases) of the proposed Transactions, the Bidding Procedures Order, the Approval Order, and all related notices of any hearings related thereto, all in accordance with the requirements set forth in the Bid Procedures Order, the local rules of the Bankruptcy Court, the Bankruptcy Code, and the Bankruptcy Rules.

3.3 **Conditions to Obligations of Purchaser.** The obligation of Purchaser to consummate the Transactions is subject to the satisfaction, at or before the Closing, of each of the following conditions, any of which conditions may, except for the condition set forth in Section 3.2 of this Agreement, be waived by Purchaser in its sole discretion:

(a) Representations and Warranties. The representations and warranties of Sellers set forth in Section 4 of this Agreement shall be true and correct in all material respects (except for those representations and warranties qualified by materiality, which shall be true and correct in all respects) on the date hereof and on and as of the Closing Date, as though made on and as of the Closing Date (except for representations and warranties made as of a specified date, which shall be true and correct only as of the specified date).

(b) Agreements and Covenants. Each Seller shall have performed and complied with each agreement, covenant and obligation required to be performed or complied with by them under this Agreement at or before the Closing in all material respects.

(c) Consents. All consents, authorizations, or approvals required to be obtained from any third party, other than with respect to the Alcohol Licenses, shall have been obtained and be in full force and effect.

(d) Union Agreement. Purchaser and the Union shall have negotiated and executed a memorandum of understanding on terms mutually agreeable to Purchaser and the Union (the "MOU").

(e) Transition Licenses. Sellers shall have negotiated and executed licenses or short-term leases for the benefit of Purchaser, in form reasonably satisfactory to Purchaser, so that Purchaser may use the facilities, which are the subject of the East Rutherford Lease and Savannah Lease, on terms and conditions that are substantially the same or better than those terms and conditions in the existing applicable lease, for a duration of not less than three (3) months after the Closing.

(f) Customers. No later than thirty (30) days after the Effective Date, Purchaser shall have met with those customers listed on Schedule 3.3(f); provided, however, that Purchaser shall notify Seller in writing at least two (2) Business Days in advance of any such meeting, and Seller shall be permitted to attend any such meeting.

(g) Approval Order. The Bankruptcy Court shall have entered the Approval Order (as defined in Section 6.2) which shall be reasonably satisfactory to Purchaser and contain certain findings of fact and rulings including, without limitation, the following: (i) approving the sale of the Acquired Assets to Purchaser free and clear of all Liens, Claims, interest, and encumbrances, and confirming that Purchaser shall not assume any Excluded Liabilities and enjoining all holders of Claims against the Sellers from asserting or attempting to collect such amounts from Purchaser (ii) approving the assumption and assignment of the Assigned Contracts and Assigned Leases to Purchaser, (iii) providing for the waiver of the fourteen (14) day automatic stay contained in Federal Rule of Bankruptcy Procedure 6004(h), (iv) finding that Purchaser is a "good faith purchaser" within the meaning of Section 363(m) of the Bankruptcy Code and is thereby entitled to the protection afforded a good faith, arms-length purchaser, (v) finding that the Purchase Price is fair and reasonable; (vi) finding that this Agreement was negotiated at arms-length;

and (vii) finding that the sale of the Acquired Assets hereunder was conducted in a "non-collusive manner" within the meaning of Section 363(n) of the Bankruptcy Code, and the Approval Order shall not have been stayed, vacated and/or reversed.

(h) Interim Management Agreement. The Owners shall have executed and delivered to Purchaser the Interim Management Agreement.

3.4 **Conditions to Obligations of Sellers.** The obligation of each Seller to consummate the Transactions is subject to the satisfaction, at or before the Closing, of each of the following conditions, any of which conditions may, except for the condition set forth in Section 3.2 of this Agreement, be waived by any Seller in its sole discretion:

(a) Representations and Warranties. The representations and warranties of Purchaser set forth in Section 5 of this Agreement shall be true and correct in all material respects (except for those representations and warranties qualified by materiality, which shall be true and correct in all respects) on the date hereof and on and as of the Closing Date, as though made on and as of the Closing Date (except for representations and warranties made as of a specified date, which shall be true and correct only as of the specified date).

(b) Agreements and Covenants. Purchaser shall have performed and complied with each agreement, covenant and obligation required to be performed or complied with by it under this Agreement at or before the Closing in all material respects.

(c) Consents. All consents, authorizations, or approvals required to be obtained from any Governmental Body shall have been obtained and be in full force.

(d) Approval Order. The Bankruptcy Court shall have entered the Approval Order on terms reasonably satisfactory to Sellers.

(e) Deposit. The Purchaser shall have timely complied with its obligation to pay the Deposit to the Escrow Agent in accordance with the Bidding Procedures Order and the Parties have instructed the Escrow Agent to release the Deposit to the Sellers.

(f) Purchase Price: Purchaser has delivered the Purchase Price.

(g) Interim Management Agreement. The Purchaser shall have executed and delivered to Sellers the Interim Management Agreement.

3.5 **Closing Obligations.** In addition to any other documents to be delivered under other provisions of this Agreement, at the Closing:

(a) Sellers Deliverables. Sellers shall deliver to Purchaser:

(i) such bills of sale, assignments, certificates of title, documents, and instruments of transfer as may reasonably be requested by Purchaser to consummate the transactions contemplated by this Agreement, each in form and substance reasonably satisfactory to Purchaser and its legal counsel and executed by Sellers;

(ii) a certified copy of the Approval Order entered on the docket in the Chapter 11 Case;

(iii) A certificate of active status or good standing of each Seller issued by the Secretary of State of the state of incorporation or formation of each Seller, as applicable;

(iv) A properly completed IRS Form W-9, duly executed by each Seller; and

(b) Purchaser Deliverables. Purchaser shall deliver, or cause to be delivered, to:

(i) Sellers the Purchase Price, net of the Deposit; and

(ii) the counterparties of such Assigned Contracts or the Assigned Leases, on behalf of the Sellers, the Cure Amounts.

(c) Purchaser and Sellers Joint Deliverables. The Purchaser and Sellers shall jointly instruct the Escrow Agent to deliver the Deposit to Sellers.

3.6 **Delivery of Possession of Assets.** Right to possession of all Acquired Assets shall transfer to Purchaser at the Closing, free and clear of all Liens and Claims. Sellers shall bear all risk of loss with respect to the Acquired Assets prior to Closing. Purchaser shall bear all risk of loss with respect to the Acquired Assets from and after the Closing.

**4. REPRESENTATIONS AND WARRANTIES OF SELLERS.** Sellers represent and warrant to Purchaser that the statements contained in this Section 4 are true and correct as of the date hereof and will be true and correct through the Closing Date.

4.1 **Organization, Good Standing and Power.** Each Seller is legally formed and in good standing under the laws of the State of its incorporation or formation, each of which is listed on Schedule 4.1. Subject to the applicable provisions of the Bankruptcy Code, Sellers have the power to own their properties and carry on their businesses as now being conducted and is qualified to do business and is in good standing in each jurisdiction, except where the failure to be so qualified and in good standing would not have a Material Adverse Effect on the Sellers.

4.2 **Authority Relative to this Agreement; Execution and Binding Effect.** Each Seller has full power and authority to execute and deliver this Agreement and the Ancillary Agreements and, subject to receipt of Bankruptcy Court approval and entry of the Approval Order in accordance with the Bankruptcy Code, to consummate the Transactions applicable to such Seller. The execution and delivery of this Agreement and the Ancillary Agreements and the consummation of the Transactions have been duly and validly approved and adopted by the board of directors or managers, as appropriate, of each Seller, and, except for Bankruptcy Court approval and entry of the Approval Order, no other proceedings or approvals on the part of Sellers are necessary to approve this Agreement and the Ancillary Agreements and to consummate the Transactions. This Agreement has been duly and validly executed and delivered by each Seller. Assuming due authorization, execution and delivery by Purchaser, this Agreement constitutes, and each of the Ancillary Agreements at the Closing will constitute, the valid and binding obligation of Sellers, enforceable against Sellers in accordance with their terms, except as such enforcement may be limited by (a) the effect of bankruptcy, insolvency, reorganization, receivership, conservatorship, arrangement, moratorium or other laws affecting or relating to the rights of creditors generally, or (b) the rules governing the availability of specific performance, injunctive relief or other equitable remedies and general principles of equity, regardless of whether considered in a proceeding in equity or at law.

4.3 **No Defaults.** To each Sellers' Knowledge, the execution and delivery by each Seller of this Agreement, any Ancillary Agreements, and the consummation of the Transactions do not and will not (a), except for any such defaults that will be cured at the Closing, with or without the giving of notice or

the lapse of time, or both, conflict with, or result in the material breach of or constitute a material default under, or result in the modification, cancellation, lapse or termination of, or limitation, or curtailment under, or materially violate any (i) provision of Law, or (ii) agreement (including without limitation any loan or financing agreement), Contract, lease, power of attorney, commitment, instrument, insurance policy, arrangement, undertaking, order, decree, ruling or injunction to which such Seller is subject or a party or by which it is bound (or with respect to which its properties or assets are subject or bound); or (b) violate the governing documents of such Seller.

4.4 **Compliance with Laws**. Except as disclosed on Schedule 4.4, to Sellers' Knowledge, no Seller is in violation or default, and in carrying out the transactions described in this Agreement will not come into material violation or default, under any present material laws, ordinances, regulations, orders or decrees applicable to the Business, any Seller or the Acquired Assets that could reasonably be expected to have a Material Adverse Effect.

4.5 **Existing Leases**. Sellers have made available to Purchaser, true and correct copies of all Leased Real Property (including all amendments thereto), each of which are listed on Schedule 4.5. Except as disclosed on Schedule 4.5 attached hereto, Sellers have not received written notice of any default or breach on the part of any Seller of any of the Assigned Leases which has not been cured. To each Seller's Knowledge, the premises subject to the Leased Real Property are in good condition and repair, ordinary wear and tear excepted, and are suitable for the purposes for which they are currently used in the Business. Except as disclosed on Schedule 4.5 attached hereto, Sellers have not received written notice of any material defects or violations relating to the premises subject to the Leased Real Property that have not been cured or remedied.

4.6 **Contracts**. Sellers have made available to Purchaser, true and correct copies of all material Contracts (including all amendments thereto), each of which are listed on Schedule 4.6. Except as disclosed on Schedule 4.6 attached hereto, Sellers have not received written notice of any default or breach on the part of any Seller under any Assigned Contract which has not been cured or will not be cured as of the Closing.

4.7 **Permits**. Sellers have made available to Purchaser copies of Permits in their possession, each of which are listed on Schedule 4.7. To each Seller's Knowledge and except as disclosed on Schedule 4.7, the Permits are in full force and effect except where any Seller is in the process of renewing or reinstating periodic or lapsed Permits, and there is no outstanding material violation of any Permit that could reasonably be expected to have a Material Adverse Effect.

4.8 **Legal Proceedings**. Except as listed in Schedule 4.8, there is not pending or, to each Seller's Knowledge , threatened, any legal, administrative, arbitration or other proceeding or investigation related to the Business or the Acquired Assets, and Sellers have no Knowledge of any circumstances that could be expected to give rise to any action, suit or proceeding against Sellers or Purchaser that could reasonably be expected to have a Material Adverse Effect.

4.9 **Equipment**. Sellers have made available to Purchaser a list of all equipment owned by each Seller in its possession, which such equipment and the applicable Seller that owns such equipment is listed on Schedule 4.9. To Sellers' Knowledge, as of the date hereof and as of the Closing Date, the equipment included in the Acquired Assets will be present at the Sellers' facilities and no such equipment shall have been removed from Sellers' facilities since the date hereof.

4.10 **Employees**. Each Seller has provided Purchaser with a list of each current individual employee and independent contractor providing labor or similar services for each such Seller , any written agreement with such person and such Person's name; location; title; date of hire; active or inactive status

(including type of leave, if any); employment status (i.e., full-time, part-time, temporary); exempt or non-exempt status under the Fair Labor Standards Act; current annual base salary or hourly wage compensation; and target bonus/commission compensation and total compensation for the prior year and current year to date. Except as set forth on Schedule 4.10, all employees of each Seller entity are employees-at-will. Schedule 4.10 lists each "employee benefit plan" (as defined by Section 3(3) of ERISA) and any other material bonus, compensation, deferred compensation, stock option, stock purchase, fringe benefit, post-retirement, scholarship, sick leave, vacation, individual employment, payroll practice, or retention plan, agreement, policy or arrangement currently in effect for each Person listed on Schedule 4.10. This Schedule 4.10 will be updated as of the Closing Date.

4.11 **No Brokers.** Sellers have not incurred and will not incur, directly or indirectly, as a result of any action taken or permitted to be taken by or on behalf of Sellers, any Liability for brokerage or finders' fees or agents' commissions or similar charges in connection with the execution and delivery by Sellers of this Agreement, any Ancillary Agreements, and the consummation of the Transactions.

4.12 **Title, Sufficiency and Condition of Assets**. Except as disclosed on Schedule 4.12, as of the date hereof and as of Closing, each Seller has (or, with respect to the Closing, shall have) good and valid title to, a valid leasehold interest in or a written license to all of the Acquired Assets free and clear of any and all Liens (other than Liens that will be terminated at Closing). The Acquired Assets are sufficient to enable Purchaser to conduct the Business in the same manner immediately after the Closing as the Business was conducted by Sellers as of immediately prior to the Closing. To Sellers' Knowledge, the tangible personal property, machinery, equipment, fixtures, furniture, vehicles, and other tangible assets included in the Acquired Assets are in good operating condition and repair, ordinary wear and tear excepted, and are suitable for the purposes for which they are currently used in the Business.

4.13 **Accounts Receivable**. Schedule 4.13 sets forth a true and complete list of all Accounts Receivable of Sellers as of the date hereof, which Schedule shall be updated as of the Closing Date. All Accounts Receivable of Sellers reflected on the books and records of Sellers or arising after the date hereof (a) have arisen from bona fide transactions in the ordinary course of the Business, (b) represent valid obligations owed to Sellers, and (c) except as may be set forth in Schedule 4.13, are not subject to any valid counterclaims, setoffs, or defenses. From the date hereof through the Closing Date, Sellers shall use commercially reasonable efforts to collect Accounts Receivable in the ordinary course of business consistent with past practice and shall not compromise, settle, or write off any Accounts Receivable other than in the ordinary course of business consistent with past practice.

4.14 **Tax Returns**. Except as disclosed on Schedule 4.14, each Seller has timely filed, or caused to be timely filed (taking into account any valid extensions), all Tax returns required to be filed by such Seller with respect to the Business or the Acquired Assets for all periods ending on or prior to the Closing Date. To Sellers' Knowledge all such Tax returns are true, correct, and complete in all material respects. Except as disclosed on Schedule 4.14, each Seller has timely paid all Taxes due and payable with respect to the Business or the Acquired Assets (whether or not shown on any Tax return).

4.15 **Insurance**. Schedule 4.15 sets forth a true and complete list of all insurance policies maintained by Sellers with respect to the Business or the Acquired Assets, including the name of the insurer, type of coverage, policy number, coverage limits, deductibles, and expiration date. All such insurance policies are in full force and effect, and no Seller is in default with respect to its obligations under any such policies. No Seller has received any written notice of cancellation or non-renewal of any such policy.

4.16 **Financial Statements**. Sellers have made available to Purchaser true and complete copies of (a) the balance sheets and statements of income, changes in equity, and cash flows of each Seller as of and for the fiscal years ended 12/31/2023, 12/31/2024, and 12/31/2025 (the "**Annual Financial**

**Statements**”), and (b) the unaudited balance sheet and statement of income of each Seller as of and for the period ended 5/31/26 (the “**Interim Financial Statements**” and, together with the Annual Financial Statements, the “**Financial Statements**”). To each Seller’s Knowledge, the Financial Statements (i) have been prepared in accordance with GAAP applied on a consistent basis throughout the periods covered thereby (except as may be indicated in the notes thereto and, with respect to the Interim Financial Statements, subject to normal year-end adjustments and the absence of footnotes), (ii) fairly present in all material respects the financial position, results of operations, and cash flows of such Seller as of the dates and for the periods indicated, and (iii) are consistent with the books and records of such Seller.

4.17 **Intellectual Property**. Schedule 4.17 sets forth a true and complete list of all Intellectual Property owned by or licensed to Sellers and used in the Business, including all trademarks, service marks, trade names, patents, copyrights, domain names, and material software. Except as set forth on Schedule 4.17, Sellers own or have valid rights to use all Intellectual Property necessary for the conduct of the Business as currently conducted. To Sellers’ Knowledge, the conduct of the Business does not infringe, misappropriate, or otherwise violate the Intellectual Property rights of any third party. No claims have been received by any Seller or, to Sellers’ Knowledge, threatened against any Seller alleging any such infringement, misappropriation, or violation.

4.18 **Affiliate Transactions**. Except as set forth on Schedule 4.18, no officer, director, shareholder, partner or other direct or indirect owner of any Seller (each, a “Related Party”) or any Affiliate or immediate family member of any such Related Party (a) is a party to any agreement, arrangement or transaction with any Seller, (b) has any material interest or right in any material property or right, tangible or intangible, used by any Seller or (c) owns, directly or indirectly, any material interest in, or is an officer, director, employee or consultant of, any Person which is a material supplier, payor or customer of any Seller.

4.19 **Customers and Suppliers**. Schedule 4.19 sets forth (a) a list of the ten (10) largest customers of the Business for the twelve (12) month period ended June 30,2026, and (b) a list of the ten (10) largest suppliers of the Business for the twelve (12) month period ended June 30, 2026. Except as set forth on Schedule 4.19, since January 1, 2026, no such customer or supplier has (i) terminated or materially reduced its business relationship with Sellers, or (ii) notified Sellers of its intention to terminate or materially reduce its business relationship with Sellers.

## 5. REPRESENTATIONS AND WARRANTIES OF PURCHASER.

Purchaser represents and warrants to Sellers that the statements contained in this Section 5 are true and correct as of the date hereof and will be true and correct on the Closing Date.

5.1 **Organization, Good Standing and Power.** Purchaser is legally formed and in good standing under the laws of the State of its incorporation or formation. Purchaser has the power to own its properties and carry on its business as now being conducted and is qualified to do business and is in good standing in each jurisdiction in which the failure to be so qualified and in good standing would have a Material Adverse Effect on the Purchaser.

5.2 **Authority Relative to this Agreement; Execution and Binding Effect.** Purchaser has full power and authority to execute and deliver this Agreement and any Ancillary Agreements and to consummate the Transactions. The execution and delivery of this Agreement and any Ancillary Agreements and the consummation of the Transactions have been duly and validly approved and adopted by all necessary action of Purchaser and no other proceedings or approvals (shareholder or otherwise) on the part of Purchaser are necessary to approve this Agreement and any Ancillary Agreements and to consummate the Transactions. This Agreement has been duly and validly executed and delivered by Purchaser.

Assuming due authorization, execution and delivery by Sellers, this Agreement constitutes, and each of any Ancillary Agreements at the Closing will constitute, the valid and binding obligation of Purchaser, enforceable against Purchaser in accordance with their terms, except as such enforcement may be limited by (a) the effect of bankruptcy, insolvency, reorganization, receivership, conservatorship, arrangement, moratorium or other laws affecting or relating to the rights of creditors generally, or (b) the rules governing the availability of specific performance, injunctive relief or other equitable remedies and general principles of equity, regardless of whether considered in a proceeding in equity or at law.

5.3 **No Defaults.** The execution and delivery by Purchaser of this Agreement, any Ancillary Agreements, and the consummation of the Transactions do not and will not (a) with or without the giving of notice or the lapse of time, or both, conflict with, or result in the material breach of or constitute a material default under, or result in the modification, cancellation, lapse or termination of, or limitation, or curtailment under, or materially violate any (i) provision of Law, or (ii) agreement (including without limitation any loan or financing agreement), Contract, lease, power of attorney, commitment, instrument, insurance policy, arrangement, undertaking, order, decree, ruling or injunction to which Purchaser is subject or a party or by which it is bound (or with respect to which its properties or assets are subject or bound); or (b) violate the articles of incorporation or bylaws of Purchaser.

5.4 **Governmental and Other Consents.** Except for the receipt of any necessary Bankruptcy Court approval and entry of the Approval Order in accordance with the Bankruptcy Code and any bulk sales filings to be made by Purchaser, no consent, notice, authorization or approval of, or exemption by, or filing with or notifications to any Governmental Body or any other Person, whether pursuant to contract or otherwise, is required in connection with the execution and delivery by Purchaser of this Agreement, any Ancillary Agreements, and the consummation of the Transactions.

5.5 **Financial Ability.** Purchaser currently has and will have at Closing cash available that is sufficient to enable it to pay the Purchase Price, as well as all other amounts otherwise payable to consummate the Transactions pursuant to and in accordance with this Agreement.

5.6 **No Brokers.** Purchaser has not incurred and will not incur, directly or indirectly, as a result of any action taken or permitted to be taken by or on behalf of Purchaser, any Liability for brokerage or finders' fees or agents' commissions or similar charges in connection with the execution and delivery by Purchaser of this Agreement, any Ancillary Agreements, and the consummation of the Transactions.

**6. COVENANTS**.

6.1 **Operation of Business.** Subject to the requirements of, and the obligations imposed upon, Sellers as debtors-in-possession and pursuant to the Bankruptcy Code and pursuant to any Debtor In Possession Financing Orders and except as otherwise contemplated by this Agreement or the Bidding Procedures Order or as required to comply with debtor-in-possession financing obtained by Sellers, from the date hereof and until the Transactions shall have been consummated or abandoned as contemplated herein, Sellers shall operate the Business in the ordinary course (relative to that in effect immediately prior to the execution of the Agreement) and, consistent with such operation, and the Sellers' debtor in possession credit agreement and any applicable dip financing orders, and consistent with acting as debtors-in-possession in a Chapter 11 bankruptcy case, shall use commercially reasonable efforts to maintain the goodwill associated with the Business and the relationships with the employees, customers and suppliers of the Business. By way of example and not limitation, Sellers shall:

(a) diligently pursue approval of a sale motion to approve the Transactions and entry of the Bidding Procedures Order and Approval Order by the Bankruptcy Court;

(b) maintain the operation of the Business and conduct the Business in the ordinary course and in accordance with business practices in effect immediately prior to the execution of the Agreement;

(c) maintain and repair all tangible Acquired Assets in accordance with business practices in effect immediately prior to the execution of the Agreement;

(d) comply with all applicable material laws, rules and regulations in all material respects applicable to the Business or the Acquired Assets;

(e) maintain insurance in the ordinary course of business with respect to the Acquired Assets until the Closing Date;

(f) advertise and market the Business consistent with business practices in effect immediately prior to the execution of the Agreement;

(g) not sell or dispose of any of the Acquired Assets other than in the ordinary course of the operation of the Business; and

(h) not incur, assume, guarantee, create or otherwise become liable with respect to any indebtedness, borrowed money, or similar obligation, except in the ordinary course of business consistent with past practices, with respect to the Leased Real Property, the Acquired Assets, or the Business.

6.2 **Approval Order**.

(a) Purchaser agrees that it will take such actions as are reasonably requested by Sellers to assist Sellers in obtaining entry of the Approval Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of adequate assurance of future performance under any proposed Assigned Contracts and Assigned Leases, performance by Purchaser under this Agreement and demonstrating that Purchaser is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code.

(b) Prior to the Closing, and subject to the provisions of this Agreement, Purchaser and Sellers shall use their commercially reasonable efforts to obtain entry of a Final Order or Final Orders by the Bankruptcy Court pursuant to Sections 363 and 365 of the Bankruptcy Code (the "**Approval Order**"), in form and substance reasonably acceptable to the Parties, which shall approve this Agreement and the Transactions. Such Approval Order shall, at a minimum, contain the provisions set forth below (it being understood that certain of such provisions may be contained in either the findings of fact or conclusions of law to be made by the Bankruptcy Court as part of the Approval Order):

(i) Approval of the sale, transfer, and assignment by Sellers of their applicable Acquired Assets and assumption and assignment of any applicable Assigned Contracts and Assigned Leases to Purchaser pursuant to this Agreement, the Bankruptcy Rules, and Bankruptcy Code §§105, 363 and 365, as applicable;

(ii) The transfers of the Acquired Assets by Sellers to Purchaser (A) vest or will vest Purchaser with all right, title, and interest of Sellers in and to the Acquired Assets and possession and operation of the Acquired Assets, and to the fullest extent permitted by 11 U.S.C. § 363(f) and all other applicable laws, free and clear of all Liens, interests, encumbrances, and claims (including, but not limited to, any "claims" as defined in 11 U.S.C. § 101(5), reclamation claims, covenants, restrictions, hypothecations, charges, indentures, loan agreements, causes of action, instruments, contracts, leases,

licenses, options, rights of first refusal, offsets, rights of recovery, judgments, orders and decrees of any court or foreign or domestic governmental entity, claims for reimbursement, successor liability, contribution, indemnity or exoneration, assignment, preferences, debts, charges, suits, rights of recovery, interests, products liability, alter-ego, environmental liability, successor liability, tax and other liabilities, causes of action and claims, and in each case whether secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, notice or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or unmatured, material or non-material, disputed or undisputed, or known or unknown whether arising prior to, on, or subsequent to the date on which Sellers filed the Chapter 11 Case (collectively, "**Claims**"), except as otherwise provided in section 2.3 of this Agreement, with any such Liens and Claims to attach only to the proceeds of the sale with the same priority, validity, force and effect as they existed with respect to the Acquired Assets prior to Closing, and (B) constitute transfers for reasonably equivalent value and fair consideration under the Bankruptcy Code and the laws of the State of New Jersey. For the avoidance of doubt and without limiting the foregoing, the transfer of the Acquired Assets to Purchaser shall be free and clear of any Claims or Causes of Action relating to or in connection with (i) any Employee Benefit Plan or pension plans contributed to or maintained by Sellers, or multi-employer plan participated in by Sellers prior to or subsequent to the Petition Date; (ii) the Worker Adjustment and Retraining Notification Act of 1988, (iii) the Consolidated Omnibus Budget Reconciliation Act of 1985 or any similar laws or regulations; or (iv) any collective bargaining agreement(s) to which Sellers are a party or otherwise obligated under.

(iii) The sale and transfer of the Acquired Assets to Purchaser or Purchaser's occupation and use of the Acquired Assets will not subject Purchaser to any liability (including successor liability) with respect to the operation of Sellers' business or Acquired Assets prior to Closing or by reason of such transfer. Purchaser is not holding itself out to the public as a continuation of Sellers, and no common identity of directors, stockholders, members, or other equity holders exists between Purchaser and Sellers. The Transactions do not amount to a consolidation, merger, or de facto merger of Purchaser and Sellers and/or Sellers' bankruptcy estates; there is no substantial continuity, common identity, or continuation of enterprise between Sellers and Purchaser. Purchaser is not a mere continuation of Sellers or their bankruptcy estates, and Purchaser does not constitute an alter ego or a successor in interest to Sellers or their bankruptcy estates. Purchaser is not a successor to Sellers or their bankruptcy estates by reason of any theory of law or equity;

(iv) While Purchaser is authorized to possess and operate the Acquired Assets, including without limitation, the Alcohol Licenses, nothing in the Approval Order or this Agreement authorizes the transfer or assignment of the Alcohol Licenses without compliance with all applicable requirements and approvals under applicable Laws.

(v) The Transactions are undertaken by Purchaser and Sellers at arm's length, without collusion and in good faith within the meaning of Section 363(m) of the Bankruptcy Code, and such parties are entitled to the protections of Section 363(m) of the Bankruptcy Code;

(vi) This Agreement was negotiated at arms-length;

(vii) The sale of the Acquired Assets hereunder was conducted in a "non-collusive manner" within the meaning of Section 363(n) of the Bankruptcy Code;

(viii) a determination that selling the Acquired Assets free and clear of all Liens, Claims, interest, and encumbrances is in the best interest of Sellers' Estate;

(ix) that Purchaser shall not assume or have any responsibility or liability whatsoever for any of the Excluded Liabilities and enjoining any holder of a Claim against Sellers from attempting to assert or collect such Claim against or from Purchaser;

(x) enjoining the counterparties to the Assigned Contracts and Assigned Leases from collecting any amounts arising prior to the Closing Date from Purchaser; and

(xi) all other customary findings of fact and conclusions of law that a customary purchaser would expect in connection with a Section 363 sale, as further described in Section 3.3(g) of this Agreement.

(c) If the Approval Order or any other orders of the Bankruptcy Court relating to this Agreement shall be appealed by any Person (or a petition for certiorari or motion for rehearing or reargument shall be filed with respect thereto), each party hereto agrees to use commercially reasonable efforts to obtain an expedited resolution of such appeal; provided, however, that nothing herein shall preclude the parties hereto from consummating the Transactions if the Approval Order shall have been entered and has not been stayed in which event Purchaser shall be able to assert the benefits of Section 363(m) of the Bankruptcy Code.

6.3 **Bidding Procedures Order, Stalking Horse and Bid Protections, and Bidding Procedures**.

(a) Sellers shall seek approval from the Bankruptcy Court of the entry an order entered by the Bankruptcy Court (i) approving all aspects of this Agreement as a stalking horse bid, subject to higher and better bids, (ii) the Bidding Procedures, and (iii) Bid Protections set forth below (the "**Bidding Procedures Order**"), which shall designate Purchaser as the stalking horse bidder for the sale of the Acquired Assets pursuant to Sections 363 and 365 of the Bankruptcy Code ((1) – (4) below, the "**Bid Protections**"):

(1) a Break-Up Fee equal to 3% of the Base Purchase Price, payable to Purchaser if the parties execute this Agreement and Sellers consummate an Alternative Transaction, to be paid at the closing of any such Alternative Transaction solely from the proceeds of such sale and before any distribution to Sellers or their secured parties of closing proceeds;

(2) an Expense Reimbursement in the amount not to exceed $150,000 for Purchaser's reasonable and documented out-of-pocket fees and expenses incurred in connection with negotiating, documenting the transaction, and participating in the sale process, to be paid at the closing of any Alternative Transaction solely from the proceeds of such sale and before any distribution to Sellers or their secured parties of closing proceeds;

(3) an initial overbid requirement of at least $50,000 above the Base Purchase Price;

(4) minimum bid increments of $50,000 for any subsequent bids at auction. For the avoidance of doubt, the Bidding Procedures Order must require that any topping bid by a qualified bidder shall exceed the sum of the Base Purchase Price, the Break-Up Fee, the Expense Reimbursement, and the initial overbid amount.

6.4 **Bidding Procedures**. Purchaser shall have the right to review and provide reasonable input on the proposed Bidding Procedures Order and Bidding Procedures prior to the filing of any motion seeking approval thereof. The "**Bidding Procedures**" shall provide, among other things, that: (a) qualified bidders

must demonstrate adequate financing and submit a marked version of this Agreement with their bid that is substantially similar in form and substance to this Agreement (without the Bid Protections); (b) credit bidding by secured creditors, if any, shall be subject to limitations as determined by the Bankruptcy Court; (c) Purchaser shall have the right, but not the obligation, to submit a topping bid at any auction; (d) Purchaser shall be automatically deemed to be a qualified bidder under the Bidding Procedures Order at any auction; (e) qualified bidders must provide Sellers with a deposit in an amount equal to or greater than ten percent (10%) of the purchase price proposed by such qualified bidders; (f) provide notice to all counterparties to the Assigned Contracts and Assigned Leases of the deadline to object to the proposed assumption and assignment such agreements, including objections based on cure amounts and/or objections based on adequate assurance of future performance issues; and (g) Purchaser shall have the right to credit the Break-Up Fee and the Expense Reimbursement against any increased bid submitted by Purchaser at the auction.

6.5 **Access to Facilities**, **Personnel, and Information**. Prior to the Closing, Sellers shall permit during normal business hours and in a manner that does not unreasonably interfere with ordinary business operations, representatives of Purchaser to have reasonable access to all premises, property, books, records (excluding Tax records ), Contracts, and documents (excluding all documents and other items subject to attorney-client privilege, attorney work product privilege and all other similar privileges) of or pertaining to the Business or any of the Acquired Assets which are under Sellers' control (provided that any representatives of Purchaser shall be subject to the confidentiality obligations under the Confidentiality Agreement or otherwise agree in writing to be bound by the terms of such Confidentiality Agreement applicable to Purchaser thereunder).

6.6 **Further Assurances.** Purchaser and Sellers agree to take such further actions and execute such other documents as may be reasonably required to fulfill the conditions to Closing and, after Closing, to fully effect the Transactions contemplated by this Agreement, any Ancillary Agreements, and further secure to each party the rights intended to be conferred hereby and thereby.

6.7 **Tax Matters.**

(a) All Transfer Taxes incurred in connection with the purchase and sale of the Acquired Assets shall be borne by Purchaser when due. Purchaser shall file, to the extent required by applicable Law, all necessary Tax returns and other documentation with respect to all such Transfer Taxes. To the extent required by applicable Law, Purchaser will join in the execution of any such Tax returns or other documentation.

(b) Purchaser and Sellers agree that the Purchase Price and the assumption of any Assumed Liabilities (together with any other amounts treated as consideration for Income Tax purposes) (the "**Tax Purchase Price**") shall be allocated among the Acquired Assets in a manner that is in accordance with Section 1060 of the Code and the Treasury Regulations promulgated thereunder (collectively, the "**Allocation Methodology**"). Purchaser and Sellers shall negotiate in good faith, on or prior to the Closing Date, an allocation of the Tax Purchase Price among the Acquired Assets in accordance with the Allocation Methodology. Notwithstanding such allocation of the Tax Purchase Price, nothing in the foregoing shall be determinative of values ascribed to the Acquired Assets or the allocation of the value of the Acquired Assets in any proceeding in the Chapter 11 Case that may be proposed. Sellers reserve the right on their behalf and on behalf of their estates, to the extent not prohibited by applicable law and accounting rules, for purposes of any proceeding in connection with the Chapter 11 Case, to ascribe values to the Acquired Assets and to allocate the value of the Acquired Assets to Sellers in the event of, or in order to resolve, creditor disputes in the Chapter 11 Case.

6.8 **Change of Name**. On the Closing Date, Sellers shall assign to Purchaser, all of their right, title and interest in and to the names and phrases P. Judge & Sons, The Judge Organization, Port Elizabeth Terminal & Warehouse, Amex Shipping Agent, Judge Warehousing, P. Judge & Sons Trucking, The Judge Organization Logistics Services, and any derivative names thereof and Sellers agree that Purchaser may, but is not required to, conduct business under such name from and after the Closing. From and after the Closing, no Seller shall, directly or indirectly, conduct business under any such names or any derivative names thereof. Further, Sellers shall, within ten (10) Business Days after the Closing Date, change their names to names that do not include the names and phrases "P. Judge & Sons," "The Judge Organization," "Judge Warehousing," "P. Judge & Sons Trucking," "Port Elizabeth Terminal & Warehouse," "Amex Shipping Agent," "Judge Organization Logistics Services," or any similar names thereof, as determined by Purchaser's sole discretion, and Sellers shall provide documentary evidence of such name changes within (10) Business Days after the Closing Date.

**7. EMPLOYEES**. Immediately after the Closing, Sellers will notify all of their Employees who are engaged in connection with the operation of the Business that the Acquired Assets have been sold to Purchaser. Purchaser and Sellers agree that Purchaser may, but is not obligated to, offer to the Employees employment with Purchaser. This Section 7 does not establish, as to any Employee, a contract of employment for a definite term or any term or any contractual right that his or her employment can only be terminated for just cause, and no Employee has any rights under this Agreement as a third-party beneficiary or otherwise. Purchaser shall assume, and be fully responsible for, all Employee Costs, which shall be considered Assumed Liabilities hereunder. Sellers shall be responsible for providing any notice required pursuant to the WARN Act or any similar Law that is triggered by any action that occurs prior to the Closing Date. Purchaser shall offer employment to a sufficient number of employees so not to trigger notice requirements under the WARN Act or any state Law similar to the WARN Act. Furthermore, Purchaser shall offer certain of those Employees that Purchaser elects to hire an opportunity to execute an Employment Agreement, in form and substance substantially similar to the form attached hereto as Exhibit A.

**8. TERMINATION; EFFECT OF TERMINATION.**

8.1 **Termination**. This Agreement may, by notice given prior to or at the Closing, be terminated:

(a) by mutual, written consent of Purchaser and Sellers;

(b) by Purchaser in the event the Closing has not occurred (other than through failure of any party seeking to terminate this Agreement to comply fully with its obligations under this Agreement) on or before November 13, 2026;

(c) by Purchaser if (i) any Seller sells all or part of the Acquired Assets to a third party other than Purchaser and shall thereafter consummate such sale, in which case Purchaser shall be entitled to payment of the Break-Up Fee and the Expense Reimbursement out of the proceeds of such sale, or (ii) Sellers' Chapter 11 Case is converted to one under Chapter 7 of the Bankruptcy Code;

(d) by Purchaser if the Bidding Procedures Order is not entered on the Docket in the Chapter 11 Case on or before September 4, 2026;

(e) by Purchaser, at any time prior to the entry of the Bidding Procedures Order, if Purchaser is not satisfied, in its reasonable discretion, with the results of its due diligence review of the Acquired Assets or the Business;

(f) by Purchaser if the Approval Order is not entered on the Docket in the Chapter 11 Case on or before October 23, 2026;

(g) by Purchaser if any term of the Bidding Procedures Order or Approval Order is not reasonably acceptable to Purchaser in any manner that is materially adverse to Purchaser;

(h) by Purchaser, if there has occurred a Material Adverse Effect, the determination of which is subject to determination by the Bankruptcy Court if disputed in good faith by the Sellers.

(i) by the non-breaching party upon a breach of any provision of this Agreement, provided that such breach has not been waived by the non-breaching party and has continued after notice to the breaching party by the non-breaching party without cure for a period of five (5) Business Days (provided that the non-breaching party shall have an immediate right to terminate if the breaching party has willfully breached any provision of this Agreement which breach is not cured); or

(j) by Sellers if, on November 13, 2026 (or on such later date as the Parties may in writing agree), all of the conditions set forth in Section 3.3 of this Agreement have been satisfied but Purchaser refuses to consummate the Closing.

8.2 **Effect of Termination.** If this Agreement is terminated pursuant to Section 8.1(a) of this Agreement or terminated by Purchaser pursuant to Section 8.1(b), (c), (d), (e), (f), (g), (h) or (i) of this Agreement, Purchaser and its Affiliates shall not have any Liability or obligations under this Agreement and the Escrow Agent shall promptly return the Deposit to Purchaser. If this Agreement is terminated by Sellers pursuant to Section 8.1(i) or (j) of this Agreement, Sellers shall be paid the Deposit by the Escrow Agent as Sellers' sole and exclusive remedy, and Purchaser and its Affiliates shall not have any other Liability or obligations under this Agreement.

8.3 **Injunctive Relief.** Each Party agrees that any breach of this Agreement would constitute irreparable harm and damages at law are an inadequate remedy for the breach of any of the covenants, promises and agreements contained in this Agreement, and, accordingly, except as set forth in Section 8.2, either Party is entitled to injunctive relief with respect to any such breach, including specific performance of such covenants or obligations or an order enjoining a Party from any threatened, or from the continuation of any actual, breach of the covenants or obligations contained in this Agreement. Each Party hereby waives any requirement for the securing or posting of any bond in connection with any such injunctive relief. The rights set forth in this Section 8.3 shall be in addition to any other rights that a Party may have at law or in equity pursuant to this Agreement.

## 9. GENERAL PROVISIONS.

9.1 **"As Is", "Where Is", and "With All Faults" Transaction.** PURCHASER ACKNOWLEDGES AND AGREES THAT, EXCEPT AS EXPRESSLY PROVIDED IN SECTION 4 OF THIS AGREEMENT OR IN THE ANCILLARY AGREEMENTS, SELLERS MAKE NO REPRESENTATIONS OR WARRANTIES WHATSOEVER, EXPRESS OR IMPLIED, WITH RESPECT TO ANY MATTER RELATING TO THE ACQUIRED ASSETS OR THE BUSINESS, INCLUDING (A) FINANCIAL PROJECTIONS, REVENUES, PROFITS OR INCOME TO BE DERIVED OR COSTS OR EXPENSES TO BE INCURRED IN CONNECTION WITH THE ACQUIRED ASSETS, (B) THE PHYSICAL CONDITION OF ANY ACQUIRED ASSETS, (C) THE ENVIRONMENTAL CONDITION OR OTHER MATTERS RELATING TO THE PHYSICAL CONDITION OF THE LEASED REAL PROPERTY OCCUPIED BY SELLERS, (D) THE ZONING OF THE LEASED REAL PROPERTY OCCUPIED BY SELLERS, (E) THE VALUE OF THE ACQUIRED ASSETS OR ANY PORTION THEREOF, (F) THE TRANSFERABILITY OF THE ACQUIRED

ASSETS, (G) THE TERMS, AMOUNT, VALIDITY OR ENFORCEABILITY OF ANY ASSUMED LIABILITIES, (H) TITLE TO ANY OF THE ACQUIRED ASSETS OR ANY PORTION THEREOF, (I) THE MERCHANTABILITY OR FITNESS OF THE ACQUIRED ASSETS OR ANY PORTION THEREOF FOR ANY PARTICULAR PURPOSE, OR (J) ANY OTHER MATTER OR THING RELATING TO THE ACQUIRED ASSETS OR ANY PORTION THEREOF. PURCHASER ACKNOWLEDGES THAT PURCHASER HAS CONDUCTED AN INDEPENDENT INSPECTION AND INVESTIGATION OF THE PHYSICAL CONDITION OF ALL ACQUIRED ASSETS AND ALL SUCH OTHER MATTERS RELATING TO OR AFFECTING THE ACQUIRED ASSETS AS PURCHASER DEEMS NECESSARY OR APPROPRIATE AND THAT IN PROCEEDING WITH ITS ACQUISITION OF THE ACQUIRED ASSETS, EXCEPT FOR ANY REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN SECTION 4 OF THIS AGREEMENT, PURCHASER IS DOING SO BASED SOLELY UPON SUCH INDEPENDENT INSPECTIONS AND INVESTIGATIONS. ACCORDINGLY, EXCEPT FOR ANY REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN SECTION 4 OF THIS AGREEMENT OR IN THE ANCILLARY AGREEMENTS, PURCHASER WILL ACCEPT THE ACQUIRED ASSETS AT THE CLOSING “AS IS,” “WHERE IS,” AND “WITH ALL FAULTS.”

9.2 **Transaction Expenses.** Except as expressly provided for herein, each party shall pay all fees, costs, and expenses incurred by it with respect to this Agreement, whether or not the Transactions are consummated; provided that, Sellers shall be responsible for paying the Break-Up Fee and the Expense Reimbursement as set forth in this Agreement and the Bidding Procedures Order.

9.3 **Certain Interpretive Matters and Definitions.** Unless the context requires, references to the plural include the singular and references to the singular include the plural; references to any gender includes the other gender; the words “include,” “includes” and “including” do not limit the preceding terms or words and shall be deemed to be followed by the words “without limitation”; the terms “hereof”, “herein”, “hereunder”, “hereto” and similar terms in this Agreement refer to this Agreement as a whole and not to any particular provision of this Agreement; and all references to Sections, Articles, or Schedules are to Sections, Articles, Exhibits or Schedules of or to this Agreement.

9.4 **Termination of Representations and Warranties.** The representations and warranties of the parties set forth in this Agreement shall terminate and be of no further force or effect after the Closing.

9.5 **Amendment.** Any provision of this Agreement may be amended if, but only if, such amendment is in writing and is signed by Sellers and Purchaser (or by any successor to such Party).

9.6 **Waiver; Remedies Cumulative.** The rights and remedies of the parties to this Agreement are cumulative and not alternative. Neither any failure nor any delay by any party in exercising any right, power or privilege under this Agreement or any of the documents referred to in this Agreement will operate as a waiver of such right, power or privilege, and no single or partial exercise of any such right, power or privilege will preclude any other or further exercise of such right, power or privilege or the exercise of any other right, power or privilege. To the maximum extent permitted by applicable law, (a) no claim or right arising out this Agreement or any of the documents referred to in this Agreement can be discharged by one party, in whole or in part, by a waiver or renunciation of the claim or right unless in writing signed by the other party; (b) no waiver that may be given by a party will be applicable except in the specific instance for which it is given; and (c) no notice to or demand on one party will be deemed to be a waiver of any obligation of that party or of the right of the party giving such notice or demand to take further action without notice or demand as provided in this Agreement or the documents referred to in this Agreement.

9.7 **Notices.** All notices, demands and other communications required or permitted to be given under this Agreement shall be in writing and shall be deemed to be given when hand delivered (or, if hand

delivery is refused, on the date such delivery was attempted) or the date of delivery or refusal if sent by a nationally recognized overnight courier for next Business Day delivery to the addresses set forth below. A copy of all notices also shall be provided on the same Business Day.

Sellers:

Port Elizabeth Terminal & Warehouse, Corp.
P. Judge & Sons, Inc.
Amex Shipping Agent, Inc.
P. Judge & Sons Trucking, LLC
Judge Warehousing, LLC
The Judge Organization, LLC
c/o Cambridge Financial Services, LLC
105 Fieldcrest Ave., Suite 506
Edison, NJ 08837
Attn: Nick Jalowski
Email: nbj@cambridgefinancialcorp.com
Attn: Joe Compitello
Email: joscompitello@gmail.com

with a copy to (which shall not constitute notice):

Saul Ewing LLP
1735 Market Street, 34th Floor
Philadelphia, PA 19102
Attention: Jeffrey C. Hampton,
Turner N. Falk
Stephen B. Ravin
Email: jeffrey.hampton@saul.com
turner.falk@saul.com
stephen.ravin@saul.com

Purchaser:

East Coast Warehouse and Distribution Corp.
1140 Polaris Street
Elizabeth, NJ 07201
Attn: Jamie Overley, CEO
Email: joverley@eastcoastwarehouse.com

with a copy to each of (which shall not constitute notice):

Arnall Golden Gregory LLP
171 17th Street, NW, Suite 2100
Atlanta, Georgia 30363
Attention: Sean P. Fogarty, Esq.
E-mail Address: sean.fogarty@agg.com

and

Equity Group Investments
Two North Riverside Plaza, Suite 600
Chicago, Illinois 60606
Attn: Joe Miron and Shallene Cua Gross

Email:jmiron@egii.com, sgross@egii.com and
legalnotices@egii.com

A party may designate another address by giving notice in accordance with this Section.

9.8 **Jurisdiction.** The parties agree that the Bankruptcy Court shall retain exclusive jurisdiction to resolve any controversy or claim arising out of or relating to this Agreement or the implementation or breach hereof; provided that in the event the Chapter 11 Case has concluded or been dismissed or the Bankruptcy Court declines to exercise jurisdiction or lacks jurisdiction, in each instance with respect to any controversy or claim arising out of or relating to this Agreement or the implementation or breach hereof, then exclusive jurisdiction shall be in the federal or state courts for the State of New Jersey.

9.9 **Governing Law.** To the extent not governed by the Bankruptcy Code, this Agreement shall be governed by and construed in accordance with the laws of the State of New Jersey, without giving effect to rules governing the conflict of laws.

9.10 **Time is of the Essence.** Time is of the essence in this Agreement, and all of the terms, covenants and conditions hereof.

9.11 **Severability.** If any provision of this Agreement shall be held invalid, illegal or unenforceable, in whole or in part, the validity, legality, and enforceability of the remaining part of such provision, and the validity, legality and enforceability of all other provisions hereof or thereof, shall not be affected thereby.

9.12 **Titles and Headings.** Titles and headings of Sections of this Agreement are for convenience of reference only and shall not affect the construction of any provision of this Agreement.

9.13 **Assignment; Successors and Assigns.** This Agreement and the rights, duties and obligations hereunder may not be assigned by any party without the prior written consent of the other parties, and any attempted assignment without consent shall be void. Subject to this paragraph, this Agreement and the provisions hereof shall be binding upon each of the parties, their successors and permitted assigns. Notwithstanding the foregoing, this Agreement may be assigned in whole or in part by Purchaser to one or more Affiliates, provided that such Affiliates assume all of the applicable obligations of Purchaser under this Agreement; provided further that Purchaser shall not be released of its obligations under this Agreement such that Purchaser and its Affiliate shall be jointly and severally liable for the performance of the obligations of Purchaser hereunder.

9.14 **No Third-Party Rights.** The parties do not intend to confer any benefit hereunder on any Person other than the parties hereto.

9.15 **Wrong Pockets.** If, at any time following the Closing, either Party (or any of its Affiliates) receives or otherwise comes to possess any asset, property, right, benefit, or payment (including any cash, check, Accounts Receivable, contract payment, refund, or other amount) that was intended to be transferred to, or that properly belongs to, the other Parties under this Agreement, such Party shall (a) promptly (but in no event later than five (5) Business Days after becoming aware of such receipt or possession) notify the other Party in writing, (b) hold such asset, property, right, benefit, or payment in trust for the benefit of the other Party, and (c) promptly (but in no event later than ten (10) Business Days after becoming aware of such receipt or possession) transfer, assign, and deliver such asset, property, right, benefit, or payment to the other Party, without any additional consideration or offset. Without limiting the foregoing, if any Seller or any of its Affiliates receives or comes into possession of any Acquired Asset or any proceeds, payments, or rights relating thereto following the Closing, such Seller shall promptly transfer such Acquired Asset,

proceeds, payment, or right to Purchaser. The Parties shall cooperate in good faith to effect any such transfer, including by executing any documents or instruments reasonably requested by the receiving Party. Any costs or expenses incurred by a Party in connection with any transfer required by this Section 9.15 shall be borne by the transferring Party. The obligations under this Section 9.15 shall survive the Closing indefinitely.

9.16 **Confidentiality Agreement.** The parties acknowledge that the Confidentiality Agreement dated January 29, 2026 between the Sellers and East Coast Warehouse and Distribution Corp. (the "**Confidentiality Agreement**") shall remain in full force and effect after the date hereof until the Closing Date, at which point it shall terminate and be of no further force and effect.

9.17 **Books and Records Access.** Notwithstanding anything to the contrary herein, and for the avoidance of doubt, at all times after the Closing Date, Purchaser shall provide Sellers with reasonable access to all books and records acquired hereunder, if any, as Sellers deem necessary and/or desirable to allow Sellers to administer the Chapter 11 Case.

9.18 **Entire Agreement.** This Agreement, any Ancillary Agreements, and the Confidentiality Agreement constitute the entire agreement between the parties regarding the subject matter hereof and no extrinsic evidence whatsoever may be introduced in any proceeding involving this Agreement, any Ancillary Agreements, or the Confidentiality Agreement.

9.19 **Prevailing Party.** If any litigation or other court action, arbitration or similar adjudicatory proceeding is sought, taken, instituted or brought by Sellers or Purchaser to enforce their rights under this Agreement, all fees, costs and expenses, including, without limitation, reasonable attorneys' fees and court costs, of the prevailing party in such action, suit or proceeding shall be borne by the party against whose interest the judgment or decision is rendered. This Section 9.19 shall survive the Closing. Sellers agree that any amounts awarded to Purchaser pursuant to this Section 9.19 shall be payable as administrative expenses pursuant to Section 503(b)(1)(A) of the Bankruptcy Code.

9.20 **Execution of this Agreement**. This Agreement may be executed in two or more counterparts, each of which shall be deemed to be an original, but all of which shall constitute one and the same agreement. The exchange of copies of this Agreement and of signature pages by electronic transmission shall constitute effective execution and delivery of this Agreement as to the parties and may be used in lieu of the original Agreement for all purposes. Signatures of the parties transmitted by electronic transmission shall be deemed to be their original signatures for all purposes.

9.21 **Survival**. None of the representations or warranties of the Parties set forth in this Agreement, or any other agreement or certificate executed in connection with, or delivered pursuant to, this Agreement shall survive the Closing. Other than the requirements of further assurances and actions specifically identified to be taken after the Closing, all other covenants of the Parties shall expire upon Closing. This Section 9.21 shall not limit any covenant or agreement of any Party which, by its term, contemplates performance after the Closing, but only to the extent such covenants and agreement are to be performed, or prohibit actions, subsequent to the Closing. The obligations, limitations and rights provided for under this Section 9 shall survive any termination of this Agreement.

9.22 **WAIVER OF JURY**. EACH PARTY HERETO EXPRESSLY WAIVES ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING WITH RESPECT TO ANY ACTION OR CLAIM ARISING OUT OF OR ANY DISPUTE IN CONNECTION WITH THIS AGREEMENT OR UNDER ANY AMENDMENT, INSTRUMENT, DOCUMENT OR AGREEMENT DELIVERED OR WHICH MAY IN THE FUTURE BE DELIVERED IN CONNECTION WITH THIS AGREEMENT OR ARISING FROM ANY RELATIONSHIP EXISTING IN CONNECTION WITH THIS AGREEMENT

AND AGREES THAT ANY SUCH ACTION OR PROCEEDING SHALL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY. EACH PARTY HAS REVIEWED THIS WAIVER AND KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL. IN THE EVENT OF LITIGATION, A COPY OF THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

*(Signatures appear on the following page)*

IN WITNESS WHEREOF, the undersigned have duly executed this Agreement as of the Effective Date.

**SELLERS**

**PORT ELIZABETH TERMINAL & WAREHOUSE, CORP.**

By: ____________________
Name: Patrick Wynne
Its: President

**P. JUDGE & SONS, INC.**

By: ____________________
Name: Patrick Wynne
Its: President

**AMEX SHIPPING AGENT, INC.**

By: ____________________
Name: Patrick Wynne
Its: President

**THE JUDGE ORGANIZATION, LLC**

By: ____________________
Name: Patrick Wynne
Its: President

**P. JUDGE & SONS TRUCKING, LLC**

By: ____________________
Name: Patrick Wynne
Its: President

**JUDGE WAREHOUSING, LLC**

By: ____________________
Name: Patrick Wynne
Its: President

**PURCHASER**

**EAST COAST WAREHOUSE AND DISTRIBUTION CORP.**

By: ______________________________
Name: Jamie Overley
Its: Chief Executive Officer

**Schedule 2.1(a)**

**Assigned Contracts**

| Seller Entity | Nature of Contract or Lease | Name | Address | Effective Date/Notes |
|---|---|---|---|---|
| P. Judge & Sons, Inc. | Machinery Lease | Renaissance Capital Alliance, LLC. | 5440 Corporate DR. Suite 275, Troy, MI 48098 | 7/18/2022 |
| Port Elizabeth Terminal & Warehouse Corp. | Machinery Lease | Renaissance Capital Alliance, LLC. | 5440 Corporate DR. Suite 275, Troy, MI 48098 | 01/19/2023 |
| Port Elizabeth Terminal & Warehouse Corp. | Machinery Lease | Ontario Credit Corporation | Dept. 2082. P.O. Box 87618, Chicago, IL 60680-0618 | 10/06/2021 |
| Port Elizabeth Terminal & Warehouse Corp. | Machinery Lease | Ontario Credit Corporation | Dept. 2082. P.O. Box 87618, Chicago, IL 60680-0618 | 12/20/2021 |
| Port Elizabeth Terminal & Warehouse Corp. | Machinery Lease | Newlane Finance Company | 123 S. Broad Street, 17th Fl, Philadelphia, PA 19109 | 12/31/2021 |
| Port Elizabeth Terminal & Warehouse Corp. | Machinery Lease | De Lage Landen Financial Services, Inc. | PO Box 825736, Philadelphia, PA 19182-5736 | 03/21/2022 |
| Port Elizabeth Terminal & Warehouse Corp. | Machinery Lease | Ontario Credit Corporation | Dept. 2082. P.O. Box 87618, Chicago, IL 60680-0618 | 01/11/2021 |

| Seller Entity | Nature of Contract or Lease | Name | Address | Effective Date/Notes |
|---|---|---|---|---|
| Judge Warehousing, LLC | Machinery Lease | Renaissance Capital Alliance, LLC. | 5440 Corporate DR. Suite 275, Troy, MI 48098 | 04/25/2022 |
| P. Judge & Sons, Inc. | Machinery Lease | Marlin Leasing Corporation Dba PEAC Solutions | 300 Fellowship Road, MT. Laurel, NJ, 08054 | 03/07/2023 |
| P. Judge & Sons, Inc. | Machinery Lease | Marlin Leasing Corporation Dba PEAC Solutions | 300 Fellowship Road, MT. Laurel, NJ 08054 | 04/24/2023 |
| Port Elizabeth Terminal & Warehouse Corp. | Machinery Lease | Renaissance Capital Alliance, LLC. | 5440 Corporate DR. Suite 275, Troy, MI 48098 | 09/29/2023 |
| Port Elizabeth Terminal & Warehouse Corp. | Machinery Lease | McCabe's East Coast Forklifts, LLC/Med One Capital Funding LLC | 221 Creek Road, Bellmawr, NJ 08031 | 12/12/2023 |
| P. Judge & Sons, Inc. | Machinery Lease | McCabe's East Coast Forklifts, LLC/Med One Capital Funding LLC | 221 Creek Road, Bellmawr, NJ 08031 | 03/22/2024 |
| Port Elizabeth Terminal & Warehouse Corp. | Machinery Lease | Marlin Leasing Corporation Dba PEAC Solutions | 300 Fellowship Road, MT. Laurel, NJ 08054 | 7/1/2024 |

| Seller Entity | Nature of Contract or Lease | Name | Address | Effective Date/Notes |
|---|---|---|---|---|
| Port Elizabeth Terminal & Warehouse Corp.<br><br>P. Judge & Sons, Inc. | Machinery Lease | McCabe's East Coast Forklifts, LLC/ Med One Capital Funding LLC | 221 Creek Road, Bellmawr, NJ 08031 | 07/26/2024 |
| Port Elizabeth Terminal & Warehouse Corp.<br><br>P. Judge & Sons, Inc | Machinery Lease | McCabe's East Coast Forklifts, LLC/ Med One Capital Funding LLC | 221 Creek Road, Bellmawr, NJ 08031 | 08/08/2024 |
| Port Elizabeth Terminal & Warehouse Corp.<br><br>P. Judge & Sons, Inc | Machinery Lease | McCabe's East Coast Forklifts, LLC/ Med One Capital Funding LLC | 221 Creek Road, Bellmawr, NJ 08031 | 08/26/2024 |
| Port Elizabeth Terminal & Warehouse Corp. | Machinery Lease | Marlin Leasing Corporation. Dba PEAC Solutions | 300 Fellowship Road, MT. Laurel, NJ 08054 | 6/10/2024 |

| Seller Entity | Nature of Contract or Lease | Name | Address | Effective Date/Notes |
|---|---|---|---|---|
| Port Elizabeth Terminal & Warehouse Corp. | Machinery Lease | Toshiba Financial SVCS | PO Box 825736, Philadelphia, PA 19182-5736 | 07/10/2024 |
| Port Elizabeth Terminal & Warehouse Corp. | Machinery Lease | Marlin Leasing Corporation. Dba PEAC Solutions | 300 Fellowship Road, MT. Laurel, NJ 08054 | 9/30/2024 |
| Port Elizabeth Terminal & Warehouse Corp. | Security Services Agreement | ADT Security Systems, Inc/ Johnson Controls Security Solutions | PO BOX 371967, Pittsburgh, PA 15250-7967 | Unexecuted agreement provided |
| The Judge Organization | Software License Agreement | Friedman Corporation d/b/a Argos Software | 10275 W. Higgins Road Suite 250 Rosemont, IL 60018 | Unexecuted agreement provided |
| Port Elizabeth Terminal & Warehouse Corp. | Equipment Lease | Our Three Z's Inc. | Maslon LLP, Attn: Amy Swedberg, 225 South Sixth Street, Suite 2900, Minneapolis, MN 55402 | Re: Penn Jersey |
| Port Elizabeth Terminal & Warehouse Corp. | Equipment Lease | Sunbelt Rentals, Inc. | PO BOX 409211 Atlanta, GA 30384-9211 | 02/28/2020 |
| Judge Warehousing | Machinery Lease | Navitas Credit Corp | 201 Executive Center DR. Suite 100, Columbia, SC 29210 | 09/10/2022 |
| Judge Warehousing | Machinery Lease | Renaissance Capital Alliance, LLC. | 5440 Corporate DR. Suite 275, Troy, MI 48098 | 10/7/2022 |
| Judge Warehousing | Machinery Lease | HYG Financial Services Inc. | 5000 Riverside Drive, Suite 300 East, Irving, TX 75309-4314 | 12/6/2023 |

| Seller Entity | Nature of Contract or Lease | Name | Address | Effective Date/Notes |
|---|---|---|---|---|
| Judge Warehousing | Machinery Lease | HYG Financial Services Inc. | 5000 Riverside Drive, Suite 300 East, Irving, TX 75309-4314 | 11/15/2024 |
| Judge Warehousing | Machinery Lease | HYG Financial Services Inc. | 5000 Riverside Drive, Suite 300 East, Irving, TX 75309-4314 | 11/15/2024 |
| Judge Organization | Machinery Lease | De Lage Landen Financial Services, Inc. | PO Box 825736, Philadelphia, PA 19182-5736 | 9/09/2024 |
| Judge Warehousing | Machinery Lease | Liftpower | 6801 Suemac Place, Jacksonville, FL 32254 | 12/26/2025 |
| The Judge Organization | Machinery Lease | Ogden Forklifts, Inc | PO BOX 43606 Atlanta, GA 30336 | 11/9/2021 |
| The Judge Organization | Security Services | Vector Security | PO BOX 531687 Atlanta, GA 30353 | 6/17/2020 |
| P. Judge & Sons, Inc. | Equipment loan | Med One Capital Funding LLC | 36 South State Street, Suite 1400, Salt Lake City, UT 84111 | 12/13/2023 |
| P. Judge & Sons, Inc. | E-Z Pass | NJ E- Z Pass Violation Proc. Ctr. | P.O BOX 52005, Newark, NJ 07101-8205 | No formal agreement |
| P. Judge & Sons, Inc. | Equipment Leases | Ryder Transportation Services | PO BOX 96723, Chicago, IL 60693 | 08/26/2022 |
| P. Judge & Sons, Inc. | Staffing Agreement | Transforce | PO BOX 69250, Baltimore, MD 21264-9250 | 02/01/2011 |
| P. Judge & Sons, Inc. | Equipment Lease | Wells Fargo Vendor Financial Services, LLC | 800 Walnut St., F0006-051, Des Moines, IA 50309 | 1/13/2025 |
| P. Judge & Sons Trucking, LLC | Equipment lease | Atlantic Equipment Leasing, LLC | 107 Flyatt Rd, Vincentown, NJ 08088 | N/A |
| P. Judge & Sons Trucking, LLC | Equipment Lease | Coastal Industrial Equipment | 1121 Suemac Rd., Jacksonville, FL 32254-2793 | 10/1/2025 |
| P. Judge & Sons Trucking, LLC | Equipment Lease | Ryder Transportation Services | PO BOX 96723, Chicago, IL 60693 | 03/13/2023 |

| Seller Entity | Nature of Contract or Lease | Name | Address | Effective Date/Notes |
|---|---|---|---|---|
| Amex Shipping Agent, Inc. | Freight Forwarding | Fr. Meyer's Sohn North America LLC | 5 Commerce Drive Reading PA 19607 | Oral Contract |
| Judge Warehousing | SaaS | Lease Crunch LLC | PO BOX 201610 Dallas TX 75320-1610 | Oral Contract |
| Port Elizabeth Terminal & Warehouse Corp. | Pest Control | Rz Tech Pest Control | 100 Ryam St Building B Suite 31 South Plainfield NJ 07080 | Oral Contract |
| Judge Warehousing | Office Equipment Lease | Toshiba America Business | PO BOX 418600 BOSTON MA 02241-8600 | 2/15/2023 |
| Port Elizabeth Terminal & Warehouse Corp. | Warehousing Agreement | Crown Imports LLC | 131 S. Dearborn St., Chicago IL 60603 | 07/01/2023 |
| Port Elizabeth Terminal & Warehouse Corp. | Administrative Services Agreement | Odyssey Transport & Warehouse LLC fka Grand Worldwide Logistics Corporation | 4350 West Ohio Street, Chicago IL 60624 | 07/01/2023 |
| Port Elizabeth Terminal & Warehouse Corp. | Services Agreement | Odyssey Transport & Warehouse LLC fka Grand Worldwide Logistics Corporation | 4350 West Ohio Street, Chicago IL 60624 | 07/01/2023 |
| Port Elizabeth Terminal & Warehouse Corp. | Warehousing Agreement | Odyssey Transport & Warehouse LLC fka Grand Worldwide Logistics Corporation | 4350 West Ohio Street, Chicago IL 60624 | 01/1/2024 |
| Judge Warehousing | Transportation Services | International Paper Company | 6400 Poplar Avenue, Tower I, Room 5-047, Memphis TN 38197 | No copy of this agreement is available |

| Seller Entity | Nature of Contract or Lease | Name | Address | Effective Date/Notes |
|---|---|---|---|---|
| | Contract No. USE2015129 | | | |
| Judge Warehousing | Weyerhaeuser Contract No. USE2015130 | International Paper Company | 6400 Poplar Avenue, Tower I, Room 5-047, Memphis TN 38197 | 7/27/2017 |
| Judge Warehousing | Dray Carrier Contract | Global Cellulose Fibers Acceptance | 6400 Poplar Ave, Memphis, TN 38197 | 01/01/2026 |
| Judge Warehousing | Equipment Lease | Greatamerica Financial Services Corporation | 625 First St. SE, Cedar Rapids, IA 52401 | 08/23/2023 |
| Port Elizabeth Terminal & Warehouse Corp. | Equipment Lease | Greatamerica Financial Services Corporation | 625 First St. SE, Cedar Rapids, IA 52401 | 6/14/2023 |
| Port Elizabeth Terminal & Warehouse Corp. | Amendment No. 2 to Warehousing Agreement | Crown Imports LLC | 131 S. Dearborn St., Chicago IL 60603 | 10/9/2026 |

**Schedule 2.1(b)**

**Assigned Leases**

| Seller Entity | Nature of Contract or Lease | Name | Address | Effective Date/Notes |
|---|---|---|---|---|
| Port Elizabeth Terminal & Warehouse Corp. | Warehouse Lease | RREEF America Reit II Corp. YYY | 150 Industrial Drive, Jersey City, NJ 07305 | 12/12/2014 |
| Port Elizabeth Terminal & Warehouse Corp. and The Judge Organization | Warehouse Lease and Office Lease | F. Greek Bristol Properties, L.P. | 30 Runway Road, Levittown, PA 19057 | 10/30/2003 |

**Schedule 4.9**

**Equipment**

Approximately 50 trailers are located at customer facilities. Additionally, certain warehouse equipment is located at third-party facilities for repair.

| Seller | Equipment | Date in Service |
|---|---|---|
| P. Judge and Sons Trucking, LLC | Royal Ace Hardware | 3/12/2012 |
| P. Judge and Sons Trucking, LLC | 2 New Yale Forklifts SA070 | 3/31/2015 |
| P. Judge and Sons Trucking, LLC | 1 New Yale Forklift SA120E | 3/31/2015 |
| P. Judge and Sons Trucking, LLC | 1 New Auramo Paper Roll Clamp | 3/31/2015 |
| P. Judge and Sons Trucking, LLC | Safety Equipment | 11/30/2020 |
| P. Judge and Sons Trucking, LLC | Security Cameras | 5/31/2021 |
| P. Judge and Sons Trucking, LLC | Cameras | 6/30/2021 |
| Port Elizabeth Terminal and WHSE | Modular At 201 Clipper St | 1/25/1999 |
| Port Elizabeth Terminal and WHSE | Sinclair Furnish & Install 1 | 2/11/1999 |
| Port Elizabeth Terminal and WHSE | Door # 7 | 2/24/1999 |
| Port Elizabeth Terminal and WHSE | (72) 250 Watt 120 Volt Hps Fix | 5/1/1999 |
| Port Elizabeth Terminal and WHSE | Colins Cable Installation | 2/19/1999 |
| Port Elizabeth Terminal and WHSE | Guard Reel And Guard | 10/12/1999 |
| Port Elizabeth Terminal and WHSE | Kilovar Electric Conduit | 3/22/2000 |
| Port Elizabeth Terminal and WHSE | Adt Security System | 6/14/2000 |
| Port Elizabeth Terminal and WHSE | Kilovar Electric Conduit | 1/30/2003 |
| Port Elizabeth Terminal and WHSE | Dock Plates | 12/11/2003 |
| Port Elizabeth Terminal and WHSE | Allmark Door | 6/13/2006 |
| Port Elizabeth Terminal and WHSE | Allmark Door | 8/8/2006 |
| Port Elizabeth Terminal and WHSE | Lockers | 1/31/2007 |
| Port Elizabeth Terminal and WHSE | Close Circuit Tv Electical System | 1/31/2007 |
| Port Elizabeth Terminal and WHSE | Sonitrol of Metro NY | 1/31/2007 |
| Port Elizabeth Terminal and WHSE | Warehouse Technology | 4/26/2006 |
| Port Elizabeth Terminal and WHSE | Warehouse Technology | 5/17/2006 |
| Port Elizabeth Terminal and WHSE | Rail & Dock Boards | 7/31/2007 |
| Port Elizabeth Terminal and WHSE | Fence | 7/31/2007 |
| Port Elizabeth Terminal and WHSE | Improvements | 2/1/2008 |
| Port Elizabeth Terminal and WHSE | Improvements | 2/1/2008 |
| Port Elizabeth Terminal and WHSE | Improvements | 9/24/2008 |
| Port Elizabeth Terminal and WHSE | Improvements | 11/11/2008 |
| Port Elizabeth Terminal and WHSE | Improvements | 11/11/2008 |
| Port Elizabeth Terminal and WHSE | Improvements | 1/14/2009 |
| Port Elizabeth Terminal and WHSE | Improvements | 1/12/2009 |
| Port Elizabeth Terminal and WHSE | Improvements | 4/24/2009 |
| Port Elizabeth Terminal and WHSE | Improvements | 5/12/2009 |

| | | |
|---|---|---|
| Port Elizabeth Terminal and WHSE | Improvements | 5/19/2009 |
| Port Elizabeth Terminal and WHSE | Fence 110 Ft to 8 Ft | 1/12/2010 |
| Port Elizabeth Terminal and WHSE | Rebuild Cast Iron at 199 | 2/25/2010 |
| Port Elizabeth Terminal and WHSE | Exterior Wall Panels | 4/12/2010 |
| Port Elizabeth Terminal and WHSE | 42 Tracks Fpr Drive In Rack | 5/9/2010 |
| Port Elizabeth Terminal and WHSE | Heater | 2/11/2011 |
| Port Elizabeth Terminal and WHSE | Outside Warehouse Lighting | 3/14/2011 |
| Port Elizabeth Terminal and WHSE | Lighting System | 7/1/2013 |
| Port Elizabeth Terminal and WHSE | James Stanley Paving | 3/13/2014 |
| Port Elizabeth Terminal and WHSE | Energy Efficient Lightning | 3/26/2014 |
| Port Elizabeth Terminal and WHSE | Stanley Convergent Security | 3/27/2014 |
| Port Elizabeth Terminal and WHSE | Stanley Convergent Security | 3/27/2014 |
| Port Elizabeth Terminal and WHSE | Stanley Convergent Security | 4/1/2014 |
| Port Elizabeth Terminal and WHSE | Kilovar Electrical | 7/30/2016 |
| Port Elizabeth Terminal and WHSE | Roof Replacement | 1/1/2019 |
| Port Elizabeth Terminal and WHSE | 2 New Rolling Steel Door | 9/17/2020 |
| Port Elizabeth Terminal and WHSE | Chain Link Fence | 8/24/2020 |
| Port Elizabeth Terminal and WHSE | Raise Track 3" To 5" | 8/21/2020 |
| Port Elizabeth Terminal and WHSE | Fences | 3/30/2021 |
| Port Elizabeth Terminal and WHSE | Fences | 3/30/2021 |
| Port Elizabeth Terminal and WHSE | Asphalt Paving | 4/3/2023 |
| Port Elizabeth Terminal and WHSE | Fence | 6/7/2023 |
| Port Elizabeth Terminal and WHSE | Lite Bar Kits/ Position Pres | 6/30/2004 |
| Port Elizabeth Terminal and WHSE | Clamp | 9/1/2004 |
| Port Elizabeth Terminal and WHSE | Toshiba Survellixpc Dvr16- | 8/1/2004 |
| Port Elizabeth Terminal and WHSE | Pet Clamp Used | 12/31/2002 |
| Port Elizabeth Terminal and WHSE | Forklift Attachment | 10/31/2006 |
| Port Elizabeth Terminal and WHSE | Computer Equipment | 5/31/2006 |
| Port Elizabeth Terminal and WHSE | Computer Equipment | 9/30/2006 |
| Port Elizabeth Terminal and WHSE | Computer Equipment | 1/31/2007 |
| Port Elizabeth Terminal and WHSE | Roll Clamp | 3/22/2007 |
| Port Elizabeth Terminal and WHSE | Carton Clamp | 8/26/2007 |
| Port Elizabeth Terminal and WHSE | Cascade Roll Clamp | 11/12/2007 |
| Port Elizabeth Terminal and WHSE | Forklift | 11/1/2007 |
| Port Elizabeth Terminal and WHSE | Forklift | 11/1/2007 |
| Port Elizabeth Terminal and WHSE | Electric Pallet - Used | 8/5/2008 |
| Port Elizabeth Terminal and WHSE | Clamp - Used | 8/5/2008 |
| Port Elizabeth Terminal and WHSE | Forklift - New | 5/1/2008 |
| Port Elizabeth Terminal and WHSE | Forklift - New | 6/1/2008 |
| Port Elizabeth Terminal and WHSE | Clamp - New | 9/1/2008 |
| Port Elizabeth Terminal and WHSE | Compressor | 6/9/2008 |

| | | |
|---|---|---|
| Port Elizabeth Terminal and WHSE | Forklift - New | 10/30/2008 |
| Port Elizabeth Terminal and WHSE | Clamp - New | 10/30/2008 |
| Port Elizabeth Terminal and WHSE | Single/Double Fork Position | 10/30/2008 |
| Port Elizabeth Terminal and WHSE | Single / Double Fork Position | 10/30/2008 |
| Port Elizabeth Terminal and WHSE | Single / Double Fork Position | 10/30/2008 |
| Port Elizabeth Terminal and WHSE | Attachment Equipment Ram | 5/12/2017 |
| Port Elizabeth Terminal and WHSE | Used Cascade Single Double | 8/1/2009 |
| Port Elizabeth Terminal and WHSE | New Cascade Single Double | 8/1/2009 |
| Port Elizabeth Terminal and WHSE | New Cascade Pulp Bale | 8/1/2009 |
| Port Elizabeth Terminal and WHSE | New Cascade Single Double | 8/1/2009 |
| Port Elizabeth Terminal and WHSE | New Cascade Single Double | 8/1/2009 |
| Port Elizabeth Terminal and WHSE | Pulp Bale Clamp | 8/1/2009 |
| Port Elizabeth Terminal and WHSE | Pulp Bale | 10/15/2009 |
| Port Elizabeth Terminal and WHSE | New Cascade Push Attachment | 11/16/2009 |
| Port Elizabeth Terminal and WHSE | New Cascade | 1/22/2010 |
| Port Elizabeth Terminal and WHSE | New Cascade | 2/25/2010 |
| Port Elizabeth Terminal and WHSE | Machinery And Equipment | 2/28/2010 |
| Port Elizabeth Terminal and WHSE | New Cascade | 3/4/2010 |
| Port Elizabeth Terminal and WHSE | Machinery And Equipment | 3/8/2010 |
| Port Elizabeth Terminal and WHSE | Machinery And Equipment | 3/23/2010 |
| Port Elizabeth Terminal and WHSE | Rebuild Lift Cylinder | 3/31/2010 |
| Port Elizabeth Terminal and WHSE | Cascade | 6/1/2010 |
| Port Elizabeth Terminal and WHSE | Cascade | 6/1/2010 |
| Port Elizabeth Terminal and WHSE | Used Fork Positioner | 6/11/2010 |
| Port Elizabeth Terminal and WHSE | Cascade Paper Roll Clamp | 6/15/2010 |
| Port Elizabeth Terminal and WHSE | New Cascade | 6/18/2010 |
| Port Elizabeth Terminal and WHSE | New Cascade | 6/18/2010 |
| Port Elizabeth Terminal and WHSE | Used Forklift | 9/1/2010 |
| Port Elizabeth Terminal and WHSE | Railcar Ramp | 1/3/2011 |
| Port Elizabeth Terminal and WHSE | Forks Iron Works | 1/3/2011 |
| Port Elizabeth Terminal and WHSE | Used Cascade | 1/3/2011 |
| Port Elizabeth Terminal and WHSE | Single Double Pallet Hand | 1/3/2011 |
| Port Elizabeth Terminal and WHSE | Pulp Bale Clamps | 1/3/2011 |
| Port Elizabeth Terminal and WHSE | Forklift | 2/11/2011 |
| Port Elizabeth Terminal and WHSE | Cascade | 2/23/2011 |
| Port Elizabeth Terminal and WHSE | New Forklift | 8/1/2011 |
| Port Elizabeth Terminal and WHSE | New Pulp Bale Clamp | 8/1/2011 |
| Port Elizabeth Terminal and WHSE | Yale Box Car Design Forkl | 5/9/2011 |
| Port Elizabeth Terminal and WHSE | Yale Box Car Design Forkli | 5/9/2011 |
| Port Elizabeth Terminal and WHSE | Cascade Model 70d Bale Cl | 5/9/2011 |
| Port Elizabeth Terminal and WHSE | 5 Jacks @ 695 | 1/16/2012 |

| | | |
|---|---|---|
| Port Elizabeth Terminal and WHSE | 2 Tilt Trucks @ 675 | 3/5/2012 |
| Port Elizabeth Terminal and WHSE | Compressor | 4/12/2012 |
| Port Elizabeth Terminal and WHSE | Walkie Low Lift 2 | 4/20/2012 |
| Port Elizabeth Terminal and WHSE | Truck Sacle And Camera Sy | 5/31/2012 |
| Port Elizabeth Terminal and WHSE | Equipment | 6/30/2012 |
| Port Elizabeth Terminal and WHSE | Protection One - Equip | 8/31/2012 |
| Port Elizabeth Terminal and WHSE | 4 Generators @ 776.63 | 11/5/2012 |
| Port Elizabeth Terminal and WHSE | Portable Steel Truck Dook | 12/28/2012 |
| Port Elizabeth Terminal and WHSE | Hyster Forklift - 070r | 6/9/2012 |
| Port Elizabeth Terminal and WHSE | Hyster New 4 Wheel - 120ra | 4/2/2012 |
| Port Elizabeth Terminal and WHSE | Hyster New Forklift - 040y | 6/5/2012 |
| Port Elizabeth Terminal and WHSE | Yale Equipment Model #Glc040s | 1/24/2013 |
| Port Elizabeth Terminal and WHSE | Hyster Forklift | 1/25/2013 |
| Port Elizabeth Terminal and WHSE | Hyster Forklift | 5/1/2013 |
| Port Elizabeth Terminal and WHSE | 2013 Yale Forklift | 4/25/2013 |
| Port Elizabeth Terminal and WHSE | Yale Equipment Model #GLC040S | 1/24/2013 |
| Port Elizabeth Terminal and WHSE | Yale Equipment Model #Glc120v | 1/24/2013 |
| Port Elizabeth Terminal and WHSE | Yale Equipment Model #GLC120V | 1/24/2013 |
| Port Elizabeth Terminal and WHSE | Yale Equipment Model #Glc120v | 1/24/2013 |
| Port Elizabeth Terminal and WHSE | 2 Electric Heaters | 10/31/2013 |
| Port Elizabeth Terminal and WHSE | Prebonded Tygard | 9/6/2013 |
| Port Elizabeth Terminal and WHSE | 3 Used Forklifts | 11/18/2013 |
| Port Elizabeth Terminal and WHSE | New Hyster Forklift | 10/2/2013 |
| Port Elizabeth Terminal and WHSE | Pair Of Folks And Side Shift | 1/31/2014 |
| Port Elizabeth Terminal and WHSE | Pair Of Folks And Side Shift | 1/31/2014 |
| Port Elizabeth Terminal and WHSE | 2 Walkie Low Lifts 4941 Each | 2/11/2014 |
| Port Elizabeth Terminal and WHSE | Coll O Crimp Hose Machine | 3/28/2014 |
| Port Elizabeth Terminal and WHSE | Watt Light Tower | 5/12/2014 |
| Port Elizabeth Terminal and WHSE | Powerramp Mechanical Do | 4/3/2014 |
| Port Elizabeth Terminal and WHSE | Used Yale Forklifts & Attac | 1/16/2014 |
| Port Elizabeth Terminal and WHSE | New Yale Forklift A910v239 | 1/21/2014 |
| Port Elizabeth Terminal and WHSE | Tennant Sweeper | 3/31/2014 |
| Port Elizabeth Terminal and WHSE | Used Forklift Sn # A910v132 | 3/31/2014 |
| Port Elizabeth Terminal and WHSE | 2 New 2013 Yale Forklifts S | 3/31/2014 |
| Port Elizabeth Terminal and WHSE | Used Forklift Sn A910v13243 | 3/31/2014 |
| Port Elizabeth Terminal and WHSE | NEW YALE FORKLIFT Sn F818VO | 4/30/2014 |
| Port Elizabeth Terminal and WHSE | 3 New Cascade Bale Clamp | 4/30/2014 |
| Port Elizabeth Terminal and WHSE | Portable Steel Rail Dock Boad | 3/17/2015 |
| Port Elizabeth Terminal and WHSE | New Cascade Paper Roll Cl | 4/30/2014 |
| Port Elizabeth Terminal and WHSE | Pallet Handler | 7/1/2014 |
| Port Elizabeth Terminal and WHSE | Forklift | 5/31/2017 |

| | | |
|---|---|---|
| Port Elizabeth Terminal and WHSE | Cascade Paper Roll Clamp S/N PT | 8/21/2014 |
| Port Elizabeth Terminal and WHSE | Used- Cascada Roll Clamp | 3/18/2016 |
| Port Elizabeth Terminal and WHSE | 3 New Yale Forklifts #080EE And # | 10/5/2015 |
| Port Elizabeth Terminal and WHSE | 2 Hyster Forklifts Ser#1562N And | 4/13/2015 |
| Port Elizabeth Terminal and WHSE | 2015 Cascade Ser #3327 | 5/19/2015 |
| Port Elizabeth Terminal and WHSE | 2014 Pallet Handler | 3/1/2015 |
| Port Elizabeth Terminal and WHSE | | 10/15/2015 |
| Port Elizabeth Terminal and WHSE | Compressor, Air 5.5 Hp 4b22 | 10/16/2015 |
| Port Elizabeth Terminal and WHSE | Scale, Floor Roughdeck 5x | 11/15/2015 |
| Port Elizabeth Terminal and WHSE | Tennant Model T20 Scrubber | 5/21/2015 |
| Port Elizabeth Terminal and WHSE | Hyster S70ft W/Single Double - N | 12/1/2015 |
| Port Elizabeth Terminal and WHSE | Water Heater & Compressor | 11/7/2016 |
| Port Elizabeth Terminal and WHSE | New-Eod Levelers For Docks | 8/24/2016 |
| Port Elizabeth Terminal and WHSE | Poweramp Leveler N Bumpers | 8/24/2016 |
| Port Elizabeth Terminal and WHSE | Dock Leveler | 7/28/2017 |
| Port Elizabeth Terminal and WHSE | Powerramp Dock Leveler | 8/11/2017 |
| Port Elizabeth Terminal and WHSE | Air Conditioners | 8/30/2018 |
| Port Elizabeth Terminal and WHSE | Ge Capital | 10/26/2018 |
| Port Elizabeth Terminal and WHSE | Eastern Lift Truck Co. Inc | 11/30/2018 |
| Port Elizabeth Terminal and WHSE | Arbor Material Handling - Lift Truc | 7/16/2018 |
| Port Elizabeth Terminal and WHSE | Allmark Door Company (2) | 6/19/2019 |
| Port Elizabeth Terminal and WHSE | Bar Code Scanners | 2/28/2019 |
| Port Elizabeth Terminal and WHSE | Pallet Pack | 1/1/2023 |
| Port Elizabeth Terminal and WHSE | Forklift - Barclay | 6/25/2019 |
| Port Elizabeth Terminal and WHSE | 2 Dock Levelers | 7/3/2019 |
| Port Elizabeth Terminal and WHSE | 4 Dock Plates | 7/1/2020 |
| Port Elizabeth Terminal and WHSE | 2 Dock Lever | 10/27/2020 |
| Port Elizabeth Terminal and WHSE | Mechanical Dock Lever | 12/24/2020 |
| Port Elizabeth Terminal and WHSE | Rolling Steel Door | 12/24/2020 |
| Port Elizabeth Terminal and WHSE | Dock Leveler | 12/24/2020 |
| Port Elizabeth Terminal and WHSE | East Coast Dock & Door | 11/6/2020 |
| Port Elizabeth Terminal and WHSE | East Coast Dock & Door | 11/25/2020 |
| Port Elizabeth Terminal and WHSE | Dock Leveler | 10/9/2020 |
| Port Elizabeth Terminal and WHSE | Dock Leveler | 11/4/2020 |
| Port Elizabeth Terminal and WHSE | East Coast Dock Door | 1/4/2021 |
| Port Elizabeth Terminal and WHSE | East Coast Dock Door | 1/5/2021 |
| Port Elizabeth Terminal and WHSE | Fence Railing Equipment | 1/1/2022 |
| Port Elizabeth Terminal and WHSE | Cameras | 2/9/2022 |
| Port Elizabeth Terminal and WHSE | Eastern Lift Truck | 1/25/2021 |
| Port Elizabeth Terminal and WHSE | 4 Dock Levelers | 4/1/2022 |
| Port Elizabeth Terminal and WHSE | Dock Pads | 2/8/2021 |

| | | |
|---|---|---|
| Port Elizabeth Terminal and WHSE | Steel Door | 2/23/2021 |
| Port Elizabeth Terminal and WHSE | Steel Door | 2/26/2021 |
| Port Elizabeth Terminal and WHSE | 5 New Steel Rool Up Doors | 4/1/2022 |
| Port Elizabeth Terminal and WHSE | Pit And Shipping | 4/1/2022 |
| Port Elizabeth Terminal and WHSE | Bomber M9 | 4/12/2022 |
| Port Elizabeth Terminal and WHSE | Cameras | 4/30/2022 |
| Port Elizabeth Terminal and WHSE | Heater Replacement | 4/30/2022 |
| Port Elizabeth Terminal and WHSE | New Fence | 4/12/2021 |
| Port Elizabeth Terminal and WHSE | Air Compressor | 4/30/2022 |
| Port Elizabeth Terminal and WHSE | Cascade Attachments | 5/5/2022 |
| Port Elizabeth Terminal and WHSE | Cameras | 5/31/2022 |
| Port Elizabeth Terminal and WHSE | Two Pallet Trucks | 6/17/2022 |
| Port Elizabeth Terminal and WHSE | Cameras | 5/31/2022 |
| Port Elizabeth Terminal and WHSE | 2 New Steel Rail Doors | 6/15/2021 |
| Port Elizabeth Terminal and WHSE | 2 Hyster S40fts Cushion Forklif | 9/15/1999 |
| Port Elizabeth Terminal and WHSE | Cascade Roller Clamp | 7/13/2021 |
| Port Elizabeth Terminal and WHSE | 35k Pentalift Dock Leveler | 7/2/2021 |
| Port Elizabeth Terminal and WHSE | Dock Leveler | 8/18/2021 |
| Port Elizabeth Terminal and WHSE | Cameras | 8/31/2021 |
| Port Elizabeth Terminal and WHSE | Cameras | 9/30/2021 |
| Port Elizabeth Terminal and WHSE | Argos Software | 12/29/2021 |
| Port Elizabeth Terminal and WHSE | Barcodes - Equipment | 11/17/2021 |
| Port Elizabeth Terminal and WHSE | Cameras | 3/1/2021 |
| Port Elizabeth Terminal and WHSE | Equipment (15 Machines Trade) | 6/23/2023 |
| Port Elizabeth Terminal and WHSE | Dock Trail Repairs | 1/3/2024 |
| Port Elizabeth Terminal and WHSE | Equipment | 10/31/2021 |
| Port Elizabeth Terminal and WHSE | Dock Stairs | 11/17/2021 |
| Port Elizabeth Terminal and WHSE | Equipment | 11/30/2021 |
| Port Elizabeth Terminal and WHSE | Cameras | 12/31/2021 |
| Port Elizabeth Terminal and WHSE | Compressor | 12/31/2021 |
| Port Elizabeth Terminal and WHSE | Dock Trail Repairs | 1/25/2024 |
| Port Elizabeth Terminal and WHSE | Cameras | 7/31/2022 |
| Port Elizabeth Terminal and WHSE | Cameras | 8/31/2022 |
| Port Elizabeth Terminal and WHSE | Cameras | 8/31/2022 |
| Port Elizabeth Terminal and WHSE | Forklift | 2/23/2024 |
| Port Elizabeth Terminal and WHSE | Fence | 9/30/2022 |
| Port Elizabeth Terminal and WHSE | Two New Forklifts | 5/16/2024 |
| Port Elizabeth Terminal and WHSE | Fence | 10/21/2022 |
| Port Elizabeth Terminal and WHSE | Doors | 10/1/2022 |
| Port Elizabeth Terminal and WHSE | Gates | 11/30/2022 |
| Port Elizabeth Terminal and WHSE | Fence | 12/7/2022 |

| | | |
|---|---|---|
| Port Elizabeth Terminal and WHSE | Cameras & Scanners | 7/31/2024 |
| Port Elizabeth Terminal and WHSE | Cameras | 8/31/2024 |
| Port Elizabeth Terminal and WHSE | Bolzoni Model Arc - 74 - 147 | 8/30/2024 |
| Port Elizabeth Terminal and WHSE | Cameras | 9/30/2024 |
| Port Elizabeth Terminal and WHSE | Cameras | 10/31/2024 |
| Port Elizabeth Terminal and WHSE | Cameras | 11/30/2024 |
| Port Elizabeth Terminal and WHSE | Water Heater | 11/21/2024 |
| Port Elizabeth Terminal and WHSE | Cameras | 12/6/2024 |
| Port Elizabeth Terminal and WHSE | Cameras | 2/1/2025 |
| Port Elizabeth Terminal and WHSE | Cameras | 3/1/2025 |
| Port Elizabeth Terminal and WHSE | Forklift | 7/23/2025 |
| Port Elizabeth Terminal and WHSE | Shop Manor CA, ERS/WIF INSTA | 9/1/2025 |
| Port Elizabeth Terminal and WHSE | Clamper | 5/1/2026 |
| Port Elizabeth Terminal and WHSE | | 6/1/1991 |
| Port Elizabeth Terminal and WHSE | | 6/1/1991 |
| Port Elizabeth Terminal and WHSE | Computer | 10/1/1991 |
| Port Elizabeth Terminal and WHSE | Computer Detailer | 10/1/1991 |
| Port Elizabeth Terminal and WHSE | Computer | 6/25/1993 |
| Port Elizabeth Terminal and WHSE | Computer | 4/20/1994 |
| Port Elizabeth Terminal and WHSE | Merlin Legend Telephone S | 12/1/1994 |
| Port Elizabeth Terminal and WHSE | 3 Phone Legend Mlx10d @ 30 | 12/1/1994 |
| Port Elizabeth Terminal and WHSE | 1 Phone Legend Mlx28d @ 36 | 12/1/1994 |
| Port Elizabeth Terminal and WHSE | Pc | 12/30/1994 |
| Port Elizabeth Terminal and WHSE | Comp/Sftwr + Pc 486dx-50-,3 | 12/28/1994 |
| Port Elizabeth Terminal and WHSE | Comp/Sftwr + Pc | 7/31/1995 |
| Port Elizabeth Terminal and WHSE | Comp/Sftwr + Pc | 7/31/1995 |
| Port Elizabeth Terminal and WHSE | Comp/Sftwr + Pc | 8/31/1995 |
| Port Elizabeth Terminal and WHSE | Computer | 8/17/1995 |
| Port Elizabeth Terminal and WHSE | Time Recorder | 6/13/1996 |
| Port Elizabeth Terminal and WHSE | Time Recorder | 6/13/1996 |
| Port Elizabeth Terminal and WHSE | Love Seat/Chairs/Book Cas | 7/16/1996 |
| Port Elizabeth Terminal and WHSE | Lap | 12/18/1996 |
| Port Elizabeth Terminal and WHSE | | 9/9/1996 |
| Port Elizabeth Terminal and WHSE | Book Shelves | 9/8/1997 |
| Port Elizabeth Terminal and WHSE | Various Computer Equipme | 5/1/1997 |
| Port Elizabeth Terminal and WHSE | Oki/520/61800801-Amex/320/Bk | 6/27/1997 |
| Port Elizabeth Terminal and WHSE | Mss Software | 9/1/1997 |
| Port Elizabeth Terminal and WHSE | Argos Software | 8/1/1997 |
| Port Elizabeth Terminal and WHSE | 2 Laser Jet 6pse+Cable | 12/31/1997 |
| Port Elizabeth Terminal and WHSE | High Chair | 4/16/1998 |
| Port Elizabeth Terminal and WHSE | Radios 22/23 | 4/16/1998 |

| | | |
|---|---|---|
| Port Elizabeth Terminal and WHSE | 195-Copier | 6/2/1998 |
| Port Elizabeth Terminal and WHSE | Peripheral | 10/7/1998 |
| Port Elizabeth Terminal and WHSE | Citrix Metaframe/Setup/Tra | 10/1/1998 |
| Port Elizabeth Terminal and WHSE | Lucent Tech | 2/1/1999 |
| Port Elizabeth Terminal and WHSE | Copier | 3/22/1999 |
| Port Elizabeth Terminal and WHSE | Copier | 2/1/1999 |
| Port Elizabeth Terminal and WHSE | Computer | 7/15/1999 |
| Port Elizabeth Terminal and WHSE | Computer | 10/31/1999 |
| Port Elizabeth Terminal and WHSE | 6 Scanners | 2/9/2000 |
| Port Elizabeth Terminal and WHSE | Pet Computer Scanner | 12/31/1995 |
| Port Elizabeth Terminal and WHSE | Pet | 12/31/2000 |
| Port Elizabeth Terminal and WHSE | Peripheral | 10/2/2000 |
| Port Elizabeth Terminal and WHSE | 2 Motorola Ht750 4ch 450-5 | 10/24/2000 |
| Port Elizabeth Terminal and WHSE | Argos Software | 11/15/2000 |
| Port Elizabeth Terminal and WHSE | Argos Software | 1/31/2001 |
| Port Elizabeth Terminal and WHSE | Pet Computer Apc Smart Up | 9/30/2000 |
| Port Elizabeth Terminal and WHSE | Dell Cumputer American E | 7/13/2001 |
| Port Elizabeth Terminal and WHSE | Insight Custom Programmi | 9/1/2001 |
| Port Elizabeth Terminal and WHSE | Peripheral | 9/1/2001 |
| Port Elizabeth Terminal and WHSE | Radios | 11/28/2001 |
| Port Elizabeth Terminal and WHSE | 5 Scanners | 12/13/2001 |
| Port Elizabeth Terminal and WHSE | Fax Machine | 8/12/2002 |
| Port Elizabeth Terminal and WHSE | Printer | 9/4/2002 |
| Port Elizabeth Terminal and WHSE | Printer | 9/19/2002 |
| Port Elizabeth Terminal and WHSE | Base Sever,Power Efge Upg | 10/1/2002 |
| Port Elizabeth Terminal and WHSE | Base Transformer Killer B | 10/28/2001 |
| Port Elizabeth Terminal and WHSE | | 11/21/2002 |
| Port Elizabeth Terminal and WHSE | 9 Desktop 2 Servers | 9/1/2003 |
| Port Elizabeth Terminal and WHSE | 2 Scanners | 8/1/2004 |
| Port Elizabeth Terminal and WHSE | Phil Titus Laptop | 8/30/2004 |
| Port Elizabeth Terminal and WHSE | 2 Scanners | 8/25/2004 |
| Port Elizabeth Terminal and WHSE | Nework Voice Bld 199 | 1/31/2005 |
| Port Elizabeth Terminal and WHSE | Patrick Laptop | 2/28/2005 |
| Port Elizabeth Terminal and WHSE | Radio Communication | 6/29/2005 |
| Port Elizabeth Terminal and WHSE | Desk And Misc Furniture | 12/1/2003 |
| Port Elizabeth Terminal and WHSE | Desk And Misc Furniture | 12/1/2003 |
| Port Elizabeth Terminal and WHSE | Misc. Furniture, Computer | 8/31/2004 |
| Port Elizabeth Terminal and WHSE | Pet Sofya's Computer | 12/31/2001 |
| Port Elizabeth Terminal and WHSE | Pet Office Furniture | 12/31/2001 |
| Port Elizabeth Terminal and WHSE | Dell Computer | 7/25/2006 |
| Port Elizabeth Terminal and WHSE | Hewlett Packard PC | 12/1/2006 |

| | | |
|---|---|---|
| Port Elizabeth Terminal and WHSE | Computer Equip | 3/30/2007 |
| Port Elizabeth Terminal and WHSE | Equipment | 4/1/2007 |
| Port Elizabeth Terminal and WHSE | Furniture | 4/6/2007 |
| Port Elizabeth Terminal and WHSE | Office Equipment | 12/3/2007 |
| Port Elizabeth Terminal and WHSE | Equipment | 2/1/2007 |
| Port Elizabeth Terminal and WHSE | Computer Equip | 7/31/2007 |
| Port Elizabeth Terminal and WHSE | Office Equipment | 4/5/2008 |
| Port Elizabeth Terminal and WHSE | Office Equipment | 5/12/2008 |
| Port Elizabeth Terminal and WHSE | Office Equipment | 7/31/2008 |
| Port Elizabeth Terminal and WHSE | Computer Equipment | 9/1/2008 |
| Port Elizabeth Terminal and WHSE | Office Equipment | 9/1/2008 |
| Port Elizabeth Terminal and WHSE | Office Equipment | 9/1/2008 |
| Port Elizabeth Terminal and WHSE | Computer | 7/1/2008 |
| Port Elizabeth Terminal and WHSE | Computer Equipment | 9/26/2008 |
| Port Elizabeth Terminal and WHSE | Cabinet | 10/8/2008 |
| Port Elizabeth Terminal and WHSE | Computer | 11/17/2008 |
| Port Elizabeth Terminal and WHSE | Software | 9/1/2008 |
| Port Elizabeth Terminal and WHSE | Computer Equipment | 6/30/2008 |
| Port Elizabeth Terminal and WHSE | Computer Equipment | 1/7/2009 |
| Port Elizabeth Terminal and WHSE | Computer Equipment | 1/7/2009 |
| Port Elizabeth Terminal and WHSE | Computer Equipment | 2/12/2009 |
| Port Elizabeth Terminal and WHSE | Computer Equipment | 2/12/2009 |
| Port Elizabeth Terminal and WHSE | Computer Equipment | 2/28/2009 |
| Port Elizabeth Terminal and WHSE | Locker 2 Tier | 1/19/2010 |
| Port Elizabeth Terminal and WHSE | Computer Equipment | 1/19/2010 |
| Port Elizabeth Terminal and WHSE | Assem Locker 2 Tier | 3/31/2010 |
| Port Elizabeth Terminal and WHSE | Periphery | 8/31/2010 |
| Port Elizabeth Terminal and WHSE | Periphery | 9/10/2010 |
| Port Elizabeth Terminal and WHSE | Furniture | 9/30/2010 |
| Port Elizabeth Terminal and WHSE | Furniture | 10/5/2010 |
| Port Elizabeth Terminal and WHSE | Periphery | 10/31/2010 |
| Port Elizabeth Terminal and WHSE | Periphery | 11/30/2010 |
| Port Elizabeth Terminal and WHSE | Periphery | 12/31/2010 |
| Port Elizabeth Terminal and WHSE | Periphery | 10/5/2010 |
| Port Elizabeth Terminal and WHSE | Furniture | 6/30/2010 |
| Port Elizabeth Terminal and WHSE | Periphery | 1/31/2011 |
| Port Elizabeth Terminal and WHSE | Periphery | 1/13/2011 |
| Port Elizabeth Terminal and WHSE | Periphery | 2/28/2011 |
| Port Elizabeth Terminal and WHSE | Periphery | 2/16/2011 |
| Port Elizabeth Terminal and WHSE | Periphery | 2/18/2011 |
| Port Elizabeth Terminal and WHSE | Periphery | 3/31/2011 |

| | | |
|---|---|---|
| Port Elizabeth Terminal and WHSE | Periphery | 3/29/2011 |
| Port Elizabeth Terminal and WHSE | Periphery | 4/30/2011 |
| Port Elizabeth Terminal and WHSE | Office Equipment | 6/30/2011 |
| Port Elizabeth Terminal and WHSE | Office Equipment | 6/30/2011 |
| Port Elizabeth Terminal and WHSE | Office Equipment | 6/30/2011 |
| Port Elizabeth Terminal and WHSE | Argos Software - First Inst | 1/1/2012 |
| Port Elizabeth Terminal and WHSE | Argos Software | 1/2/2012 |
| Port Elizabeth Terminal and WHSE | Amazon - Office Equipment | 1/31/2012 |
| Port Elizabeth Terminal and WHSE | Amazon - Offce Equipment | 1/31/2012 |
| Port Elizabeth Terminal and WHSE | Argos Software | 2/2/2012 |
| Port Elizabeth Terminal and WHSE | Pc Connections | 3/31/2012 |
| Port Elizabeth Terminal and WHSE | Amazon - Off Equipment | 3/31/2012 |
| Port Elizabeth Terminal and WHSE | Amazon - Off Equipment | 3/31/2012 |
| Port Elizabeth Terminal and WHSE | Amazon - Office Equipment | 6/30/2012 |
| Port Elizabeth Terminal and WHSE | Furniture & Fixtures | 2/28/2013 |
| Port Elizabeth Terminal and WHSE | Air Conditioner | 6/18/2013 |
| Port Elizabeth Terminal and WHSE | Furniture & Fixtures | 7/8/2013 |
| Port Elizabeth Terminal and WHSE | Furniture & Fixtures | 7/31/2013 |
| Port Elizabeth Terminal and WHSE | Furniture | 6/30/2014 |
| Port Elizabeth Terminal and WHSE | Furniture | 8/31/2014 |
| Port Elizabeth Terminal and WHSE | Furniture | 10/31/2014 |
| Port Elizabeth Terminal and WHSE | Furniture | 11/30/2014 |
| Port Elizabeth Terminal and WHSE | 2 Steel Rail Dockboards | 10/14/2014 |
| Port Elizabeth Terminal and WHSE | Sectional Overhead Door | 6/30/2015 |
| Port Elizabeth Terminal and WHSE | Camera NVR System | 8/25/2015 |
| Port Elizabeth Terminal and WHSE | Three Computers And Six Monitor | 9/30/2017 |
| Port Elizabeth Terminal and WHSE | Cameras | 1/31/2023 |
| Port Elizabeth Terminal and WHSE | Laptops | 1/31/2023 |
| Port Elizabeth Terminal and WHSE | Cameras & Laptops | 3/31/2023 |
| Port Elizabeth Terminal and WHSE | Cameras | 8/3/2023 |
| Port Elizabeth Terminal and WHSE | Lighting Fixtures | 4/27/2020 |
| Port Elizabeth Terminal and WHSE | Lighting Fixtures | 3/27/2020 |
| Port Elizabeth Terminal and WHSE | Lighting Fixtures | 3/27/2020 |
| Port Elizabeth Terminal and WHSE | 3 Drumfan | 7/9/2020 |
| Port Elizabeth Terminal and WHSE | 14 Hand Dryer | 7/17/2020 |
| Port Elizabeth Terminal and WHSE | Refridge | 1/30/2021 |
| Port Elizabeth Terminal and WHSE | Electric Heaters | 2/10/2021 |
| Port Elizabeth Terminal and WHSE | Forklift | 2/15/2021 |
| Port Elizabeth Terminal and WHSE | Light Bulb Caddy | 2/15/2021 |
| Port Elizabeth Terminal and WHSE | Locker | 2/19/2021 |
| Port Elizabeth Terminal and WHSE | Dunnage Bag | 3/15/2021 |

| | | |
|---|---|---|
| Port Elizabeth Terminal and WHSE | Dunnage Bag | 3/15/2021 |
| Port Elizabeth Terminal and WHSE | Cameras | 5/31/2023 |
| Port Elizabeth Terminal and WHSE | Cabinets | 4/1/2021 |
| Port Elizabeth Terminal and WHSE | Cameras | 6/30/2023 |
| Port Elizabeth Terminal and WHSE | Conveyor Belt | 8/22/2023 |
| Port Elizabeth Terminal and WHSE | Heavy Duty Tilt Truck | 10/25/2021 |
| Port Elizabeth Terminal and WHSE | 2 Entry Canopies | 10/26/2021 |
| Port Elizabeth Terminal and WHSE | Refrigerator | 10/31/2021 |
| Port Elizabeth Terminal and WHSE | Heaters | 12/1/2021 |
| Port Elizabeth Terminal and WHSE | Portable A/C | 7/21/2022 |
| Port Elizabeth Terminal and WHSE | Furniture & Fixtures | 4/30/2024 |
| Port Elizabeth Terminal and WHSE | New Doors | 4/24/2024 |
| Port Elizabeth Terminal and WHSE | Camera | 6/1/2025 |
| Port Elizabeth Terminal and WHSE | Camera | 6/1/2025 |
| Port Elizabeth Terminal and WHSE | Scanners | 6/6/2025 |
| Port Elizabeth Terminal and WHSE | Leah Laptop | 5/31/2025 |
| Port Elizabeth Terminal and WHSE | Cameras | 4/1/2025 |
| Port Elizabeth Terminal and WHSE | Intellasight LLC | 8/1/2025 |
| Port Elizabeth Terminal and WHSE | Scale | 8/19/2025 |
| Judge Warehousing, LLC | Compressor | 1/30/2012 |
| Judge Warehousing, LLC | 2 Used Paper Roll Clamp | 3/1/2012 |
| Judge Warehousing, LLC | Steel Railcar Ramp | 3/5/2012 |
| Judge Warehousing, LLC | Forklift 110783 B | 5/22/2012 |
| Judge Warehousing, LLC | Forklift Series 3011174-B | 5/22/2012 |
| Judge Warehousing, LLC | Clamp Ser 3047110 | 5/22/2012 |
| Judge Warehousing, LLC | Equipment | 4/13/2012 |
| Judge Warehousing, LLC | Wells Fargo - Forklift | 4/30/2012 |
| Judge Warehousing, LLC | Equipment | 3/9/2012 |
| Judge Warehousing, LLC | De Lage Landen New Ca | 3/8/2012 |
| Judge Warehousing, LLC | Floor Scale | 1/30/2013 |
| Judge Warehousing, LLC | Avenger Scale | 3/19/2013 |
| Judge Warehousing, LLC | Forklift Platform | 4/9/2013 |
| Judge Warehousing, LLC | Roll Clamp | 5/31/2013 |
| Judge Warehousing, LLC | Used Paper Roll Clamp | 10/31/2013 |
| Judge Warehousing, LLC | Teston Machine Equipm | 11/8/2013 |
| Judge Warehousing, LLC | Dock Boards | 11/12/2013 |
| Judge Warehousing, LLC | 2 Used Forklifts | 11/18/2013 |
| Judge Warehousing, LLC | Equipment | 1/31/2014 |
| Judge Warehousing, LLC | 72 X 60 DOCK PLATE | 2/26/2014 |
| Judge Warehousing, LLC | Portable Steel Dock Board A | 2/25/2015 |
| Judge Warehousing, LLC | Equipment | 6/30/2014 |

| | | |
|---|---|---|
| Judge Warehousing, LLC | Used Paper Roll Clamp | 2/24/2015 |
| Judge Warehousing, LLC | Equipment | 5/16/2014 |
| Judge Warehousing, LLC | Equipment | 5/16/2014 |
| Judge Warehousing, LLC | Equipment | 5/16/2014 |
| Judge Warehousing, LLC | Davis Material Handlin | 6/12/2014 |
| Judge Warehousing, LLC | 2 Cascade Paper Roll Clam | 5/21/2014 |
| Judge Warehousing, LLC | Savannah Blinds Shutt | 10/13/2014 |
| Judge Warehousing, LLC | Equipment | 10/31/2014 |
| Judge Warehousing, LLC | Equipment | 11/30/2014 |
| Judge Warehousing, LLC | Equipment | 12/31/2014 |
| Judge Warehousing, LLC | Hyster Forklift S/N E010V046 | 6/17/2014 |
| Judge Warehousing, LLC | 2 Cascade Single Double Pa | 9/2/2014 |
| Judge Warehousing, LLC | Toyota Forklift Ser# 10239 | 5/26/2015 |
| Judge Warehousing, LLC | 2015-Equipment Model Bluf | 6/23/2015 |
| Judge Warehousing, LLC | 2011 Hyster Ser#367J | 5/12/2015 |
| Judge Warehousing, LLC | New Cascade Pulp Bale Cla | 6/8/2015 |
| Judge Warehousing, LLC | 2 2014 Hyster Forklifts #050 | 5/20/2015 |
| Judge Warehousing, LLC | 2010 Yale Forklift Ser# 3491 | 5/14/2015 |
| Judge Warehousing, LLC | 2007 Hyster Forklift Ser#234 | 5/21/2015 |
| Judge Warehousing, LLC | 2 Forklifts Hyster S120ft | 8/19/2015 |
| Judge Warehousing, LLC | 1 Auramo- Serial Number 38 | 9/1/2016 |
| Judge Warehousing, LLC | Welder Engine Driven Range | 12/7/2016 |
| Judge Warehousing, LLC | Clamp Forklift Toyota Serial | 1/1/2016 |
| Judge Warehousing, LLC | Eastern Lift Truck- Cascade | 1/1/2017 |
| Judge Warehousing, LLC | Ameridock Loading Dock Sy | 1/1/2019 |
| Judge Warehousing, LLC | Equipment | 11/6/2023 |
| Judge Warehousing, LLC | Cameras | 12/31/2023 |
| Judge Warehousing, LLC | Flex Frame Shelters | 11/25/2020 |
| Judge Warehousing, LLC | Docklevers | 11/25/2020 |
| Judge Warehousing, LLC | Racks | 2/28/2021 |
| Judge Warehousing, LLC | Cameras | 7/31/2021 |
| Judge Warehousing, LLC | Cameras | 8/31/2021 |
| Judge Warehousing, LLC | Cameras | 9/30/2021 |
| Judge Warehousing, LLC | Ashley Furniture | 9/30/2021 |
| Judge Warehousing, LLC | Cameras | 10/31/2021 |
| Judge Warehousing, LLC | Cameras | 11/30/2021 |
| Judge Warehousing, LLC | Doug Bean Sign | 11/30/2021 |
| Judge Warehousing, LLC | Cameras | 12/31/2021 |
| Judge Warehousing, LLC | Yale Glp 120vx Forklift | 1/1/2021 |
| Judge Warehousing, LLC | Cameras | 1/31/2022 |
| Judge Warehousing, LLC | 1 Spotter Sn: 16767 | 3/31/2022 |

| | | |
|---|---|---|
| Judge Warehousing, LLC | Purchase | 7/29/2022 |
| Judge Warehousing, LLC | Cameras | 4/30/2022 |
| Judge Warehousing, LLC | Cameras | 5/31/2022 |
| Judge Warehousing, LLC | Purchases | 6/7/2022 |
| Judge Warehousing, LLC | Cameras | 8/31/2022 |
| Judge Warehousing, LLC | Cameras | 1/31/2024 |
| Judge Warehousing, LLC | Cameras | 7/31/2022 |
| P. Judge & Sons | Ms | 3/1/1986 |
| P. Judge & Sons | Cp | 10/1/1988 |
| P. Judge & Sons | Partner Plus System | 9/20/1994 |
| P. Judge & Sons | Merlin Ledgend System | 11/14/1994 |
| P. Judge & Sons | Pc | 12/30/1994 |
| P. Judge & Sons | Pc | 12/30/1994 |
| P. Judge & Sons | Pc | 12/30/1994 |
| P. Judge & Sons | 5 At&T Wireless | 12/31/1994 |
| P. Judge & Sons | Pc | 12/31/1994 |
| P. Judge & Sons | Computers/Printer/De | 4/15/1997 |
| P. Judge & Sons | Executive Furniture De | 4/15/1997 |
| P. Judge & Sons | 2 Ht 1000 2ch Uhf | 5/14/1997 |
| P. Judge & Sons | Pc Miler | 5/23/1997 |
| P. Judge & Sons | Visual Movement Softw | 6/30/1997 |
| P. Judge & Sons | Xellence 66 Dual-Whee | 7/31/1998 |
| P. Judge & Sons | Dell Power Edge 2200 B | 8/1/1998 |
| P. Judge & Sons | Chair Grade # 50 Eagle | 8/13/1998 |
| P. Judge & Sons | Laptop 1610 P/150mmx 1 | 8/14/1998 |
| P. Judge & Sons | Peripherial(Server,Pri | 9/30/1998 |
| P. Judge & Sons | Vpn-1 Gateway/50 V.40 - | 10/1/1998 |
| P. Judge & Sons | Cisco 2514 Dual Ethern | 11/13/1998 |
| P. Judge & Sons | Dell Power Edge 2200 B | 12/31/1998 |
| P. Judge & Sons | Copier Toshiba 1350 | 6/18/1999 |
| P. Judge & Sons | Patrick Iii Computer | 12/26/1999 |
| P. Judge & Sons | Inspiron 3800,7500mhz, | 8/31/2000 |
| P. Judge & Sons | Drinking Machine | 3/2/2001 |
| P. Judge & Sons | 5 Pocket Pc 16mb | 6/7/2001 |
| P. Judge & Sons | Peripherial(For Video A | 5/6/2002 |
| P. Judge & Sons | Xerox Phaser 6200n 24 | 9/11/2002 |
| P. Judge & Sons | Boise Cascade | 9/30/2002 |
| P. Judge & Sons | Dispatch Office Improv | 12/31/2002 |
| P. Judge & Sons | 1 Servers And 6 Deskto | 9/1/2003 |
| P. Judge & Sons | Furniture & Fixtures | 6/30/2006 |
| P. Judge & Sons | Computer | 6/30/2006 |

| | | |
|---|---|---|
| P. Judge & Sons | Dell Financial Services | 3/10/2007 |
| P. Judge & Sons | Video Monitors | 4/1/2007 |
| P. Judge & Sons | 10 Monitors | 3/19/2007 |
| P. Judge & Sons | Equipment | 5/20/2007 |
| P. Judge & Sons | Office Equipment | 6/26/2007 |
| P. Judge & Sons | Equipment | 11/29/2007 |
| P. Judge & Sons | Equipment | 6/30/2007 |
| P. Judge & Sons | Computer Equipment | 3/31/2008 |
| P. Judge & Sons | Scanner | 1/18/2008 |
| P. Judge & Sons | Vending Machine | 3/18/2008 |
| P. Judge & Sons | Desk | 11/13/2008 |
| P. Judge & Sons | Computer Equipment | 9/8/2008 |
| P. Judge & Sons | Furniture And Fixtures | 7/31/2010 |
| P. Judge & Sons | Furniture And Fixtures | 7/31/2010 |
| P. Judge & Sons | Furniture And Fixture | 8/31/2010 |
| P. Judge & Sons | Furniture And Fixtures | 10/1/2010 |
| P. Judge & Sons | Furniture And Fixtures | 12/29/2010 |
| P. Judge & Sons | Shoretel Extension | 5/25/2011 |
| P. Judge & Sons | Furniture | 1/31/2013 |
| P. Judge & Sons | Furniture | 1/31/2013 |
| P. Judge & Sons | Office Furniture | 4/12/2013 |
| P. Judge & Sons | Furniture | 6/30/2013 |
| P. Judge & Sons | Furniture | 7/31/2013 |
| P. Judge & Sons | Furniture | 8/31/2013 |
| P. Judge & Sons | Furniture | 9/30/2013 |
| P. Judge & Sons | Equipment | 2/20/2013 |
| P. Judge & Sons | License And Clock | 1/31/2014 |
| P. Judge & Sons | Clock | 1/31/2014 |
| P. Judge & Sons | Furniture | 1/13/2014 |
| P. Judge & Sons | Furniture | 2/28/2014 |
| P. Judge & Sons | Two Computers | 7/31/2017 |
| P. Judge & Sons | Equipment Sales | 2/1/2021 |
| P. Judge & Sons | Snap On Specialty Too | 6/11/2021 |
| P. Judge & Sons | Welding Gun | 8/31/2022 |
| P. Judge & Sons | Cameras | 6/30/2025 |
| P. Judge & Sons | New 120/208 Volt 200 Am | 11/8/2002 |
| P. Judge & Sons | Dispatch Office Improv | 11/8/2002 |
| P. Judge & Sons | Grand Warehouse | 12/31/2002 |
| P. Judge & Sons | Fence | 12/18/2009 |
| P. Judge & Sons | Improvements | 7/22/2010 |
| P. Judge & Sons | Improvements | 7/20/2010 |

| | | |
|---|---|---|
| P. Judge & Sons | Bath And Kitchen Upgr | 3/7/2011 |
| P. Judge & Sons | Receptacles And Elect | 2/28/2011 |
| P. Judge & Sons | 201 - Time Clock Install | 2/28/2011 |
| P. Judge & Sons | Installation Carpet An | 3/5/2011 |
| P. Judge & Sons | Work On Bldg 194 | 4/6/2011 |
| P. Judge & Sons | Remove Dry Wall Bala | 11/28/2011 |
| P. Judge & Sons | Paint Office Bldg 173 | 11/16/2011 |
| P. Judge & Sons | Green Service Truck | 3/5/1999 |
| P. Judge & Sons | Cherokee Vehicle | 8/4/2001 |
| P. Judge & Sons | Truck | 10/29/2004 |
| P. Judge & Sons | Security System | 2/1/2007 |
| P. Judge & Sons | Truck | 4/5/2007 |
| P. Judge & Sons | 3 Great Dane Tractors | 4/30/2009 |
| P. Judge & Sons | Ottawa Yard Tractors | 6/8/2011 |
| P. Judge & Sons | Ottowa Tractor | 6/8/2011 |
| P. Judge & Sons | 2005 Dodge Ram | 1/9/2013 |
| P. Judge & Sons | Avenel Truck & Equipm | 3/13/2013 |
| P. Judge & Sons | Avenel Truck & Equipm | 3/13/2013 |
| P. Judge & Sons | Tractor - Avenel Truck | 2/11/2014 |
| P. Judge & Sons | Skidsteer Pusher Ser 4 | 2/24/2014 |
| P. Judge & Sons | New Wabash Trailer | 2/5/2015 |
| P. Judge & Sons | Bobcat Skid Steer Loa | 2/28/2014 |
| P. Judge & Sons | Taylor & Martin Inc | 8/25/2014 |
| P. Judge & Sons | 3 Used Great Dane Van | 8/27/2014 |
| P. Judge & Sons | Salt Spreader | 10/30/2014 |
| P. Judge & Sons | Radio Communication Equip | 8/7/2015 |
| P. Judge & Sons | 9' Pro Plus W/Quad: Bla | 10/22/2015 |
| P. Judge & Sons | 2015 Dodge Ram 500 4x4 | 8/26/2015 |
| P. Judge & Sons | 2007 Crystal Welding Tande | 5/22/2017 |
| P. Judge & Sons | Snow Plow | 1/5/2017 |
| P. Judge & Sons | Tanker Truck | 1/7/2020 |
| P. Judge & Sons | Switcher | 8/31/2021 |
| P. Judge & Sons | Forge 2.0 Hopper Sprea | 11/11/2021 |
| P. Judge & Sons | Equipment | 12/10/2021 |
| P. Judge & Sons | Kalmar Ottawa T2 | 6/8/2022 |
| P. Judge & Sons | QUINCY COMPRESSOR | 4/1/2022 |
| P. Judge & Sons | New Wabash Trailer (2015( | 7/7/2022 |
| P. Judge & Sons | New Wabash Trailer (2015) | 7/7/2022 |
| P. Judge & Sons | New Wabash Trailer (2015) | 6/22/2022 |

| | | |
|---|---|---|
| P. Judge & Sons | New wabash Trailer (2015) | 6/22/2022 |
| P. Judge & Sons | New Wabash Trailer | 6/22/2022 |
| P. Judge & Sons | 2023 stroughton dry van | 6/27/2022 |
| P. Judge & Sons | 2023 Stoughton dry van | 6/27/2022 |
| P. Judge & Sons | 2023 Stroughton Dry van | 6/27/2022 |
| P. Judge & Sons | 2023 stroughton dry van | 6/27/2022 |
| P. Judge & Sons | 4 Heaters | 12/27/2022 |
| P. Judge & Sons | Scale | 12/31/2023 |
| P. Judge & Sons | TMW Software License | 5/1/2007 |
| P. Judge & Sons | Software | 9/8/2008 |
| P. Judge & Sons | Jeep Patriot | 9/30/2012 |
| P. Judge & Sons | Trailer 1JJV532W19L253518 | |
| P. Judge & Sons | Trailer 1JJV532W69L253515 | |
| P. Judge & Sons | Trailer 1JJV532D2AL340427 | |
| P. Judge & Sons | Trailer 5V8VA532XAM000785 | |
| P. Judge & Sons | Trailer 5V8VA5321AM000786 | |
| P. Judge & Sons | Trailer 5V8VA5323AM000787 | |
| P. Judge & Sons | Trailer 1JJV532D5BL393026 | |
| P. Judge & Sons | Trailer 1JJV532D7BL393027 | |
| P. Judge & Sons | Trailer 1JJV532D9BL393028 | |
| P. Judge & Sons | Trailer 1JJV532D0BL393029 | |
| P. Judge & Sons | Trailer 1JJV532D7BL393030 | |
| P. Judge & Sons | Trailer 1JJV532D9BL393031 | |
| P. Judge & Sons | Trailer 1JJV532D0BL393032 | |
| P. Judge & Sons | Trailer 1JJV532D2BL393033 | |
| P. Judge & Sons | Trailer 1JJV532D4BL393034 | |
| P. Judge & Sons | Trailer 1JJV532D8BL393036 | |
| P. Judge & Sons | Trailer 1JJV532DXBL393037 | |
| P. Judge & Sons | Trailer 1GRAA96234B701162 | |
| P. Judge & Sons | Trailer 1GRAA96274B701164 | |
| P. Judge & Sons | Trailer 1JJV482W55L922206 | |
| P. Judge & Sons | Trailer 1GRAA96275B705117 | |
| P. Judge & Sons | Trailer 1GRAA96275B705118 | |
| P. Judge & Sons | Trailer 1GRAA96275B705119 | |
| P. Judge & Sons | Trailer 1GRAA96275B705121 | |
| P. Judge & Sons | Trailer 1GRAA96275B705126 | |
| P. Judge & Sons | Trailer 1GRAA96226B702001 | |
| P. Judge & Sons | Trailer 1GRAA96266B701997 | |
| P. Judge & Sons | Trailer 1GRAA96247B704527 | |
| P. Judge & Sons | Trailer 1GRAA96247B704530 | |

| | |
|---|---|
| P. Judge & Sons | Trailer 1GRAA96247B704531 |
| P. Judge & Sons | Trailer 1GRAA96289B700705 |
| P. Judge & Sons | Trailer 1GRAA96289B700706 |
| P. Judge & Sons | Trailer 1GRAA96289B700707 |
| P. Judge & Sons | Trailer 1GRAA96289B700709 |
| P. Judge & Sons | Trailer 1GRAA96289B700711 |
| P. Judge & Sons | Trailer 1GRAA96289B700712 |
| P. Judge & Sons | Trailer 1GRAA9629AB703123 |
| P. Judge & Sons | Trailer 1GRAA9620AB703124 |
| P. Judge & Sons | Trailer 1GRAA9622AB703125 |
| P. Judge & Sons | Trailer 1GRAA96228D433392 |
| P. Judge & Sons | Trailer 1JJV532DXCL723227 |
| P. Judge & Sons | Trailer 1JJV532D1CL723228 |
| P. Judge & Sons | Trailer 1JJV532D7CL716767 |
| P. Judge & Sons | Trailer 1JJV532D9CL716768 |
| P. Judge & Sons | Trailer 1JJV532D0CL716769 |
| P. Judge & Sons | Trailer 1JJV532D7CL716770 |
| P. Judge & Sons | Trailer 1JJV532D9CL716771 |
| P. Judge & Sons | Trailer 1JJV532D0CL716772 |
| P. Judge & Sons | Trailer 1JJV532D2CL716773 |
| P. Judge & Sons | Trailer 1JJV532D4CL716774 |
| P. Judge & Sons | Trailer 1JJV532D6CL716775 |
| P. Judge & Sons | Trailer 1JJV532D8CL716776 |
| P. Judge & Sons | Trailer 1JJV532D7DL761502 |
| P. Judge & Sons | Trailer 1JJV532D9DL761503 |
| P. Judge & Sons | Trailer 1JJV532D0DL761504 |
| P. Judge & Sons | Trailer 1JJV532D2DL761505 |
| P. Judge & Sons | Trailer 1JJV532D4DL761506 |
| P. Judge & Sons | Trailer 1JJV532D6DL761507 |
| P. Judge & Sons | Trailer 1JJV532D8DL761508 |
| P. Judge & Sons | Trailer 1JJV532DXDL761509 |
| P. Judge & Sons | Trailer 1JJV532D6DL761510 |
| P. Judge & Sons | Trailer 1JJV532D8DL761511 |
| P. Judge & Sons | Trailer 1JJV532DXDL761512 |
| P. Judge & Sons | Trailer 1JJV532D1DL761513 |
| P. Judge & Sons | Trailer 1GRAA062X8D433636 |
| P. Judge & Sons | Trailer 1JJV532D5GL896448 |
| P. Judge & Sons | Trailer 1JJV532D7GL896449 |
| P. Judge & Sons | Trailer 1JJV532D3GL896450 |

| | |
|---|---|
| P. Judge & Sons | Trailer 1JJV532D5GL896451 |
| P. Judge & Sons | Trailer 1JJV532D7GL896452 |
| P. Judge & Sons | Trailer 1JJV532D9GL896453 |
| P. Judge & Sons | Trailer 1JJV532D0GL896454 |
| P. Judge & Sons | Trailer 1JJV532D2GL896455 |
| P. Judge & Sons | Trailer 1JJV532D4GL896456 |
| P. Judge & Sons | Trailer 1JJV532D8GL896458 |
| P. Judge & Sons | Trailer 1JJV532DXGL896459 |
| P. Judge & Sons | Trailer 1GRDM96217H705605 |
| P. Judge & Sons | Trailer 1GRDM96237H705606 |
| P. Judge & Sons | Trailer 1JJV532D3FL836750 |
| P. Judge & Sons | Trailer 1JJV532D6FL836760 |
| P. Judge & Sons | Trailer 1JJV532D6FL836788 |
| P. Judge & Sons | Trailer 1JJV532D6FL836798 |
| P. Judge & Sons | Trailer 1JJV532D6FL836819 |
| P. Judge & Sons | Trailer 1JJV532W19L253518 |
| P. Judge & Sons | Trailer 1JJV532W69L253515 |
| P. Judge & Sons | Trailer 1JJV532D2AL340427 |
| P. Judge & Sons | Trailer 5V8VA532XAM000785 |
| P. Judge & Sons | Trailer 5V8VA5321AM000786 |
| P. Judge & Sons | Trailer 5V8VA5323AM000787 |
| P. Judge & Sons | Trailer 1JJV532D5BL393026 |
| P. Judge & Sons | Trailer 1JJV532D7BL393027 |
| P. Judge & Sons | Trailer 1JJV532D9BL393028 |
| P. Judge & Sons | Trailer 1JJV532D0BL393029 |
| P. Judge & Sons | Trailer 1JJV532D7BL393030 |
| P. Judge & Sons | Trailer 1JJV532D9BL393031 |
| P. Judge & Sons | Trailer 1JJV532D0BL393032 |
| P. Judge & Sons | Trailer 1JJV532D2BL393033 |
| P. Judge & Sons | Trailer 1JJV532D4BL393034 |
| P. Judge & Sons | Trailer 1JJV532D8BL393036 |
| P. Judge & Sons | Trailer 1JJV532DXBL393037 |
| P. Judge & Sons | Trailer 1GRAA96234B701162 |
| P. Judge & Sons | Trailer 1GRAA96274B701164 |
| P. Judge & Sons | Trailer 1JJV482W55L922206 |
| P. Judge & Sons | Trailer 1GRAA96275B705117 |
| P. Judge & Sons | Trailer 1GRAA96275B705118 |
| P. Judge & Sons | Trailer 1GRAA96275B705119 |
| P. Judge & Sons | Trailer 1GRAA96275B705121 |
| P. Judge & Sons | Chassis 5EF3GC402DB778384 |
| P. Judge & Sons | Chassis 5EF3GC404DB778385 |

| | |
|---|---|
| P. Judge & Sons | Chassis 5EF3GC406DB778386 |
| P. Judge & Sons | Chassis 5SECE45259T000027 |
| P. Judge & Sons | Chassis 5SECE45279T000028 |
| P. Judge & Sons | Chassis 5SECE45299T000029 |
| P. Judge & Sons | Tri-Axle Chassis 5EF3GC404FB783525 |
| P. Judge & Sons | Tri-Axle Chassis 5EF3GC406FB783526 |
| P. Judge & Sons | Tri-Axle Chassis 5EF3GC408FB783527 |
| P. Judge & Sons | Tri-Axle Chassis 5EF3GC40XFB783528 |
| P. Judge & Sons | Tri-Axle Chassis 5EF3GC401FB783529 |
| P. Judge & Sons | Tri-Axle Chassis 5EF3GC408FB783530 |

**<u>Exhibit A</u>**

Form of Employment Agreement

**TEMPLATE**

# EMPLOYMENT AGREEMENT

This EMPLOYMENT AGREEMENT ("**Agreement**"), dated as of ______________, 2026, and effective as of the Effective Date (as defined below), is hereby entered into by and between _______________ (the **"Company"**), and ________________ ("**Employee**").

## RECITALS

WHEREAS, pursuant to the terms of that certain Asset Purchase Agreement, dated as of [●], 2026 (the "**Purchase Agreement**"), by and among Port Elizabeth Terminal & Warehouse, Corp., a New Jersey Corporation, P. Judge & Sons, Inc., a New Jersey corporation, Amex Shipping Agent, Inc., a New Jersey corporation, The Judge Organization, LLC, a Georgia limited liability company, P. Judge & Sons Trucking, LLC, a Georgia limited liability company, and Judge Warehousing, LLC, a Georgia limited liability company (collectively, the "**Sellers**"), and the Company (the transaction contemplated by such Purchase Agreement, the "**Transaction**", and the date on which the Transaction is consummated, the "**Effective Date**"), the Company has agreed to purchase from the Sellers, and the Sellers have agreed to sell to the Company, certain of the assets used in connection with the Sellers' transportation, logistics, and warehouse-related services business;

WHEREAS, as of the Effective Date, the Company desires to employ Employee and Employee desires to accept such employment upon the terms and conditions contained in this Agreement;

WHEREAS, the Company and Employee desire to fully set forth their respective duties and obligations with respect to the Company's employment of Employee herein;

NOW, THEREFORE, for good and valuable consideration, the receipt, adequacy and sufficiency of which are hereby acknowledged by Employee and the Company, including, without limitation, the promises, covenants, representations, and warranties described herein, the parties hereto, intending to be legally bound, hereby agree as follows:

1. Term of Employment.

a. Agreement to Employ. Upon the terms and subject to the conditions of this Agreement, the Company hereby employs Employee and Employee hereby accepts such employment with the Company commencing on the Effective Date.

b. At-Will Relationship. The Company shall employ Employee at-will, as defined under applicable law, meaning that either Employee or Company may terminate Employee's employment with the Company at any time for any reason or no reason, without further obligation or liability.

c. Effect of Agreement. This Agreement is executed and delivered by the parties as of the signing date of the Purchase Agreement but shall not become effective until the Effective Date. Notwithstanding the foregoing, if the Purchase Agreement is terminated prior to the Effective Date, or if the Transaction otherwise fails to be consummated for any reason, this Agreement shall automatically become null and void ab initio, and neither party shall have any rights or obligations hereunder.

2. Duties and Responsibilities of Employee.

During the term of this Agreement, Employee shall be employed, on a full-time basis, as **[POSITION TITLE]** and in such other position or positions with the Company as the Company shall from time-to-time specify. Employee shall fulfill all of the duties and responsibilities ordinarily associated with

Employee's position as requested by the Company, as well as any other duties that may be assigned to Employee by the Company from time to time.

Notwithstanding anything herein that may be construed to the contrary, Employee understands and agrees that the Company, in its sole discretion and as deemed in the best interests of the Company, retains the right to change or modify Employee's position or title or assign to Employee other or additional duties and responsibilities. Employee further shall fulfill such modified duties and responsibilities as directed by the Company.

During the Employee's employment, Employee agrees that Employee will: (i) devote Employee's full time, attention, energy, ability, skill, and best efforts to promote the interests of the Company and its subsidiaries and affiliates (collectively, the "**Company Group**"); (ii) carry out Employee's duties in a competent and professional manner; (iii) generally promote the interests of the Company Group; and (iv) fulfill Employee's duties and responsibilities as described herein in a reasonable and appropriate manner in light of the Company Group's policies and practices, and the laws and regulations which apply to the Company Group's operation and administration. Employee acknowledges that Employee has a duty of loyalty to the Company Group and shall not, either directly or indirectly, engage in any outside business or other activity unrelated to serving the Company Group's interest, during the term of this Agreement, without the prior approval of management of the Company.

3. Compensation.

a. Base Salary. The Company shall pay Employee an annual base salary of **$_________** ("**Base Salary**"), which shall be payable in equal installments according to the Company's regular payroll practices, which is currently to pay biweekly. The Company may review Employee's Base Salary annually and may, in its discretion, change such Base Salary as it deems appropriate. The Company shall pay Employee's Base Salary in accordance with the Company's then-current payroll procedures.

b. Benefits and Perquisites.

(i) During Employee's employment with the Company, Employee shall be eligible to participate in such benefit plans as may be offered by the Company on the same terms and conditions as other employees. While the Company currently offers certain benefits described in the following subparagraph 3(b)(ii), the Company reserves the right to discontinue, change, or terminate any of its benefit plans in its sole discretion, and does not guarantee that any particular benefit, or any particular plan (including those in subparagraph 3(b)(ii)) will continue to be offered. Further, all plan terms shall control the benefits provided pursuant to each plan, and shall control over anything to the contrary herein.

(ii) Subject to subparagraph 3(b)(i) above, Employee shall be eligible for the following benefits immediately upon the inception of employment (i) the Company agrees to waive any customary waiting period for Employee to participate in medical health insurance, such that Employee may immediately obtain coverage upon selecting and enrolling in a plan according to the terms and conditions of that plan; (ii) Employee will be eligible to participate in the Company's 401(k) plan after 60 days of employment for so long as the Company offers a 401(k) plan; (iii) Employee will be eligible for Company-paid life insurance under currently-existing policies; and (iv) Employee will receive a car allowance of $________per month.

c. Paid Time Off and Holidays. During Employee's employment with the Company, Employee shall be entitled to four weeks of paid time off for each whole year of employment, which includes sick leave. This allotment shall be pro-rated for 2026. All paid time off must be applied for and taken in accordance with Company policy and applicable state law. In addition, Employee shall be eligible for any

paid holidays recognized by the Company in its discretion.

d. Business Expenses. In accordance with applicable policies and procedures of the Company, the Company shall reimburse Employee for all reasonable and necessary travel and business expenses incurred by Employee that are directly related to Employee's performance of Employee's responsibilities and duties for the Company under this Agreement and comply with the policies and procedures of the Company. Employee shall submit to the Company all expense statements and supporting documents required by the Company to justify, in reasonable detail, all expenses so incurred. The Company shall reimburse Employee for all expenses it deems reimbursable in its discretion within a reasonable period of time as determined by the Company under the circumstances or otherwise in accordance with the policies and procedures of the Company.

e. Judge Trucking Specific Bonus Plan. Within the first thirty days of employment, Employee will be offered the opportunity to enter into a bonus plan that is materially similar to the terms of the bonus plan attached hereto as **Exhibit A**.

4. Termination of Employment.

a. Termination by the Company. In the event of a termination by the Company for any reason or no reason whatsoever, including due to Cause, Employee's death, or Disability (all as defined below), the Company shall pay, to Employee or Employee's estate (as applicable), all Base Salary and other forms of compensation that accrued as of the date of Employee's termination. Employee or Employee's estate (and each of Employee's surviving beneficiaries) shall not be entitled to any other payments other than those due pursuant to any Company benefit plan in which Employee participated at the time of Employee's termination and was eligible pursuant to the terms of such benefit plan.

i. Severance. If Employee is terminated by the Company for reasons other than Employee's death, Disability, or Cause, or if Employee resigns for Good Reason, then Company shall pay Employee as severance twelve months' worth of Employee's then-effective Base Salary ("**Severance**"). Notwithstanding the foregoing, in the event Employee resigns for Good Reason and specifically due to a reduction in the Employee's salary that is not in accordance with Section 4(a)(iv)(i), the Company shall pay Employee as severance twelve months' worth of Employee's Base Salary that was in effect prior to any reduction that gave rise to Good Reason. The Severance shall be payable in equal installments on the Company's regularly scheduled paydays over a twelve-month period, with the payments to begin no later than the second regularly scheduled payday following Employee's execution and non-revocation of a general release in a form reasonably acceptable to the Company. The execution of a general release is an express condition precedent to receiving Severance. Employee must execute the release no later than sixty (60) days following the termination of Employee's employment.

ii. "**Cause**" shall mean the occurrence of one or more of the following: (i) Employee's violation of any law, which is materially or reasonably expected to be materially injurious to the operations, financial condition, or business reputation of the Company Group, including Employee's indictment for, conviction of, or plea of *nolo contendere* to, any felony, or of any other crime (including a misdemeanor) involving dishonesty, moral turpitude or illegal drugs; (ii) Employee's breach of any material provision of this Agreement; (iii) Employee's refusal to perform Employee's job duties, or to comply with the lawful directives of the Company, which has not been cured (if curable) by Employee within ten (10) days after the Company provides notice of the issue; (iv) Employee's willful dishonesty, fraud, or misconduct with respect to the business or affairs of the Company Group; (v) Employee's causing intentional and material damage to any property of the Company Group; (vi) Employee's violation of any material policy of the Company Group, such as engaging in threats, acts of violence, or unlawful discrimination, harassment, or retaliation in the workplace or in the course and scope of any

business activity on behalf of the Company Group; or (vii) conduct by Employee which demonstrates gross unfitness to serve (for example, (A) improper fraternization, flirtation and/or advances made by Employee to any Company Group personnel or any customers or prospects of the Company Group, (B) use of alcohol or drugs that interferes with Employee's job duties or compromises the integrity and reputation of the Company or any other Company Group entity, (C) unauthorized possession of weapons, firearms, ammunitions or explosives by Employee while on Company Group premises, or while rendering services on behalf of the Company Group, or (D) making malicious or derogatory statements that are reasonably likely to damage the integrity or reputation of the Company Group, its products and performance, or its officers, employees, managers, equityholders or directors).

Notwithstanding the foregoing, Employee is not prohibited from, and it shall not be grounds for "Cause" for Employee to report possible violations of law or regulation to any governmental agency or entity, including but not limited to the U.S. Equal Employment Opportunity Commission, the National Labor Relations Board, the Occupational Safety and Health Administration, the Securities and Exchange Commission, or making other disclosures that are protected under applicable whistleblower statutes, and Employee shall not be required to obtain prior authorization from the Company to make such reports or disclosures.

iii. "**Disability**" shall mean the inability of Employee to perform substantially all of Employee's job duties for a continuous period of 120 days or for a period 180 days within a one-year period due to Employee's diagnosed physical or mental health condition.

iv. "**Good Reason**" shall mean the occurrence of the following without the Employee's written consent: (i) a reduction in Employee's base salary, unless such reduction is part of an across-the-board reduction for other similarly situated employees due to financial hardship of the company; (ii) the Company's requirement that Employee permanently relocate to any office or location that results in an increase of 25 miles or more in Employee's daily commute; provided, however, that to be able to exercise a right to terminate employment for Good Reason, the Employee must first provide written notice to the Company (or its successor) within thirty (30) days following the initial existence of the condition, describing the existence of the condition, and the Company will thereafter have the right to remedy the condition within ten (10) days of the date the Company received the written notice from Employee. If the Company remedies the condition within the ten (10) day cure period, then no Good Reason shall be deemed to exist with respect to that condition. If the Company does not remedy the condition within the ten (10) day cure period, then the Employee must deliver a Notice of Termination for Good Reason to the Company within 20 days of the end of the cure period in order to resign for Good Reason.

b. <u>Resignation by Employee</u>. Employee may terminate Employee's employment either for Good Reason as stated above or without Good Reason. A resignation without Good Reason shall be given by tendering the Company no less than thirty (30) days' notice (the **"Resignation Period"**) in the manner provided herein. However, the Company may still terminate Employee's employment during the notice period in its discretion for Cause (if Cause exists) or without Cause. Upon resignation without Good Reason, Employee shall be entitled only to Employee's Base Salary through the date of termination and shall not be entitled to any other payments (including Severance), other than those due pursuant to any Company benefit plan in which Employee is participating and remains eligible as of the time of termination.

c. <u>Early Termination of the Employment Term</u>. The employment period shall end upon the *earliest* of termination by the Company or the resignation by the Employee.

5. <u>Employee Covenants</u>.

**TEMPLATE**

a. Definitions. For the specific purpose of the covenants contained in this Paragraph and for all other purposes under this Agreement, certain terms are defined as follows:

(1) "**Business**" means the transportation, logistics, and warehousing businesses, including specifically, customs exam services, temperature-controlled logistics, non-temperature controlled logistics, life science logistics, food and beverage logistics, port-focused services, co-packing, labeling, cross-dock, transloading, indoor rail-siding, drayage regional distribution, over-the-road trucking, freight brokerage, last mile delivery, and any other line of business of which Employee has actual knowledge that the Company or any member of the Company Group is engaging in, or has active plans to engage in, within the last two (2) years of Employee's employment.

(2) "**Competing Business**" means any person, business or subdivision of a business which substantially engages in the Business, or which is actively planning to engage in the Business.

(3) **"Confidential Information"** shall mean, collectively, all **"Proprietary Information"** and **"Trade Secrets"** of the Company.

(4) "**Material Communications**" means contact in person, by telephone, or by paper or electronic correspondence in furtherance of the business interests of the Company during the last twenty-four (24) months of Employee's employment with the Company.

(5) **"Proprietary Information"** shall mean all data, formulae, processes, procedures, methods, documentation, information, records, drawings, designs, specifications, test results, evaluations, know-how, material directly related to sales processes, information risk management, tests or assays, business, assets, products, or prospects related to the Company Group's business, which is communicated to, supplied to, or observed by Employee, either directly or indirectly, at any time during the employment relationship, whether or not received from the Company Group or from any actual or potential customer or client of the Company Group, or from any person with a business relationship, whether contractual or otherwise, with the Company Group. The term **"Proprietary Information"** shall not include any information that Employee can prove: (a) was known or independently developed by Employee prior to the time of receipt from the Company Group, as long as such information was not acquired, either directly or indirectly, from the Company Group; (b) is or becomes publicly known through no direct or indirect act, fault, or omission of Employee; (c) is or becomes part of the public domain through no direct or indirect act, fault or omission of Employee; or (d) was received by Employee from a third party having the legal right to transmit the same without restriction as to use and disclosure and such receipt was not in connection with any business relationship or prospective business relationship with the Company Group; provided, however, that a combination of features shall not be deemed to be within the foregoing exceptions merely because individual features are in the public domain or otherwise within such exceptions, as previously described, unless the combination itself is in the public domain or otherwise entirely within any one such exception. For clarity, all assets purchased by the Company through the Transaction shall be deemed Proprietary Information of the Company.

(6) "**Restricted Period**" means the period beginning on the Effective Date and ending twelve (12) months after Employee's employment with the Company ends for any reason.

(7) "**Restricted Territory**" means Arizona, Georgia, Maryland, New Jersey, New York, Pennsylvania, South Carolina, Texas, and each state of the United States in Employee has conducted business on behalf of the Company or any of its subsidiaries or affiliates within the last two years of Employee's employment, in each case as of the date of Employee's termination of employment or at any time during the twenty-four (24) month period immediately preceding such termination.

**TEMPLATE**

(8) **"Trade Secrets"** shall mean information not generally known about the Business which is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality and from which the Company Group derives economic value from the fact that the information is not generally known to other persons who can obtain economic value from its disclosure or use, and shall include any and all Proprietary Information which may be protected as a trade secret under any applicable law, even if not specifically designated as such. Unless told otherwise, Employee shall treat all Proprietary Information as Trade Secrets. Trade Secrets may include, but are not limited to, technical or non-technical data, compilations, programs and methods, techniques, drawings, processes, financial data, lists of actual customers and potential customers, customer route books, cards or lists containing the names, addresses, habits, and business locations of past, present, and prospective customers, sales reports, price lists, product formulae, methods, and procedures relating to services.

b. Acknowledgments. Employee acknowledges that: (1) the Company has expended and will continue to expend substantial time, money, effort, and other resources to develop its goodwill, clients, business sources, and relationships; (2) the Company Group has a legitimate business interest in protecting the same; (3) in connection with Employee's employment by the Company, the Company may introduce Employee to its customers, business sources, and relationships and has expended and will expend considerable time, effort, and capital to train Employee in the Company's business; (4) by virtue of Employee's employment with the Company, Employee may have contact with certain of the Company Group's customers and business sources and relationships; (5) in Employee's capacity, Employee may be privy to certain Confidential Information, Proprietary Information, and Trade Secrets not generally known or available to the Company Group's competitors or the general public; (6) the nature and periods of the restrictions imposed by the covenants contained in this Paragraph 5 are fair, reasonable, and necessary to protect and preserve for the Company Group the benefits of Employee's employment hereunder and that such restrictions will not prevent Employee from earning a livelihood; and (7) the Company Group would sustain great and irreparable loss and damage if Employee were in any manner to breach any of such covenants.

c. Protection of Confidential Information. Having acknowledged the foregoing, Employee covenants and agrees that all Confidential Information (including all Proprietary Information and Trade Secrets) and all physical embodiments thereof received or developed by Employee or disclosed to Employee while employed by the Company is confidential and is and will remain the sole and exclusive property of the Company and/or Company Group. Employee further covenants and agrees that while Employee is in the Company's employ and during the Restricted Period, Employee will hold all Proprietary Information in trust and in the strictest confidence, and will not use, reproduce, distribute, disclose, or otherwise disseminate the Proprietary Information or any physical embodiments thereof except to the extent necessary to perform the duties assigned to Employee by the Company, and in no event shall Employee take any action causing or fail to take the action necessary in order to prevent any Proprietary Information disclosed to or developed by Employee to lose its character or cease to qualify as Proprietary Information. Notwithstanding anything contained herein to the contrary, this covenant shall not limit in any manner the protection of the Company and/or Company Group's Trade Secrets otherwise afforded by law. Furthermore, the disclosure of Trade Secrets by Employee is prohibited for the life of Employee, or until the Trade Secret information becomes publicly available through no direct or indirect fault or act of Employee.

d. Protection of Company Property. Having acknowledged the foregoing, the physical embodiment of Employee's work relating to the Business, including all writings, records, notes, files, data, memoranda, reports, price lists, devices, client lists, drawings, plans, sketches, documents, equipment, apparatus, physical manifestations of programs and like items, and all copies thereof, and all Confidential Information prepared by Employee or which is disclosed to, or comes into the possession of, Employee, shall remain the sole and exclusive property of the Company. Employee covenants and agrees that, at any time upon request from the Company and/or Company Group, Employee shall promptly deliver

to the Company the originals and all copies of any of the foregoing Confidential Information in Employee's possession, custody, or control, and any other property belonging to the Company or Company Group, together with a written statement certifying Employee's compliance with the foregoing. Employee further covenants and agrees to return all Company property, including, but not limited to, Confidential Information, to the Company immediately upon Company's request and/or at termination of Employee's employment, together with a written statement certifying Employee's compliance with the foregoing.

e. Protection of Computer Files and Systems. Employee acknowledges and agrees that the Company has a critical business interest in maintaining complete control and access to its various computer systems. In view of this interest, Employee covenants and agrees that Employee shall have no right to privacy as to any personal information that Employee inputs or otherwise causes to become a part of such systems, including any personal computer or laptop computer made available to Employee. Furthermore, the Company shall be entitled, in the exercise of its sole discretion, to delete, erase, and/or destroy any and all such information that Employee may input or cause to become a part of the Company's computer systems.

f. Noncompetition. Employee agrees that during the Restricted Period and within the Restricted Territory, Employee shall not, directly or indirectly, whether on Employee's own behalf or on behalf of any other person or entity, perform services on behalf of a Competing Business that are the same as or similar to the types of services Employee conducted, authorized, offered or provided to the Company during the last twenty-four (24) months of Employee's employment with the Company; provided, however, that nothing herein shall prohibit Employee from, directly or indirectly, owning, as a passive investment, two percent (2%) or less of the equity securities of any entity whose securities are listed on any national securities exchange, so long as Employee has no other business relationship with the issuer of such securities.

g. Non-solicitation of Business Relations. Employee agrees that during the Restricted Period, Employee shall not, directly or indirectly, whether on Employee's own behalf or on behalf of any other person or entity, (i) solicit, call, or service, or attempt to solicit, call, or service any actual or prospective customer of the Company with whom Employee had Material Communications for the purpose of offering or providing services for a Competing Business, or (ii) interfere or attempt to interfere with the business relationship between the Company and its customers, referral partners, contractors, consultants, suppliers, vendors or other business relations with whom Employee had Material Communications, including, but not limited to, inducing or attempting to induce any such customer, referral partner, contractor, consultant, supplier, vendor or other business relation to terminate, cancel, withdraw from, reduce, diminish or limit its business relationship with the Company; *provided, however*, that general advertisements not specifically targeted at the Company's customers or business relations shall not be deemed to violate this Paragraph 5(g).

h. Non-solicitation of Employees and Independent Contractors. Employee agrees that during the Restricted Period, Employee shall not, directly or indirectly, whether on Employee's own behalf or on behalf of any other person or entity, solicit, recruit or induce, or attempt to solicit, recruit or induce, any employee or independent contractor of the Company with whom Employee had Material Communications to terminate or lessen such employment or independent contractor relationship with the Company; provided, however, that general solicitations of employment not targeted at any such employee or independent contractor (or group thereof) shall not be deemed to violate this Paragraph 5(h).

6. Legal Remedies.

a. Employee acknowledges and agrees that by virtue of the duties and responsibilities attendant to Employee's employment by the Company, Employee has special knowledge of the business,

clients, and operations of the Company. Accordingly, as a consequence of Employee's employment, the Company will suffer irreparable loss and damage if Employee should breach or violate any of the covenants and agreements contained in this Agreement. Employee further acknowledges and agrees that each of the covenants in Paragraph 5 is reasonably necessary to protect and preserve the Company's business and assets, including, but not limited to, its and their goodwill and Confidential Information. Employee therefore agrees and consents that, in addition to any other remedies available to the Company, the Company shall be entitled to a judicial injunction to prevent a breach or contemplated breach by Employee of any of the covenants or agreements contained in Paragraph 5. Nothing contained in this Agreement shall limit, abridge, or modify the rights of the parties under any applicable trade secret, trademark, copyright, patent, or unfair competition law. Any rights created by this Agreement shall be in addition to, and not in lieu of, any other remedies that may exist under any applicable law.

b. Attorneys' Fees and Costs. The parties to this Agreement acknowledge that if an action is brought to enforce any term, condition, right, or obligation provided in this Agreement, each party shall bear its own attorneys' fees and expenses, regardless of which party prevails in the action, and in no event shall either party shift its attorneys' fees and expenses to the other.

7. Miscellaneous.

a. Assignment. This Agreement is not assignable or delegable, in whole or in part, by Employee without the prior written consent of the Company. Notwithstanding the foregoing, the covenants of Employee contained in this Agreement shall be binding upon Employee's heirs and legal representatives and shall survive the termination of this Agreement. The rights and obligations of the Company under this Agreement shall inure to the benefit of, and shall be binding upon, the successors and assigns of the Company. Furthermore, the Company shall have the right to assign this Agreement to its successors and assigns, and all covenants herein shall inure to the benefit of, and be enforceable by, said successors and assigns.

b. Counterparts. This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original, but all of which together will constitute one and the same Agreement.

c. Waiver. The waiver by one party of a breach of any provision of this Agreement by the other party shall not operate or be construed as a waiver of any subsequent breach of the same or any other provision by the other party. The failure of a party at any time to require performance of any provision hereof shall in no manner affect its right at a later time to enforce the same.

d. Severability. If any provision of this Agreement or the application of any provision hereof to any person or circumstance is held invalid, unenforceable or otherwise illegal, the remainder of this Agreement and the application of such provision to any other person or circumstance shall not be affected, and the provision so held to be invalid, unenforceable or otherwise illegal shall be reformed to the extent (and only to the extent) necessary to make it valid, enforceable, and legal; provided, however, if the provision so held to be invalid, unenforceable, or otherwise illegal cannot be reformed so as to be valid and enforceable, then it shall be severed from, and shall not affect the enforceability of, the remaining provisions of the Agreement.

e. Choice of Law. This Agreement shall be interpreted under the laws of the State in which Employee primarily resides and performs services for the Company as of the date of this Agreement, without regard to conflict of law principles. Notwithstanding the foregoing, nothing in this Agreement shall be construed to waive, limit, or preempt any employment protections mandated by the law of the state in which Employee primarily resides and performs services, including, without limitation,

wage and hour law, restrictive covenant statutes, and anti-retaliation and whistleblower protections of that state.

f. Entire Agreement. This Agreement supersedes all other agreements, oral or written, between the parties with respect to the subject matter hereof, and contains all of the agreements and understandings between the parties with respect to the employment of Employee by the Company. There are no promises, representations, inducements, or statements between the parties other than those that are expressly contained herein. Employee acknowledges that Employee is entering into this Agreement of Employee's own free will and accord, and with no duress, that Employee has read this Agreement and understands its legal consequences. No parol evidence or other evidence may be admitted to alter, modify, or construe this Agreement, which may be changed only by a writing signed by the parties hereto. Furthermore, any waiver or modification of any term of this Agreement shall be effective only if it is set forth in writing and signed by all parties hereto.

g. Independent Counsel. The Company hereby notifies Employee that Employee has the right to consult with counsel prior to signing this Agreement, and Employee understands that Employee has the right to consult with counsel before signing this Agreement. If Employee signs this Agreement without consulting counsel, Employee did so voluntarily and understands that Employee had the opportunity to consult with counsel before signing.

IN WITNESS WHEREOF, the Company has caused this Agreement to be executed by its duly authorized officer and Employee has hereunto set Employee's hand as of the day and year first above written.

**EMPLOYEE:**

________________________________________

**COMPANY:**

________________________________________

By: ______________________________________

Its: ______________________________________

**Exhibit B**

Interim Management Agreement

**INTERIM MANAGEMENT AGREEMENT**

This INTERIM MANAGEMENT AGREEMENT (this "Agreement"), dated as of [●], 2026 (the "Effective Date"), is entered into by and between Port Elizabeth Terminal & Warehouse, Corp., a New Jersey corporation ("Port Elizabeth"), The Judge Organization, LLC, a Georgia limited liability company ("Judge Organization"), Judge Warehousing, LLC, a Georgia limited liability company ("Judge Warehousing" and together with Port Elizabeth and Judge Organization, "Owner"), and East Coast Warehouse and Distribution Corp., a New Jersey corporation, and its designees ("Manager"). Owner and Manager are sometimes individually referred to in this Agreement as a "Party" and collectively as the "Parties." All capitalized terms not otherwise defined herein have the meaning set forth in the Asset Purchase Agreement (as defined below).

WHEREAS, effective as of the Effective Date, Manager has acquired the Acquired Assets pursuant to that certain Asset Purchase Agreement dated as of August ___, 2026 by and among Port Elizabeth, P. Judge & Sons, Inc., a New Jersey corporation, Amex Shipping Agent, Inc., a New Jersey corporation, P. Judge & Sons Trucking, LLC, a Georgia limited liability company, Judge Warehousing and Judge Organization (collectively, the "Sellers"), and Manager (the "Asset Purchase Agreement"). The Asset Purchase Agreement and this Agreement were approved by Order of the United States Bankruptcy Court for the District of New Jersey (the "Bankruptcy Court") that was entered in Sellers' jointly administered chapter 11 bankruptcy cases on or about [●] (the "Sale Order"). Pursuant to the Sale Order, on the Effective Date, Manager has purchased from Sellers out of bankruptcy free and clear of all liens, claims, interests, and encumbrances, and now owns, the Acquired Assets, including those Acquired Assets located at the facilities under the Jersey City Lease and the Levittown Lease (each, a "Facility" and collectively, the "Facilities") and further obtained the right to possess and operate of the Acquired Assets at the Facilities.

WHEREAS, each Facility requires the use of an Alcohol License in order to operate certain aspects of the Business at each such Facility.

WHEREAS, Owner and Manager want the operation of each of the Facilities to continue without interruption until Manager, with respect to each such Facility, obtains from the relevant Governmental Body the applicable Alcohol License at each such Facility in its name either through transfer or initial application.

NOW, THEREFORE, for and in consideration of the sum of Ten Dollars ($10.00) paid in hand, and other good and valuable consideration as provided herein and in the Asset Purchase Agreement, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto agree as follows.

1. The "Term" will commence on the Effective Date and will terminate for each Facility, upon the earliest of (a) Manager's receipt via transfer from Owner or through initial application for license issuance from the pertinent state and/or local regulatory authority(ies) of the applicable Alcohol License, or (b) five (5) days after the date that Owner receives written notice of termination from Manager.

2. During the Term, Owner will remain as the holder of the Alcohol Licenses for the Facilities. In accordance with the terms of the Sale Order, Manager is hereby granted a license to utilize the Alcohol Licenses solely for the purpose of operating the Business at the Facilities during the Term. Owner hereby appoints Manager as its agent to manage, control, and operate all portions of the Business at the Facility.

To the extent Owner is required to take any action in its capacity as holder of the Alcohol Licenses to maintain such licenses in effect, Owner, subject to receiving funding from Manager to take any such action(s), shall do so promptly and in accordance with Manager's reasonable directions; provided, that Owner shall have no operational discretion with respect to the Business and shall not interfere with Manager's operation of the Business. Pursuant to its appointment as Owner's agent, Manager will be entitled to take any and all action on behalf of Owner hereunder, including opening of any bank accounts in the name of Manager and to collect and to retain all revenues generated by the Business at the Facilities during the Term, and will be solely responsible for and obligated to pay all costs, expenses, liabilities, and obligations, pursuant to this Agreement and in accordance with the Asset Purchase Agreement arising out of, related to, or associated with the Business at the Facilities during the Term. Notwithstanding anything contained herein to the contrary, all employees necessary for the operation of the Facilities will be provided by and employed by Manager, and Owner will have no duty or authority to take action as an employer with respect to any such employee or to enter into any contract on behalf of Owner, without Manager's prior written consent.

3. For valuable consideration received, Owner and Manager covenant and agree as follows, which covenants and agreements will survive the termination of this Agreement:

a. Neither Party will have any duties or responsibilities under this Agreement other than those specified herein and no implied obligations will be read into this Agreement;

b. Neither Manager, nor any of its Affiliates, employees, officers, directors, managers, members, representatives, agents, attorneys, direct or indirect equity holders, successors, predecessors or assigns, will be liable to Owner for, and Owner releases and forever discharges Manager and its Affiliates, employees, officers, directors, managers, members, representatives, agents, attorneys, direct or indirect equity holders, successors, predecessors and assigns from, any and all claims, liabilities, actions, suits, judgments, losses, injuries, damages, costs and expenses arising out of or connected with any act or omission of Manager or its Affiliates, employees, officers, directors, managers, members, representatives, agents, attorneys, direct or indirect equity holders, successors, predecessors and assigns pursuant to this Agreement or with respect to the performance of Manager's obligations under this Agreement, except for claims arising out of such person's breach of this Agreement, gross negligence, fraud, or willful misconduct;

c. Other than with respect to the gross negligence, fraud or willful misconduct of Owner Indemnified Parties (as defined below), Manager agrees to indemnify, defend and hold harmless and discharges Owner and its Affiliates, employees, officers, directors, members, representatives, agents, attorneys, direct or indirect equity holders, successors, predecessors and assigns (collectively, the "Owner Indemnified Parties") from and against any and all claims, actions, demands, judgments, losses, costs, expenses, damages and liabilities (including attorneys' fees and other expenses of litigation) arising out of or resulting from any Assumed Liabilities or from performance by Owner of its obligations under this Agreement at Manager's direction.

d. For the avoidance of doubt, during the Term, all services rendered with respect to the operation of the Facilities will be in the name of Manager; and

e. Nothing in this Agreement or the Asset Purchase Agreement will be deemed to be a transfer of any Alcohol Licenses unless and until such transfer is duly approved by all applicable Governmental Bodies having applicable licensing authority, and each Alcohol License is issued in the name of Manager or its designee. Owner shall maintain each Alcohol License in full force and effect during the Term and shall not take any action, or fail to take any action, that would cause any Alcohol License to be suspended, revoked, or otherwise impaired. In furtherance of the previous sentence, Owner hereby covenants to maintain each Owner entity in good standing under the laws of its jurisdiction of organization and not to dissolve any such entity during the Term. Manager shall : (i) pay directly for all applicable annual license fees and/or license renewal fees due to the licensing authorities as of and after the Effective Date in connection with the maintenance of each Alcohol License; and (ii) provide all funds necessary to maintain each Alcohol License in full force and effect; provided, however, that Owner shall be solely responsible for maintaining any surety bonds or other financial assurances posted with any licensing authority in connection with the Alcohol Licenses during the Term, and Manager shall have no obligation to reimburse Owner for, or otherwise bear the cost of, any such bonds or financial assurances until such time as the Alcohol Licenses are transferred to and issued in the name of Manager. If before the issuance of all Alcohol Licenses, one or more of the Alcohol Licenses are required to be renewed or otherwise request or require action by Owner, the licensee or permittee of record to fulfill any administrative, financial or legal responsibility associated with said Alcohol License(s), Owner shall promptly notify manager in writing of such renewal or requested or required action, and cooperate in a commercially reasonable manner with and facilitate the filing of state and/or local license renewal applications of any such Alcohol License in each case, as reasonably instructed and funded by Manager so as to secure the continued ability to operate the Business at the Facilities to the extent allowed by applicable Law; provided, however, that Manager shall directly pay any license fees and expenses required to be paid as part of such renewals or actions. If Owner's breach of its obligations under this Section 3(e) results in the suspension, revocation, or impairment of any Alcohol License, Owner shall be liable to Manager for all damages, losses, costs, and expenses (including lost profits and attorneys' fees) incurred by Manager as a result thereof. The determination of any such asserted breach under this Section 3(e) and resulting damages, if any, shall be determined by the Bankruptcy Court.

4. All equipment, facilities and personal property necessary for operating the Facilities will be maintained by Manager, and will be insured at Manager's discretion during the term of this Agreement for the benefit of Manager in accordance with this Agreement and the Asset Purchase Agreement (all such costs with respect to such insurance (including any premiums) to be paid for by Manager). Manager shall maintain all such insurance required to enable Owner to maintain the Alcohol Licenses; provided, however, that Manager shall not be required to maintain insurance in scope or size larger than that maintained by Owner prior to the Closing.

5. In the event that either Party violates: (a) any provision of this Agreement other than those related to Legal Requirements (as defined below) and such violation remains uncured for five (5) Business Days after written notice thereof to the violating Party, or (b) any final and nonappealable determination of violation of a Legal Requirement, the non-violating Party will have the right to terminate this Agreement immediately upon written notice to the violating Party. Upon issuance to Manager of the Alcohol Licenses, Owner will (1) deliver promptly the original Alcohol Licenses, as the case may be, for such Facility to Manager or to the pertinent Governmental Body, (2) notify the pertinent Governmental Body that it is

surrendering the original Alcohol License(s), and desires that they be canceled, and (3) take such other action with respect to the pertinent Governmental Body that is required to effect and confirm the cancellation of the original Alcohol License(s). "Legal Requirements" will mean and include all those Laws applicable to maintaining each relevant Alcohol License and obtaining its respective Alcohol License.

6. Time is of the essence in this Agreement. Manager shall work diligently to obtain the Alcohol Licenses at the Facilities in its name, and Owner agrees to cooperate in good faith with Manager at Manager's sole cost and as reasonably may be necessary. Manager shall email Owner's representative, Joe Compitello at joscompitello@gmail.com, with weekly written updates regarding its efforts to obtain approval for the transfer or issuance of the Alcohol Licenses to Manager.

7. This Agreement shall be binding upon and shall inure to the benefit of the Parties and their respective permitted successors and assigns. This Agreement shall not be assignable (nor shall this Agreement be transferred by operation of law or otherwise) without the prior written consent of the other Party hereto, but such consent shall not be unreasonably withheld or conditioned. Notwithstanding the foregoing, Manager may assign this Agreement to any Affiliate, whether by operation of law or otherwise, though in such event Manager shall remain fully liable for all of its obligations hereunder.

8. This Agreement shall be governed by the laws of the State of New Jersey, without regard to the principles thereof relating to conflict of laws. The Parties agree that irreparable damage would occur if any material provision of this Agreement were not performed in accordance with the terms hereof and that the Parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy to which they are entitled at law or in equity. Any action or proceeding for any such remedy shall be brought in the Bankruptcy Court, and each Party waives (i) any objection that it may have to the venue of any such action or proceeding, and (ii) any requirement for the securing or posting of any bond in connection with any such remedy.

9. All notices, requests, demands, claims or other communications hereunder will be in writing and shall be deemed duly given if delivered in accordance with Section 9.7 of the Asset Purchase Agreement.

10. Miscellaneous.

(a) No course of dealing, and no failure of Manager or Owner to insist upon strict performance of any of the terms, conditions, and covenants herein, shall be deemed a waiver of (i) any rights or remedies that such Party may have hereunder, or (ii) any subsequent breach of the terms, conditions, and covenants herein contained. No waiver of Manager or Owner of any rights it or they may have hereunder shall be deemed to have occurred except as expressly provided in this Agreement or in a writing signed by an authorized officer of the Party to be charged.

(b) The headings contained in this Agreement are for the convenience of the Parties only and shall not affect in any way the meaning or interpretation of this Agreement unless the context clearly and unambiguously requires otherwise.

(c) This Agreement may not be amended except by a writing signed by an authorized officer of the Party to be charged.

(d) The Parties agree that all Parties participated in the preparation and negotiation of this Agreement and the agreements contemplated hereby, and that neither this Agreement nor any of the agreements contemplated hereby shall be construed against any Party by virtue of the fact that any Party prepared or drafted such agreements.

(e) Any accounting terms used herein and not expressly defined herein shall have the meanings given to them under United States Generally Accepted Accounting Principles, consistently applied.

(f) This Agreement (including all agreements and other documents referenced herein) constitutes the entire agreement among the Parties with respect to the subject matter hereof and supersedes any prior understandings or agreements, written or oral, that relate to the subject matter hereof.

(g) Unless the context of this Agreement clearly requires otherwise, (i) words of any gender include each other gender; (ii) words using the singular or plural number also include the plural or singular number, respectively; (iii) the terms "hereof," "herein," "hereby" and derivative or similar words refer to this entire Agreement; (iv) the term "Section" refers to the specified Section of this Agreement; (v) the term "other Party" refers to Manager, on the one hand, and Owner, on the other; and (vi) the phrases "include" and "including" shall mean "include without limitation" and "including without limitation".

(h) Except as otherwise expressly stated herein, nothing in this Agreement is intended to create any rights in or benefits for any Party other than Manager and Owner and their respective Affiliates.

(i) This Agreement may be executed in several counterparts, each of which shall be an original and all of which shall constitute one and the same Agreement. Signature pages exchanged by fax/telecopier or other electronic transmission shall be fully binding.

(j) This Agreement shall be interpreted in conjunction with the Asset Purchase Agreement and any other documents and instruments referenced therein. However, to the extent of any clear and irresolvable conflict between the terms of this Agreement and the terms of the Asset Purchase Agreement and any other documents and instruments referenced therein, the terms of this Agreement shall govern.

(k) The Parties to this Agreement will execute and deliver, or cause to be executed and delivered, such additional or further instruments as either Party or its counsel may reasonably request for the purpose of carrying out the transactions contemplated by this Agreement.

(l) Notwithstanding any other agreement the Parties have entered into (including those agreements entered into contemporaneously with this Agreement), the Parties' relationship to each other with respect to any and all matters addressed or covered by this Agreement shall for all purposes be one of independent contractors. Nothing in this Agreement or any other agreement between the Parties shall be interpreted as making any Party the partner, joint venturer, employee or agent of the other with respect to any and all matters addressed or covered by this Agreement. It is agreed and understood that the Parties have no special relationship to each other (either fiduciary, confidential—except as expressly set forth herein—or other) under this Agreement, and no Party shall have any special duty or obligation to the other except as expressly set forth in this Agreement. Except as otherwise expressly contemplated hereby, no Party shall have the authority to assume or create any liability or obligation, express or implied, on behalf of, or bind in any manner, any other Party without such other Party's express prior written consent.

*[Signatures on the following page]*


**Error! Unknown document property name.**

IN WITNESS WHEREOF, the Parties have duly executed this Agreement as of the Effective Date.

**OWNER:**

**Port Elizabeth Terminal & Warehouse, Corp.**

By: ______________________________

Name: ______________________________

Title: ______________________________

**The Judge Organization, LLC**

By: ______________________________

Name: ______________________________

Title: ______________________________

**Judge Warehousing, LLC**

By: ______________________________

Name: ______________________________

Title: ______________________________

**MANAGER:**

**East Coast Warehouse and Distribution Corp.**

By: ______________________________

Name: ______________________________

Title: ______________________________

*[Signature Page to Interim Management Agreement]*


**Error! Unknown document property name.**

STANDARD ESCROW AGREEMENT

This Escrow Agreement dated as of this 26th day of August, 2026 (the "Escrow Agreement"), is entered into by and among The Fiduciary Valet Corp., a Florida corporation (the "Escrow Agent"), East Coast Warehouse and Distribution Corp., a New Jersey corporation (the "Depositor"), and Port Elizabeth Terminal & Warehouse, Corp., a New Jersey Corporation, P. Judge & Sons, Inc., a New Jersey corporation, Amex Shipping Agent, Inc., a New Jersey corporation, The Judge Organization, LLC, a Georgia limited liability company, P. Judge & Sons Trucking, LLC, a Georgia limited liability company, and Judge Warehousing, LLC, a Georgia limited liability company (collectively, the "Debtor").

RECITALS

WHEREAS, on November 14, 2025, Debtor each commenced a voluntary case (collectively, the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of New Jersey (the "Court") jointly administered as Case No. 25-22123 (JKS);

WHEREAS, the Debtor contemplates the filing of a *Motion for Entry of Order (I) Authorizing and Approving Bidding Procedures for the Sale of All or Substantially All of the Debtors' Assets, (II) Approving Bid Protections, (III) Scheduling an Auction and a Sale Hearing (IV) Approving the Form and Manner of Notice Thereof, and (V) Establishing Notice and Procedures for Assumption and Assignment of Certain Executory Contracts and Leases* (the "Bidding Procedures Motion"), pursuant to which the Debtor, among other things, will seek approval of certain procedures (the "Bidding Procedures") to be followed in connection with one or more sales of the Debtor's assets (each, a "Sale");

WHEREAS, pursuant to the Bid Procedures, interested bidders will be required to make deposits in order to submit bids for the Debtor's assets;

WHEREAS, the Debtor and Depositor seek to establish one or more bank accounts at the Depository Bank (as defined below) (each, an "Account" and collectively, the "Accounts") for the purpose of receiving deposits and/or other Sale proceeds (the "Funds") from the Depositor, and distributing such deposits and proceeds in accordance with and pursuant to the Bidding Procedures and any order approving same;

WHEREAS, the Debtor shall designate in writing one person ("Representative") who shall initially be Patrick Wynne, to authorize, direct and instruct the Escrow Agent on behalf of the Debtor with respect to any deposits, transfers, payments or withdrawals with respect to the Accounts and the Funds (the "Representative");

WHEREAS, the Escrow Agent shall take such actions, directions and instructions which it is authorized to do by the Representative and the Depositor Representative with respect to the Accounts and the Funds;

WHEREAS, the Debtor and Depositor desire to engage the services of the Escrow Agent for the purpose of holding the Funds in escrow in connection with the transactions associated with certain funds or assets from the bankruptcy estate of the Debtor;

WHEREAS, the Escrow Agent is willing to act as Escrow Agent subject to and upon the

terms and conditions set forth in this Escrow Agreement; and

WHEREAS, the Debtor, Depositor and the Escrow Agent have entered into this Escrow Agreement in order to set forth the conditions upon which, and the manner in which, Funds will be held in escrow and thereafter disbursed by the Escrow Agent.

NOW, THEREFORE, in consideration of the foregoing and the mutual covenants set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Debtor, the Depositor, and the Escrow Agent agree as follows:

## ARTICLE 1
## ESCROW DEPOSIT

1.1 Appointment as Escrow Agent. Debtor and Depositor hereby designate and appoint Escrow Agent as the escrow agent under this Escrow Agreement. Escrow Agent hereby accepts such designation and appointment and agrees to carry out the duties of escrow agent pursuant to the terms and provisions of this Escrow Agreement.

1.2 Deposit of Escrow Funds. Following execution hereof, Escrow Agent is authorized to establish one or more escrow accounts to hold the funds with respect to the Debtor and Depositor (the “Escrow Account(s)”). Each Escrow Account shall be established at Western Alliance Bank (the “Depository Bank”) and shall at all times be insured by the Federal Deposit Insurance Corporation (“FDIC”) to the maximum extent available. The Escrow Agent shall not co-mingle the Escrow Funds with any other funds held by the Escrow Agent or any other party. Following establishment of the Escrow Account(s), the Escrow Agent shall promptly provide the Depositor with the account number and other identifying information for each Escrow Account, and the Depositor shall have the right, at any time and from time to time, to independently verify the status of the Escrow Account(s) directly with the Depository Bank. Following establishment of the Escrow Account(s), Depositor shall deliver (or cause to be delivered) certain funds to the Escrow Agent to be deposited in the Escrow Account(s) (the “Escrow Amount”), and shall include written instructions to Escrow Agent with all pertinent and advisable information relating to the certain funds to be deposited in the Escrow Account(s) (including the applicable Depositor for the funds) and from which Escrow Agent shall invest and reinvest the Escrow Amount and all interest or other income thereof (the “Escrow Funds”) in non-interest-bearing demand deposit accounts at the Depository Bank. No other investment of the Escrow Funds will be permitted during the term of this Escrow Agreement.

1.3 Disbursements from Escrow Account. The Escrow Agent shall continue to hold the Escrow Funds in escrow in accordance with and subject to this Escrow Agreement from the date of its receipt of the Escrow Funds until the Escrow Agent receives joint written authorization and instruction from the Representative, and a person authorized by the Depositor (the “Depositor Representative”) of the applicable Funds, directing the disbursement of the Escrow Funds. Notwithstanding anything to the contrary herein, any instructions in any way related to the transfer or distribution of the Escrow Funds, must, in order to be deemed delivered and effective, be in writing and executed by Representative on behalf of the Debtor and the Depositor Representative. Under no circumstances shall the Escrow Agent have the right to unilaterally withdraw, transfer, or disburse any Escrow Funds, or to permit any other party to withdraw, transfer, or disburse any Escrow Funds, without the prior joint written authorization of both the Representative and the Depositor Representative, except as may be required by a final, non-appealable order of a court of competent jurisdiction.

1.4 Income Tax Allocation and Reporting. To the extent necessary or advisable, Debtor agrees to cause an IRS Form W-9 to be delivered to Escrow Agent. Debtor and Escrow Agent agree that for tax reporting purposes, all interest and other income as of the end of each calendar year and to the extent required by the Internal Revenue Service, be allocated for U.S. federal income tax purposes and to the extent required by law, reported, by Escrow Agent to the IRS, or any other taxing authority, on IRS Form 1099 or 1042/1042-S (or other appropriate form) as income earned from the Escrow Amount, allocated to the Debtor, whether or not such income was disbursed during such calendar year. Any taxes arising out of income allocated to the Debtor per this paragraph shall be paid by the Debtor.

1.5 Termination. When all of the Escrow Funds in the Escrow Accounts have been disbursed in full in accordance with Section 1.3 herein, this Escrow Agreement shall be deemed terminated.

## ARTICLE 2
## DUTIES OF THE ESCROW AGENT

2.1 Scope of Responsibility. Notwithstanding any provision to the contrary, the Escrow Agent is obligated only to perform the duties specifically set forth in this Escrow Agreement, which shall be deemed purely ministerial in nature. Under no circumstance will the Escrow Agent be deemed to be a fiduciary to Debtor, the Depositor, or any other person under this Escrow Agreement. The Escrow Agent will not be responsible or liable for the failure of Debtor and/or the Depositor to perform in accordance with this Escrow Agreement. References in this Escrow Agreement to any other agreement, instrument, or document that are not attached as exhibits to this Escrow Agreement and acknowledged by Escrow Agent are for the convenience of the parties, and the Escrow Agent has no duties or obligations with respect thereto. The Escrow Agent will not be responsible to determine or to make inquiry into any term, capitalized, or otherwise not defined herein. This Escrow Agreement sets forth all matters pertinent to the Escrow Agent in respect of the escrow contemplated hereunder, and no additional obligations of the Escrow Agent shall be inferred or implied from the terms of this Escrow Agreement or any other agreement.

2.2 Attorneys and Agents. The Escrow Agent may consult legal counsel selected by it in the event of any dispute or question as to the construction of any of the provisions hereof or of any other agreement or of its duties hereunder, or relating to any dispute involving this Escrow Agreement, and shall be entitled to rely on the advice of such legal counsel. The Escrow Agent may perform any and all of its duties through its agents, representatives, attorneys, custodians, and/or nominees. Debtor represents that this Escrow Agreement has been duly and validly executed and delivered by a person who is duly authorized to execute and deliver such type of instrument on behalf of Debtor and shall be effective to constitute the legal, valid and binding obligation of Debtor. The Escrow Agent shall not incur any liability to anyone resulting from any actions taken by the Escrow Agent in accordance with the terms of this Escrow Agreement in reliance in good faith on such execution and delivery.

2.3 Reliance. The Escrow Agent shall not be liable for any action taken or not taken by it in accordance with the written direction of the Representative. The Escrow Agent shall not be liable for acting or refraining from acting upon any notice, request, consent, direction, requisition, certificate, order, affidavit, letter, or other paper or document believed by it to be genuine and correct and to have been signed or sent by the Representative, without further inquiry into the person's or persons' authority. Debtor represents and warrants that the person signing this Escrow Agreement on behalf of Debtor is duly authorized and has legal capacity to execute and

deliver this Escrow Agreement, along with each exhibit, agreement, document, and instrument to be executed and delivered by the Debtor to the Escrow Agent pursuant to this Escrow Agreement.

2.4 Right Not Duty Undertaken. The permissive rights of the Escrow Agent to do things enumerated in this Escrow Agreement shall not be construed as duties.

2.5 No Financial Obligation. No provision of this Escrow Agreement shall require the Escrow Agent to risk or advance its own funds or otherwise incur any financial liability or potential financial liability in the performance of its duties or the exercise of its rights under this Escrow Agreement, regardless of any knowledge of actual or potential harm.

2.6 Reporting Requirements. The Escrow Agent shall keep appropriate records to reflect the current value from time to time of the Escrow Account including appropriate adjustments for deposits and disbursements. On or before the fifth calendar day of each month beginning the first month after the execution of this Escrow Agreement, the Escrow Agent shall provide a report to Debtor and the Depositor on a monthly basis of all Escrow Funds deposited into each Escrow Account and all Escrow Funds disbursed from each Escrow Account in accordance with the terms of this Escrow Agreement.

## ARTICLE 3
## PROVISIONS CONCERNING THE ESCROW AGENT

3.1 Indemnification. The Debtor shall indemnify, defend and hold the Escrow Agent harmless from and against any and all loss, liability, cost, damage and expense, including reasonable attorneys' fees and expenses or other reasonable professional fees and expenses which the Escrow Agent may suffer or incur by reason of any action, claim or proceeding brought against the Escrow Agent arising out of or relating in any way to this Escrow Agreement or any transaction to which this Escrow Agreement relates, unless such loss, liability, cost, damage or expense shall have been finally adjudicated to have been caused by the fraud, willful misconduct or gross negligence of the Escrow Agent. The provisions of this Section 3.1 shall survive the resignation or removal of the Escrow Agent and the termination of this Escrow Agreement.

3.2 Limitation of Liability. THE ESCROW AGENT SHALL NOT BE LIABLE, DIRECTLY OR INDIRECTLY, FOR ANY (I) DAMAGES, LOSSES OR EXPENSES ARISING OUT OF THE SERVICES PROVIDED HEREUNDER, OTHER THAN DAMAGES, LOSSES OR EXPENSES WHICH HAVE BEEN FINALLY ADJUDICATED TO HAVE RESULTED FROM THE ESCROW AGENT'S FRAUD, GROSS NEGLIGENCE OR WILLFUL MISCONDUCT, OR (II) SPECIAL, INDIRECT, PUNITIVE, OR CONSEQUENTIAL DAMAGES OR LOSSES OF ANY KIND WHATSOEVER (INCLUDING, WITHOUT LIMITATION, LOST PROFITS), EVEN IF THE ESCROW AGENT HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH LOSSES OR DAMAGES AND REGARDLESS OF THE FORM OF ACTION EXCEPT TO THE EXTENT OF ESCROW AGENT'S FRAUD, GROSS NEGLIGENCE OR WILLFUL MISCONDUCT.

3.3 Resignation or Removal. The Escrow Agent may resign by furnishing written notice of its resignation to the Debtor and the Depositor, and the Debtor and Depositor may jointly remove the Escrow Agent by furnishing to the Escrow Agent a written notice of its removal. Upon such removal, the Escrow Agent shall be entitled to payment of all fees and expenses to which the Escrow Agent is entitled through the date of removal. Such resignation or removal, as the case may be, shall be effective thirty (30) calendar days after the delivery of such notice or upon the earlier appointment of a successor, and the Escrow Agent's sole responsibility thereafter shall

be to safely keep the Escrow Accounts and to deliver the same to a successor escrow agent as shall be jointly appointed by the Debtor and Depositor, as evidenced by a joint written notice from Debtor, Depositor and such successor escrow agent filed with the Escrow Agent or in accordance with a court order. If the Debtor and Depositor have failed to appoint a successor escrow agent prior to the expiration of thirty (30) calendar days following the delivery of such notice of resignation or removal, the Escrow Agent may petition the Bankruptcy Court (as defined in Section 4.4) or if the Bankruptcy Court will not accept such petition, any other court of competent jurisdiction for the appointment of a successor escrow agent or for other appropriate relief, and any such resulting appointment shall be binding upon the Debtor and the Depositor.

3.4 Compensation. The Escrow Agent shall be entitled to compensation for its services as more particularly set forth on Schedule A annexed hereto and made a part hereof, which compensation shall be paid fifty percent (50%) by Debtor, on one hand, and fifty percent (50%) by Depositor, on the other hand, at the time of presentment for deposit and otherwise when due from the funds in the Escrow Account(s). All bills for any fees due shall be presented to the Debtor and Depositor no less than two business days prior to any Escrow Account funds being disbursed to pay such fees. The fee agreed upon for the services rendered hereunder is intended as full compensation for the Escrow Agent's services as contemplated by this Escrow Agreement.

3.5 Disagreements. If any conflict, disagreement or dispute arises between or among the Debtor, the Depositor, and/or the Escrow Agent concerning the meaning or validity of any provision hereunder or concerning any other matter relating to this Escrow Agreement, or the Escrow Agent is in doubt as to the action to be taken hereunder, the Escrow Agent may, at its option, retain the Escrow Account(s) until the Escrow Agent (i) receives a final non-appealable order of a court of competent jurisdiction or a final non-appealable arbitration decision directing delivery of the Escrow Account(s), (ii) receives joint written instructions from the Debtor and the Depositor directing delivery of the Escrow Account(s) in accordance with such, or (iii) files an interpleader or similar action in any court of competent jurisdiction, and upon the filing thereof, the Escrow Agent shall be relieved of all liability as to the Escrow Account(s) and shall be entitled to recover reasonable attorneys' fees, expenses and other costs incurred in commencing and maintaining any such interpleader action. Any such court order or arbitration decision shall be accompanied by a written instrument of the presenting Party certifying that such court order or arbitration decision is final, non-appealable and from a court of a competent jurisdiction or from a competent arbitration panel, upon which instrument the Escrow Agent shall be entitled to conclusively rely without further investigation. The Escrow Agent shall be entitled to act on any such agreement, court order, or arbitration decision without further question, inquiry, or consent.

3.6 Attachment of Escrow Account; Compliance with Legal Orders. In the event that the Escrow Account(s) is attached, garnished or levied upon by any court order, or the delivery thereof is stayed or enjoined by an order of a court, or any order, judgment or decree is made or entered by any court order affecting the Escrow Account(s), the Escrow Agent is hereby expressly authorized, in its sole discretion, to respond as it deems appropriate or to comply with all writs, orders or decrees so entered or issued, or which it is advised by legal counsel of its own choosing is binding upon it, whether with or without jurisdiction. In the event that the Escrow Agent obeys or complies with any such writ, order or decree it shall not be liable to the Debtor, the Depositor, or to any other person, firm or corporation, should, by reason of such compliance notwithstanding, such writ, order or decree be subsequently reversed, modified, annulled, set aside or vacated. The Escrow Agent agrees to, if legally permitted, send a copy of any such writ, order or decree to

the Debtor and the Depositor as soon as practicable after receipt thereof. The Escrow Agent shall have no further obligation to pursue any action that is not in accordance with applicable law.

3.7 Force Majeure. No party to this Escrow Agreement shall be responsible or liable for any failure or delay in the performance of its obligation under this Escrow Agreement arising out of or caused, directly or indirectly, by circumstances beyond its reasonable control, including acts of God; earthquakes; fire; flood; wars; acts of terrorism; civil or military disturbances; sabotage; epidemic; riots; material interruptions, loss or malfunctions of utilities, computer(hardware or software) or communications services; material accidents; labor disputes; acts of civil or military authority or governmental action; it being understood that each party hereto shall use commercially reasonable efforts which are consistent with accepted practices in the banking industry (as applicable) to resume performance as soon as reasonably practicable under the circumstances.

ARTICLE 4
MISCELLANEOUS

4.1. Successors and Assigns. This Escrow Agreement shall be binding on and inure to the benefit of the parties hereto and their respective successors and permitted assigns. No other persons shall have any rights under this Escrow Agreement. No assignment of the interest of any of parties hereto shall be binding unless and until written notice of such assignment shall be delivered to the other parties hereto and shall require the prior written consent of the other parties hereto (such consent not to be unreasonably withheld).

4.2 Escheat. The Debtor and the Depositor are aware that under applicable state law, property which is presumed abandoned may under certain circumstances escheat to the applicable state. The Escrow Agent shall have no liability to the Debtor, the Depositor, or their respective heirs, legal representatives, successors and assigns, for any amount disbursed from an account maintained under this Escrow Agreement to a governmental entity or public official in compliance with any applicable abandoned property, escheatment or similar law.

4.3 Notices. All notices, requests, demands, and other communications required under this Escrow Agreement shall be in writing, in English, and shall be deemed to have been duly given if delivered (i) personally, (ii) by facsimile transmission with written confirmation of receipt, (iii) on the day of transmission if sent by electronic mail "e-mail", as long as such e-mail is accompanied by a PDF signature or similar version of the relevant document bearing an authorized signature, to the e-mail address given below, and written confirmation of delivery is obtained promptly after completion of transmission, (iv) by overnight delivery with a reputable national overnight delivery service, or (v) by certified mail, return receipt requested, and postage prepaid. If any notice is mailed, it shall be deemed given five (5) Business Days after the date such notice is deposited in the United States mail. For the purpose of this Escrow Agreement, "Business Day" shall mean any day other than a Saturday, a Sunday, a Federal or State holiday, and any other day on which the Escrow Agent is closed. If notice is given to a party hereto, it shall be given at the address for such party set forth below. It shall be the responsibility of each party to notify the other party in writing of any name or address change.

**If to the Escrow Agent:**

Jennifer Rabinowitz
The Fiduciary Valet

140 Riverside Blvd. 2101
New York, NY 10069
917.796.9591
jennifer@thefiduciaryvalet.com

**If to the Debtor:**

P. Judge & Sons, Inc.
Attn: Patrick Wynne, President
13 Manor Rd.
East Rutherford, NJ 07073
pwynne@judgeorg.com

with copies to:

Saul Ewing LLP
1735 Market Street, 34th Floor
Philadelphia, PA 19102
Attention: Jeffrey C. Hampton,
Turner N. Falk
Stephen B. Ravin
Email: jeffrey.hampton@saul.com
turner.falk@saul.com
stephen.ravin@saul.com

**If to the Depositor:**

East Coast Warehouse and Distribution Corp.
1140 Polaris Street
Elizabeth, NJ 07201
Attn: Jamie Overley, CEO
Email: joverley@eastcoastwarehouse.com

with copies to:

Arnall Golden Gregory LLP
171 17th Street, NW, Suite 2100
Atlanta, Georgia 30363
Attention: Sean P. Fogarty, Esq.
E-mail Address: sean.fogarty@agg.com

4.4 Governing Law; Venue. This Escrow Agreement shall be governed by and construed in accordance with the laws of the State of New Jersey. Each of the parties hereto irrevocably (a) consents to the exclusive jurisdiction and venue of the United States Bankruptcy Court for the District of New Jersey (the "Bankruptcy Court") and in the event the Bankruptcy Court declines to accept jurisdiction, the state and federal courts in the State of New Jersey in connection with any matter arising out of this Agreement, (b) waives any objection to such jurisdiction or venue (c) agrees not to commence any legal proceedings related hereto except in such courts and (d) consents to and agrees to accept service of process to vest personal

jurisdiction over it in any such courts made as set forth in this subsection.

4.5 Entire Agreement. This Escrow Agreement and any exhibits hereto set forth the entire agreement and understanding of the parties to this Escrow Agreement relating to the holding, investment and disbursement of Escrow Funds.

4.6 Amendment. This Escrow Agreement may be amended, modified, superseded, rescinded, or canceled only by a written instrument, designated as such, executed by the Debtor, the Depositor, and the Escrow Agent.

4.7 Waivers. The failure of any party to this Escrow Agreement at any time or times to require performance of any provision under this Escrow Agreement shall in no manner affect the right at a later time to enforce the same performance. A waiver by any party to this Escrow Agreement of any such condition or breach of any term, covenant, representation, or warranty contained in this Escrow Agreement, in any one or more instances, shall neither be construed as a further or continuing waiver of an such condition or breach nor a waiver of any other condition or breach of any term, covenant, representation, or warranty contained in this Escrow Agreement.

4.8 Headings. Section headings of this Escrow Agreement have been inserted for convenience and reference only and shall in no way restrict or otherwise modify any of the terms or provisions of this Escrow Agreement.

4.9 Counterparts. This Escrow Agreement may be executed in one or more counterparts, each of which when executed shall be deemed to be an original, and such counterpart shall together constitute one and the same instrument. The exchange of copies of this Escrow Agreement and of signature pages by facsimile or by electronic image scan transmission in .pdf format shall constitute effective execution and delivery of this Escrow Agreement as to the parties and the Escrow Agent and may be used in lieu of the original Escrow Agreement for all purposes.

4.10 Trial by Jury. EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY TO THE EXTENT PERMITTED BY LAW IN ANY LITIGATION, ACTION, PROCEEDING IN ANY COURT ARISING OUT OF, RELATING TO OR IN CONNECTION WITH THIS ESCROW AGREEMENT.

4.11 Interpretation. As used herein, the term “including” means “including, without limitation” or words to similar effect.

[Signature Page Follows]

IN WITNESS WHEREOF, this Escrow Agreement has been duly executed by the parties hereto as of the date first written above.

**The Fiduciary Valet Corp.**

By:
Name: Jennifer Rabinowitz
Title: President

**East Coast Warehouse and Distribution Corp.**

By:
Name: Jamie Overley
Title: CEO

**Port Elizabeth Terminal & Warehouse, Corp.**

By:
Name: Patrick Wynne
Title: President

**P. Judge & Sons, Inc.**

By:
Name: Patrick Wynne
Title: President

**Amex Shipping Agent, Inc.**

By:
Name: Patrick Wynne
Title: President

**The Judge Organization, LLC**

By:
Name: Patrick Wynne
Title: President

**P. Judge & Sons Trucking, LLC**

By:
Name: Patrick Wynne
Title: President

*(Signatures continue on following page)*

**Judge Warehousing, LLC**

By: 
Name: Patrick Wynne
Title: President

IN WITNESS WHEREOF, this Escrow Agreement has been duly executed by the parties hereto as of the date first written above.

**The Fiduciary Valet Corp.**

By: 
Name: Jennifer Rabinowitz
Title: President

**East Coast Warehouse and Distribution Corp.**

By:____________________
Name: Jamie Overley
Title: CEO

*(Signatures continue on following page)*

## SCHEDULE A

## SCHEDULE OF FEES

Per Account Fee ............................................................ $10,000.00 U.S.

Encompassing all duties of Escrow Agent, including usual and customary ministerial duties, including record keeping, distributions, document compliance and such other duties and limited responsibilities expressly set forth in the Escrow Agreement, for each Escrow Account.

[End of Document]